# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

FIDELITY & GUARANTY LIFE
INSURANCE CO.,

      Plaintiff,

vs.

NETWORK PARTNERS
INTERNATIONAL, LLC, ABHINAV
SHARMA,
REQUITELIFE, INC., JASON MANDEL,
TOWER STRATEGIC GROUP, LLC,
GREGG KIRSCHNER, MRM ADVISORS,
LLC, JOSHUA MANDEL, RUBICON
ADVISORY PARTNERS, INC.,
REBECCA NADLER, EVAN
PESCATORE, AGENT DOES 1-10, AND
OTHER PERSON DOES 1-10,

      Defendants.

Case No. 17-cv-01508-RDB

**AMENDED COMPLAINT**

Pursuant to Fed. R. Civ. P. 8, Plaintiff Fidelity & Guaranty Life Insurance Company ("FGLIC") states and alleges that Defendants Network Partners International, LLC ("Network Partners"), Abhinav Sharma ("Sharma"), RequiteLife, Inc. ("RequiteLife"), Jason Mandel, Tower Strategic Group, LLC ("TSG"), Gregg Kirschner ("Kirschner"), MRM Advisors, LLC ("MRM"), Joshua Mandel, Rubicon Advisory Partners, Inc. ("RAP"), Rebecca Nadler ("Nadler"), Evan Pescatore ("Pescatore"), Agent Does 1-10, and Other Person Does 1-10 (Agent Does, MRM, Pescatore, Kirschner, TSG, Jason Mandel, Joshua Mandel, Nadler, RAP, RequiteLife, Sharma and Network Partners are sometimes referred to as the "Agent Defendants") (collectively, "Defendants") have engaged in a massive fraudulent rebating conspiracy that has caused FGLIC tens of millions of dollars in damages, wreaked tremendous

harm on the consuming public and damaged the insurance industry as a whole. Thus, FGLIC states and alleges:

## NATURE OF THE ACTION

### Overview

1.     This is an affinity marketing conspiracy, founded upon the illegal rebating of commissions from the sale of life insurance policies.

2.     The affinity fraud largely involves various members of the Hasidic and Orthodox Jewish communities in New Square, NY; Monsey, NY; Borough Park, NY; Lakewood, NJ; and other communities. To a lesser extent, it involves others.

3.     Leaders and members of these Hasidic and Orthodox communities already have been the subject of federal investigations and criminal proceedings, including:

   (a)     A rabbi in Brooklyn, NY who, in 2011, pled guilty to 15 counts of money laundering, involving 196 nonprofits registered to the same address on Bedford Avenue in Brooklyn, NY. *See:* https://www.justice.gov/archive/usao/nj/Press/files/Fish,%20Mordchai%20News%20Release.html  and https://nypost.com/2011/08/01/suite-charity-mystery/.

   (b)     A notary public from Lakewood, NJ, who notarized at least two insurance applications at issue here and who, in 2017, pled guilty to an information charging him with running an unlicensed money transmitting business. *See:* https://www.justice.gov/usao-nj/pr/ocean-county-new-jersey-business-owner-admits-operating-unlicensed-money-transmitting.

4.     The State of New Jersey has already filed charges against at least one named Defendant here, former FGLIC agent Defendant Evan Pescatore (and his parents) for money laundering, insurance fraud, and theft by deception, for engaging in exactly the kind of conspiratorial conduct that is alleged here. Attached as Exhibit A is a true and correct copy of the Indictment lodged against Pescatore.

5.     The New Jersey Attorney General issued a press release regarding the charges against Pescatore: http://nj.gov/oag/newsreleases17/pr20170413d.html. The press release is attached as Exhibit B.

6.     The New Jersey Attorney General explained the nature of the Pescatore conspiracy, which is almost exactly the conspiracy of issue here:

> This family allegedly conspired in a criminal plot to file more than a dozen fraudulent insurance applications that cost numerous insurance companies millions of dollars in ill-gotten commissions, rebates, and free-short-term insurance. Though the alleged scheme was complicated, the defendants carefully shepherded illicit funds through a series of transactions, knowing that they would reap hundreds of thousands of dollars in undeserved commissions along the way.

*Id*., Ex. B, April 13, 2017 Press Release, State of New Jersey, Department of Law and Public Safety, Office of the Attorney General.

7.     Acting New Jersey Insurance Fraud Investigator Christopher Iu explained the harm created by this type of conspiracy:

> Rebating fraud is a costly problem for insurance companies but the ultimate victim is the consumer. They're the ones who pay the price in the form of higher premiums. These indictments should serve as a warning that we will not allow criminals to get rich by cheating the insurance system and driving up costs for honest policy holders.

*Id*.

8.     The rebating scheme alleged in the Pescatore indictment is nearly identical to the pattern at issue here.

9.     Pescatore borrowed the money from a third party funding source, recruited policyholders by offering them free insurance, the premiums were paid from the borrowed funds, and the ill-gotten commissions were "rebated" to the source that funded the premium, with the remaining commission amount taken as profits by the agents and others.

10.     FGLIC, and the public, have similarly been victimized by Defendants' fraudulent rebating scheme.

11.     Defendants' affinity marketing and rebating conspiracy is comprised of independent insurance agents of FGLIC, and others, who conspired to fraudulently obtain FGLIC insurance policies for insureds, in order to obtain high commissions from FGLIC, and then caused or allowed those insurance policies to lapse, leaving FGLIC holding the bag.

12.     This rebating conspiracy cost FGLIC tens of millions of dollars in fraudulently obtained commissions that were paid to Defendants and to other agents working with them or at their direction (the "Agent Does"), and in unpaid premiums, as well as ultimately harming the public in the form of higher premiums for life insurance.

13.     The amount of ill-gotten commissions and bonuses paid over some fifteen months, to Defendants Sharma/RequiteLife, Jason Mandel/TSG, Kirschner/MRM, Joshua Mandel/RAP, Nadler, Pescatore, and their respective upline agencies demonstrates the pattern and effect of the rebating scheme, and totals **_over 14 million dollars_**:

| Policy Number[1] | Policy Eff. Date | Name of Agent | IMO | Agent Commission | IMO Commission | IMO Bonus | Total Commissions and Bonuses |
|---|---|---|---|---|---|---|---|
| 658 | 2/1/2015 | Mandel, Jason | Network Partners | $460,570.00 | $83,740.00 | $125,610.00 | $669,920.00 |
| 070 | 3/6/2015 | Mandel, Jason | Network Partners | $298,001.00 | $56,765.50 | $62,805.00 | $417,571.50 |
| 516 | 3/18/2015 | Sharma, Abhinav | Network Partners | $19,574.20 | $24,916.40 | $10,674.00 | $55,164.60 |
| 194 | 3/25/2015 | Sharma, Abhinav | Network Partners | $185,647.00 | $236,278.00 | $101,262.00 | $523,187.00 |
| 188 | 5/1/2015 | Kirschner, Gregg | Network Partners | $441,000.00 | $84,000.00 | $126,000.00 | $651,000.00 |
| 956 | 5/1/2015 | Mandel, Joshua | Network Partners | $119,732.00 | $22,808.00 | $34,200.00 | $176,740.00 |
| 383 | 5/6/2015 | Sharma, Abhinav | Network Partners | $32,857.86 | $41,847.70 | $10,081.00 | $84,786.56 |
| 777 | 5/20/2015 | Sharma, | Network | $79,995.40 | $101,814.80 | $31,734.00 | $213,544.20 |

[1] For privacy and security purposes, FGLIC is redacting all but the last three digits of the policy numbers.

| Policy Number[1] | Policy Eff. Date | Name of Agent | IMO | Agent Commission | IMO Commission | IMO Bonus | Total Commissions and Bonuses |
|---|---|---|---|---|---|---|---|
| | | Abhinav | Partners | | | | |
| 475 | 6/2/2015 | Mandel, Jason | Network Partners | $108,801.00 | $20,724.00 | $31,086.00 | $160,611.00 |
| 269 | 6/4/2015 | Mandel, Jason | Network Partners | $363,919.50 | $69,318.00 | $103,977.00 | $537,214.50 |
| 844 | 6/6/2015 | Sharma, Abhinav | Network Partners | $305,230.00 | $390,520.00 | $166,080.00 | $861,830.00 |
| 639 | 6/8/2015 | Kirschner, Gregg | Network Partners | $189,892.50 | $36,170.00 | $54,255.00 | $280,317.50 |
| 704 | 6/10/2015 | Sharma, Abhinav | Network Partners | $225,148.00 | $286,552.00 | $122,808.00 | $634,508.00 |
| 465 | 7/1/2015 | Kirschner, Gregg | Network Partners | $520,915.50 | $99,222.00 | $148,833.00 | $768,970.50 |
| 707 | 7/2/2015 | Mandel, Jason | Network Partners | $117,033.00 | $22,292.00 | $33,438.00 | $172,763.00 |
| 914 | 7/21/2015 | Sharma, Abhinav | Network Partners | $156,406.25 | $199,062.50 | $43,312.00 | $398,780.75 |
| 097 | 7/23/2015 | Sharma, Abhinav | Network Partners | $91,091.00 | $115,934.00 | $49,686.00 | $256,711.00 |
| 957 | 8/3/2015 | Sharma, Abhinav | Network Partners | $260,997.00 | $332,178.00 | $142,362.00 | $735,537.00 |
| 153 | 9/22/2015 | Kirschner, Gregg | Network Partners | $459,795.00 | $87,580.00 | $98,370.00 | $645,745.00 |
| 440 | 9/24/2015 | Mandel, Joshua | Network Partners | $49,455.00 | $9,420.00 | $14,130.00 | $73,005.00 |
| 499 | 9/28/2015 | Sharma, Abhinav | Network Partners | $142,175.00 | $180,950.00 | $77,550.00 | $400,675.00 |
| 145 | 10/1/2015 | Mandel, Jason | Network Partners | $202,177.50 | $38,510.00 | $57,765.00 | $298,452.50 |
| 883 | 10/12/2015 | Sharma, Abhinav | Network Partners | $49,214.00 | $62,636.00 | $26,844.00 | $138,694.00 |
| 824 | 10/16/2015 | Pescatore, Evan | Brokerage Insurance Partners | $250,614.00 | $35,802.00 | $71,604.00 | $358,020.00 |
| 683 | 10/24/2015 | Kirschner, Gregg | Network Partners | $585,900.00 | $111,600.00 | $124,920.00 | $822,420.00 |
| 473 | 11/2/2015 | Mandel, Jason | Network Partners | $241,920.00 | $46,080.00 | $69,120.00 | $357,120.00 |
| 362 | 11/13/2015 | Mandel, Joshua | Network Partners | $73,488.00 | $14,492.00 | $20,700.00 | $108,680.00 |
| 392 | 1/28/2016 | Sharma, Abhinav | Network Partners | $99,000.00 | $126,000.00 | $54,000.00 | $279,000.00 |
| 690 | 2/9/2016 | Nadler, Rebecca | Network Partners | $165,000.00 | $210,000.00 | $90,000.00 | $465,000.00 |
| 829 | 2/23/2016 | Mandel, Jason | Network Partners | $238,392.00 | $45,408.00 | $68,112.00 | $351,912.00 |
| 113 | 3/1/2016 | Mandel, Jason | Network Partners | $181,440.00 | $34,560.00 | $51,840.00 | $267,840.00 |
| 419 | 4/12/2016 | Sharma, Abhinav | Network Partners | $402,600.00 | $512,400.00 | $219,600.00 | $1,134,600.00 |
| 145 | 4/25/2016 | Sharma, Abhinav | Network Partners | $312,180.00 | $397,320.00 | $170,280.00 | $879,780.00 |

| Policy Number[1] | Policy Eff. Date | Name of Agent | IMO | Agent Commission | IMO Commission | IMO Bonus | Total Commissions and Bonuses |
|---|---|---|---|---|---|---|---|
| | | | Totals | $7,430,161.71 | $4,136,900.90 | $2,613,038.00 | $14,180,100.61 |

14.     In addition, state regulators have already identified fraudulent conduct allegedly committed by certain of the Defendants here.

15.     The State of Connecticut Insurance Department entered into a Stipulation and Consent Order, dated March 22, 2017, with Defendants Joshua Mandel and RAP, based upon the Insurance Commissioner's suspicion, following an investigation, that:

> Rubicon Advisory Partners, Inc. [and] Joshua Mandel violated pertinent insurance laws by engaging in acts of conduct intended to aid and assist another insurance producer to place insurance with an insurer with which such other producer was not personally appointed and for representing on three insurance application that Joshua Mandel was the writing agent and had personally assisted the proposed insured in completing the application when in fact *he had never met with or assisted the proposed insured with such applications* [emphasis added].

Ex. C, Stipulation and Consent Order.

## The Rebating Scheme

16.     Upon the sale of a life insurance policy, FGLIC paid its agents up to 155% of a policy's first year premium in commission and bonus payments.

17.     Other insurance companies also pay their agents' commissions and bonuses in excess of each insured's first year premium, as it is common in the industry.

18.     By paying commissions and bonuses in excess of an insured's first year premium, FGLIC was conducting business within industry norms.

19.     FGLIC paid commissions and bonuses in excess of each insured's first year premium in reliance upon the expectation that the life insurance policies would remain in effect for years.

20.     It does not make economic sense for an insured to pay a large first year premium and then allow the policy to lapse after the first year (thereby losing the premium), <u>unless</u> the agent was making the premium payment out of the commission and bonus payment.

21.     When an agent makes all or part of the insured's premium payment, the agent is "rebating" the premium.

22.     "Rebating" premiums is prohibited by law.

23.     In fact "rebating" is prohibited by the following statutes in the states in which the Agent Defendants sold insurance policies:

| State | Statute |
|-------|---------|
| Connecticut | CT. Gen. Stat. § 38a-465i |
| Florida | Fla. Stat. Ann. § 626.572 |
| New Jersey | N.J.S.A. §§ 17:29A-15, 17:29-AA-14; 17B:30-13 |

24.     Thus, FGLIC reasonably believed that the Agent Defendants would not violate the law and reasonably relied upon representations made the Agent Defendants when they submitted applications for life insurance that they were acting in compliance with applicable rules, regulations and statutes.

25.     But, the Agent Defendants, and each of them, knowingly and with *scienter* violated the statute referenced in Paragraph 23.

26.     FGLIC historically would not charge back the commission and bonus payments so long as the policy remained in force for one year.

27.     From early 2015 through 2016, Defendants conspired (i) to sell FGLIC life insurance policies for a single year, with no intention that such policies would be renewed, (ii) used their commission and bonus payments to illegally rebate the insurance premiums, and (iii) predicted the difference between the commission (plus bonus) and the first year's premium.

Defendants' falsely represented to FGLIC that such policies were legitimate insurance policies and that they were acting lawfully.

28.     This is a classic hub-and-spoke conspiracy, which engaged in a fraudulent rebating scheme prohibited by law.

29.     Network Partners acted as a "hub" of the rebating conspiracy, directing the activities of Sharma and RequiteLife (of which Sharma was or is president and controls), Jason Mandel and TSG (of which Jason Mandel was or is president and controls), Kirschner and MRM (of which Kirschner was or is president and controls), Joshua Mandel and RAP (of which Joshua Mandel was or is president and controls)[2], Nadler[3], Pescatore,[4] the Agent Does, and other persons acting in furtherance of the conspiracy (the "Other Person Does"), who acted as the "spokes."

30.     The conspiracy began in October 2014 when Network Partners asked to be appointed by FGLIC as FGLIC's General Agent.

31.     In applying to become and in becoming a General Agent, Network Partners made certain representations to FGLIC that were false, upon which FGLIC relied to its detriment.

32.     On or about October 16, 2014, Network Partners entered into an agreement (the "Agency Agreement") with FGLIC, whereby Network Partners was appointed as, and agreed to act as, a producer and agent for FGLIC for the purpose of selling insurance policies issued by FGLIC, in accordance with the terms of the Agency Agreement.

---

[2]   In effect, RequiteLife is the alter ego of and d/b/a for Sharma; TSG is the alter ego of and d/b/a for Jason Mandel; MRM is the alter ego and d/b/a for Kirschner; and RAP is the alter ego and d/b/a for Joshua Mandel.

[3]   Nadler reported directly to Network Partners.

[4]   Pescatore acted through his upline agency, Brokerage Insurance Partners, Inc.

33.     A true and correct copy of the Agency Agreement, along with Network Partners' electronic signature to the Agency Agreement, is attached hereto as Exhibit D.

34.     FGLIC also entered into an agreement (the "Insurance Producer Agreement") with Sharma/RequiteLife, Jason Mandel/TSG, Kirschner/MRM, Joshua Mandel/RAP, Nadler, Pescatore, and each of the Agent Does (collectively, the "Agent Defendants"), whereby the Agent Defendants were appointed as, and agreed to act as, agents for FGLIC for the purpose of selling insurance policies issued by FGLIC, in accordance with the terms of the Insurance Producer Agreements.

35.     A true and correct specimen copy of the Insurance Producer Agreement is attached hereto as Exhibit E.

36.     In selling insurance policies, each of the Agent Defendants was obligated to (i) disclose to FGLIC honestly and completely the financial, medical and other pertinent facts upon which FGLIC would rely in considering, pricing and issuing policies; and (ii) disclose honestly and completely the terms of FGLIC's insurance policies to prospective insureds, including that premiums could not be rebated.

37.     Accordingly, each of the Agent Defendants owed FGLIC fiduciary duties.

38.     In breach of their fiduciary duties, Network Partners, the Agent Defendants, and the Other Person Does conspired and schemed to sell insurance policies issued by FGLIC to individuals (the "Insureds") for the sole purpose of obtaining commission payments from FGLIC that were in excess of the first year's premiums, and then allowing the policies to lapse after the first year – all while making false representations to FGLIC, including the false representation that Network Partners and the Agent Defendants were properly selling FGLIC insurance policies.

39.     There is a very strong factual inference of fraudulent conduct by Network Partners and the Agent Defendants, because the Lapse Rate of FGLIC policies sold by Network Partners and its individual agents during the second year after issuance varies dramatically and materially from FGLIC's usual and ordinary business and its product Lapse Rates.

40.     The "Lapse Rate" is the percentage of policies that lapse in a given policy year.

41.     FGLIC's Large Policies (*i.e.*, policies for which the insured paid $25,000 or more in annual premiums), issued from 2011 through August 1, 2016 had a Lapse Rate of 0.1% during the first policy year.

42.     From the date Network Partners became an agent of FGLIC in October of 2014, the Lapse Rate for FGLIC Large Policies sold by Network Partners or individual agents within the Network Partners hierarchy is 0% during the first policy year.

43.     FGLIC's Large Policies issued from 2011 through August 1, 2016 had a Lapse Rate of 9.9% during the second policy year.

44.     The Lapse Rate for Large Policies sold by Network Partners and the Agent Defendants during the second policy year is ***84.4% - more than eight times higher than the Lapse Rate for FGLIC's policies sold by other agents***.

45.     Network Partners and the Agent Defendants, upon information and belief:

(1)     Falsely represented to the Insureds that they could maintain the FGLIC insurance policies without paying the full annual premiums, and that the agents would either pay or cause to be paid the premiums.

(2)     Conspired with the Other Person Does to pay some or all of the first year premiums, which is fraudulent rebating;

(3)    Intentionally defrauded FGLIC by submitted fraudulent applications for life insurance;

(4)    Collected commission and bonus payments from FGLIC that were in excess of the Insureds' first year premiums;

(5)    Used a portion of the commission and bonus payment to pay the premiums for the insureds;

(6)    Allowed or encouraged the Insureds' policies to lapse after one year; and

(7)    Pocketed the difference between the commission (plus bonus) payments and the first year premiums, as the profits of their rebating conspiracy.

46.    As further evidence of the fraudulent scheme, the pattern of behavior exhibited by the Insureds and the holders of the policies placed by Network Partners and the Agent Defendants does not make any sense.

47.    In the ordinary course of FGLIC's business, FGLIC would expect an Insured whose policy is about to lapse in the second year after payment of a significant premium during the first year to complain to FGLIC about the lapse.

48.    Here, none of the Insureds who were introduced to FGLIC by Network Partners and its individual agents and who purchased Large Policies issued by FGLIC complained to FGLIC about the pending lapse of their Large Policies.

49.    By way of example, it makes absolutely no financial sense for an Insured to make a $400,000 to $500,000 premium payment during the first policy year, make no payments after the first year, allow the policy to lapse worthless during the second year and NOT contact FGLIC to complain.

50.     Reasonable people just do not spend $400,000 to $500,000 for a single year of life insurance, without taking some sort of action to prevent a lapse, unless they never really made the premium payment in the first place, or expected their agent to do so, or are taking some form of consideration as part of the conspiracy, all of which involves fraudulent rebating.

51.     This conduct constitutes a breach of contract, fraud and conspiracy, is inequitable and against the interests of FGLIC and the public, violates the Racketeer Influenced & Corrupt Organizations Act, and has caused FGLIC to suffer damage.

52.     This conduct continues.

53.     In recognition of Defendants' bad faith exploitation of FGLIC's one-year chargeback policy, FGLIC was forced to change its policy in or about January of 2017, so that FGLIC began to charge back commission and bonus payments if the policy lapsed before two years.

54.     This change, necessitated by Defendants' fraudulent conduct, has harmed FGLIC in the marketplace.

## PARTIES

55.     FGLIC was incorporated in Maryland.

56.     FGLIC affirmatively alleges that it is now incorporated in Iowa, and does business at 1001 Fleet Street, Baltimore, Maryland 21202.

57.     FGLIC's corporate headquarters is located at 601 Locust Street, Des Moines, Iowa 50309.

58.     Network Partners is a New York corporation which, upon information and belief, has its principal place of business at 535 Fifth Ave., Suite 1012 New York, New York 10017.

59.     Sharma, Jason Mandel, Joshua Mandel, Nadler and Kirschner are the control persons and alter egos of Network Partners.

60.     Sharma is an individual who, upon information and belief, either resides or works at 78 McBee Court, Monroe, New York 10950.

61.     RequiteLife is a Delaware corporation which, upon information and belief, has its principal place of business at 78 McBee Court, Monroe, New York 10950.

62.     Upon information and belief, Sharma is the president of RequiteLife, directs its activities, and is the alter ego of RequiteLife.

63.     Jason Mandel is an individual who, upon information and belief, either resides or works at 6 Twin Circle Drive, Westport, Connecticut 06880.

64.     Tower Strategic Group, LLC ("TSG") is a Connecticut limited liability company which, upon information and belief, has its principal place of business at 1266 E Main Street, Suite 700R, Stamford, Connecticut 06902.

65.     Upon information and belief, Jason Mandel is the president of TSG, directs its activities, and is the alter ego of TSG.

66.     Gregg Kirschner is an individual who, upon information and belief, either resides or works at 5 Whistler Way, Marlboro, New Jersey 07746.

67.     MRM Advisors, LLC ("MRM") is a New Jersey limited liability company which, upon information and belief, has its principal place of business at 2 Tower Center Boulevard, 19th Floor, East Brunswick, New Jersey 08816.

68.     Upon information and belief, Kirschner is the president of MRM, directs MRM's activities, and is the alter ego of MRM.

69.     Joshua Mandel is an individual who, upon information and belief, either resides or works at 330 West 45th Street, Apartment 11A, New York, New York 10036.

70.     Rubicon Advisory Partners, Inc. ("RAP") is a New York corporation which, upon information and belief, has its principal place of business at 535 Fifth Avenue, Suite 1012, New York, New York 10017 or 330 West 45th Street, Apartment 11A, New York, New York 10036.

71.     Upon information and belief, Joshua Mandel is the president of RAP, directs RAP's activities, and is the alter ego of RAP.

72.     Rebecca Nadler is an individual who, upon information and belief, either resides or works at 108 West 39th Street, New York, New York 10018.

73.     Evan Pescatore is an individual who, upon information and belief, either resides or works at 1501 Ocean Avenue, Unit 1814, Asbury Park, New Jersey 07712.

74.     There are other individuals and entities involved in this conspiracy and scheme.

75.     FGLIC reserves the right to amend this Amended Complaint to add Defendants including the Agent Does and the Other Person Does, allege additional facts about their respective roles, and allege additional claims against them as discovery progresses.

## JURISDICTION AND VENUE

76.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship between FGLIC, on the one hand, and Network Partners, Sharma, RequiteLife, Jason Mandel, TSG, Kirschner, MRM, Joshua Mandel, RAP, Nadler, Pescatore, the Agent Does, and the Other Person Does, on the other hand, and the amount in controversy exceeds $75,000.00.

77.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

78.     This Court has personal jurisdiction over the parties.

79.     Network Partners and the Agent Defendants have expressly agreed that the Agency Agreement and Insurance Producer Agreements are "made and entered into in the State of Maryland." *See* Ex. D, § 30; Ex. E, § 28.

80.     Network Partners and each of the Agent Defendants have expressly agreed that "all suits and special proceedings brought with respect to this Agreement, any other agreement or document received or delivered in connection with this Agreement or with respect to any aspect of our relationship shall be brought only in the courts of the State of Maryland located in the City of Baltimore and of the United States District Court for the District of Maryland—Northern Division (collectively, the 'Courts'), and not in any other courts." *See* Ex. D, § 31; Ex. E, § 29.

81.     This Court has personal jurisdiction over the Agent Does and the Other Person Does as they might be residents of Maryland, and/or they conduct business in Maryland, and/or the Agent Does submitted to personal jurisdiction in Maryland in the respective Insurance Producer Agreements, and/or pursuant to one or more other grounds set forth in Md. Code Ann., Cts. & Judicial Proceedings Article, Sections 6-102 and/or 6-103.

82.     Venue is proper because the Defendants and FGLIC mutually agreed by contract to this venue and certain of the events at issue occurred in this District.

83.     FGLIC reserves the right to amend this Amended Complaint to allege that jurisdiction and venue are proper with respect to the Agent Does and the Other Person Does following discovery.

## FACTS

84.     The Agency Agreement provides that FGLIC appointed Network Partners and the Agent Defendants as representatives of FGLIC to sell FGLIC's products in the jurisdictions in which they were licensed. *See* Ex. D, § 2.

85.     The Agency Agreement and the Insurance Producer Agreements are governed by Maryland law. Ex. D, § 29; Ex. E, § 27.

86.     Network Partners and the Agent Defendants are also deemed "insurance producers" pursuant to Md. Code Ann., Insurance Article, Section 1-101(u) and 1-101(dd).

87.     After their respective appointments as agents by FGLIC, Network Partners and the Agent Defendants held themselves out as agents of FGLIC.

88.     Network Partners and each of the Agent Defendants owe FGLIC all of the duties that an agent owes its principal.

89.     Network Partners and each of the Agent Defendants owe FGLIC fiduciary duties.

90.     Upon information and belief, Network Partners and the Agent Defendants, including Sharma, RequiteLife, Jason Mandel, TSG, Kirschner, MRM, Joshua Mandel, RAP, Nadler and Pescatore devised a scheme by which they would:

i.      Sell FGLIC universal life insurance policies with an annual premium in excess of $25,000 to the Insureds, which are Large Policies;

ii.     During the first year of each policy, collect commission and bonus payments from FGLIC that exceeded the first year annual premium;

iii.    Rebate the premium payment back to the insured or the funding source on the insured's behalf;

iv.     Allow the life insurance policies to lapse after one year; and

v.      Pocket the difference between the commission (plus bonus) and the first year annual premiums, as the profit from the scheme.

91.     FGLIC became aware of this scheme when it noticed that Large Policies sold by Network Partners and the Agent Defendants were lapsing between the first and second anniversaries of each respective policy's issuance at a suspiciously high rate, all without any Insured contacting FGLIC to complain.

92.     It is unusual that a FGLIC customer purchases a policy and, after paying an initial premium in excess of $25,000, allows the policy to lapse worthless after one year.

93.     It is especially unusual that a FGLIC customer would pay a premium in excess of $25,000 and then allow the policy to lapse worthless without ever contacting FGLIC.

94.     Upon information and belief, beginning in 2014, Network Partners, either directly or through its co-conspirators the Agent Defendants and the Other Person Does, contacted the Insureds about purchasing insurance policies issued by FGLIC for the sole purpose of obtaining commission and bonus payments from FGLIC through the illegal rebating scheme.

95.     Upon information and belief, Network Partners, either directly or through its co-conspirators the Agent Defendants and the Other Person Does, either falsely represented to the Insureds that they could maintain insurance policies issued by FGLIC without paying the full annual premiums, despite knowing that such policies would require annual premium payments to be paid after the first policy year to remain in effect, or conspired with the Insureds to pay some or all of the first year premiums from commissions and bonus payments paid by FGLIC to the Agent Defendants.

96.     Upon information and belief, Network Partners, either directly or through its co-conspirators the Agent Defendants and the Other Person Does, also represented to the Insureds that the Insureds could either (i) continue to keep the insurance policies in force after the first year, without paying the full annual premiums; or (ii) allow the insurance policies to lapse, with no consequence to the Insureds.

97.     Since 2014, Network Partners and the Agent Defendants submitted approximately 38 applications for Large Policies, each with an annual premium in excess of $25,000, to FGLIC on behalf of the Insureds.

98.     These Large Policies are lapsing after the first year at a Lapse Rate that is grossly out of line with FGLIC's ordinary course of business, and in a manner that simply makes no

sense outside of a conspiracy by Network Partners, the Agent Defendants, and the Other Person Does.

99.     FGLIC has identified approximately 29 predicate acts associated with this scheme.

100.    FGLIC's investigation is ongoing.

101.    In **Predicate Act One**, Sharma sold Insured "RP"[5] an $8 million life insurance policy, with an effective date of June 6, 2015.

102.    The first year's premium for Insured RP's policy was $553,600.

103.    Insured RP failed to make the second year's scheduled premium payment.

104.    Accordingly, Insured RP's policy lapsed worthless.

105.    Outside of a conspiracy to defraud FGLIC (of which Insured RP may have been a part or an unwitting pawn) and a rebating scheme, the actions of Insured RP make no sense.

106.    Insured RP spent $553,600 for one year of life insurance protection, with no further benefit for that payment.

107.    Network Partners and Sharma (through RequiteLife), on the other hand, earned $861,830 in commission and bonus payments from FGLIC for the sale of the policy to Insured RP.

108.    The profit of the conspiracy was $308,230 (the difference between the commission plus bonus and the first year's premium).

109.    As further evidence of the fraudulent scheme, while Insured RP resides in Northport, New York, Insured RP utilized an out-of-state bank to fund the first-year premium and an out-of-state trustee (whose broker-dealer registration was revoked by the State of New

---

[5]  To protect the Insureds' privacy, FGLIC is not disclosing the Insureds' full name and identity at this time.

Jersey) to establish the beneficiary trust. Insured RP also founded a company that (i) had a history of securities violations; and (ii) purchased a law firm associated with an attorney who was subsequently disbarred.

110.    Upon information and belief, Sharma either paid or "rebated" a portion of the profit to Insured RP as a "cut" of the conspiracy's profits, or funded or financed the premium payment on behalf of Insured RP, with Insured RP being an unwitting pawn of the conspiracy who thought he was receiving one year of life insurance protection for free.

111.    In **Predicate Act Two**, Sharma sold Insured "DN" a $5,500,000 life insurance policy, with an effective date of August 3, 2015.

112.    The first year's premium for Insured DN's policy was $474,540.

113.    Insured DN failed to make the second year's scheduled premium payment.

114.    Accordingly, Insured DN's policy lapsed worthless.

115.    Outside of conspiracy to defraud FGLIC (of which Insured DN may have been a part or an unwilling accomplice) through an illegal rebating scheme, the actions of Insured DN make no sense.

116.    Insured DN spent $474,540 for one year of life insurance protection, with no further benefit for that payment.

117.    Network Partners and Sharma (through RequiteLife), on the other hand, earned $735,537 in commission and bonus payments from FGLIC for the sale of the policy to Insured DN.

118.    The profit of the conspiracy was $260,997 (the difference between the commission plus bonus and the first year's premium).

119.     As further evidence of the fraudulent scheme, while Insured DN resides in Monsey, New York, Insured DN utilized an out-of-state bank to fund the first-year premium, an out-of-state trustee to establish the beneficiary trust (which was notarized in Florida), and an out-of-state doctor in his insurance application.

120.     Upon information and belief, Network Partners and Sharma either paid or "rebated" a portion of the profit to Insured DN as a "cut" of the conspiracy's profits, or funded or financed the premium payment on behalf of Insured DN, with Insured DN being an unwitting pawn of the conspiracy who thought he was receiving one year of life insurance protection for free.

121.     In **Predicate Act Three**, Sharma sold Insured "SB" a life insurance policy with a face amount of $500,000 and an effective date of March 18, 2015.

122.     The first year's premium for Insured SB's policy was $36,000.

123.     Insured SB failed to make the second year's scheduled premium payment.

124.     Accordingly, Insured SB's policy lapsed worthless.

125.     Outside of a conspiracy to defraud FGLIC (of which Insured SB may have been a part or an unwitting pawn) through a rebating scheme, the actions of Insured SB make no sense.

126.     Insured SB spent $36,000 for one year of life insurance protection, with no further benefit from that large sum of money.

127.     Network Partners and Sharma (through RequiteLife), on the other hand, earned $55,164.60 in commission and bonus payments from FGLIC for the sale of the policy to Insured SB.

128.     The profit of the conspiracy was $19,164.60 (the difference between the commission plus bonus and the first year premium).

129.   Before filing this lawsuit, FGLIC obtained an affidavit from Insured SB, dated April 8, 2017. A true and correct copy of the April 8, 2017 affidavit is attached hereto as Exhibit F.

130.   In the affidavit, Insured SB states: "I did not meet with or speak to Abhinav Sharma about the application for Fidelity & Guaranty Life Insurance Company Policy . . . nor did Mr. Sharma witness my signature on this or any other insurance application." Ex. F at ¶ 7.

131.   Subsequently, Defendants obtained and produced a second affidavit from Insured SB, dated September 12, 2017, that contradicts much of Insured SB's April 8, 2017 affidavit. A true and correct copy of the September 12, 2017 affidavit is attached hereto as Exhibit G.

132.   In the September 12, 2017 affidavit, Insured SB states: "I purchased this policy through Abhinav Sharma, who provided me with the necessary paperwork for the application." Ex. G at ¶ 4.

133.   In addition, in the application for the life insurance policy issued to Insured SB, Sharma represented that he had "witnessed the signatures on this application." Sharma also sent a letter accompanying the application representing to FGLIC that he "had the pleasure of knowing [Insured SB] for several years" and that "my experience and personal history with [Insured SB] have endowed me with the utmost respect and esteem for him as a person and a professional."

134.   Upon information and belief, Network Partners and Sharma knew these representations were false and fraudulent when made because Sharma had never met Insured SB at the time these representations were made.

135.   Upon information and belief, Network Partners and Sharma either paid or "rebated" a portion of the profit to Insured SB as Insured SB's "cut" of the conspiracy's profits,

or funded or financed the premium payment on behalf of Insured SB, with Insured SB being an unwitting pawn of the conspiracy who thought he was receiving one year of life insurance protection for free.

136.    In **Predicate Act Four**, Jason Mandel sold Insured "RG" a life insurance policy with a face amount of $10,000,000 and an effective date of February 1, 2015.

137.    The first year's premium for Insured RG's policy was $418,000.

138.    Insured RG failed to make the second year's scheduled premium payment.

139.    Accordingly, Insured RG's policy lapsed worthless.

140.    Outside of a conspiracy to defraud FGLIC (of which Insured RG may have been a part or an unwitting pawn) through a fraudulent rebating scheme, the actions of Insured RG make no sense.

141.    Insured RG spent $418,000 for one year of life insurance protection, with no further benefit from that large sum of money.

142.    Network Partners and Jason Mandel (through TSG), on the other hand, earned $669,920 in commission and bonus payments from FGLIC for the sale of the policy to Insured RG.

143.    The profit of the conspiracy was $251,920 (the difference between the commission plus bonus and the first year premium).

144.    As further evidence of the fraudulent scheme, while Insured RG resides in Allentown, Pennsylvania, Insured RG utilized an out-of-state bank to fund the first-year premium and an out-of-state trustee to establish the beneficiary trust, which was formed in Florida.

145.    Upon information and belief, Network Partners and Jason Mandel either paid or "rebated" a portion of the profit to Insured RG as Insured RG's "cut" of the conspiracy's profits, or funded or financed the premium payment on behalf of Insured RG, with Insured RG being an unwitting pawn of the conspiracy who thought he was receiving one year of life insurance protection for free.

146.    In **Predicate Act Five**, Jason Mandel sold Insured "IH" a life insurance policy with a face amount of $9,000,000 and an effective date of June 4, 2015.

147.    The first year's premium for Insured IH's policy was $346,590.

148.    Insured IH failed to make the second year's scheduled premium payment.

149.    Accordingly, Insured IH's policy lapsed worthless.

150.    Outside of a conspiracy to defraud FGLIC (of which Insured IH may have been a part or an unwitting pawn) through a classic rebating fraud, the actions of Insured IH make no sense.

151.    Insured IH spent $346,590 for one year of life insurance protection, with no further benefit from that large sum of money.

152.    Network Partners and Jason Mandel (through TSG), on the other hand, earned $537,214.50 in  commission and bonus payments from FGLIC for the sale of the policy to Insured IH.

153.    The profit of the conspiracy was $190,624.50 (the difference between the commission plus bonus and the first year premium).

154.    As further evidence of the fraudulent scheme, Insured IH provided a power of attorney to FGLIC's former agent "ML," who was previously terminated for conduct that mirrors the scheme underlying FGLIC's claims against Defendants.

155.     Upon information and belief, Network Partners and Jason Mandel either paid or "rebated" a portion of the profit to Insured IH as Insured IH's "cut" of the conspiracy's profits, or funded or financed the premium payment on behalf of Insured IH, with Insured IH being an unwitting pawn of the conspiracy who thought he was receiving one year of life insurance protection for free.

156.     In **Predicate Act Six**, Kirschner sold Insured "IW" a life insurance policy with a face amount of $5,000,000 and an effective date of May 1, 2015.

157.     The first year's premium for Insured IW's policy was $420,000.

158.     Insured IW failed to make the second year's scheduled premium payment.

159.     Accordingly, Insured IW's policy lapsed worthless.

160.     Outside of a conspiracy to defraud FGLIC (of which Insured IW may have been a part or an unwitting pawn) through classic rebating fraud, the actions of Insured IW make no sense.

161.     Insured IW spent $420,000 for one year of life insurance protection, with no further benefit from that large sum of money.

162.     Network Partners and Kirschner (through MRM), on the other hand, earned $651,000 in commission and bonus payments from FGLIC for the sale of the policy to Insured IW.

163.     The profit of the conspiracy was $231,000 (the difference between the commission plus bonus and the first year premium).

164.     As further evidence of the fraudulent scheme, while Insured IW resides in Brooklyn, New York, Insured IW utilized an out-of-state bank to fund the first-year premium and an out-of-state trustee to establish the beneficiary trust, which was formed in Connecticut.

165.    Insured IW is also a disbarred attorney, a fact that Kirschner/MRM and Network Partners failed to disclose to FGLIC.

166.    Upon information and belief, Network Partners and Kirschner either paid or "rebated" a portion of the profit to Insured IW as Insured IW's "cut" of the conspiracy's profits, or funded or financed the premium payment on behalf of Insured IW, with Insured IW being an unwitting pawn of the conspiracy who thought he was receiving one year of life insurance protection for free.

167.    In **Predicate Act Seven**, Kirschner sold Insured "BS" a life insurance policy with a face amount of $7,500,000 and an effective date of October 24, 2015.

168.    The first year's premium for Insured BS's policy was $416,400.

169.    Insured BS failed to make the second year's scheduled premium payment.

170.    Accordingly, Insured BS's policy lapsed worthless.

171.    Outside of a conspiracy to defraud FGLIC (of which Insured BS may have been a part or an unwitting pawn) through rebating fraud, the actions of Insured BS make no sense.

172.    Insured BS spent $416,400 for one year of life insurance protection, with no further benefit from that large sum of money.

173.    Network Partners and Kirschner (through MRM), on the other hand, earned $822,420 in commission and bonus payments from FGLIC for the sale of the policy to Insured BS.

174.    The profit of the conspiracy was $406,020 (the difference between the commission plus bonus and the first year premium).

175.    As further evidence of the fraudulent scheme, while Insured BS resides in Brooklyn, New York, Insured BS utilized an out-of-state bank to fund the first-year premium and an out-of-state trustee to establish the beneficiary trust, which was formed in Connecticut.

176.    Upon information and belief, Network Partners and Kirschner either paid or "rebated" a portion of the profit to Insured BS as Insured BS's "cut" of the conspiracy's profits, or funded or financed the premium payment on behalf of Insured BS, with Insured BS being an unwitting pawn of the conspiracy who thought he was receiving one year of life insurance protection for free.

177.    In **Predicate Act Eight**, Pescatore sold Insured "RB" a life insurance policy with a face amount of $3,000,000 and an effective date of October 16, 2015.

178.    The first year's premium for Insured RB's policy was $238,680.

179.    Insured RB failed to make the second year's scheduled premium payment.

180.    Accordingly, Insured RB's policy lapsed worthless.

181.    Outside of a conspiracy to defraud FGLIC (of which Insured RB may have been a part or an unwitting pawn) through rebating fraud, the actions of Insured RB make no sense.

182.    Insured RB spent $238,680 for one year of life insurance protection, with no further benefit from that large sum of money.

183.    Pescatore and his upline agency, on the other hand, earned $358,020 in commission and bonus payments from FGLIC for the sale of the policy to Insured RB.

184.    The profit of the conspiracy was $119,340 (the difference between the commission plus bonus and the first year premium).

185.    As further evidence of the fraudulent scheme, while Insured RB resides in Asbury Park, New Jersey, Insured RB utilized an out-of-state bank to fund the first-year premium.

186.    Upon information and belief, Pescatore and his upline agency either paid or "rebated" a portion of the profit to Insured RB as Insured RB's "cut" of the conspiracy's profits, or funded or financed the premium payment on behalf of Insured RB, with Insured RB being an unwitting pawn of the conspiracy who thought he was receiving one year of life insurance protection for free.

187.    Upon information and belief, Other Person Does, including Other Persons "DB," "HJ," "BB," "EV," "HM," and "JV," who acted as trustees for the policies identified above, participated in this scheme.

188.    In addition, and as evidence of the "affinity fraud" that is a part of Defendants' conspiracy, numerous of the above Predicate Acts and other Predicate Acts involve the Hasidic and Orthodox Jewish communities in New Square, NY; Monsey, NY; the Borough Park neighborhood of Brooklyn, NY; and Lakewood, NJ, including:

  (a)    In Predicate Act Two, Insured DN lives in Monsey, NY;

  (b)    In Predicate Act Six, Insured IW lives in the Borough Park neighborhood of Brooklyn, NY;

  (c)    In Predicate Act Seven, Insured BS lives in Brooklyn, NY; and

  (d)    Defendant Sharma sold a policy to Insured FN, who lives in Monsey, NY.

189.    The conspiracy is continuing and continues to harm FGLIC.

190.    Upon information and belief, Network Partners and the Agent Defendants fraudulently represented to FGLIC that the life insurance applications submitted to FGLIC by Network Partners were legitimate applications submitted for the purpose of obtaining life insurance, when at least some of them were in fact submitted for the sole purpose of obtaining commissions in excess of the first year premiums in furtherance of the fraudulent scheme.

191.    During this period, FGLIC issued insurance policies to the Insureds in reliance on the representations of Network Partners and the Agent Defendants and possible Other Person Does that the applications for these life insurance policies were proper.

192.    FGLIC paid Network Partners and the Agent Defendants commissions in connection with the sales of life insurance policies, which commissions exceeded the first year premiums.

193.    FGLIC paid these commissions in reliance on Network Partners' and the Agent Defendants' representations that the applications for and life insurance policies themselves were legitimate.

194.    Upon information and belief, Network Partners and the Agent Defendants, either directly or through its co-conspirators, paid at least a portion of the first year's annual premiums on the Insureds' behalf, or caused at least a portion to be paid out of other funds that did not belong to the Insureds, and told the Insureds that they would not have to pay the annual premiums in full.  This is a classic rebating scheme.

195.    Such payments were in violation of the Agency Agreement, which states at Section 15:

> **Section 15. Limitations of Authority**: You are not authorized to: (i) incur on behalf of the Company any expense, indebtedness or liability; (ii) make, alter or discharge contracts; (iii) waive forfeitures; (iv) quote rates except as published by the Company; (v) extend the time of payment of any premium; (vi) extend credit for the purpose of purchasing or keeping any insurance product in force; (vii) approve any application for insurance; (viii) represent to any person(s) that any insurance is in effect before the Company so acknowledges; (ix) acknowledge or represent the existence of any insurance with the Company; (x) make any representation or state any opinion regarding the validity or payment of any claim; or (xi) engage in any act on behalf of the Company that is not specifically authorized by this Agreement.

Ex. D, § 15.

196.    Because the offer of insurance without payment of the full annual premium is not authorized by the Agency Agreement, Network Partners breached the Agency Agreement.

197.    Such payments were also in violation of the Insurance Producer Agreement, which states at Section 13:

> **Section 13. Limitations of Authority**: You are not authorized to: (i) incur on behalf of the Company any expense, indebtedness or liability; (ii) make, alter or discharge contracts; (iii) waive forfeitures; (iv) quote rates except as published by the Company; (v) extend the time of payment of any premium; (vi) extend credit for the purpose of purchasing or keeping any insurance product in force; (vii) approve any application for insurance; (viii) represent to any person(s) that any insurance is in effect before the Company so acknowledges; (ix) acknowledge or represent the existence of any insurance with the Company; (x) make any representation or state any opinion regarding the validity or payment of any claim; or (xi) engage in any act on behalf of the Company that is not specifically authorized by this Agreement.

Ex. E, § 13.

198.    Because the offer of insurance without payment of the full annual premium is not authorized by the Insurance Producer Agreement, the Agent Defendants breached the Insurance Producer Agreement.

199.    Network Partners and the Agent Defendants also breached Section 15(vi) of the Agency Agreement and Section 13(vi) of the Insurance Producer Agreement, respectively, by, upon information and belief, extending credit in the form of arranging for premium payments by Network Partners and/or the Agent Defendants or by a third party for the purpose of purchasing insurance.

200.    Pursuant to the Agency Agreement, Network Partners agreed to comply with all applicable laws and regulations and with FGLIC's internal policies and procedures, including but not limited to the Market Conduct Guide and Code of Ethical Procedure as follows:

> **Section 8.   Agency Obligations to Comply with Law and Policy:**   You are obligated to, and agree to, comply with all laws, rules and regulations applicable to the offer or sale of insurance products pursuant to this Agreement or the offer

or sale of the same by Producers appointed to you, including but not limited to those that govern licensing, continuing education, anti-money laundering requirements, privacy and policy solicitation and issuance; provided, however, that the Agency shall not be held responsible for the submission of legally mandated forms related to the submission of a product application where the Company accepted such application without providing specific notice to the Agency of the need for such mandated forms. You also agree to comply with all current and future rules, regulations and directives of any nature issued by the Company with respect to market conduct or otherwise.

You specifically acknowledge receipt of and agree to comply with the policies, procedures and other terms set forth in the Company's Market Conduct Guide (the "Guide"), the Company's Agent Monitoring Program (the "Program") and the Company's Code of Ethical Conduct (the "Code") as any or all may be amended from time to time.

Ex. D, § 8.

201.    Pursuant to the Insurance Producer Agreement, the Agent Defendants agreed to comply with all applicable laws and regulations and with FGLIC's internal policies and procedures, including but not limited to the Market Conduct Guide and Code of Ethical Procedure as follows:

**Section 5. Producer Obligations to Comply with Law and Policy:** You are obligated to comply with all laws, rules and regulations applicable to your offer or sale of insurance products pursuant to this Agreement, including but not limited to those that govern licensing, continuing education and sales practices. You also agree to comply with all current and future rules, regulations and directives of any nature issued by the Company with respect to market conduct or otherwise.

You specifically acknowledge receipt of and agree to comply with the policies, procedures and other terms set forth in the Company's Market Conduct Guide (the "Guide") and the Company's Code of Ethical Conduct for Producers and Employees (the "Code") as either or both may be amended from time to time. You acknowledge that the Code requires, among other things, your adherence to the following principles:

Ex. E, § 5.

202.    The Market Conduct Guide, attached hereto as Exhibit H, sets forth certain duties of producers such as Network Partners and the Agent Defendants, including duties with respect

to applications, which include the requirement that the producer must meet with the applicant.

For example:

> **Under no circumstance should a Producer act as a "surrogate" for a non-licensed or non-appointed Producer**. That means that if a Producer appointed by the Company signs the application as the Producer, he or she must have been the Producer who met with the customer or solicited the application. Deliberately circumventing such rules will jeopardize the Producer's appointment with the Company and likely subject the Producer to fines, penalties and possibly the loss of their insurance license.

Ex. H at 24.

203.    The Market Conduct Guide lists fraudulent insurance acts in Section XI, which include "[k]nowingly or willfully make any false or fraudulent statement in or with reference to any application for insurance." *Id*., Section XI at 23.

204.    Upon information and belief, Network Partners and the Agent Defendants also breached the Market Conduct Guide and committed fraudulent insurance acts as defined therein by falsely representing to the Insureds with respect to their applications for insurance that they could obtain insurance policies from FGLIC without paying the full annual premiums.

205.    The Market Conduct Guide contains restrictions on marketing and specifically forbids producers from:

> Mak[ing] any statement (i.e., such as the policy will be "self-supporting") or represent in any way that premium payments will not be required unless such representation is accompanied by an adequate explanation as to what benefits would be provided or discontinued at the time when payments will no longer be required, and the conditions under which this would occur.

*Id.,* Section V at 14.

206.    Upon information and belief, Network Partners and the Agent Defendants breached the Market Conduct Guide by representing to the Insureds that they would not have to pay the full annual premiums.

207.    Upon information and belief, the Agent Defendants assisted Network Partners, and furthered Network Partners' breach of the Agency Agreement and the Market Conduct Guide by, among other acts, locating the Insureds to whom the Large Policies were offered and sold.

208.    Upon information and belief, Network Partners and the Agent Defendants engaged in this scheme to provide insurance for the sole purpose of obtaining commissions from FGLIC and then allowing the Large Policies after each policy's first anniversary date.

209.    FGLIC did not receive any premiums for the Insureds' Large Policies after the first year, and consequently each of the subject policies either lapsed, was rescinded prior to lapse, or is pending lapse.

210.    FGLIC incurred damages consisting of a portion of the lost premiums on the Insureds' Large Policies, the exact amount of which damages will be proven at trial.

211.    FGLIC also incurred damages consisting of the commission paid to Network Partners and/or the Agent Defendants in connection with the Insureds' Large Policies, which commissions would not have been paid but for the misconduct of Network Partners and the Agent Defendants, the exact amount of which damages exceed $75,000.

212.    These damages were proximately caused by the actions of Network Partners and the Agent Defendants who, upon information and belief, falsely told the Insureds that they could maintain insurance policies from FGLIC without paying the full annual premiums.

213.    Upon information and belief, the Insureds either no longer wanted the Large Policies when they learned they would have to pay the full premiums after the first year, or they knew of the wrongful activities of Network Partners and the Agent Defendants as alleged in this pleading.

214.     These damages were also proximately caused by the breach by Network Partners

and the Agent Defendants of the Agency Agreement, the Insurance Producer Agreements, and

Market Conduct Guide, and by the negligence of Network Partners and the Agent Defendants in

failing to meet the required standard of the fiduciary duty which they owed to their principal

FGLIC.

## COUNT 1 – FRAUD (NETWORK PARTNERS, AGENT DEFENDANTS, AND OTHER PERSON DOES)

215.     FGLIC repeats and re-alleges the allegations set forth in Paragraphs 1 through 214

of the Amended Complaint as if fully set forth herein.

216.     Network Partners and the Agent Defendants, as FGLIC's agents, each owed

FGLIC a fiduciary duty.

217.     FGLIC, as principal, had reason to put its trust in Network Partners and the Agent

Defendants, and had reason to rely on, and put its confidence and faith in, Network Partners and

the Agent Defendants, who each had the duty to act in FGLIC's best interest.

218.     Upon information and belief, Network Partners and the Agent Defendants, either

directly or indirectly through their co-conspirators, Other Person Does, fraudulently represented

to FGLIC that the Insureds' life insurance policy applications were legitimate applications for

life insurance, when they were in fact part of a fraudulent rebating scheme to collect

commissions from FGLIC that were in excess of the policies' first year premiums.

219.     For example, in the application for the life insurance policy issued to Insured SB,

Sharma falsely represented that he had "witnessed the signatures on this application."

220.     Sharma also sent a letter accompanying the application falsely representing to

FGLIC that he "had the pleasure of knowing [Insured SB] for several years" and that "my

experience and personal history with [Insured SB] have endowed me with the utmost respect and esteem for him as a person and a professional."

221.    Upon information and belief, Network Partners and Sharma knew these representation were false and fraudulent when made because Sharma had never met Insured SB at the time these representations were made.

222.    The specific details regarding additional fraudulent representations are within the unique and exclusive knowledge of Network Partners and the Agent Defendants and/or the Other Person Does, and FGLIC is unable to allege these specific fraudulent representations with more certainty until discovery takes place in this matter.

223.    FGLIC reserves the right to move to amend its Amended Complaint after discovery.

224.    The conduct of Network Partners, the Agent Defendants, and the Other Person Does, which upon information and belief, included deceiving FGLIC and deceiving the Insureds regarding reduced cost insurance, constituted a violation of FGLIC's confidence as well as a violation of the public's interest in not being deceived with respect to the sale of insurance products.

225.    Upon information and belief, Network Partners and the Agent Defendants and possibly the Other Person Does committed fraud by concealing the material fact that Network Partners and the Agent Defendants were offering, on their own or in concert with others, free or reduced cost insurance to the Insureds for the sole purpose of obtaining commission payments from FGLIC, despite knowing that the representation that the Insureds could maintain insurance from FGLIC without paying the full annual premiums was false.

226.    FGLIC has suffered damages in that it issued policies to Insureds based upon its trust and confidence, and its reliance on its agents Network Partners and the Agent Defendants, who owed FGLIC fiduciary duties.

227.    But for the submission by Network Partners and the Agent Defendants of these policy applications in breach of their duties to FGLIC, and more particularly in breach of their fiduciary duties with a special relationship with FGLIC, FGLIC would not have issued these policies.

228.    FGLIC did not receive any premiums for the Insureds' policies after the first year, and consequently these policies either lapsed, were rescinded prior to lapse, or are pending lapse.

229.    Nor did FGLIC receive any net policy premiums.

230.    FGLIC incurred damages consisting of a portion of the lost premiums on the Insureds' policies, which may exceed $20,000,000.

231.    FGLIC also incurred damages consisting of the commissions paid to Network Partners and the Agent Defendants in connection with the Insureds' policies, which commissions would not have been paid but for the fraud and deceitful acts committed by Network Partners and the Agent Defendants upon which FGLIC relied to its detriment.

232.    These damages were proximately caused by the actions of Network Partners and the Agent Defendants, when upon information and belief, Network Partners and the Agent Defendants, either directly or through their co-conspirators, Other Person Does, falsely represented to FGLIC that the Insureds' policy applications were legitimate applications submitted for the purpose of obtaining life insurance, when in fact the applications were submitted as part of a fraudulent scheme to obtain commissions in excess of the premiums paid.

**COUNT 2 – CIVIL CONSPIRACY TO BREACH DUTY OF AGENT
TO PRINCIPAL AND AIDING AND ABETTING THAT BREACH
(AGAINST NETWORK PARTNERS AND AGENT DEFENDANTS)**

233.    FGLIC repeats and re-alleges the allegations set forth in Paragraphs 1 through 232 of the Amended Complaint as if fully set forth herein.

234.    On or about October 2014, Network Partners entered into the Agency Agreement with FGLIC, whereby Network Partners was appointed as, and agreed to act as, a producer and agent for FGLIC for the purpose of selling insurance policies issued by FGLIC.

235.    The Agency Agreement provides, in pertinent part, that Network Partners and each Agent Defendant "specifically acknowledge[s] receipt of and agree[s] to comply with the policies, procedures and other terms set forth in the Company's Market Conduct Guide (the 'Guide'), the Company's Agent Monitoring Program (the 'Program') and the Company's Code of Ethical Conduct (the 'Code')." Ex. D, § 8.

236.    FGLIC also entered into the Insurance Producer Agreement with the Agent Defendants, whereby the Agent Defendants were appointed as, and agreed to act as, agents for FGLIC for the purpose of selling insurance policies issued by FGLIC, in accordance with the terms of the Insurance Producer Agreements.

237.    Network Partners and each Agent Defendant are deemed an "insurance producer" pursuant to Md. Code Ann., Insurance Article, Section 1-101(u) and 1-101(dd), and an agent of FGLIC.

238.    Since its appointment as agent by FGLIC, Network Partners and each Agent Defendant have held themselves out as agents of FGLIC.

239.    Network Partners and each Agent Defendant owe to FGLIC all of the duties that an agent owes to its principal.

240.    Upon information and belief, the Agent Defendants made the initial contact with the Insureds and offered them reduced cost insurance at the direction of, or with the assistance of, Network Partners and/or the Other Person Does.

241.    Upon information and belief, the Agent Defendants knew or should have known that they and Network Partners were agents of FGLIC and knew or should have known that they and Network Partners owed a fiduciary duty to FGLIC.

242.    Upon information and belief, Network Partners and the Agent Defendants all took actions to have the Insureds' applications for insurance completed and submitted to FGLIC while knowing that the information they had provided to the Insureds and FGLIC was false.

243.    Upon information and belief, the Agent Defendants gave substantial assistance to and encouraged Network Partners in the conspiracy and scheme to offer reduced cost insurance to the Insureds and others, knowing that such conduct was a violation of their and Network Partners' fiduciary duty.

244.    Based upon the Agent Defendants' assistance, and Network Partners' acts and omissions and submission of applications for these policies in violation of Network Partners' duties as agent, FGLIC has incurred damages, because these policies subsequently lapsed when additional premiums due were not paid. But for submission of these policy applications by Network Partners and the Agent Defendants, and Network Partners' and the Agent Defendants' conspiracy and more particularly their breach of fiduciary duties, FGLIC would not have issued these policies.

245.    FGLIC did not receive any premiums for the Insureds' policies after the first year, and consequently each of the subject policies either lapsed, was rescinded prior to lapse, or are pending lapse.

246.     FGLIC incurred damages consisting of a portion of the lost premiums on the Insureds' policies.

247.     FGLIC also incurred damages consisting of the commissions paid to Network Partners and the Agent Defendants in connection with the Insureds' policies, which commissions would not have been paid but for the conspiracy of Network Partners and the Agent Defendants in the breach of fiduciary duties owed FGLIC.

248.     These damages were proximately caused by the actions of Network Partners and the Agent Defendants in conspiring to further the breach of their duties which they owed to FGLIC, when, upon information and belief, Network Partners and the Agent Defendants falsely represented to the Insureds that they could maintain insurance policies from FGLIC without paying the full annual premiums, despite knowing that such policies would require annual premium payments in full.

249.     Upon information and belief, the Insureds no longer wanted the policies when they learned they would have to pay the full cost of the premiums after the first year.

## COUNT 3 – VIOLATION OF RACKETEER INFLUENCED & CORRUPT ORGANIZATIONS ACT (NETWORK PARTNERS, THE AGENT DEFENDANTS AND OTHER PERSON DOES)

250.     FGLIC repeats and re-alleges the allegations set forth in Paragraphs 1 through 249 of the Amended Complaint as if fully set forth herein.

251.     FGLIC is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

252.     Network Partners and each of the Agent Defendants are "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

253.     Network Partners and the Agent Defendants engaged in an ongoing "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), which enterprise was engaged in, and the activities of which affected, interstate commerce.

254.    Network Partners and the Agent Defendants were each associated with the enterprise and participated in its management and operation by directing its affairs and by conducting business with each other.

255.    Specifically, Network Partners and the Agent Defendants conspired together to sell life insurance for the fraudulent purpose of obtaining commissions that were in excess of the premiums paid.

256.    Network Partners and the Agent Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity for the unlawful purpose of defrauding FGLIC.

257.    Specifically, Network Partners and the Agent Defendants submitted fraudulent applications for insurance policies.

258.    These applications were not submitted for the purpose of obtaining life insurance for the Insureds.

259.    The applications were submitted for the fraudulent purpose of a rebating scheme to obtain commissions from FGLIC that were in excess of the premiums paid.

260.    For example, in the application for the life insurance policy issued to Insured SB, Sharma falsely represented that he had "witnessed the signatures on this application." Sharma also sent a letter accompanying the application falsely representing to FGLIC that he "had the pleasure of knowing [Insured SB] for several years" and that "my experience and personal history with [Insured SB] have endowed me with the utmost respect and esteem for him as a person and a professional."

261.    Upon information and belief, Network Partners and Sharma knew these representations were false and fraudulent when made because Sharma had never met Insured SB at the time these representations were made.

262.    Network Partners and the Agent Defendants used the mails and wire to conduct this scheme by sending fraudulent insurance applications through the mail and wire, sending premium payments from undisclosed funding sources through the wire, and rebating the premium payments back to the insureds and/or the funding sources through the wire.

263.    In addition, Network Partners and the Agent Defendants each participated, directly and indirectly, in the conduct of the enterprise's affairs through a pattern of unlawful activity under 18 U.S.C. § 1961(i)(b), 1961(5) and 1962(c), including but not limited to:

> (1)    Deceiving FGLIC by submitting applications containing false and fraudulent statements to FGLIC for the express purpose of receiving commissions in excess of the first year premiums and then allowing or encouraging the policies to lapse after one year, rather than for the purpose of obtaining life insurance for the Insureds;

> (2)    Deceiving FGLIC regarding the sources and/or the purposes of the premium payments received; and

> (3)    Sharing the ill-gotten gains of the conspiracy (*i.e.*, the difference between the first year commission payments and the first year premiums) between Network Partners and the Agent Defendants, and also possibly with Other Person Does who may include the Insureds.

264.    Many of the specific details regarding the fraud are within the unique and/or exclusive knowledge of Network Partners and/or the Agent Defendants and/or Other Person

Does, and FGLIC reserves the right to move to amend its Amended Complaint to allege additional acts of fraud after discovery.

265.    As further evidence of the fraudulent scheme and conspiracy, certain of the Agent Defendants began calling FGLIC after the announcement of the change to the chargeback provision, requesting a calculation of the minimum payment required to take certain insurance policies over the second policy year threshold.

266.    In other words, the Agent Defendants were trying to ascertain how much more the Insureds (or possibly the agents themselves) needed to pay to avoid the two-year chargeback provision.

267.    The enterprise set forth above constitutes both an open-ended and closed-ended pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

268.    Network Partners', the Agent Defendants', and the Other Person Does' enterprise constitutes an open-ended pattern of racketeering activity because Network Partners and the Agent Defendants continue to hold themselves out as FGLIC's agents and because many of the fraudulent insurance policies are still pending lapse.

269.    The enterprise poses a threat of continuing criminal conduct beyond the period during which the predicate acts were performed.

270.    The enterprise of Network Partners, the Agent Defendants, and Other Person Does also constitutes a closed-ended pattern of racketeering activity because the predicate acts extend over a substantial period of time and include various fraudulent acts and injuries to FGLIC and the public.

271.    As a direct and proximate result of the racketeering activities of Network Partners, the Agent Defendants, and Other Person Does and their violations of 18 U.S.C. §

1962(c), FGLIC has been injured in its business and property, within the meaning of 18 U.S.C. § 1964(c), in an amount to be proven at trial, but which exceeds $75,000.

272.     Specifically, FGLIC has been damaged by the loss of premiums from the Insureds and the commissions paid to Network Partners and its agents as a result of the fraudulent conspiracy.

273.     The public are also victims of the racketeering activities of Network Partners, the Agent Defendants, and Other Person Does.

274.     For example, several of the policies sold by Network Partners and the Agent Defendants were placed in trust in Connecticut, and Insured IH's policy in Predicate Act Five was sold in Connecticut. The Connecticut insurance laws explicitly provide that "***no*** insurance company doing business in this state, or attorney, ***producer or any other person shall pay*** or allow, ***or offer to pay*** or allow, ***as inducement*** to insurance, ***any rebate of premium payable*** on the policy, or any special favor or advantage in the dividends or other benefits to accrue thereon, ***or any valuable consideration or inducement not specified in the policy*** of insurance." Conn. Gen. Stat. Ann. § 38a-825 (emphasis added).

275.     Upon information and belief, Network Partners, the Agent Defendants, and Other Person Does violated this statute when they either paid or "rebated" to the Insureds a portion of the conspiracy's profits and/or funded or financed the premium payment on the Insureds' behalf.

276.     The Connecticut statutes explicitly provide that the purpose of "all laws respecting insurance companies" is "to protect the public interest." Conn. Gen. Stat. Ann. § 38a-8.

277.    By committing the insurance fraud described herein, and by violating the insurance laws regarding, for example, the payment of rebates and inducements to the Insureds, Network Partners, the Agent Defendants, and Other Person Does victimized the public.

## COUNT 4 – BREACH OF CONTRACT (AGAINST NETWORK PARTNERS)

278.    FGLIC repeats and re-alleges the allegations set forth in Paragraphs 1 through 277 of the Amended Complaint as if fully set forth herein.

279.    The Agency Agreement constituted a valid contract between FGLIC and Network Partners, which was entered into by the parties on or about October of 2014.

280.    FGLIC has fully performed all of its obligations under the Agency Agreement.

281.    Network Partners breached the Agency Agreement by failing to abide by its terms as, upon information and belief, it either offered insurance without payment of the full annual premium, or conspired with the Insureds to pay or finance some or all of the first year premiums on the Insureds' behalf, in violation of the Agency Agreement, as part of a fraudulent rebating scheme.

282.    Network Partners also breached Section 13(vi) of the Agency Agreement by, upon information and belief, extending credit in the form of arranging for premium payments by Network Partners or by a third party for the purpose of purchasing insurance.

283.    Pursuant to Section 8 of the Agency Agreement, Network Partners agreed "to comply with the policies, procedures and other terms set forth in the Company's Market Conduct Guide (the 'Guide') and the Company's Code of Ethical Conduct for Producers and Employees (the 'Code') as either or both may be amended from time to time."

284.    The Market Conduct Guide listed fraudulent insurance acts in Section XI, which include "[k]nowingly or willfully make any false or fraudulent statement in or with reference to any application for insurance."

285.    Upon information and belief, Network Partners breached the Market Conduct Guide and committed a fraudulent insurance act as defined therein by falsely representing to the Insureds, either directly or through Network Partners' co-conspirators at Network Partners' direction, that the Insureds would not need to pay the full annual premiums with respect to their applications for insurance.

286.    The Market Conduct Guide contains restrictions on marketing and specifically forbids producers from:

> Make[in] any statement (i.e., such as the policy will be "self-supporting") or represent in any way that premium payments will not be required unless such representation is accompanied by an adequate explanation as to what benefits would be provided or discontinued at the time when payments will no longer be required, and the conditions under which this would occur.

Ex. H, § V at 14.

287.    Upon information and belief, Network Partners breached the Market Conduct Guide by falsely representing to the Insureds, either directly or through Network Partners' co-conspirators at Network Partners' direction, that the Insureds could maintain insurance policies from FGLIC without paying the full annual premiums, despite knowing that such policies would require annual premium payments in full.

288.    FGLIC has been damaged by Network Partners' breaches of the Agency Agreement and Market Conduct Guide in that it issued policies to the Insureds based upon Network Partners' submission of applications for these policies, which policies subsequently lapsed when additional premiums due were not paid.

289.    But for Network Partners' acts and omissions and its submission of these policy applications in breach of the Agency Agreement and Market Conduct Guide, FGLIC would not have issued these policies.

290.    FGLIC did not receive any premiums for the Insureds' policies after the first year, and consequently each of these policies has either lapsed or is pending lapse.

291.    FGLIC incurred damages consisting of a portion of the lost premiums on the Insureds' policies, the exact amount of which damages will be proven at trial.

292.    FGLIC also incurred damages consisting of the commissions paid to Network Partners and its individual agents in connection with the Insureds' policies, which commissions would not have been paid but for the breach of contract by Network Partners, the exact amount of which damages will be proven at trial.

293.    These damages were proximately caused by the actions of Network Partners, which were in breach of the Agency Agreement and Market Conduct Guide when, upon information and belief, Network Partners, either directly or through its co-conspirators at Network Partners' direction, falsely represented to the Insureds that they could maintain insurance policies from FGLIC without paying the full annual premiums, despite knowing that such policies would require annual premium payments in full.

### COUNT 5 – BREACH OF CONTRACT (AGAINST AGENT DEFENDANTS)

294.    FGLIC repeats and re-alleges the allegations set forth in Paragraphs 1 through 293 of the Amended Complaint as if fully set forth herein.

295.    The Insurance Producer Agreement constituted a valid contract between FGLIC and each Agent Defendant.

296.    FGLIC has fully performed all of its obligations under the Insurance Producer Agreement.

297.    The Agent Defendants breached the Insurance Producer Agreement by failing to abide by its terms as, upon information and belief, they either offered insurance without payment of the full annual premium or conspired with the Insureds to pay or finance some or all of the

first year premiums on the Insureds' behalf, in violation of the Insurance Producer Agreement, as part of a fraudulent rebating scheme.

298.   FGLIC has been damaged by the Agent Defendants' breaches of the Insurance Producer Agreement and Market Conduct Guide in that it issued policies to the Insureds based upon the Agent Defendants' submission of applications for these policies, which policies subsequently lapsed when additional premiums due were not paid.

299.   But for the Agent Defendants' acts and omissions and its submission of these policy applications in breach of the Insurance Producer Agreement and Market Conduct Guide, FGLIC would not have issued these policies.

300.   FGLIC did not receive any premiums for the Insured's policies after the first year and consequently each of these policies has either lapsed or is pending lapse.

301.   FGLIC incurred damages consisting of a portion of the lost premiums on the Insureds' policies, the exact amount of which damages will be proven at trial.

302.   FGLIC also incurred damages consisting of the commissions paid to the Agent Defendants in connection with the Insureds' policies, which commissions would not have been paid but for the breach of contract by the Agent Defendants, the exact amount of damages will be proven at trial.

303.   These damages were proximately caused by the actions of the Agent Defendants, which were in breach of the Insurance Producer Agreement and Market Conduct Guide when, upon information and belief, the Agent Defendants, either directly or through its co-conspirators, falsely represented to the Insureds that they could maintain insurance policies from FGLIC without paying the full annual premiums, despite knowing that such policies would require annual premium payments in full.

## COUNT 6 – RESCISSION, RESTITUTION, AND CONSTRUCTIVE TRUST (AGAINST NETWORK PARTNERS, IN THE ALTERNATIVE)

304.    FGLIC repeats and re-alleges the allegations set forth in Paragraphs 1 through 303 of the Amended Complaint as if fully set forth herein.

305.    FGLIC entered into the Agency Agreement with Network Partners in good faith on or about October of 2014.

306.    This claim and the remedy sought is found in equity.

307.    FGLIC respectfully requests that the jury render an advisory opinion as to the facts for the benefit of the Court, which shall decide the cause of action and remedy.

308.    Upon information and belief, Network Partners entered into the Agency Agreement with FGLIC for the fraudulent purpose of obtaining commission payments from FGLIC under the false premise that Network Partners was legitimately selling insurance products for the benefit of the Insureds.

309.    FGLIC has fully performed all of its obligations under the Agency Agreement.

310.    Network Partners breached the Agency Agreement by failing to abide by its terms as, upon information and belief, it either offered insurance without payment of the full annual premium, or conspired with the Insureds to pay some or all of the first year premiums on the Insureds' behalf, in violation of the Agency Agreement.

311.    Network Partners also breached Section 15(vi) of the Agency Agreement by, upon information and belief, extending credit in the form of arranging for premium payments by Network Partners or by a third party for the purpose of purchasing insurance.

312.    Pursuant to Section 8 of the Agency Agreement, Network Partners agreed "to comply with the policies, procedures and other terms set forth in the Company's Market Conduct

Guide (the 'Guide') and the Company's Code of Ethical Conduct for Producers and Employees (the 'Code') as either or both may be amended from time to time."

313.    Upon information and belief, Network Partners breached the Market Conduct Guide and committed a fraudulent insurance act as defined therein by either falsely representing to the Insureds, either directly or through Network Partners' co-conspirators at Network Partners' direction, that the Insureds would not need to pay the full annual premiums with respect to their applications for insurance, or conspiring with Insureds to pay some or all of the first year premiums on the Insureds' behalf, as part of a fraudulent rebating scheme.

314.    Upon information and belief, Network Partners breached the Market Conduct Guide by falsely representing to the Insureds, either directly or through Network Partners' co-conspirators at Network Partners' direction, that the Insureds could maintain insurance policies from FGLIC without paying the full annual premiums, despite knowing that such policies would require annual premium payments in full.

315.    Network Partners' actions constitute material breaches of the Agency Agreement such that they go to the root of, and defeat the object of, the agreement (*i.e.*, the sale of legitimate insurance policies).

316.    FGLIC, upon learning of the fraudulent scheme, promptly exercised its right to rescind the Agency Agreement and gave notice of its intent to rescind, through its initial Complaint.

317.    However, Network Partners is clearly unwilling to return to FGLIC the consideration and benefits received under the Agency Agreement.

318.    Based on Network Partners' fraudulent intent in entering into the Agency Agreement, and its material breaches of that agreement, the Agency Agreement should be rescinded and the parties restored to their precontractual positions.

319.    Network Partners acquired its commission payments from FGLIC under circumstances rendering it inequitable for Network Partners to retain such payments.

320.    Specifically, such commission payments were acquired based on a fraudulent intent and in material breach of the Agency Agreement.

321.    Network Partners has been unlawfully and unjustly enriched through receipt of such commission payments under these circumstances.

322.    The commissions received by Network Partners and the agents in its hierarchy should be placed in a constructive trust for the benefit of FGLIC and anyone else harmed by this scheme.

## COUNT 7 – RESCISSION, RESTITUTION, AND CONSTRUCTIVE TRUST (AGAINST AGENT DEFENDANTS, IN THE ALTERNATIVE)

323.    FGLIC repeats and re-alleges the allegations set forth in Paragraphs 1 through 322 of the Amended Complaint as if fully set forth herein.

324.    FGLIC entered into the Insurance Producer Agreements with the Agent Defendants in good faith.

325.    A specimen copy of the Insurance Producer Agreement is attached hereto as Exhibit E and is incorporated by this reference.

326.    This claim and the remedy sought is found in equity.

327.    FGLIC respectfully requests that the jury render an advisory opinion as to the facts for the benefit of the Court, which shall decide the cause of action and remedy.

328.    Upon information and belief, the Agent Defendants entered into the Insurance Producer Agreements with FGLIC for the fraudulent purpose of obtaining commission payments from FGLIC under the false premise that the Agent Defendants were legitimately selling insurance products for the benefit of the Insureds.

329.    FGLIC has fully performed all of its obligations under the Insurance Producer Agreements.

330.    The Agent Defendants breached the Insurance Producer Agreements by failing to abide by their terms as, upon information and belief, the Agent Defendants either offered insurance without payment of the full annual premium, or conspired with the Insureds to pay some or all of the first year premiums on the Insureds' behalf, in violation of the Insurance Producer Agreements, as part of a fraudulent rebating scheme.

331.    The Agent Defendants also breached Section 13(vi) of the Insurance Producer Agreements by, upon information and belief, extending credit in the form of arranging for premium payments by the Agent Defendants or by a third party for the purpose of purchasing insurance.

332.    Pursuant to Section 5 of the Insurance Producer Agreement, the Agent Defendants agreed "to comply with the policies, procedures and other terms set forth in the Company's Market Conduct Guide (the 'Guide') and the Company's Code of Ethical Conduct for Producers and Employees (the 'Code') as either or both may be amended from time to time." Ex. E, § 5.

333.    Upon information and belief, the Agent Defendants breached the Market Conduct Guide and committed a fraudulent insurance act as defined therein by either falsely representing to the Insureds, either directly or through the Agent Defendants' co-conspirators at the Agent Defendants' direction, that the Insureds would not need to pay the full annual premiums with

respect to their applications for insurance, or conspiring with Insureds to pay some or all of the first year premiums on the Insureds' behalf.

334.   Upon information and belief, the Agent Defendants breached the Market Conduct Guide by falsely representing to the Insureds, either directly or through the Agent Defendants' co-conspirators at the Agent Defendants' direction, that the Insureds could maintain insurance policies from FGLIC without paying the full annual premiums, despite knowing that such policies would require annual premium payments in full.

335.   The Agent Defendants' actions constitute material breaches of the Insurance Producer Agreements such that they go to the root of, and defeat the object of, the agreement (*i.e.*, the sale of legitimate insurance policies).

336.   FGLIC, upon learning of the fraudulent scheme, promptly exercised its right to rescind the Insurance Producer Agreements and gave notice of its intent to rescind, through its initial Complaint.

337.   However, the Agent Defendants are clearly unwilling to return to FGLIC the consideration and benefits received under the Insurance Producer Agreements.

338.   Based on the Agent Defendants' fraudulent intent in entering into the Insurance Producer Agreements, and their material breaches of those agreements, the Insurance Producer Agreements should be rescinded and the parties restored to their precontractual positions.

339.   The Agent Defendants acquired their commission payments from FGLIC under circumstances rendering it inequitable for the Agent Defendants to retain such payments.

340.   Specifically, such commission payments were acquired based on a fraudulent intent and in material breach of the Insurance Producer Agreements.

341.    The Agent Defendants have been unlawfully and unjustly enriched through receipt of such commission payments under these circumstances.

342.    The commissions received by the Agent Defendants should be placed in a constructive trust for the benefit of FGLIC and anyone else harmed by this scheme.

## COUNT 8 – NEGLIGENCE BY FAILING TO ACT WITH THE FIDUCIARY DUTY REQUIRED FROM AGENT TO PRINCIPAL (AGAINST NETWORK PARTNERS)

343.    FGLIC repeats and re-alleges the allegations set forth in Paragraphs 1 through 342 of the Amended Complaint as if fully set forth herein.

344.    As an agent, Network Partners owed its principal FGLIC a fiduciary duty, including but not limited to a duty to act solely for FGLIC's benefit in all matters connected to its agency.

345.    As an agent, Network Partners also owed its principal FGLIC a duty to avoid any conflict between its own self-interest and the interests of FGLIC.

346.    As an agent, Network Partners owed its principal FGLIC a duty to disclose any information FGLIC might reasonably want to know about the transactions and relationship between them.

347.    Network Partners breached the duties it owed as agent to its principal FGLIC by, upon information and belief, offering insurance to the Insureds with a reduced annual premium, which scheme was solely in Network Partners' best interest and was not in the best interests of FGLIC, as the scheme resulted in FGLIC's payment to Network Partners of commissions for the sale of insurance policies that did not generate the anticipated continuing premium income for FGLIC, as the policies lapsed after the first year and no additional premiums were paid.

348.    Network Partners breached the duties it owed as agent to its principal FGLIC by, upon information and belief, acting in conflict with FGLIC's best interests.

349.     Network Partners, either directly or through its co-conspirators at Network Partners' direction, made promises of reduced cost insurance that conflicted with the interests of FGLIC in keeping these policies in force, and in obtaining further and future premiums on the policies sold by Network Partners.

350.     Network Partners breached the duties it owed as agent to its principal FGLIC, upon information and belief, when it concealed from FGLIC the fact that Network Partners, either directly or through its co-conspirators at Network Partners' direction, was offering reduced cost insurance, and concealed that the Insureds were not paying the entire first year premiums.

351.     Network Partners' breach of its duties as agent to its principal FGLIC constituted negligence as it failed to abide by the duties of care it owed to FGLIC including, but not limited to, the fiduciary duty it owed to FGLIC.

352.     FGLIC has suffered damages in that it issued policies to the Insureds based upon Network Partners' acts, omissions, and submission of applications for these policies in violation of Network Partners' duties as agent, which policies subsequently lapsed when additional premiums which were due were not paid.

353.     But for Network Partners' submission of these policy applications in breach of its duties as agent, and more particularly in breach of its fiduciary duty as agent, FGLIC would not have issued these policies.

354.     FGLIC did not receive any premiums for the Insureds' policies after the first year, and consequently these policies have either lapsed or are pending lapse.

355.     FGLIC incurred damages consisting of a portion of the lost premiums on the Insureds' policies, the exact amount of which damages will be proven at trial.

356.     FGLIC also incurred damages consisting of the commission paid to Network Partners in connection with the Insureds' policies, which commissions would not have been paid but for the breach of contract by Network Partners, the exact amount of which damages will be proven at trial.

357.     These damages were proximately caused by the actions of Network Partners, which constituted negligence and a breach of the fiduciary duty it owed to FGLIC as agent.

## COUNT 9 – INDEMNIFICATION AND ATTORNEYS' FEES (NETWORK PARTNERS)

358.     FGLIC repeats and re-alleges the allegations set forth in Paragraphs 1 through 357 of the Amended Complaint as if fully set forth herein.

359.     Pursuant to the Agency Agreement, Network Partners agreed to indemnify and hold FGLIC harmless as follows:

> **Indemnification of Company:**  You agree to indemnify, hold harmless and defend (with commercially reasonable counsel of the Company's choice subject to your agreement not to be unreasonably withheld) the Company against any claim, judgment, loss, settlement, cost, damage or other expense (including but not limited to attorney's fees but excluding any such items assessed by a regulatory agency) the Company may suffer or incur, as the result of any error or omission; fraudulent, negligent, or unauthorized act; or breach of this Agreement by you.  Producers appointed by you, your officers, your employees, any persons whose activities result in the Agency receiving from the Company any compensation or other remuneration subject to the following exceptions:
>
> 1.   Settlements or judgments representing life insurance policy limits paid in contestable claims; and
>
> 2.   Class Actions under either Federal or State law unless (1) there is an adjudication by a court of competent jurisdiction that you knowingly permitted Producers to engage in acts or omissions found by said court to be the basis for liability or (2) the Class Action alleges actions relative to a course of business engaged in by you and alleges only vicarious liability as to the Company.
>
> The Company shall have exclusive authority to direct the defense and effect any settlement in any action for which the foregoing indemnity may apply. You also agree to reimburse the Company for any judgment, loss, settlement, cost, damage or other expense (including but not limited to reasonable

attorney's fees but excluding any such items assessed by a regulatory agency) incurred by the Company in answering, defending or otherwise addressing any: arbitration claim; attachment; complaint; court proceeding; dispute; garnishment; regulatory or other inquiry or investigation; or other proceeding involving you.  Producers appointed to you, your officers, your employees, all persons who act on your behalf or at your direction, and all persons whose activities result in the Agency receiving from the Company any compensation or other remuneration.  You shall, upon demand, pay the Company as a debt due hereunder any sums due to it in accordance with this section.

Ex. D, § 21.

360.    As set forth above, Network Partners breached the Agency Agreement and the Market Conduct Guide, and engaged in conduct constituting fraud, conspiracy, negligence, and unauthorized acts.

361.    Accordingly, FGLIC is entitled to indemnification under Section 21 of the Agency Agreement for damages including, but not limited to, the costs, expenses, attorneys' fees incurred by FGLIC in connection with this action, and also in connection with any other future action or proceeding involving the conduct of Network Partners as alleged herein.

362.    FGLIC is entitled to damages pursuant to the indemnification provision in an amount to be proven at trial.

## DEMAND JURY TRIAL

363.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, FGLIC demands a trial by jury on any issues triable of right by a jury.

364.    FGLIC requests that the Court impanel an advisory jury for any issues not triable of right by a jury, such as Counts 6 and 7.

## PRAYER FOR RELIEF

**WHEREFORE**, FGLIC requests that this Court issue a Judgment and Order as follows:

A.    Awarding to FGLIC against Network Partners, the Agent Defendants, the Agent Does, and the Other Person Does as follows:

i.  damages consisting of all or a portion of the lost premiums on the Insureds' policies, the exact amount of which damages will be proven at trial;

ii.  damages consisting of the commissions paid to Network Partners, the Agent Defendants, and the Agent Does in connection with the Insureds' policies, the exact amount of which damages will be proven at trial;

iii.  damages consisting of the costs, expenses, attorneys' fees incurred by FGLIC in connection with this action, and also in connection with any other future action or proceeding involving the conduct of Network Partners, the Agent Defendants, the Agent Does, and the Other Person Does as alleged herein; and

iv.  Granting FGLIC such other and further relief as the Court may deem just and proper.

B.  In the alternative, FGLIC seeks relief as follows:

i.  That FGLIC is entitled to rescind the Agency Agreement and the Insurance Producer Agreements, based on Network Partners' and the Agent Defendants' material breach of said agreements, and restore the parties to their precontractual positions;

ii.  That a constructive trust be charged upon the commission payments made to Network Partners and the Agent Defendants for the benefit of FGLIC; and

iii.  That the Court grant such other and further relief as the Court may deem just proper, and equitable under the circumstances.

Dated:  March 8, 2018                    Respectfully submitted,

                                         **BRIGGS AND MORGAN, P.A.**


By: _____ */s/* _____
                                         Frank A. Taylor
                                         Julie M. Firestone
                                         *Admitted Pro Hac Vice*
                                         2200 IDS Center
                                         80 South Eighth Street
                                         Minneapolis, Minnesota 55402-2157
                                         Telephone: 612-977-8400
                                         Fax: 612-977-8650
                                         Email: jfirestone@briggs.com
                                         Email: ftaylor@briggs.com



                                         Priscilla A. Donovan (Bar No. 27031)
                                         Daniel J. Donovan (Bar No. 22661)
                                         Donovan & Rainie, LLC
                                         One South Street, Suite 1120
                                         Baltimore, Maryland 21202
                                         Phone: (410) 685-8800
                                         Fax: (410) 685-8885
                                         Email: pard@donovanrainie.com
                                         Email: djd@donovanrainie.com

                                         **ATTORNEYS FOR FIDELITY &
                                         GUARANTY LIFE INSURANCE
                                         COMPANY**

**CERTIFICATE OF SERVICE**

I hereby certify that on this 8th day of March 2018, a copy of the foregoing Amended

Complaint was served via CM/ECF on counsel of record as follows:

Gregory L. Ewing, Esq.
Angela Grau, Esq.
Davis, Agnor, Rapaport & Skalny
10211 Wincopin Circle, Suite 600
Columbia, Maryland 21044
gewing@darslaw.com
agrau@darslaw.com
*Counsel for Defendant Abhinav Sharma and RequiteLife, Inc.*

_____/s/_____
Priscilla A. Donovan