**THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

---

FIDELITY & GUARANTY LIFE
INSURANCE COMPANY,

      Plaintiff,

vs.

NETWORK PARTNERS INT'L., LLC;
DAVID MEYER; DAVID A. COHEN;
M&M BROKERAGE SERVICES, INC.;
ESTATE OF MARVIN MEYER; JASON
MANDEL; TOWER STRATEGIC
GROUP, LLC; TOWER STRATEGIC
PARTNERS, LLC; SOUNDVIEW
STRATEGIC PARTNERS, LLC;
SOUNDVIEW STRATEGIC
MANAGEMENT, L.P.; SOUNDVIEW
STRATEGIC FUND, L.P.;
MOUNTAINVIEW FINANCE, LLC;
GRAND SKY 2011 IRREVOCABLE
TRUST; HOLMDEL FINANCIAL
SERVICES, INC.; MARK LAGAMBINA,
INDIVIDUALLY AND D/B/A MESA
CONSUMER FINANCE, LLC, AND
CROSSRIDGE PARTNERS, INC.; MSL
INSURANCE ADVISORS, LLC;
ABHINAV SHARMA; REQUITELIFE,
INC.; GREGG KIRSCHNER; MRM
ADVISORS, LLC; JOSHUA MANDEL;
RUBICON ADVISORY PARTNERS,
INC.; REBECCA NADLER; DAVID R.
COHEN; DAROCO & ASSOCIATES,
LLC; JAMES KAPLAN; STEVEN
KAPLAN; KERRY PROPPER; AARON
AFTERGOOD; SETTLING TRUSTEE 1;
PETER BILFIELD; SETTLING TRUSTEE
2; SETTLING TRUSTEE 3; DAVID
HARKHAM; HOWARD JAHRE;
SETTLING TRUSTEE 4; SETTLING
TRUSTEE 5; DANA MANDEL;
SETTLING TRUSTEE 6; SETTLING
TRUSTEE 7; CESAR PEREZ; SETTLING
TRUSTEE 8; SETTLING TRUSTEE 9;

---

Case No. 17-cv-01508-RDB

**[PROPOSED] SECOND
AMENDED COMPLAINT**

**JURY TRIAL DEMANDED ON
ALL COUNTS EXCEPT
COUNTS 7 AND 8, WHICH ARE
PLEAD IN EQUITY AND IN
THE ALTERNATIVE, WITH
THE JURY TO RENDER AN
ADVISORY OPINION TO THE
COURT AS TO FACTS ONLY
ON THOSE COUNTS**

ROBERT SWETNICK; SETTLING
TRUSTEE 10; DAVID VYNERIB;
SETTLING TRUSTEE 11; BROKERAGE
INSURANCE PARTNERS, INC.;
ANDREW MORAFATES; DEMETRIOS
VELISSARIOS; VELCO
DEVELOPMENT LLC; RICHARD
WHITBECK; MICHAEL GOLDMAN,
INDIVIDUALLY AND D/B/A HAREI AT
INC., INSURED ON TIME, 107 OLD
NYACK LLC, AND CNM SERVICES,
LLC; RONIN COLLINS,
INDIVIDUALLY AND D/B/A OCELOT
ADVISORY PARTNERS; COFFEY
ANDERSON; JOHN BIVONA; DANA
BALLESTO; DAVID BREIN; STANLEY
CHESED; DAVID CRISPEL; BRUCE
DILWORTH; JACOB EISENBERG;
PHILIP HON; GERALD HUGHES;
TRENT JAMES; ROCK ISLAND
INSURANCE GROUP; TATANISHA
LEER; TZVIE LEIFER; HBM LIFE INC.;
LEON LOWENTHAL; EVAN
PESCATORE; CHESKY WEBER;
SHLOIME WOSNER; AGENT DOES 1-
10; FUNDING DOES 1-10; TRUSTEE
DOES 1-10; AND OTHER PERSON
DOES 1-10,

     Defendants.

Pursuant to Fed. R. Civ. P. 8 and 9, Plaintiff Fidelity & Guaranty Life Insurance Company

("FGLIC") states and alleges that the Defendants identified in Exhibit 1, attached hereto, conspired

to defraud FGLIC of $62 million by, among other things:

(i)       Selling so-called "free" life insurance policies to insureds;

(ii)     Submitting fraudulent life insurance applications to FGLIC through the mail and

           wire, upon which fraudulent applications FGLIC relied in issuing the policies;

(iii)    Funding the life insurance premiums through co-conspirator investors;

(iv)     Inducing FGLIC and other insurance companies to pay commissions and bonuses on the policies obtained through the conspiracy's fraudulent actions;

(v)      Rebating ("kicking back") the commissions and bonuses to perpetuate the conspiracy; and

(vi)     Pocketing the difference between the commissions and bonuses, on the one hand, and the premiums, on the other, as the profits from the conspiracy.

The above actions violated applicable insurance laws, as set forth in the body of this Second Amended Complaint.  This fraudulent scheme has wreaked significant harm on the consuming public and damaged the insurance industry as a whole.

## NATURE OF THE ACTION[1]

### Overview

1.      Defendants perpetrated a wide-ranging fraudulent conspiracy against FGLIC and other insurers, over the mail and wire, founded upon the fraudulent sale of "free" life insurance and the illegal rebating of commissions and bonuses from the sale of life insurance policies.

2.      The scheme involved systematically and fraudulently inducing the sale of life insurance policies and funding the first-year premiums through loans or other payments by co-conspirators at no cost to the insureds (thereby offering the insureds "free insurance"), in order to fraudulently obtain commissions and bonuses from FGLIC and other insurance companies in excess of the first-year premiums.

---

[1] FGLIC shall refer to this action as the "*Network Partners* Litigation," and the action pending in this Court captioned as *Brokerage Insurance Partners v. Fidelity & Guaranty Life Insurance Company, Fidelity & Guaranty Life, FS Holdco II Ltd, and John Doe*, and docketed at Case No. 17-cv-1815 as the "*BIP* Litigation."

3.      The policies lapsed after a single year (or, in a few instances, two years), leaving FGLIC and the other insurers holding the bag.

4.      FGLIC alone was victimized in the amount of ***approximately $62 million in fraudulently obtained commissions and bonuses***.

5.      Defendants' conspiracy consists of three categories of wrongdoers, each complicit in the other's actions:

(i)      The Agent Defendants are insurance agents of FGLIC, who fraudulently obtained FGLIC insurance policies for insureds by making false representations on life insurance applications and supporting documents and by fraudulently concealing material facts from FGLIC;

(ii)      The Funding Defendants are investors and their business associates who established and utilized a web of financing vehicles to fund first-year insurance premiums at no cost to the insureds, providing the insureds with "free" insurance; and

(iii)      The Trustee Defendants executed sham agreements and wired funds to facilitate the fraudulent transfer of funds from the Funding Defendants to FGLIC, to obtain commissions and bonuses from FGLIC.

*See* Exh. 1 (identifying Defendants by category).[2]  This Second Amended Complaint organizes Defendants by these three categories to explain how the conspiracy was perpetrated; specific allegations about each Defendant's misconduct are set forth throughout this pleading.

---

[2] The exhibits to this Second Amended Complaint are listed and described in Appendix A, attached hereto.

6.      The Defendants received, and paid themselves out of, the ill-gotten commissions and bonuses, and rebated most of the funds to the Funding Defendants, in order to continue funding premiums and perpetuate the scam.

7.      In other words, the fraudulently obtained commissions and bonuses from one sham policy were rebated and funneled back into the system to finance premiums for future sham policies and ill-gotten profits for the co-conspirators.

8.      Defendants exploited the customary hierarchy of the insurance industry in which individual agents and their alter-ego "d/b/a companies" serve as insurance agents through a General Agent, which is charged with validating individual agents' submissions before forwarding them on to the insurance company.

9.      The Agent Defendants, in furtherance of the conspiracy, submitted life insurance applications through the "hierarchies" of three General Agents: Defendants Network Partners,[3] MSL Insurance Advisors,[4] and BIP.[5]

10.     In the Network Partners and MSL Insurance Advisors hierarchies, the amount of fraudulently acquired commissions and bonuses paid by FGLIC over some fifteen months totals *over $21.8 million*:

---

[3] General Agent Network Partners worked closely with another General Agent, M&M Brokerage Services ("M&M").  Network Partners is the alter ego of David Meyer; M&M is the alter ego of David Meyer's late father, Marvin Meyer.

[4] MSL Insurance Advisors is the alter ego of Defendant Mark LaGambina, who also controlled two of the entities that funded the scheme: Mesa Consumer Finance, LLC, and Crossridge Partners, Inc.

[5] BIP is an acronym for Brokerage Insurance Partners, which is controlled by Defendants Demetrios Velissarios, Andrew Morafates, and Richard Whitbeck.

| Policy Number[6] | Policy Effective Date | Individual Agent | General Agent | Individual Agent Commission | General Agent Commission | General Agent Bonus | Total Commissions and Bonuses |
|---|---|---|---|---|---|---|---|
| 658 | 2/1/2015 | Mandel, Jason | Network Partners | $460,570.00 | $83,740.00 | $125,610.00 | $669,920.00 |
| 070 | 3/6/2015 | Mandel, Jason | Network Partners | $298,001.00 | $56,765.50 | $62,805.00 | $417,571.50 |
| 516 | 3/18/2015 | Sharma, Abhinav | Network Partners | $19,574.20 | $24,916.40 | $10,674.00 | $55,164.60 |
| 194 | 3/25/2015 | Sharma, Abhinav | Network Partners | $185,647.00 | $236,278.00 | $101,262.00 | $523,187.00 |
| 188 | 5/1/2015 | Kirschner, Gregg | Network Partners | $441,000.00 | $84,000.00 | $37,800.00 | $562,800.00 |
| 956 | 5/1/2015 | Mandel, Joshua | Network Partners | $119,780.00 | $22,840.00 | $34,200.00 | $176,820.00 |
| 383 | 5/6/2015 | Sharma, Abhinav | Network Partners | $32,857.86 | $41,847.70 | $10,081.00 | $84,786.56 |
| 777 | 5/20/2015 | Sharma, Abhinav | Network Partners | $79,995.40 | $101,814.80 | $31,734.00 | $213,544.20 |
| 475 | 6/2/2015 | Mandel, Jason | Network Partners | $108,801.00 | $20,724.00 | $31,086.00 | $160,611.00 |
| 269 | 6/4/2015 | Mandel, Jason | Network Partners | $363,919.50 | $69,318.00 | $103,977.00 | $537,214.50 |
| 844 | 6/6/2015 | Sharma, Abhinav | Network Partners | $305,230.00 | $390,520.00 | $166,080.00 | $861,830.00 |
| 639 | 6/8/2015 | Kirschner, Gregg | Network Partners | $189,892.50 | $36,170.00 | $54,255.00 | $280,317.50 |
| 704 | 6/10/2015 | Sharma, Abhinav | Network Partners | $225,148.00 | $286,552.00 | $122,808.00 | $634,508.00 |
| 465 | 7/1/2015 | Kirschner, Gregg | Network Partners | $520,915.50 | $99,222.00 | $44,649.90 | $664,787.40 |
| 707 | 7/2/2015 | Mandel, Jason | Network Partners | $117,033.00 | $22,292.00 | $33,438.00 | $172,763.00 |
| 914 | 7/21/2015 | Sharma, Abhinav | Network Partners | $156,406.25 | $199,062.50 | $43,312.00 | $398,780.75 |
| 097 | 7/23/2015 | Sharma, Abhinav | Network Partners | $91,091.00 | $115,934.00 | $49,686.00 | $256,711.00 |
| 957 | 8/3/2015 | Sharma, Abhinav | Network Partners | $260,997.00 | $332,178.00 | $142,362.00 | $735,537.00 |
| 153 | 9/22/2015 | Kirschner, Gregg | Network Partners | $459,795.00 | $87,580.00 | $29,511.00 | $576,886.00 |
| 440 | 9/24/2015 | Mandel, Joshua | Network Partners | $49,455.00 | $9,420.00 | $14,130.00 | $73,005.00 |
| 499 | 9/28/2015 | Sharma, Abhinav | Network Partners | $142,175.00 | $180,950.00 | $77,550.00 | $400,675.00 |
| 145 | 10/1/2015 | Mandel, Jason | Network Partners | $202,177.50 | $38,510.00 | $57,765.00 | $298,452.50 |

[6] For privacy and security purposes, FGLIC is excluding all but the last three digits of the policy numbers.

| Policy Number[6] | Policy Effective Date | Individual Agent | General Agent | Individual Agent Commission | General Agent Commission | General Agent Bonus | Total Commissions and Bonuses |
|---|---|---|---|---|---|---|---|
| 883 | 10/12/2015 | Sharma, Abhinav | Network Partners | $49,214.00 | $62,636.00 | $26,844.00 | $138,694.00 |
| 683 | 10/24/2015 | Kirschner, Gregg | Network Partners | $585,900.00 | $111,600.00 | $37,476.00 | $734,976.00 |
| 473 | 11/2/2015 | Mandel, Jason | Network Partners | $241,920.00 | $46,080.00 | $230,400.00 | $518,400.00 |
| 649[7] | 11/3/2015 | LaGambina, Mark | - | $87,288.00 | $3,637.00 | $21,816.00 | $112,741.00 |
| 522 | 11/6/2015 | LaGambina, Mark | - | $1,644,584.50 | $68,529.50 | $411,120.00 | $2,124,234.00 |
| 968 | 11/12/2015 | Cohen, David R. | - | $207,360.00 | $8,640.00 | $51,840.00 | $267,840.00 |
| 362 | 11/13/2015 | Mandel, Joshua | Network Partners | $73,488.00 | $14,492.00 | $20,700.00 | $108,680.00 |
| 392 | 1/28/2016 | Sharma, Abhinav | Network Partners | $99,000.00 | $126,000.00 | $54,000.00 | $279,000.00 |
| 170 | 1/29/2016 | LaGambina, Mark | MSL Insurance Advisors | $ - | $1,915,312.50 | $459,675.00 | $2,374,987.50 |
| 704 | 2/3/2016 | Cohen, David R. | MSL Insurance Advisors | $ 185,480.80 | $200,945.60 | $92,736.00 | $479,162.40 |
| 690 | 2/9/2016 | Nadler, Rebecca | Network Partners | $165,000.00 | $210,000.00 | $90,000.00 | $465,000.00 |
| 829 | 2/23/2016 | Mandel, Jason | Network Partners | $238,392.00 | $45,408.00 | $20,433.60 | $304,233.60 |
| 113 | 3/1/2016 | Mandel, Jason | Network Partners | $181,440.00 | $34,560.00 | $15,552.00 | $231,552.00 |
| 082 | 3/28/2016 | Cohen, David R. | MSL Insurance Advisors | $426,960.00 | $462,540.00 | $213,480.00 | $1,102,980.00 |
| 419 | 4/12/2016 | Sharma, Abhinav | Network Partners | $402,600.00 | $512,400.00 | $219,600.00 | $1,134,600.00 |
| 145 | 4/25/2016 | Sharma, Abhinav | Network Partners | $312,180.00 | $397,320.00 | $170,280.00 | $879,780.00 |
| 025 | 5/11/2016 | LaGambina, Mark | MSL Insurance Advisors | $ - | $711,600.00 | $170,784.00 | $882,384.00 |
| 911 | 7/13/2016 | LaGambina, Mark | MSL Insurance Advisors | $ - | $747,000.00 | $179,280.00 | $926,280.00 |
| | | | **Totals** | **$9,731,269.01** | **$8,219,335.50** | **$3,870,792.50** | **$21,821,397.01** |

[7] LaGambina placed the policies ending in 649 and 522, and David R. Cohen placed the policy ending in 968, through a non-party General Agent.

11.     Once the fraudulent conspiracy moved to the Agent Defendants in the BIP hierarchy, it exploded in size.

12.     Agent Defendants in the BIP hierarchy sold 108 life insurance policies[8] and swindled commissions and bonus payments from FGLIC of over *$40 million*:

| Individual Agent | General Agent | Individual Agent Commission | General Agent Commission | General Agent Bonus | Total Commissions and Bonuses |
|---|---|---|---|---|---|
| - | BIP | $48,222.00 | $5,414,634.09 | $7,649,098.80 | $13,111,954.89 |
| Anderson, Coffey | BIP | $668,192.48 | $ - | $ - | $668,192.48 |
| Bivona, John | BIP | $1,353,039.04 | $ - | $ - | $1,353,039.04 |
| Ballesto, Dana | BIP | $1,233,092.50 | $ - | $ - | $1,233,092.50 |
| Brein, David | BIP | $1,166,972.18 | $ - | $ - | $1,166,972.18 |
| Chesed, Stanley | BIP | $226,896.05 | $ - | $ - | $226,896.05 |
| Crispel, David | BIP | $2,150,014.75 | $ - | $ - | $2,150,014.75 |
| Eisenberg, Jacob | BIP | $1,945,912.50 | $ - | $ - | $1,945,912.50 |
| Hon, Philip | BIP | $929,383.10 | $ - | $ - | $929,383.10 |
| Hughes, Gerald | BIP | $477,748.75 | $ - | $ - | $477,748.75 |
| James, Trent | BIP | $473,003.19 | $ - | $ - | $473,003.19 |
| Leer, Tatanisha | BIP | $402,223.92 | $ - | $ - | $402,223.92 |
| Leifer, Tzvie | BIP | $4,693,855.60 | $ - | $ - | $4,693,855.60 |
| Lowenthal, Leon | BIP | $4,485,110.70 | $ - | $ - | $4,485,110.70 |
| Pescatore, Evan | BIP | $250,614.00 | $ - | $ - | $250,614.00 |
| Velissarios, Demetrios | BIP | $1,515,938.03 | $ - | $ - | $1,515,938.03 |
| Weber, Chesky | BIP | $4,238,851.50 | $ - | $ - | $4,238,851.50 |
| Wosner, Shloime | BIP | $998,583.60 | $ - | $ - | $998,583.60 |
| | Totals | $27,257,653.89 | $5,414,634.09 | $7,649,098.80 | $40,321,386.78 |

---

[8] Due to the large number of fraudulent policies placed through the BIP hierarchy, the chart following Paragraph 12 summarizes the commissions and bonuses received by BIP and each Agent Defendant in the BIP hierarchy, rather than list each policy number and effective date individually.

13.    Between the Agent Defendants in the three hierarchies—Network Partners, MSL Insurance Advisors, and BIP—FGLIC was defrauded out of *$62,142,783.79* in commissions and bonuses.[9]

14.    In addition to the fraudulently obtained commissions and bonuses, Defendants' conspiracy cost FGLIC tens of millions more in unpaid premiums, as well as ultimately harming the public in the form of higher premiums for life insurance.

### The Fraudulent Rebating Scheme

15.    When an agent pays back all or part of an insured's premium to the source of the premium, the agent is "rebating" the premium.

16.    "Rebating" premiums is prohibited by law in most states.

17.    In fact, "rebating" is prohibited by statute in the following states in which the Agent Defendants sold insurance policies:

| State | Statute |
|---|---|
| Connecticut | Conn. Gen. Stat. § 38a-465i |
| Florida | Fla. Stat. Ann. § 626.572 |
| New Jersey | N.J. Stat. Ann. §§ 17:29A-15, 17:29-AA-14; 17B:30-13 |
| Utah | Utah Code Ann. 31A-23a-402.5(5)(a)(i) |
| Virginia | Va. Code Ann. § 38.2-509 |

18.    In issuing these policies, FGLIC reasonably believed that the Agent Defendants would not violate anti-rebating laws and reasonably relied upon representations made by the Agent Defendants that they were acting in compliance with applicable statutes, rules, and regulations.

19.    But, in fact, the Agent Defendants, and each of them, knowingly and with *scienter* violated applicable state law by engaging in a wide-ranging fraudulent rebating scheme.

---

[9] It is more likely than not that the conspiracy swindled the insurance industry out of more than $100 million.

20.     Upon the sale of a life insurance policy, FGLIC paid the Agent Defendants up to 155% of a policy's first-year premium in commission and bonus payments.

21.     Payment of commissions and bonuses in excess of first-year premiums is common in the insurance industry.

22.     FGLIC and other insurers pay commissions and bonuses in excess of first-year premiums in reliance upon the expectation that the life insurance policies will remain in effect for years.

23.     FGLIC and other insurers do this because it does not make economic sense for an insured to pay a large first-year premium and then allow the policy to lapse worthless after the first year, thereby losing the premium.

24.     As a general matter, large policies such as the ones at issue here are typically kept in force for many years.

25.     Accordingly, FGLIC historically would not "charge back" (*i.e.* demand the return of) the commission and bonus payments so long as the policy remained in force for one year.

26.     From early 2015 through 2016, Defendants conspired to:

(i)     Sell FGLIC life insurance policies for a single year, with no intention or expectation that such policies would be renewed;

(ii)    Fund the premium payments with sham loans or payments provided by the Funding Defendants, thereby offering the insureds "free insurance";

(iii)   Fraudulently conceal from FGLIC the fact that the policies were funded by loans or payments from co-conspirators;

(iv)    Use Agent Defendants' commission and bonus payments to illegally rebate the insurance premiums back to the Funding Defendants; and

(v)     Pocket the difference between the commission/bonuses and the first year's premium as the profit from the scheme.

27.     Defendants conspired to sell life insurance policies by representing to insureds that the policy amounted to "free life insurance" for a year, and that the insureds could decide after the "free" period if they wanted to keep the policies and pay the premiums themselves.

28.     This offer of "free" life insurance also violates applicable state insurance laws, rules, and regulations. *See, e.g.*, Conn. Gen. Stat. § 38a-816(1); Fla. Stat. Ann. § 626.9541; N.J. Stat. Ann. § 17:29A-15.

29.     In furtherance of the conspiracy, the Agent Defendants falsely represented to FGLIC that such policies were legitimate insurance policies and that they were acting lawfully.

30.     Specifically, the Agent Defendants, in violation of their contractual and fiduciary obligations to FGLIC, intentionally falsified applications and intentionally concealed material facts on the applications submitted to FGLIC, including committing one or more of the following specific fraudulent acts:

(i)     Falsely representing on life insurance applications that the premiums for each policy submitted by each Agent Defendant to FGLIC were ***not*** funded by money from third parties, when in fact all of the policies submitted by the Agent Defendants were paid through loans or payments from the Funding Defendants;

(ii)    Falsely certifying that the Agent Defendant witnessed signatures on documents submitted to FGLIC which the Agent Defendant did not, in fact, witness;

(iii)   Submitting applications and other materials with signatures that were forged;

(iv)    Falsely representing that the Agent Defendant knew the insured when, in fact, the Agent Defendant did not know the insured or, indeed, had never met the insured;

(v)     Falsely representing the insured's financial condition to convince FGLIC that the

insured had the financial ability to pay the policy premiums.

31.     Making false statements to an insurance company or obtaining insurance under

false pretenses constitutes insurance fraud, a criminal offense in the states in which the Agent

Defendants did business. *See, e.g.*, Cal. Ins. Code § 1871.4(a)(1), (3); Cal. Penal Code §§ 549,

550; Conn. Gen. Stat. § 38a-816(8); Conn. Gen. Stat. § 53a-215; Fla. Stat. Ann. § 817.234(3); N.J.

Stat. Ann. § 2C:21-4.6(a); Utah Code Ann. § 76-6-521, § 31A-31-103, 31A-23a-402(1); Va. Code.

Ann. § 18.2-178, § 38.2-512.

32.     The Agent Defendants concealed from FGLIC that they were acting as "surrogates"

for their co-conspirators, including Settling Party 1, who were not appointed by FGLIC to serve

as insurance producers, while their co-conspirators, including Settling Party 1, took charge of

identifying the insureds, selecting the insurance carriers, selecting the policy to purchase,

completing the application, and performing similar tasks reserved for a licensed and appointed life

agent.

33.     Acting as a "surrogate" for an unappointed producer is a violation of the Agent

Defendants' contract with FGLIC.

34.     The Agent Defendants then paid or "split" their commissions and bonuses with co-

conspirators who were not licensed insurance producers, including Settling Party 2.

35.     Splitting commissions with an unlicensed person is yet another violation of

insurance laws, rules, and regulations. *See, e.g.*, Cal. Ins. Code § 1633-1635; Conn. Gen. Stat.

§ 38a-702*l*(a); Fla. Stat. Ann. § 626.753; N.J. Stat. Ann. § 17:22A-41d; Utah Code Ann. § 31A-

23a-504; Va. Code Ann. § 38.2-1812.

36.     Defendants in the Network Partners and MSL Insurance Advisors hierarchies concealed the fraudulent transfer of money from the Funding Defendants to FGLIC by conspiring to establish "shell" irrevocable life-insurance trusts ("ILITs") and limited liability companies ("LLCs") in the name of the insureds.

37.     Defendants in these hierarchies conspired to channel money through wire transfers from the Funding Defendants through the ILITs and then on to FGLIC as premium payments, fraudulently concealing that the Funding Defendants were the source of the premiums.

38.     Defendants in the BIP hierarchy streamlined the conspiracy, and instead the Funding Defendants primarily transferred the money for the premiums directly to the insureds or their companies, for payment to FGLIC.

39.     The Funding Defendants can be organized into two categories: those who funded premiums of policies sold within the Network Partners and MSL Insurance Advisors hierarchies (collectively, the "Network Partners Funding Defendants"); and those who funded premiums of policies sold within the BIP hierarchy (collectively, the "BIP Funding Defendants").

40.     The following Defendants are Network Partners Funding Defendants: Jason Mandel, Soundview Partners, Soundview Management, Soundview Fund, Mountainview Finance, Grand Sky 2011 Irrevocable Trust, Holmdel Financial Services, Mark LaGambina, Crossridge, Mesa, James Kaplan, Steven Kaplan, Kerry Propper, and the Funding Does.

41.     The following Defendants are BIP Funding Defendants: Michael Goldman, Harei At Inc., Insured On Time, 107 Old Nyack, CNM Services, Ronin Collins and his alter ego Ocelot Advisory Partners, and the Funding Does.

42.     Defendants also covered their fraudulent scheme by (i) falsely representing to insureds and others that their financing mechanism was lawful; (ii) falsely representing that FGLIC

had approved the scheme; and (iii) falsely representing that the scheme had been "blessed" by legal opinions from prominent law firms.

43.     For example, Trustee Defendant Howard Jahre testified that Settling Party 1 told him that FGLIC had approved the scheme. Exh. 2 (Jahre Exam. Tr. 45:25-47:20; 90:20-22).[10]

44.     Funding Defendant Mark LaGambina testified that Settling Party 1 told him that Network Partners had communicated with FGLIC about the scheme, and that FGLIC "liked the structure."  Exh. 3 (LaGambina Exam. Tr. 95:24-96:15).[11]

45.     The statements in Paragraphs 44 and 45 above are false—FGLIC did not know about the scheme until the Defendants' fraudulent acts were discovered, well after the harm occurred.

46.     FGLIC never approved the scheme.

47.     In fact, Defendants fraudulently concealed the scheme from FGLIC.

48.     Further, the Defendants who created and orchestrated the fraudulent scheme retained prominent law firms to render advisory opinions regarding the Defendants' planned actions, in order to lend an air of legitimacy to their scheme.

49.     These Defendants circulated their lawyers' opinions widely to certain Trustee Defendants, Agent Defendants, and Funding Defendants, as well as prospective insureds.

50.     Upon information and belief, many of the Defendants were provided with these legal opinions.

---

[10] FGLIC took the Examination of Trustee Defendant Howard Jahre on November 5, 2018 (hereinafter "Jahre Exam. Tr. ___").

[11] FGLIC took the Examination of Funding Defendants Mark LaGambina, Mesa, and Crossridge on November 14, 15, and 30, 2018, and December 4, 2018 (hereinafter "LaGambina Exam. Tr. ___").

51.     However, the Defendants then knowingly and intentionally disregarded the legal advice set forth in their lawyers' opinions, thereby destroying the "cover" the legal opinions were ostensibly designed to provide.

52.     In other words, the Defendants' lawyers told them what they were not allowed to do, and they and their fellow co-conspirator Defendants rejected the legal advice and did it anyway.

53.     This fact is evidence of Defendants' fraudulent intent.

54.     The Defendants never advised FGLIC about the legal opinions.

55.     The Defendants also attempted to "polish" their scheme by retaining lawyers and accountants to serve as trustees.

56.     Defendants' conduct constitutes breach of contract, fraud, conspiracy, and tortious interference with FGLIC's prospective business relations; is inequitable and against the interests of FGLIC, other insurance companies, and the public; violates the Racketeer Influenced and Corrupt Organizations Act; and has caused FGLIC to suffer damages.

57.     The Defendants in the Network Partners and MSL Insurance Advisors hierarchies utilized the mail and wire to perpetrate their fraudulent scheme, specifically by: (i) sending fraudulent life insurance applications to FGLIC through the mail and wire; (ii) sending sham agreements such as loan agreements and assignments through the mail and wire; (iii) wiring funds from the Funding Defendants to the insured's ILIT; (iv) wiring funds from the ILIT to FGLIC; and (v) wiring commissions and bonuses back to the Funding Defendants and to fellow co-conspirators.

58.     The Defendants in the BIP hierarchy also utilized the mail and wire to perpetrate their fraudulent scheme, specifically by: (i) sending fraudulent life insurance applications to FGLIC through the mail and wire; (ii) wiring funds from the Funding Defendants to other bank

accounts to be used to pay the premiums; (iii) wiring funds from the bank accounts to FGLIC; and (iv) wiring commissions and bonuses back to the Funding Defendants and to fellow co-conspirators.

59.     Executing a fraudulent scheme by sending, transmitting, or causing to be sent or transmitted funds, documents, or items by the mail and/or wire is a violation of federal law. 18 U.S.C. § 1341 (mail fraud); 18 U.S.C. § 1343 (wire fraud).

## The Fraudulent Conspiracy Is Discovered

60.     FGLIC first became aware of Defendants' scheme when it discovered that Large Policies (policies for which $25,000 or more was paid in annual premiums) sold by the Agent Defendants were lapsing between the first and second anniversaries of each respective policy's issuance at a suspiciously high rate, all without any insured contacting FGLIC to complain.

61.     It is unusual that a FGLIC customer would purchase a Large Policy and then, after paying an initial premium in excess of $25,000, allow the policy to lapse worthless after one year, causing the FGLIC customer to lose the premium.

62.     It is especially unusual that a FGLIC customer would pay a premium in excess of $25,000 and then allow the policy to lapse worthless without ever contacting FGLIC.

63.     FGLIC reached out to insureds to investigate and learned that the Agent Defendants had promised the insureds "free life insurance" for a year—a false and unlawful representation that establishes Defendants' fraudulent intent.

64.     After learning about the offers of "free insurance," FGLIC commenced the instant action against Abhinav Sharma and his d/b/a RequiteLife on June 2, 2017. *See Network Partners Litigation*, ECF 1.

65.     FGLIC interviewed additional insureds and others as the fraudulent scheme began to unravel.

66.     In an effort to cover their tracks, at least two of the Defendants, Abhinav Sharma and Jason Mandel, contacted the insureds to attempt to influence their testimony.

67.     For example, insured Stanley Byck met his supposed "agent" Sharma for the first time when Sharma tried to persuade Mr. Byck to tell FGLIC that Defendants had not offered him "free insurance" after all. *See* Exh. 4 (Sharma Exam. Tr. 193:3-24)[12]; Exh. 5 (D. Byck Exam. Tr. 99:18-21).[13]

68.     State regulators similarly have taken action to investigate and address some of the Defendants' unlawful, fraudulent, and tortious actions in furtherance of the conspiracy.

69.     For example, Agent Defendants Joshua Mandel's and Rubicon's license as an insurance producer is currently suspended, pursuant to a Stipulation and Consent Order from the Connecticut Insurance Department ("CID") dated March 22, 2017, in which the CID accused Joshua Mandel of making false representations on three insurance applications.  Exh. 6 (*In the Matter of Joshua Mandel and Rubicon Advisory Partners, Inc.*, Stipulation and Consent Order dated March 22, 2017).

70.     In addition, in recognition of Defendants' bad-faith exploitation of FGLIC's one-year chargeback policy, FGLIC was forced to change its policy in or about January of 2017, so

---

[12] FGLIC took the Examination of Agent Defendants Sharma and RequiteLife on October 17, 2018, and December 11, 2018 (hereinafter "Sharma Exam. Tr. ___").

[13] FGLIC took the Examination of David Byck on October 22, 2018 (hereinafter "D. Byck Exam. Tr. ___").

that FGLIC began to "charge back" (*i.e.* demand the return of) commission and bonus payments on a policy that lapsed before two years, rather than one year.

71.     This change, necessitated by Defendants' fraudulent conduct, has harmed FGLIC in the marketplace.

72.     In fact, Defendant BIP sued FGLIC in this Court in the summer of 2017, claiming FGLIC's change to its chargeback policies constituted a breach of contract.  *See BIP* Litigation, ECF 1.

73.     In that matter, FGLIC asserted counterclaims based upon BIP's participation in the fraudulent conspiracy that is the subject of this action.  *See BIP* Litigation, ECF 33.

74.     On March 28, 2018, Defendants Sharma and RequiteLife filed voluntary petitions for relief under Chapter 7 of Title 11 of the United States Bankruptcy Code. *See In re Abhinav Sharma*, Case No. 18-B-08949, and *In re RequiteLife, Inc.*, Case No. 18-B-08950 (collectively, the "*Sharma/RequiteLife* Bankruptcies").[14]

75.     FGLIC filed motions for leave in the *Sharma/RequiteLife* Bankruptcies to conduct Rule 2004 Examinations and Rule 30(b)(6) Depositions (collectively, "Examinations") of numerous persons with knowledge of Defendants' misconduct, which motions were granted.

---

[14] FGLIC believes the timing of Sharma's and RequiteLife's filing of their bankruptcy petitions was an act of gamesmanship to avoid their discovery obligations in the *Network Partners* Litigation. Sharma and his counsel failed repeatedly to produce documents in the *Network Partners* Litigation within Court-ordered timeframes. *See* ECF 25, 48. Magistrate Judge Stephanie Gallagher ordered Sharma to produce all outstanding responsive documents by March 29, 2018. *Id.* ECF 48. Sharma filed for bankruptcy on March 28, 2018, the day before this production was due. FGLIC learned from Sharma during his Examination that he gave his lawyers almost all of the documents produced here—some 20,000 pages' worth—in August 2017. Exh. 4 (Sharma Exam. Tr. 27:21-28:24). No answer has been made by Sharma or his counsel to excuse the delay in forwarding these same documents to FGLIC.

76.     FGLIC has conducted 10 Examinations[15] and has issued over 20 Subpoenas *Duces Tecum*.

77.     Over 91,000 pages of documents have been produced pursuant to these subpoenas and other discovery efforts.[16]

78.     The Honorable Janet Baer of the United States Bankruptcy Court for the Northern District of Illinois reasoned that the evidence and testimony adduced in the *Sharma/RequiteLife* Bankruptcies may be used in the *Network Partners* Litigation. *In re Sharma*, ECF 77 at ¶ 3.

79.     Judge Baer authorized the Defendants named in the First Amended Complaint in the *Network Partners* Litigation and the Counterclaim Defendants in the *BIP* Litigation to appear at the Examinations and take testimony.

80.     Accordingly, FGLIC gave notice of the Examinations to counsel and the parties then-named in the *Network Partners* Litigation and the *BIP* Litigation, and provided them an opportunity to appear and cross-examine the witnesses.

81.     Certain Defendants in fact appeared at the Examinations and examined witnesses.

82.     ***These Examinations and the documents produced conclusively establish the existence of the fraudulent and unlawful conspiracy***.

---

[15] Attached as Exhibit 7 is a chart of the Examinations taken to date.

[16] This Second Amended Complaint sometimes cites to documents according to their Bates stamp prefixes, such as "FGLIC_RL," "GS," "FP_," "PUB," "SHARMA-BK," FGLIC-BK," "REQ," or "BOA-SDT."

## PARTIES

83.     FGLIC was incorporated in Maryland.

84.     FGLIC is now incorporated in Iowa, and does business at 1001 Fleet Street, Baltimore, Maryland 21202.

85.     FGLIC's corporate headquarters are located at 601 Locust Street, Des Moines, Iowa 50309.

86.     Jason Mandel is an individual who, upon information and belief, resides or works at 6 Twin Circle Drive, Westport, Connecticut 06880.

87.     Jason Mandel is both a Network Partners Funding Defendant and an Agent Defendant in the Network Partners hierarchy.

88.     Jason Mandel is the architect of this scheme.

89.     Jason Mandel led the efforts to develop and maintain the conspiracy to fraudulently obtain commissions and bonuses from FGLIC and other insurance companies.

90.     Jason Mandel treated the conspiracy like a "fund" under his management and control, as, for example, when Jason Mandel reported to Settling Party 1: "[T]he decision has been made for me on the fund.  Kerry [Propper, a Funding Defendant] wants his money back."[17]

---

[17] Upon information and belief, Kerry Propper wanted his money because his broker/dealer Chardan Capital Markets LLC ("Chardan Capital") was subject to numerous fines in the securities industry. *See* Chardan Capital FINRA BrokerCheck Report, *available at* https://files.brokercheck.finra.org/firm/firm_120128.pdf.   Specifically, SEC Admin Release 34-83251, dated May 16, 2018, states that the United States Securities Exchange Commission ("SEC") alleged that Chardan Capital failed to file Suspicious Activity Reports from at least October 2013 through June 2014, and Chardan Capital paid a $1,000,000 fine. *Id.*

91.     Jason Mandel also admitted to the conspiracy in August 2018, when he expressed concern to Settling Party 1 about discovery in the *Sharma/RequiteLife* Bankruptcies: "That's gonna tie up all these people together."

92.     Jason Mandel was concerned about being identified as the leader of the conspiracy: "I'm holding personalities together and Abhinav [Sharma] can screw it up for me through discovery . . . he could just destroy all the work I'm doing here."

93.     Jason Mandel added that other co-conspirators "want to go to the carrier [FGLIC] and explain exactly what was done which is not in my interest."

94.     Network Partners Int'l., LLC, is a New York corporation which, upon information and belief, has its principal place of business at 535 Fifth Avenue, Suite 1012, New York, New York 10017 ("Network Partners").

95.     Network Partners is an Agent Defendant in the Network Partners hierarchy.

96.     David Meyer is an individual who, upon information and belief, resides or works at 4 Flamingo Road, Roslyn, New York 06880.

97.     David Meyer is an Agent Defendant in the Network Partners hierarchy.

98.     Defendant David Meyer is a control person and alter ego of Network Partners.

99.     Upon information and belief, Network Partners did not observe corporate formalities and was controlled exclusively by David Meyer.

100.     David Meyer dominated not only Network Partners' finances but its policies and business practices.

101.     Upon information and belief, Network Partners commingled funds with David Meyer.

102.     David Meyer exerted control over Network Partners (1) to commit fraud by submitting insurance applications containing false representations; (2) to violate state insurance laws and regulations, as well as Network Partners' contractual and fiduciary duties owed to FGLIC, by rebating premiums back to Funding Defendants and unlawfully splitting insurance commissions with unlicensed insurance producers; and (3) to perpetrate an unlawful, dishonest, and unjust conspiracy to fraudulently obtain commissions and bonuses from FGLIC.

103.     David A. Cohen is an individual who, upon information and belief, resides or works at 535 Fifth Avenue, Suite 1012, New York, New York 10017.

104.     David A. Cohen is an Agent Defendant in the Network Partners hierarchy.

105.     M&M Brokerage Services, Inc., f/k/a NFP Resources I Insurance Agency, is a California corporation authorized to do business in the State of New York which, upon information and belief, has its principal place of business at 555 Madison Avenue, 21st Floor, New York, New York 10022 ("M&M").

106.     M&M is an Agent Defendant in the Network Partners hierarchy.

107.     Marvin Meyer was the father of David Meyer.

108.     Marvin Meyer was the control person and alter ego of M&M.

109.     Upon information and belief, M&M did not observe corporate formalities and was controlled exclusively by Marvin Meyer.

110.     Marvin Meyer dominated not only M&M's finances but its policies and business practices.

111.     Marvin Meyer exerted control over M&M to perpetrate an unlawful, dishonest, and unjust conspiracy to fraudulently obtain commissions and bonuses from FGLIC.

112.    Marvin Meyer died in August 2017, and his estate is in probate in the State of New Jersey, Monmouth County.  Exh. 8 (probate record).

113.    The Estate of Marvin Meyer is liable for damages incurred by FGLIC as a result of the conduct of Marvin Meyer and M&M.

114.    The Estate of Marvin Meyer is categorized in this litigation as an Agent Defendant in the Network Partners hierarchy.

115.    Tower Strategic Group, LLC, is a Connecticut limited liability company which, upon information and belief, has its principal place of business at 1266 East Main Street, Suite 700R, Stamford, Connecticut 06902 ("Tower Group").

116.    Tower Group is an Agent Defendant in the Network Partners hierarchy.

117.    Jason Mandel is the alter ego of Tower Group.

118.    Tower Group was merely a pass-through entity by which Jason Mandel received commission payments for the sale of insurance policies.

119.    Tower Group was undercapitalized.

120.    Upon information and belief, Tower Group did not observe corporate formalities and was controlled exclusively by Jason Mandel.

121.    Jason Mandel dominated not only Tower Group's finances but its policies and business practices.

122.    Jason Mandel exerted control over Tower Group (1) to commit fraud by submitting insurance applications containing false representations; (2) to violate state insurance laws and regulations, as well as Tower Group's contractual and fiduciary duties owed to FGLIC, by rebating premiums back to Funding Defendants and unlawfully splitting insurance commissions with

unlicensed insurance producers; and (3) to perpetrate an unlawful, dishonest, and unjust conspiracy to fraudulently obtain commissions and bonuses from FGLIC.

123.    Tower Strategic Partners, LLC, is a Delaware limited liability company which, upon information and belief, has its principal place of business at 1266 East Main Street, Suite 700R, Stamford, Connecticut 06902 ("Tower Partners").

124.    Tower Partners is an Agent Defendant in the Network Partners hierarchy.

125.    Jason Mandel is the alter ego of Tower Partners.

126.    Upon information and belief, Tower Partners did not observe corporate formalities and was controlled exclusively by Jason Mandel.

127.    Jason Mandel dominated not only Tower Partners' finances but its policies and business practices.

128.    Upon information and belief, Tower Partners commingled funds with Jason Mandel.

129.    Jason Mandel exerted control over Tower Partners to perpetrate an unlawful, dishonest, and unjust conspiracy to fraudulently obtain commissions and bonuses from FGLIC.

130.    Soundview Strategic Partners, LLC, is a Delaware limited liability company which, upon information and belief, has its principal place of business at 1266 East Main Street, Suite 700R, Stamford, Connecticut 06902 ("Soundview Partners").

131.    Soundview Partners is a Network Partners Funding Defendant.

132.    Jason Mandel is the alter ego of Soundview Partners.

133.    Upon information and belief, Soundview Partners did not observe corporate formalities and was controlled exclusively by Jason Mandel.

134.   Jason Mandel dominated not only Soundview Partners' finances but its policies and business practices.

135.   Upon information and belief, Soundview Partners commingled funds with Jason Mandel.

136.   Jason Mandel exerted control over Soundview Partners to perpetrate an unlawful, dishonest, and unjust conspiracy to fraudulently obtain commissions and bonuses from FGLIC.

137.   Soundview Management, L.P., is a Delaware limited partnership which, upon information and belief, has its principal place of business at 1266 East Main Street, Suite 700R, Stamford, Connecticut 06902 ("Soundview Management").

138.   Soundview Management is a Network Partners Funding Defendant.

139.   Jason Mandel is the alter ego of Soundview Management.

140.   Upon information and belief, Soundview Management did not observe corporate formalities and was controlled exclusively by Jason Mandel.

141.   Jason Mandel dominated not only Soundview Management's finances but its policies and business practices.

142.   Upon information and belief, Soundview Management commingled funds with Jason Mandel.

143.   Jason Mandel exerted control over Soundview Management to perpetrate an unlawful, dishonest, and unjust conspiracy to fraudulently obtain commissions and bonuses from FGLIC.

144.   Soundview Strategic Fund, L.P., is a Delaware limited partnership which, upon information and belief, has its principal place of business at 1266 East Main Street, Suite 700R, Stamford, Connecticut 06902 ("Soundview Fund").

145.     Soundview Fund is a Network Partners Funding Defendant.

146.     Jason Mandel is the alter ego of Soundview Fund.

147.     Upon information and belief, Soundview Fund did not observe corporate formalities and was controlled exclusively by Jason Mandel.

148.     Jason Mandel dominated not only Soundview Fund's finances but its policies and business practices.

149.     Upon information and belief, Soundview Fund commingled funds with Jason Mandel.

150.     Jason Mandel exerted control over Soundview Fund to perpetrate an unlawful, dishonest, and unjust conspiracy to fraudulently obtain commissions and bonuses from FGLIC.

151.     Mountainview Finance, LLC, is a South Dakota limited liability company which, upon information and belief, is c/o the Delta Trust Company, 330 South Poplar, Suite 103J, Pierre, South Dakota 57501 ("Mountainview Finance").

152.     Mountainview Finance is a Network Partners Funding Defendant.

153.     Jason Mandel is the alter ego of Mountainview Finance.

154.     Upon information and belief, Mountainview Finance did not observe corporate formalities and was controlled exclusively by Jason Mandel.

155.     Jason Mandel dominated not only Mountainview Finance's finances but its policies and business practices.

156.     Upon information and belief, Mountainview Finance commingled funds with Jason Mandel.

157.     Jason Mandel exerted control over Mountainview Finance to perpetrate an unlawful, dishonest, and unjust conspiracy to fraudulently obtain commissions and bonuses from FGLIC.

158.     Grand Sky 2011 Irrevocable Trust is a trust domiciled at 606 Post Road East, Suite 516, Westport, Connecticut 06880 ("Grand Sky Trust").

159.     Grand Sky Trust is a Network Partners Funding Defendant.

160.     Holmdel Financial Services, Inc., is a corporation which, upon information and belief, has its principal place of business at 670 North Beers Street, No. 2, Holmdel, New Jersey 07733 ("Holmdel").

161.     Holmdel is a Network Partners Funding Defendant.

162.     Jason Mandel is a control person of Mesa, Crossridge, Settling Party 3, Settling Party 2, Grand Sky Trust, and Holmdel.

163.     Settling Party 1 is an individual who, upon information and belief, resides in New York, New York.

164.     Settling Party 1 was classified as a Network Partners Funding Defendant prior to reaching a settlement with FGLIC; Settling Party 1 is no longer a Defendant in this action.

165.     Settling Party 2 is a Puerto Rico limited liability company.

166.     Settling Party 2 was classified as a Network Partners Funding Defendant prior to reaching a settlement with FGLIC; Settling Party 2 is no longer a Defendant in this action.

167.     Settling Party 1 is the alter ego of Settling Party 2.

168.     Upon information and belief, Settling Party 2 did not observe corporate formalities and was controlled exclusively by Settling Party 1.

169.     Settling Party 1 dominated not only Settling Party 2's finances but its policies and business practices.

170.     Upon information and belief, Settling Party 2 commingled funds with Settling Party 1.

171.     Settling Party 1 exerted control over Settling Party 2 (1) to violate state insurance laws and regulations by rebating premiums back to Funding Defendants like Settling Party 2 and unlawfully split insurance commissions with unlicensed insurance producers; and (2) to perpetrate an unlawful, dishonest, and unjust conspiracy to fraudulently obtain commissions and bonuses from FGLIC.

172.     Settling Party 3 is a Delaware limited liability company.

173.     Settling Party 3 was classified as a Network Partners Funding Defendant prior to reaching a settlement with FGLIC; Settling Party 3 is no longer a Defendant in this action.

174.     Settling Party 1 is the alter ego of Settling Party 3.

175.     Upon information and belief, Settling Party 3 did not observe corporate formalities and was controlled exclusively by Settling Party 1.

176.     Settling Party 1 dominated not only Settling Party 3's finances but its policies and business practices.

177.     Upon information and belief, Settling Party 3 commingled funds with Settling Party 1.

178.     Settling Party 1 exerted control over Settling Party 3 to perpetrate an unlawful, dishonest, and unjust conspiracy to fraudulently obtain commissions and bonuses from FGLIC.

179.    Mark LaGambina is an individual who resides at 12 Grove Street, Apartment A, Ridgefield, Connecticut 06877, and who works at 83 Wooster Heights, Suite 125, Danbury, Connecticut 06810 ("LaGambina").

180.    LaGambina is both a Network Partners Funding Defendant and an Agent Defendant in the MSL Insurance Advisors hierarchy.

181.    Mesa Consumer Finance, LLC, is a South Dakota limited liability company which has its principal place of business at 40 Richards Avenue, 3rd Floor, Norwalk, Connecticut 06854 ("Mesa").

182.    Mesa is a Network Partners Funding Defendant.

183.    LaGambina is the alter ego of Mesa.

184.    Upon information and belief, Mesa did not observe corporate formalities; for example, LaGambina identified himself on Mesa's incorporating documents as its sole control person, but all of Mesa's funding was controlled by Settling Party 1.

185.    LaGambina dominated not only Mesa's finances but its policies and business practices.

186.    Upon information and belief, Mesa commingled funds with LaGambina.

187.    LaGambina exerted control over Mesa (1) to violate state insurance laws and regulations by rebating premiums back to Funding Defendants like Mesa and unlawfully split insurance commissions with unlicensed insurance producers; and (2) to perpetrate an unlawful, dishonest, and unjust conspiracy to fraudulently obtain commissions and bonuses from FGLIC.

188.    Crossridge Partners, Inc., is a Delaware corporation which has its principal place of business at 40 Richards Avenue, 3rd Floor, Norwalk, Connecticut 06854 ("Crossridge").

189.    Crossridge is a Network Partners Funding Defendant.

190.    LaGambina is the alter ego of Crossridge.

191.    Upon information and belief, Crossridge did not observe corporate formalities; for example, LaGambina identified himself on Crossridge's incorporating documents as its sole control person, but all of Crossridge's funding was controlled by Settling Party 1.

192.    LaGambina dominated not only Crossridge's finances but its policies and business practices.

193.    Upon information and belief, Crossridge commingled funds with LaGambina.

194.    LaGambina exerted control over Crossridge (1) to violate state insurance laws and regulations by rebating premiums back to Funding Defendants like Crossridge and unlawfully split insurance commissions with unlicensed insurance producers; and (2) to perpetrate an unlawful, dishonest, and unjust conspiracy to fraudulently obtain commissions and bonuses from FGLIC.

195.    MSL Insurance Advisors, LLC, is a Connecticut limited liability company which, upon information and belief, has its principal place of business at 40 Richards Avenue, 3rd Floor, Norwalk, Connecticut 06854 ("MSL Insurance Advisors").

196.    MSL Insurance Advisors is an Agent Defendant in the MSL Insurance Advisors hierarchy.

197.    LaGambina is the alter ego of MSL Insurance Advisors.

198.    MSL Insurance Advisors was merely a pass-through entity by which LaGambina received commission payments for the sale of insurance policies.

199.    MSL Insurance Advisors was undercapitalized.

200.    Upon information and belief, MSL Insurance Advisors did not observe corporate formalities and was controlled exclusively by LaGambina.

201.    LaGambina dominated not only MSL Insurance Advisors' finances but its policies and business practices.

202.    LaGambina exerted control over MSL Insurance Advisors (1) to commit fraud by submitting insurance applications containing false representations; (2) to violate state insurance laws and regulations, and MSL Insurance Advisors' contractual and fiduciary duties owed to FGLIC, by rebating premiums back to Funding Defendants and unlawfully splitting insurance commissions with unlicensed insurance producers; and (3) to perpetrate an unlawful, dishonest, and unjust conspiracy to fraudulently obtain commissions and bonuses from FGLIC.

203.    Abhinav Sharma is an individual who now resides at 2129 Ammer Ridge Court, Unit 301, Glenview, Illinois 60025 ("Sharma").

204.    Sharma is an Agent Defendant in the Network Partners hierarchy.

205.    During the time period that Defendants were perpetrating the conspiracy, Sharma was a New York resident.

206.    RequiteLife, Inc., is a New York corporation which has or had its principal place of business at 53 West Jackson Boulevard, Suite 1115, Chicago, Illinois 60604, and its registered agent is Northwest Registered Agent, LLC, 90 State Street, Suite 700, Office 40, Albany, New York 12207 ("RequiteLife").

207.    RequiteLife is an Agent Defendant in the Network Partners hierarchy.

208.    Sharma is the alter ego of RequiteLife.

209.    RequiteLife is merely a pass-through entity by which Sharma has received commission payments for the sale of insurance policies.

210.    RequiteLife was undercapitalized—indeed, RequiteLife had no independent assets except for the commission payments that flowed through RequiteLife for a brief period of time on the way to Sharma.

211.    Upon information and belief, RequiteLife did not observe corporate formalities and was controlled exclusively by Sharma.

212.    Sharma dominated not only RequiteLife's finances but its policies and business practices.

213.    Sharma exerted control over RequiteLife (1) to commit fraud by submitting insurance applications containing false representations; (2) to violate state insurance laws and regulations, and RequiteLife's contractual and fiduciary duties owed to FGLIC, by rebating premiums back to Funding Defendants and unlawfully splitting insurance commissions with unlicensed insurance producers; and (3) to perpetrate an unlawful, dishonest, and unjust conspiracy to fraudulently obtain commissions and bonuses from FGLIC.

214.    Gregg Kirschner is an individual who, upon information and belief, resides or works at 5 Whistler Way, Marlboro, New Jersey 07746 ("Kirschner").

215.    Kirschner is an Agent Defendant in the Network Partners hierarchy.

216.    MRM Advisors, LLC, is a New Jersey limited liability company which, upon information and belief, has its principal place of business at 2 Tower Center Boulevard, 19th Floor, East Brunswick, New Jersey 08816 ("MRM").

217.    MRM is an Agent Defendant in the Network Partners hierarchy.

218.    Kirschner is the alter ego of MRM.

219.    MRM is merely a pass-through entity by which Kirschner has received commission payments for the sale of insurance policies.

220.    MRM was undercapitalized—indeed, MRM had no independent assets except for the commission payments that flowed through MRM for a brief period of time on the way to Kirschner.

221.    Upon information and belief, MRM did not observe corporate formalities and was controlled exclusively by Kirschner.

222.    Kirschner dominated not only MRM's finances but its policies and business practices.

223.    Kirschner exerted control over MRM (1) to commit fraud by submitting insurance applications containing false representations; (2) to violate state insurance laws and regulations, and MRM's contractual and fiduciary duties owed to FGLIC, by rebating premiums back to Funding Defendants and unlawfully splitting insurance commissions with unlicensed insurance producers; and (3) to perpetrate an unlawful, dishonest, and unjust conspiracy to fraudulently obtain commissions and bonuses from FGLIC.

224.    Joshua Mandel is an individual who, upon information and belief, resides or works at 229 West 60th Street, No. 22P, New York, New York 10023.

225.    Joshua Mandel is an Agent Defendant in the Network Partners hierarchy.

226.    Rubicon Advisory Partners, Inc., is a New York corporation which, upon information and belief, has its principal place of business at 229 West 60th Street, No. 22P, New York, New York 10023 ("Rubicon").

227.    Rubicon is an Agent Defendant in the Network Partners hierarchy.

228.    Joshua Mandel is the alter ego of Rubicon.

229.    Rubicon is merely a pass-through entity by which Joshua Mandel has received commission payments for the sale of insurance policies.

230. Rubicon was undercapitalized—indeed, Rubicon had no independent assets except for the commission payments that flowed through Rubicon for a brief period of time on the way to Joshua Mandel.

231. Upon information and belief, Rubicon did not observe corporate formalities and was controlled exclusively by Joshua Mandel.

232. Joshua Mandel dominated not only Rubicon's finances but its policies and business practices.

233. Joshua Mandel exerted control over Rubicon (1) to commit fraud by submitting insurance applications containing false representations; (2) to violate state insurance laws and regulations, and Rubicon's contractual and fiduciary duties owed to FGLIC, by rebating premiums back to Funding Defendants and unlawfully splitting insurance commissions with unlicensed insurance producers; and (3) to perpetrate an unlawful, dishonest, and unjust conspiracy to fraudulently obtain commissions and bonuses from FGLIC.

234. Rebecca Nadler is an individual who, upon information and belief, resides or works at 4 Durham Drive, Clark, New Jersey 07066 ("Nadler").

235. Nadler is an Agent Defendant in the Network Partners hierarchy.

236. David R. Cohen is an individual who, upon information and belief, resides or works at 46 North Street, Easton, Connecticut 06612.

237. David R. Cohen is an Agent Defendant in the MSL Insurance Advisors hierarchy.

238. Daroco & Associates, LLC, is a Connecticut limited liability company which, upon information and belief, has its principal place of business at 1286 Kossuth Street, Bridgeport, Connecticut 06608 ("Daroco").

239. Daroco is an Agent Defendant in the MSL Insurance Advisors hierarchy.

240.    David R. Cohen is the alter ego of Daroco.

241.    Daroco is merely a pass-through entity by which David R. Cohen has received commission payments for the sale of insurance policies.

242.    Daroco was undercapitalized—indeed, Daroco had no independent assets except for the commission payments that flowed through Daroco for a brief period of time on the way to David R. Cohen.

243.    Upon information and belief, Daroco did not observe corporate formalities and was controlled exclusively by David R. Cohen.

244.    David R. Cohen dominated not only Daroco's finances but its policies and business practices.

245.    David R. Cohen exerted control over Daroco (1) to commit fraud by submitting insurance applications containing false representations; (2) to violate state insurance laws and regulations, and Daroco's contractual and fiduciary duties owed to FGLIC, by rebating premiums back to Funding Defendants and unlawfully splitting insurance commissions with unlicensed insurance producers; and (3) to perpetrate an unlawful, dishonest, and unjust conspiracy to fraudulently obtain commissions and bonuses from FGLIC.

246.    James Kaplan is an individual who, upon information and belief, resides or works at 103 Bay Drive, Massapequa Park, NY 11762.

247.    James Kaplan is a Network Partners Funding Defendant.

248.    Steven Kaplan is an individual who, upon information and belief, resides or works at 39 Eagle Chase, Woodbury, NY 11797.

249.    Steven Kaplan is a Network Partners Funding Defendant.

250.    Kerry Propper is an individual who, upon information and belief, resides or works at resides at 17 State Street, #1600, New York, New York 10004.

251.    Kerry Propper is a Network Partners Funding Defendant.

252.    Aaron Aftergood is an individual who, upon information and belief, resides or works at 2049 Fox Hills Drive, Los Angeles, California 90025 ("Aftergood").

253.    Aftergood is a Trustee Defendant.

254.    Settling Trustee 1 is an individual who resides at 12276 West Sample Road, Coral Springs, Florida 33065.[18]

255.    Peter Bilfield is an individual who, upon information and belief, resides or works at 10 Pond Road, Westport, Connecticut 06880 ("Bilfield").

256.    Bilfield is a Trustee Defendant.

257.    Settling Trustee 2 is an individual who resides or works at 11245 Mainsail Court, Wellington, Florida 33449.

258.    Settling Trustee 3 is an individual who, upon information and belief, either resides or works at 5333 Oak Park Avenue, Encino, California 91316.

259.    David Harkham is an individual who, upon information and belief, resides or works at 9401 Alcott Street, Apt 303, Los Angeles, California 90035.

260.    David Harkham is a Trustee Defendant.

261.    Howard Jahre is an individual who resides or works at 85 Adams Street, Apartment 2A, Brooklyn, New York 11201 ("Jahre").

---

[18] FGLIC has entered into Memoranda of Understanding with Settling Trustees 1 through 11, who were previously classified as Trustee Defendants.  The Settling Trustees have agreed that, if the settlements are not finalized, FGLIC may substitute the names of the Settling Trustees through an amendment by interlineation.

262.     Jahre is a Trustee Defendant.

263.     Settling Trustee 4 is an individual who, upon information and belief, either resides or works at 500 West Putnam Avenue, Greenwich, Connecticut 06880.

264.     Settling Trustee 5 is an individual who, upon information and belief, resides or works at 17879 Monte Vista Drive, Boca Raton, Florida 33496.

265.     Dana Mandel is an individual who, upon information and belief, resides or works at 606 Post Road East, No. 516, Westport, Connecticut 06880.

266.     Dana Mandel is a Trustee Defendant.

267.     Settling Trustee 6 is an individual who, upon information and belief, either resides or works at 30 Old Kings Highway South, Darien, Connecticut 06820, and Settling Trustee 4's d/b/a company, of which he is the control person, is a limited liability company which, upon information and belief, has its principal place of business at 1451 West Cypress Creek Road, Fort Lauderdale, Florida 33309.

268.     Settling Trustee 7 is an individual who, upon information and belief, either resides or works at 200 Centennial Avenue, Suite 200, Piscataway, NJ 08854.

269.     Cesar Perez is an individual who, upon information and belief, resides or works at 100 Pearl Street, 14th Floor, Hartford, Connecticut 06103 ("Perez").

270.     Perez is a Trustee Defendant.

271.     Settling Trustee 8 is an individual who, upon information and belief, either resides or works at 68 Southfield Avenue, Two Stamford Landing, Suite 100, Stamford, Connecticut 06902.

272.     Settling Trustee 9 is an individual who, upon information and belief, either resides or works at 29310 Laro Drive, Agoura Hills, California 91301.

273.     Robert Swetnick is a New York lawyer who works at 250 Park Avenue, New York, New York 10177 ("Swetnick").

274.     Swetnick is a Trustee Defendant.

275.     Settling Trustee 10 is an individual who, upon information and belief, either resides or works at 25 Stony Hill Road, Ridgefield, Connecticut 06880.

276.     David Vynerib is an individual who, upon information and belief, resides or works at 24 Sterling Drive, Westport, Connecticut 06880 ("Vynerib").

277.     Vynerib is a Trustee Defendant.

278.     Settling Trustee 11 is an individual who, upon information and belief, either resides or works at One Reservoir Corporate Center, 4 Research Drive, Suite 402, Shelton, Connecticut 06484.

279.     Brokerage Insurance Partners, Inc. ("BIP") is a Florida corporation which, upon information and belief, has its principal place of business at 20283 State Road 7, Boca Raton, Florida 33498.

280.     BIP is an Agent Defendant in the BIP hierarchy.

281.     Andrew Morafates is an individual who, upon information and belief, resides or works at 20283 State Road 7, Boca Raton, Florida 33498 ("Morafates").

282.     Morafates is an Agent Defendant in the BIP hierarchy.

283.     Demetrios Velissarios is an individual who, upon information and belief, resides or works at 20283 State Road 7, Boca Raton Florida 33498, and is a resident of the State of Florida ("Velissarios").

284.     Velissarios is an Agent Defendant in the BIP hierarchy.

285.    Velco Development, LLC, is a Florida limited liability company which, upon information and belief, has its principal place of business at 2161 Fairway Villas Lane, South Atlantic Beach, Florida 32233 ("Velco").

286.    Velco is an Agent Defendant in the BIP hierarchy.

287.    Velissarios is the alter ego of Velco.

288.    Upon information and belief, Velco is merely a pass-through entity by which Velissarios has received commission payments for the sale of insurance policies.

289.    Upon information and belief, Velco was undercapitalized.

290.    Upon information and belief, Velco did not observe corporate formalities and was controlled exclusively by Velissarios.

291.    Upon information and belief, Velissarios dominated not only Velco's finances but its policies and business practices.

292.    Velissarios exerted control over Velco (1) to commit fraud by submitting insurance applications containing false representations; (2) to violate state insurance laws and regulations, and Velco's contractual and fiduciary duties owed to FGLIC, by rebating premiums back to Funding Defendants and unlawfully splitting insurance commissions with unlicensed insurance producers; and (3) to perpetrate an unlawful, dishonest, and unjust conspiracy to fraudulently obtain commissions and bonuses from FGLIC.

293.    Richard Whitbeck is an individual who, upon information and belief, resides or works at 2330 Wellington Green Drive, No. 202, Wellington, Florida 33414 ("Whitbeck").

294.    Whitbeck is an Agent Defendant in the BIP hierarchy.

295.    Upon information and belief, Morafates, Velissarios, and Whitbeck are alter egos of BIP.

296.    Upon information and belief, BIP was undercapitalized.

297.    Upon information and belief, BIP did not observe corporate formalities and was controlled exclusively by Morafates, Velissarios, and Whitbeck.

298.    Morafates, Velissarios, and Whitbeck dominated not only BIP's finances but its policies and business practices.

299.    Morafates, Velissarios, and Whitbeck exerted control over BIP (1) to commit fraud by submitting insurance applications containing false representations; (2) to violate state insurance laws and regulations, and BIP's contractual and fiduciary duties owed to FGLIC, by rebating premiums back to Funding Defendants and unlawfully splitting insurance commissions with unlicensed insurance producers; and (3) to perpetrate an unlawful, dishonest, and unjust conspiracy to fraudulently obtain commissions and bonuses from FGLIC.

300.    Michael Goldman ("Goldman") is an individual who, upon information and belief, is the control person and alter ego of Defendants Harei At Inc., Insured on Time Services, Inc., 107 Old Nyack LLC, and CNM Services LLC.

301.    Goldman is a BIP Funding Defendant.

302.    Harei At Inc. is a New York corporation which, upon information and belief, has its principal place of business at 756 Myrtle Avenue, Suite 5N, Brooklyn, New York 11206.

303.    Harei At Inc. is a BIP Funding Defendant.

304.    Goldman is the alter ego of Harei At Inc.

305.    Upon information and belief, Harei At Inc. did not observe corporate formalities and was controlled exclusively by Goldman.

306.    Upon information and belief, Goldman dominated not only Harei At Inc.'s finances but its policies and business practices.

307.    Goldman exerted control over Harei At Inc. to perpetrate an unlawful, dishonest, and unjust conspiracy to fraudulently obtain commissions and bonuses from FGLIC.

308.    Insured On Time Services, Inc., is a New York corporation which, upon information and belief, has its principal place of business at 22 South Madison Avenue, Spring Valley, New York 10977 ("Insured On Time").

309.    Insured On Time is a BIP Funding Defendant.

310.    Goldman is the alter ego of Insured On Time.

311.    Upon information and belief, Insured On Time did not observe corporate formalities and was controlled exclusively by Goldman.

312.    Upon information and belief, Goldman dominated not only Insured On Time's finances but its policies and business practices.

313.    Goldman exerted control over Insured On Time to perpetrate an unlawful, dishonest, and unjust conspiracy to fraudulently obtain commissions and bonuses from FGLIC.

314.    107 Old Nyack LLC is a New York limited liability company which, upon information and belief, has its principal place of business at 825 McDonald Avenue, Brooklyn, New York 11218 ("107 Old Nyack").

315.    107 Old Nyack is a BIP Funding Defendant.

316.    Goldman is the alter ego of 107 Old Nyack.

317.    Upon information and belief, 107 Old Nyack did not observe corporate formalities and was controlled exclusively by Goldman.

318.    Upon information and belief, Goldman dominated not only 107 Old Nyack's finances but its policies and business practices.

319.     Goldman exerted control over 107 Old Nyack to perpetrate an unlawful, dishonest, and unjust conspiracy to fraudulently obtain commissions and bonuses from FGLIC.

320.     CNM Services LLC is a New York limited liability company which, upon information and belief, has its principal place of business at 6 Truman Avenue, Spring Valley, New York 10977 ("CNM Services")

321.     CNM Services is a BIP Funding Defendant.

322.     Goldman is the alter ego of CNM Services.

323.     Upon information and belief, CNM Services did not observe corporate formalities and was controlled exclusively by Goldman.

324.     Upon information and belief, Goldman dominated not only CNM Services' finances but its policies and business practices.

325.     Goldman exerted control over CNM Services to perpetrate an unlawful, dishonest, and unjust conspiracy to fraudulently obtain commissions and bonuses from FGLIC.

326.     Ronin Collins is an individual who, upon information and belief, is the alter ego of Ocelot Advisory Partners ("Collins").

327.     Collins is a BIP Funding Defendant.

328.     Coffey Anderson is an individual who, upon information and belief, resides or works at 1222 North Niagara Street, Burbank, California 91505 ("Anderson").

329.     Anderson is an Agent Defendant in the BIP hierarchy.

330.     John Bivona is an individual who, upon information and belief, resides or works at 4 Thrush Court, East Northport, New York 11731 ("Bivona").

331.     Bivona is an Agent Defendant in the BIP hierarchy.

332.     Dana Ballesto is an individual who, upon information and belief, resides or works at 132 John Henry Circle, Folsom, California 95630 ("Ballesto").

333.     Ballesto is an Agent Defendant in the BIP hierarchy.

334.     David Brein is an individual who, upon information and belief, resides or works at 6203 Variel Avenue, No. 303, Woodland Hills, California 90048 ("Brein").

335.     Brein is an Agent Defendant in the BIP hierarchy.

336.     Stanley Chesed is an individual who, upon information and belief, resides or works at 6501 Orange Street, No. 105, Los Angeles, California 90048 ("Chesed").

337.     Chesed is an Agent Defendant in the BIP hierarchy.

338.     David Crispel is an individual who, upon information and belief, resides or works at 5564 Modena Place, Agoura Hills, California 91301 ("Crispel").

339.     Crispel is an Agent Defendant in the BIP hierarchy.

340.     Bruce Dilworth is an individual who, upon information and belief, resides or works at 2103 Canyon Creek Drive, Stockton, California 95207.

341.     Bruce Dilworth is an Agent Defendant in the BIP hierarchy.

342.     Jacob Eisenberg is an individual who, upon information and belief, resides or works at 20283 State Road 7, Boca Raton, Florida 33498 ("Eisenberg").

343.     Eisenberg is an Agent Defendant in the BIP hierarchy.

344.     Philip Hon is an individual who, upon information and belief, resides or works at 15 MacArthur Place, No. 609, Santa Ana, California 92707 ("Hon").

345.     Hon is an Agent Defendant in the BIP hierarchy.

346.     Gerald Hughes is an individual who, upon information and belief, resides or works at 902 Mills Avenue, Modesto, California 65350 ("Hughes").

347. Hughes is an Agent Defendant in the BIP hierarchy.

348. Trent James is an individual who, upon information and belief, resides or works at 3764 Madison Avenue, Tulsa, Oklahoma 74105.

349. Trent James is an Agent Defendant in the BIP hierarchy.

350. Rock Island Insurance Group, upon information and belief, is an Oklahoma corporation that has its principal place of business at 3764 Madison Avenue, Tulsa, Oklahoma 74105 ("Rock Island").

351. Rock Island is an Agent Defendant in the BIP hierarchy.

352. Trent James is the alter ego of Rock Island.

353. Rock Island is merely a pass-through entity by which Trent James has received commission payments for the sale of insurance policies.

354. Upon information and belief, Rock Island was undercapitalized.

355. Upon information and belief, Rock Island did not observe corporate formalities and was controlled exclusively by Trent James.

356. Upon information and belief, Trent James dominated not only Rock Island's finances but its policies and business practices.

357. Upon information and belief, Trent James exerted control over Rock Island (1) to commit fraud by submitting insurance applications containing false representations; (2) to violate state insurance laws and regulations, and Rock Island's contractual and fiduciary duties owed to FGLIC, by rebating premiums back to Funding Defendants and unlawfully splitting insurance commissions with unlicensed insurance producers; and (3) to perpetrate an unlawful, dishonest, and unjust conspiracy to fraudulently obtain commissions and bonuses from FGLIC.

358.    Tatanisha Leer is an individual who, upon information and belief, resides or works at 4573 Greenview Drive, El Dorado Hills, California 95762 ("Leer").

359.    Leer is an Agent Defendant in the BIP hierarchy.

360.    Tzvie Leifer is an individual who, upon information and belief, resides or works at 6 Laurie Lane, Monsey, New York 10952 ("Leifer").

361.    Leifer is an Agent Defendant in the BIP hierarchy.

362.    HBM Life Inc. is a corporation which, upon information and belief, has its principal place of business at 6 Laurie Lane, Monsey, New York 10952 ("HBM Life").

363.    HBM Life is an Agent Defendant in the BIP hierarchy.

364.    Leifer is the alter ego of HBM Life.

365.    HBM Life is merely a pass-through entity by which Leifer has received commission payments for the sale of insurance policies.

366.    Upon information and belief, HBM Life was undercapitalized.

367.    Upon information and belief, HBM Life did not observe corporate formalities and was controlled exclusively by Leifer.

368.    Upon information and belief, Leifer dominated not only HBM Life's finances but its policies and business practices.

369.    Leifer exerted control over HBM Life (1) to commit fraud by submitting insurance applications containing false representations; (2) to violate state insurance laws and regulations, and HBM Life's contractual and fiduciary duties owed to FGLIC, by rebating premiums back to Funding Defendants and unlawfully splitting insurance commissions with unlicensed insurance producers; and (3) to perpetrate an unlawful, dishonest, and unjust conspiracy to fraudulently obtain commissions and bonuses from FGLIC.

370.     Leon Lowenthal is an individual who, upon information and belief, resides or works at 5 Hopal Lane, Monsey, New York 10952 ("Lowenthal").

371.     Lowenthal is an Agent Defendant in the BIP hierarchy.

372.     Evan Pescatore is an individual who, upon information and belief, resides or works at 1501 Ocean Avenue, Unit 1814, Asbury Park, New Jersey 07712 ("Pescatore").

373.     Pescatore is an Agent Defendant in the BIP hierarchy.

374.     Chesky Weber is an individual who, upon information and belief, resides or works at 20283 State Road 7, Boca Raton Florida 33498 ("Weber").

375.     Weber is an Agent Defendant in the BIP hierarchy.

376.     Shloime Wosner is an individual who, upon information and belief, resides or works at 20283 State Road 7, Boca Raton Florida 33498 ("Wosner").

377.     Wosner is an Agent Defendant in the BIP hierarchy.

378.     There are other individuals and entities involved in this conspiracy and scheme.

379.     FGLIC reserves the right to amend this Second Amended Complaint, as discovery progresses, to add Defendants including the Agent Does, Funding Does, Trustee Does, and the Other Person Does; allege additional facts about their respective actions and roles in the conspiracy; and allege additional claims against them.

## JURISDICTION AND VENUE

380.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship between FGLIC, on the one hand, and all of the named Defendants, on the other hand, and the amount in controversy exceeds $75,000.00.

381.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

382.   This Court has personal jurisdiction over the parties pursuant to one or more grounds set forth in Md. Code Ann., Cts. & Jud. Proc. §§ 6-102 and/or 6-103.

383.   In addition, this Court has personal jurisdiction over the parties under the conspiracy theory of personal jurisdiction, as recognized in Maryland. *See e.g.*, *Wings to Go, Inc. v. Reynolds*, No. CCB-15-2556, 2016 WL 97833 (D. Md. Jan. 8, 2016).

384.   Network Partners, M&M, MSL Insurance Advisors, and BIP each executed an Agency Agreement with FGLIC, and all the other Agent Defendants executed an Insurance Producer Agreement with FGLIC, in order to sell life insurance policies on behalf of FGLIC. *See* Exh. 9 (Agency Agreement between FGLIC and Network Partners, dated October 16, 2014 ("Network Partners Agency Agreement")); Exh. 10 (Agency Agreement between FGLIC and MSL Insurance Advisors, dated September 4, 2015 ("MSL Insurance Advisors Agency Agreement")); Exh. 11 (Agency Agreement between FGLIC and BIP, dated January 27, 2015 ("BIP Agency Agreement")); *see, e.g.*, Exh. 12 (Insurance Producer Agreement between FGLIC and Sharma and his d/b/a RequiteLife, dated November 6, 2014 ( "Sharma/RequiteLife Insurance Producer Agreement")).

385.   The Agent Defendants expressly agreed that the Agency Agreement and Insurance Producer Agreement are "made and entered into in the State of Maryland."  *See* Exh. 9 (Network Partners Agency Agreement § 30); Exh. 10 (MSL Insurance Advisors Agency Agreement § 30); Exh. 11 (BIP Agency Agreement § 30); Exh. 12 (Sharma/RequiteLife Insurance Producer Agreement § 27).

386.   The Agent Defendants further expressly agreed, in either the Agency Agreement or the Insurance Producer Agreement, that:

> [A]ll suits and special proceedings brought with respect to this Agreement, any
> other agreement or document received or delivered in connection with this

Agreement or with respect to any aspect of our relationship shall be brought only in the courts of the State of Maryland located in the City of Baltimore and of the United States District Court for the District of Maryland - Northern Division (collectively, the 'Courts'), and not in any other court(s)."

*See* Exh. 9 (Network Partners Agency Agreement § 31); Exh. 10 (MSL Insurance Advisors Agency Agreement § 31); Exh. 11 (BIP Agency Agreement § 31); Exh. 12 (Sharma/RequiteLife Insurance Producer Agreement § 29).

387.    The Agent Defendants knowingly and deliberately committed numerous overt acts that violated the Agency Agreement or Insurance Producer Agreement, respectively, in order to perpetrate and further the unlawful and fraudulent rebating conspiracy that is the subject of this action.

388.    The Agent Defendants abused FGLIC by, among other things, offering insureds "free" life insurance and submitting life insurance policies to FGLIC that were intended to lapse after one year but were presented as legitimate.

389.    The Agent Defendants, using their status as FGLIC agents, fraudulently concealed the true purpose of the life insurance policies, which was solely to generate fees and commissions for the co-conspirators.

390.    This allowed the conspiracy to rob FGLIC of $62 million through ill-gotten commissions and bonuses paid to the Agent Defendants.

391.    These overt acts subjected the Agent Defendants to personal jurisdiction in the State and District of Maryland, under the Agency Agreement and/or the Insurance Producer Agreement, and furthered the conspiracy.

392.    The Funding Defendants and the Trustee Defendants had a reasonable expectation that the overt acts undertaken by the Agent Defendants subjected the Agent Defendants to personal jurisdiction in Maryland.

393.     The Funding Defendants and the Trustee Defendants participated in a conspiracy that relied on the Agent Defendants' apparent legitimacy as well as the Agent Defendants' intentional violation of their corresponding duties as set forth in FGLIC's Agency Agreement and Insurance Producer Agreement.

394.     All Defendants had a reasonable expectation that their fraudulent conduct would result in legal action.

395.     Consequently, all Defendants had a reasonable expectation at the time they entered the conspiracy that their overt acts in fraudulently obtaining life insurance policies from FGLIC would subject each of the Defendants to personal jurisdiction in Maryland, the forum agreed to in the Agency and Insurance Producer Agreements.

396.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

397.     FGLIC reserves the right, following discovery, to amend this Second Amended Complaint to allege additional facts to support their allegations that jurisdiction and venue are proper with respect to the Agent Does, the Funding Does, the Trustee Does, and the Other Person Does.

## FACTS

### A.     CHRONOLOGY OF THE REBATING CONSPIRACY: MASTERMINDING A FRAUDULENT PREMIUM FINANCING SCHEME.

398.     Defendant Jason Mandel, individually and through his various entities, is the architect and control person of the fraud and conspiracy at issue in this lawsuit.

399.     For at least the past 15 years, Jason Mandel has pursued various schemes to finance premiums for the purchase of life insurance policies on the lives of others.

400.    Until recently, Jason Mandel's cousin Settling Party 1 (who is 17 years younger than Jason Mandel) worked side-by-side with Jason Mandel beginning when Settling Party 1 was 14 years old.

401.    At Jason Mandel's direction, Settling Party 1 created and operated many of the business entities that perpetuated the conspiracy.

402.    Instrumental to the conspiracy were father and son Marvin Meyer[19] and David Meyer, who worked in the insurance industry for decades.

403.    Marvin Meyer and David Meyer, together with their respective General Agencies M&M and Network Partners, lent the scheme a veneer of legitimacy that allowed the conspiracy to flourish.

1.    **JASON MANDEL'S EARLY ATTEMPT TO PROFIT FROM FINANCING INSURANCE PREMIUMS.**

404.    In the early 2000s, Jason Mandel and a former business associate operated a hedge fund sponsor called Himelsein Mandel Fund Management, LLC ("Himelsein") *see* Exh. 13 (Certificate of Formation of Himelsein), raising funds from investors to purchase life insurance policies on the lives of others—in other words, to finance the premiums charged for the placement of life insurance policies on the lives of others.

405.    One of the funds sponsored by Himelsein was called HM Ruby Fund, L.P. ("HM Ruby"), which invested in life insurance by inducing an insured to obtain a policy, with financing arranged by HM Ruby.

---

[19] Marvin Meyer is deceased, and the Estate of Marvin Meyer has been named as a Defendant.

406.    Two years after the policy was issued, HM Ruby acquired the policy and made premium payments until the time of the insured's death, upon which event HM Ruby collected the insurance proceeds.

407.    In **2007**, Jason Mandel hired his cousin Settling Party 1—then just 14 years old and the son of a single parent employed as a social worker in Queens, New York—to provide administrative and office support for Himelsein and HM Ruby.

408.    On the surface, Jason Mandel was mentoring his young cousin in the business of insurance sales.

409.    In reality, Jason Mandel was training Settling Party 1 to transact business in an improper manner, in furtherance of Jason Mandel's nefarious purposes.

410.    At age 14, Settling Party 1 did not have the maturity or experience to know that his cousin Jason Mandel was exploiting him.

411.    In **2011**, HM Ruby was the subject of a derivative lawsuit in New York Supreme Court.

412.    The lawsuit alleged that HM Ruby overvalued the insurance policies in which it invested, to the peril of the fund overall.

413.    The litigation brought against HM Ruby was dismissed for lack of subject matter jurisdiction, because HM Ruby was organized under the laws of the Cayman Islands, and the Cayman Islands do not recognize a derivative shareholder action such as that alleged in the Complaint.  Exh. 14 (*Shenwick v. HM Ruby Fund L.P.*, Index No. 652082/2011 (Supreme Court of New York, New York County), ECF 64 (Order, dated June 5, 2012)).

414.    Turning away from Himelsein and HM Ruby, Jason Mandel formed a number of business entities to broaden his pecuniary interest in ill-gotten gains from the insurance industry.

2. **IN 2011, JASON MANDEL TEAMED UP WITH FELLOW CO-CONSPIRATORS DAVID MEYER, HIS FATHER THE LATE MARVIN MEYER, AND MARK LAGAMBINA.**

415.   Upon information and belief, Jason Mandel established a relationship with Marvin Meyer, his son David Meyer, and their respective companies M&M and Network Partners, no later than **2011**.

416.   M&M was Marvin Meyer's alter ego, and Marvin Meyer served as Chief Executive Officer of M&M.

417.   David Meyer, in turn, controlled Network Partners, and Network Partners is David Meyer's alter ego.

418.   Network Partners and M&M, as General Agents, are responsible for, among other things, validating a prospective insured's life insurance application prior to sending the application to FGLIC.

419.   On **May 2, 2011**, Jason Mandel formed a life insurance agency called Tower Strategic Partners, LLC ("Tower Partners"), a Delaware limited liability company with a principal place of business in Connecticut. Exh. 15 (Certificate of Formation of Tower Partners).

420.   Jason Mandel's first employee at Tower Partners was co-conspirator LaGambina, who was hired in **December 2011** to serve as in-house legal counsel.

421.   Jason Mandel recruited LaGambina from LaGambina's Craigslist advertisement. Exh. 3 (LaGambina Exam. Tr. 251:2-12).

422.   LaGambina obtained his license to practice law in 2004, yet he practiced law for only about one year, in 2005. *Id.* (LaGambina Exam. Tr. 249:10-20).

423.   LaGambina spent most of the intervening years working as a bartender and helping his mother with odd jobs. *Id.* (LaGambina Exam. Tr. 249:21-250:16).

**3.      IN 2012, JASON MANDEL HIRED SETTLING PARTY 1 AND CREATED PREMIUM FINANCE COMPANIES SOUNDVIEW PARTNERS, SOUNDVIEW MANAGEMENT, AND SOUNDVIEW FUND.**

424.    In **early 2012**, LaGambina, Jason Mandel, and an administrative employee of Tower Group participated in an hour-long training meeting with Marvin Meyer and his son David Meyer at the Manhattan offices of Marvin Meyer's company M&M. *Id.* (LaGambina Exam. Tr. 961:24-965:25).

425.    The purpose of the meeting with Marvin Meyer and David Meyer was to educate LaGambina and the administrative employee, who were new to the insurance industry, on the sale of life insurance policies. *Id.* (LaGambina Exam. Tr. 255:2-9, 693:18-694:13, 962:9-16, 963:12-23).

426.    On **March 29, 2012**, Jason Mandel formed Tower Strategic Group, LLC ("Tower Group"), a Connecticut limited liability company with a principal place of business in Connecticut. Exh. 16 (Certificate of Formation of Tower Group).

427.    Tower Group, like Tower Partners, was ostensibly dedicated to the sale of life insurance products.

428.    Tower Partners and Tower Group were undercapitalized.

429.    Tower Partners and Tower Group were controlled by, and were the alter egos of, Jason Mandel.

430.    In the **spring or summer of 2012**, Jason Mandel hired his cousin Settling Party 1, recently graduated from college, to work for Tower Group and Tower Partners.  Exh. 3 (LaGambina Exam. Tr. 256:17-19).

431.    Settling Party 1 provided administrative and office support to Tower Group and Tower Partners.

432.     Settling Party 1 was licensed as an insurance producer from 2012 through 2015 (although he was never appointed to serve as an insurance producer for FGLIC).

433.     Jason Mandel introduced Settling Party 1 to Marvin Meyer and David Meyer sometime in **2012**.  *Id.* (LaGambina Exam. Tr. 111:6-7).

434.     Settling Party 1, in turn, recruited Agent Defendant Sharma to participate in the conspiracy.  Exh. 4 (Sharma Exam. Tr. 45:5-23, 47:9-11).

435.      Settling Party 1 and Sharma are brothers-in-law, and have known each other for many years through family and social connections. *Id.* (Sharma Exam. Tr. 33:6-23, 46:4-19).

436.     Sharma began meeting with Settling Party 1 in 2012 to discuss the pursuit of business in the insurance industry. *Id.* (Sharma Exam. Tr. 45:5-23, 47:9-11).

437.     Settling Party 1 introduced Sharma to Jason Mandel, and when Sharma became an insurance agent in 2014, he sold his first policy to Jason Mandel's mother, Ronnie Mandel. *Id.* (Sharma Exam. Tr. 45:1-2; 48:8-19).

**4.      IN 2013, JASON MANDEL AND MARVIN MEYER SECURED $1.25 MILLION IN PREMIUM-FINANCE FUNDING, WHILE SETTLING PARTY 1 AND LAGAMBINA DEVELOPED BUSINESS MODELS TO FINANCE PREMIUMS DIRECTLY TO INSUREDS.**

438.     Early in **2013**, the co-conspirators Jason Mandel, Settling Party 1, and Marvin Meyer formed new business entities—Settling Party 3, Soundview Partners, Soundview Management, and Soundview Fund—which would serve as investment vehicles in Jason Mandel's premium finance program.

439.     On **January 9, 2013**, Settling Party 3 was organized and created under the laws of the State of Delaware, with a principal place of business in Connecticut.  Exh. 17.

440.     Settling Party 3 was formed by Settling Party 1, at the direction of Jason Mandel.

441.    Settling Party 3 was capitalized by Jason Mandel and Funding Defendants (and brothers) James Kaplan and Steven Kaplan in the amount of $150,000.

442.    On **February 22, 2013**, at the direction of Jason Mandel and Marvin Meyer, Soundview Strategic Partners, LLC, ("Soundview Partners") was organized and created under the laws of the State of Delaware, with a principal place of business in Connecticut.  Exh. 18 (Certificate of Formation of Soundview Partners).

443.    Soundview Partners is the general partner of Soundview Strategic Management, L.P. ("Soundview Management"), a Delaware limited partnership created on **February 27, 2013**, at the direction of Jason Mandel and Marvin Meyer, with a principal place of business in Connecticut.  Exh. 19 (Certificate of Formation of Soundview Management).

444.    Soundview Management, in turn, is the general partner of Soundview Strategic Fund, L.P. ("Soundview Fund"), a Delaware limited partnership created on **February 27, 2013**, at the direction of Jason Mandel and Marvin Meyer, with a principal place of business in Connecticut.  Exh. 20 (Certificate of Formation of Soundview Fund).

445.    Jason Mandel and Marvin Meyer secured $1.25 million in capital contributions to Soundview Fund from Kerry Propper, James Kaplan, Steven Kaplan, Jason Mandel, and Jason Mandel's mother, Ronnie Mandel.

446.    Jason Mandel, Marvin Meyer, Settling Party 1, and LaGambina spent the remainder of 2013 in a "flurry of activity," to borrow a phrase from LaGambina, strategizing and planning business models dedicated to life insurance premium financing.  Exh. 3 (LaGambina Exam. Tr. 835:24-25).

447.    On **April 26, 2013**, Jason Mandel directed the creation of Mountainview Finance, LLC ("Mountainview Finance"), which was organized under the laws of the State of South Dakota,

with a principal place of business in Connecticut.   Exh. 21 (Certificate of Formation of Mountainview Finance).

448.   Soundview Fund was the managing member of Mountainview Finance.

449.   Mountainview Finance was licensed as a money lender in South Dakota and as a premium finance lender in New Jersey.

450.   On **May 9, 2013**, Mesa Consumer Finance, LLC, ("Mesa") was organized and created under the laws of the State of South Dakota.  Exh. 22 (Certificate of Formation of Mesa).

451.   Mesa was formed by LaGambina, at the direction of Settling Party 1.  *Id.*

452.   Mesa's incorporating documents, filed by or at the direction of LaGambina, identify LaGambina as the sole member and manager of Mesa.  *Id.*

453.   On **May 10, 2013**, LaGambina filed various documents with the State of South Dakota to obtain a money-lending license from that state for Mesa.

454.   Mesa is a participant in the conspiracy by lending money for the purchase of policies on the lives of Roberta Gaines and Stanley Byck.  *See infra* Predicate Acts 1 and 2.

455.   LaGambina admitted under oath that he made misrepresentations to the State of South Dakota in submitting the documentation to obtain a lending license application for Mesa. Exh. 3 (LaGambina Exam. Tr. 794:22-797:10).

456.   LaGambina concealed that Settling Party 1 and Settling Party 2 were directing the activities of Mesa, in order to protect the identify of his co-conspirators. *Id.* (LaGambina Exam. Tr. 782:7-784:2).

457.   LaGambina falsely represented that he had served as a Chief Compliance Officer for an insurance brokerage, in order to induce the State of South Dakota into issuing the license to Mesa. *Id.* (LaGambina Exam. Tr. 794:22-797:10).

458.     This was a lie, as LaGambina admitted under oath. *Id.* (LaGambina Exam. Tr. 794:22-795:1).

459.     LaGambina committed mail and wire fraud by submitting false statements to a state governmental entity to obtain a money-lending license for Mesa, which loaned money to fund the purchase of at least two policies.

460.     In or about **June 2013**, Jason Mandel, Settling Party 1, and LaGambina pursued a premium finance business model under the name Access Consumer Finance, LLC. *Id.* (LaGambina Exam. Tr. 831:17-832:20); Exh. 23 (Access Consumer Finance Business Plan).

461.     Access Consumer Finance was intended to offer consumer finance loans to fund life insurance premiums.  *Id.* (Access Consumer Finance Business Plan, at GS00020687-90).

462.     Settling Party 1 and LaGambina prepared a business plan for Access Consumer Finance. Exh. 3 (LaGambina Exam. Tr. 830:17-20).

463.     The Access Consumer Finance business plan prepared by LaGambina and Settling Party 1 states, "***Compliance with the appropriate laws is extraordinarily important.***"  Exh. 23 (Access Consumer Finance Business Plan, GS00020692) (emphasis added).

464.     According to LaGambina, the business "didn't pan out . . . . Access strikes me as something that never happened." Exh. 3 (LaGambina Exam. Tr. 830:17-20).

465.     In or about **August 2013**, Jason Mandel, Settling Party 1, and LaGambina organized a third investment vehicle, which utilized a concept called a "put option."  Exh. 3 (LaGambina Exam. Tr. 837:8-839:12);  Exh. 24 (Put Summary).

466.     The lender Soundview Fund would finance an insured's premium by extending a loan to an ILIT established by the insured. *Id.* (Put Summary, GS00020712-16).

467.     Then the insured would enter into a contract called "[a] Put Option [which] if exercised by the Insured will allow the Trust, if it chooses, to transfer and assign the Policy to" the lender.  *Id.* (Put Summary, GS00020716).

468.     Otherwise stated, "Essentially, the Put is exercisable at the end of the 27 month loan period.  Pursuant to the Put Option the Irrevocable Life Insurance Trust has the right but not the obligation, to transfer and assign the Policy to Mountainview Capital," a subsidiary of Soundview Fund.  *Id.*

469.     Jason Mandel sought legal advice from the law firm of Edwards Wildman about financing premiums through the Put Option approach, which premiums would be funded by Soundview Fund and another entity called Genesis Capital Advisors, LLC.  Exh. 25 (Edwards Wildman letter dated September 16, 2013).

470.     Edwards Wildman issued a letter on the Put Option approach under Connecticut law on **September 16, 2013**.  *Id.*

471.     LaGambina acknowledged he was uncertain whether a business entity called Genesis Capital Advisors was formally organized or created.  Exh. 3 (LaGambina Exam. Tr. 850:3-4, 851:6-10).

**5.       IN 2014, JASON MANDEL WAS DENIED A PREMIUM-FINANCE LICENSE BY CONNECTICUT INSURANCE REGULATORS, WHICH LED THE CO-CONSPIRATORS TO DEVELOP A SCHEME TO DEFRAUD LIFE INSURANCE COMPANIES.**

472.     Jason Mandel sought to control each step of the process of selling a life insurance policy to an insured and then financing the premium for the policy with invested funds.

473.     The last step in the process, before a carrier like FGLIC receives life insurance application, is validation of the application by a General Agent like Network Partners.

474. Jason Mandel had strong relationships with General Agents M&M and Network Partners, through their respective principals Marvin Meyer and his son David Meyer.

475. But Jason Mandel did not control a General Agent outright—so he directed his co-conspirator Mark LaGambina to form a General Agent.

476. On **February 21, 2014**, LaGambina directed that MSL Insurance Advisors, LLC ("MSL Insurance Advisors"), be organized and created under the laws of the State of Connecticut. Exh. 26 (Certificate of Formation of MSL Insurance Advisors).

477. LaGambina named MSL after himself; "M.S.L." are his initials.

478. MSL Insurance Advisors initially served as LaGambina's d/b/a while LaGambina submitted applications for life insurance through a non-party General Agent.

479. LaGambina, at the direction of Jason Mandel and Settling Party 1, later sought to have MSL Insurance Advisors appointed as a General Agent to FGLIC.

480. Settling Party 1 directed the creation of Settling Party 2, which was established on **March 12, 2014** under the laws of the Commonwealth of Puerto Rico, with a principal place of business in Puerto Rico.  Exh. 27 (Certificate of Formation).

481. Settling Party 1 created Settling Party 2 in Puerto Rico because he moved there to minimize his taxes.

482. Settling Party 2 became the linchpin in the conspiracy to covertly fund life insurance premiums with fraudulently obtained commissions and bonuses.

483. Settling Party 1 was in charge of Settling Party 2's operations, at the direction of Jason Mandel.

484. On **March 14, 2014**, Jason Mandel, through his legal counsel, applied to the Connecticut Insurance Department ("CID") to obtain a license for Mountainview Finance to

operate a premium finance company.  Exh. 28 (Email dated March 14, 2014, from Edwards Wildman to the CID).

485.    Jason Mandel proposed that Mountainview Finance would fund premiums by making loans to ILITs established by insureds.

486.    On **April 2, 2014**, the Connecticut insurance regulators rejected Mountainview Finance's license request, citing eight reasons why Mountainview Finance's proposed lending activity "does not fall within the definition of business that can be conducted by a premium finance company."  Exh. 29 (Letter dated April 2, 2014, from the CID to Jason Mandel).

487.    Among other reasons, the Connecticut regulators advised Mountainview Finance and Jason Mandel that "[a] premium finance company cannot lend the money directly to a borrower, rather it must advance the premium to an insurer or an insurance producer."  *Id.*

488.    The Connecticut insurance regulators suggested that Mountainview Finance contact Connecticut's banking regulators, because Mountainview Finance's proposal appeared to involve more general lending activity.  *Id.*

489.    This letter from the CID placed Jason Mandel and his fellow co-conspirators on notice as early as April 2014 that making loans to ILITs for the purpose of funding life insurance policies violated Connecticut law.

490.    Jason Mandel and his fellow co-conspirators ignored this mandate from the regulators.

491.    They proceeded with their premium finance business, and instead pursued another approach to loan money directly to insureds.

492.     Jason Mandel again solicited advice from the law firm of Edwards Wildman regarding a proposed premium finance program involving Settling Party 3, Mountainview, Settling Party 2, and Mesa.

493.     The program (referenced herein as the "Settling Party 2/Mesa scheme") involved a three-step structure: first, Settling Party 2 would make a loan to Mesa; second, Mesa would enter into a "non-recourse" loan agreement with an insured, under which the insured was not required either to use the loaned funds for any stated purpose or to repay the funds to Mesa; and third, Settling Party 2 and the insured would agree independently that the insured would use the loan from Mesa to pay the premium for the life insurance policy.

494.     On **May 16, 2014**, Edwards Wildman rendered a legal opinion outlining the proposal's legal implications, including the risks of violating Connecticut laws on premium finance, anti-rebating, and stranger-originated life insurance ("STOLI").   Exh. 30 (Edwards Wildman letter dated May 16, 2014).

495.     The opinion contemplates that Settling Party 2 was allowed to receive consulting fees from life insurance producers "<u>so long as [Settling Party 2] does not sell, solicit or negotiate insurance in Connecticut</u>." *Id.* at p. 5 (emphasis in original).

496.     However, Settling Party 2 **did** sell, solicit, and negotiate insurance in Connecticut.

**6.     THE CO-CONSPIRATORS TARGETED FGLIC AS A VICTIM OF THE SCHEME.**

497.     With the Settling Party 2/Mesa scheme in place, the co-conspirators selected their victims of the scheme: FGLIC and other life insurance companies.

498.     In **October 2014**, David Meyer solicited FGLIC to appoint his company Network Partners as a General Agent of FGLIC.

499.    On or about **October 16, 2014**, Network Partners entered into an Agency Agreement with FGLIC, whereby Network Partners was appointed as, and agreed to act as, a producer and agent for FGLIC for the purpose of selling insurance policies issued by FGLIC, in accordance with the terms of the Agency Agreement.   Exh. 9 (Network Partners Agency Agreement).

500.    Likewise, upon information and belief, M&M, at the direction of Marvin Meyer, entered into an Agency Agreement with FGLIC, whereby M&M was appointed as, and agreed to act as, producer and agent for FGLIC life insurance policies.

501.    LaGambina caused MSL Insurance Advisors to enter into an Agency Agreement with FGLIC, on **September 4, 2015**, by which Agreement MSL Insurance Advisors was appointed as, and agreed to act as, producer and agent for FGLIC life insurance policies.   Exh. 10 (MSL Insurance Advisors Agency Agreement).

502.    FGLIC entered into an Insurance Producer Agreement with each of the Agent Defendants under the Network Partners hierarchy and the MSL Insurance Advisors hierarchy,[20] whereby these Agent Defendants were appointed as, and agreed to act as, agents for FGLIC for the purpose of selling insurance policies issued by FGLIC, in accordance with the terms of the Insurance Producer Agreements.   *See, e.g.*, Exh. 12 (Sharma/RequiteLife Insurance Producer Agreement).

503.    In signing the Agency Agreement and the Insurance Producer Agreement, all Agent Defendants agreed to and represented that they would comply with all applicable laws and regulations and with FGLIC's internal policies and procedures in procuring prospective insureds,

---

[20] The Agent Defendants are identified and categorized by hierarchy in Exhibit 1, which is attached hereto and incorporated herein by reference.

completing and submitting applications, and making accurate representations. *See, e.g.*, Exh. 9 (Network Partners Agency Agreement §§ 8, 10); Exh. 12 (Sharma/RequiteLife Insurance Producer Agreement at SHARMA-BK012053).

504.     The Agent Defendants agreed to and represented that they would comply with FGLIC's Market Conduct Guide and Code of Ethical Conduct. *See, e.g.*, Exh. 9 (Network Partners Agency Agreement §§ 8); Exh. 12 (Sharma/RequiteLife Insurance Producer Agreement at SHARMA-BK012046, SHARMA-BK012076).

505.     The Agency Agreement, Insurance Producer Agreement, Code of Ethical Conduct, and the Market Conduct Guide set forth certain duties of the Agent Defendants, including duties with respect to applications. *See, e.g.*, Exh. 9 (Network Partners Agency Agreement §§ 8, 10); Exh. 12 (Sharma/RequiteLife Insurance Producer Agreement at SHARMA-BK012054, SHARMA-BK012063).

506.     In selling insurance policies, the Agent Defendants were obligated to, *inter alia*, (i) disclose to FGLIC honestly and completely the financial, medical, and other pertinent facts upon which FGLIC would rely in considering, pricing, and issuing policies; and (ii) disclose honestly and completely the terms of FGLIC's insurance policies to prospective insureds. *See, e.g.*, Exh. 9 (Network Partners Agency Agreement §§ 8, 10); Exh. 12 (Sharma/RequiteLife Insurance Producer Agreement at SHARMA-BK012053, SHARMA-BK012061).

507.     Further, the Market Conduct Guide specifically prohibits a Producer from acting as a "surrogate" for an insurance producer who is either not licensed or not appointed to serve FGLIC:

> Under no circumstance should a Producer act as a "surrogate" for a non-licensed or non-appointed Producer. That means that if a Producer appointed by the Company signs the application as the Producer, he or she must have been the Producer who met with the customer or solicited the application. Deliberately circumventing such rules will jeopardize the Producer's appointment with the Company and likely subject the Producer to fines, penalties and possibly the loss of their insurance license.

Exh. 31 (FGLIC Market Conduct Guide Rev. 12-2014, at p. 24).

508.    FGLIC relied on the Agent Defendants to honestly and accurately disclose all pertinent information to FGLIC regarding the insured and the life insurance application, so that FGLIC could fairly assess whether to issue life insurance policies worth millions of dollars.  Exh. 32 (FGLIC Code of Ethical Conduct).

509.    As such, the Agent Defendants owed FGLIC fiduciary duties of care and loyalty.

### 7.    THE CO-CONSPIRATORS IMPLEMENTED THE FRAUDULENT SCHEME FUNDED THROUGH SETTLING PARTY 2 AND MESA: PREDICATE ACTS ONE AND TWO.

510.    Soundview Fund made a loan to Settling Party 2 in the amount of $1.25 million, at an interest rate of approximately 24% per year.

511.    This loan from Soundview Fund to Settling Party 2 provided sufficient funds to commence the conspiracy involving Settling Party 2 and Mesa.

512.    On **February 9, 2015**, Settling Party 1 wired $644,000 to Mesa, to fund the first premium on a policy obtained fraudulently pursuant to the Settling Party 2/Mesa scheme.  Exh. 33 (FP_009097).

### Predicate Act One: The ROBERTA GAINES Policies

513.    The first insurance policy funded under Defendants' fraudulent scheme was issued to Roberta Gaines and was sold by Jason Mandel as agent.

514.    The co-conspirators sold insured Roberta Gaines two life insurance policies issued in the State of Connecticut, one for $10 million (the "Gaines 658 Policy") and one for $5 million (the "Gaines 070 Policy"), which policies were procured by fraud and breach of fiduciary duty.

515.    On **December 17, 2014**, Jason Mandel, Settling Party 1, and Settling Trustee 6 caused the creation of the Gaines ILIT, pursuant to a trust agreement executed by Gaines as settlor, Settling Trustee 6 as trustee, and Jason Mandel as witness.  Exh. 34 (GS00017595).

516.    In **December 2014**, Jason Mandel, in his capacity as an insurance agent, sought to obtain a FGLIC life insurance policy in Gaines' name, in the amount of $10 million.

517.    Jason Mandel relied on Settling Party 1 to complete Gaines' life insurance application.

518.    The FGLIC life insurance policy application contains a "Statement of Intent," which all applicants for life insurance must complete.  Exh. 35 (FGLIC_RL00000856).

519.    The Statement of Intent provides: "It is the Company's policy that life insurance should only be purchased to provide protection to those with an insurable interest in the life (lives) of the insured(s). The Company will not knowingly participate in life insurance sales motivated by a possible sale of life insurance contracts to a secondary market or participation of investors in life insurance death benefits." *Id.*

520.    Question 2 in the Statement of Intent asks: "Will you borrow money to pay the premium for the life insurance being applied for or have someone else pay these premiums for you in return for you assigning part or all of the policy values to someone else?" *Id.*

521.    Settling Party 1 falsely answered "no" to Question 2 in this Statement of Intent.  *Id.*

522.    Settling Party 1 knew this representation was false because he knew Gaines was financing the premium with a loan from Mesa.

523.    Settling Party 1's false statements in connection with the application violated applicable state insurance laws, regulations, and rules.  *See* Conn. Gen. Stat. § 38a-816(8).

524.     Jason Mandel executed Gaines' application on **December 22, 2014**, certifying falsely that Gaines was not borrowing funds to finance the premium.

525.     Jason Mandel knew this representation about borrowing funds was false because he created the conspiracy, and he knew Gaines was financing the premium with a loan from Mesa.

526.     Jason Mandel concealed from FGLIC the fact that Gaines was obtaining a loan from Mesa in order to induce FGLIC to issue the policy to Gaines.

527.     Jason Mandel's false statements in connection with the application violated applicable state insurance laws, regulations, and rules.  *See* Conn. Gen. Stat. § 38a-816(8).

528.     Jason Mandel also knew Settling Party 1 completed the life insurance application on Gaines' behalf.

529.     Jason Mandel knew that Settling Party 1 had not been appointed to serve as an insurance producer for FGLIC.

530.     Jason Mandel knowingly acted as a "surrogate" to Settling Party 1, a non-appointed insurance producer, in violation of Jason Mandel's contract with FGLIC prohibiting an appointed insurance producer from "act[ing] as a 'surrogate' for a non-licensed or non-appointed Producer." *See* Exh. 31 (Market Conduct Guide Rev. 12-2014, at p. 24).

531.     On or about **December 22, 2014**, Jason Mandel and his d/b/a Tower Group sent Gaines' application materials by the mail or wire to Network Partners.

532.     Network Partners, in its role as General Agent, was responsible for validating Gaines' application materials prior to submitting them to FGLIC.

533.     Network Partners knew that the statement about not borrowing funds to finance the premium was false, because Network Partners knew that Gaines was financing the premium with

a loan from a co-conspirator, and Network Partners intended for FGLIC to rely on that false statement.

534.    Network Partners did not correct the false representations in Gaines' application.

535.    On or about **December 24, 2014**, Network Partners sent Gaines' application materials by facsimile transmission over the wires to FGLIC with the false representations included in the materials.

536.    Network Partners' false statements in connection with the application violated applicable state insurance laws, regulations, and rules.  *See* Conn. Gen. Stat. § 38a-816(8).

537.    In reliance on Jason Mandel and Network Partners' misrepresentations, FGLIC issued a life insurance policy to Gaines (policy number ending in 658) with a value of $10 million on **February 1, 2015** (the "Gaines 658 Policy").  Exh. 36 (GS00054262).

538.    The annual premium payment on the Gaines 658 Policy was $418,700. *Id.*

539.    LaGambina caused Mesa and the Gaines ILIT to enter into a sham Loan Agreement for the amount of $421,300, to pay the first-year premium on the Gaines 658 Policy.

540.    On **February 9, 2015**, Settling Party 1 wired $644,000 to Mesa.   Exh. 33 (FP_009097).

541.    On **February 10, 2015**, LaGambina caused Mesa to wire $421,300 to the bank account for the Gaines ILIT.  Exh. 37 (FCITB00000017).

542.    On **February 11, 2015**, Settling Trustee 6 wired $418,700 from the Gaines ILIT to FGLIC for payment of the Gaines 658 Policy premium.  Exh. 38 (FGLIC_RL00001131).

543.    Settling Trustee 6 wired additional funds (approximately $2500) to himself, as payment for his role as "trustee" in service to the conspiracy.

544.     In reliance on the fraudulent misrepresentations perpetrated by David Meyer, Network Partners, Jason Mandel, Settling Party 1, LaGambina, Settling Party 2, Mesa, and Settling Trustee 6, FGLIC paid Jason Mandel, Tower Group, and Network Partners commissions and bonuses totaling $669,920 for the fraudulent sale of the Gaines 658 Policy.

545.     Network Partners, Jason Mandel, and Tower Group paid Settling Party 2 approximately 95% of the commissions and bonuses they received from FGLIC, thereby (i) unlawfully splitting commissions with an unlicensed person, *see* Conn. Gen. Stat. § 38a-702*l*(a); and (ii) unlawfully rebating premium payments, *see* Conn. Gen. Stat. § 38a-465i.

546.     Specifically, on **February 23, 2015**, Tower Group wired $526,000 to Settling Party 2 for "Payment Roberta and Brian Gaines."  Exh. 39 (FP_009113).

547.     In **February 2015**, Jason Mandel sought a second FGLIC life insurance policy for Gaines, this time in the amount of $5 million.

548.     Jason Mandel again relied on Settling Party 1 to prepare the life insurance application on Gaines' behalf.

549.     Settling Party 1 once again made a false representation that Gaines was not borrowing funds to pay the premium on the applied-for policy, and Settling Party 1 knew the representation was false because he knew Gaines was intending to finance the premium with a loan from Mesa.  Exh. 40 (FGLIC_RL00002164).

550.     Jason Mandel executed the second Gaines application on **February 23, 2015**, certifying falsely again that Gaines was not borrowing funds to finance the premium.

551.     Jason Mandel knew this representation in this second Gaines application was false, because he knew that Gaines was once again financing the premium with a loan from a co-conspirator.

552.     On **February 23, 2015**, Jason Mandel and his d/b/a Tower Group sent Gaines' second application materials by the mail or wire to Network Partners.

553.     Network Partners, in its role as General Agent, was responsible for validating Gaines' second application materials prior to submitting them to FGLIC.

554.     Network Partners knew the representation in the second Gaines application about not borrowing funds to finance the premium was false, because he knew that Gaines was once again financing the premium with a loan from a co-conspirator, and Network Partners intended for FGLIC to rely on that false statement.

555.     Network Partners did not correct the false representations in Gaines' second application.

556.     On **February 23, 2015**, Network Partners sent Gaines' second application materials by facsimile transmission over the wire to FGLIC, with the false representations included in the materials.

557.     In reliance on the co-conspirators' misrepresentations, FGLIC issued a second life insurance policy to Gaines (policy number ending in 070) in the amount of $5 million on **March 6, 2015** (the "Gaines 070 Policy"). Ex. 41.

558.     The annual premium payment on the Gaines 070 Policy was $209,350. *Id.*

559.     Settling Party 1 caused Settling Party 2 to wire sufficient funds to Mesa to fund Gaines' premium.

560.     LaGambina caused Mesa and the Gaines ILIT to enter into a sham Loan Agreement for the amount of $213,000, to pay the first-year premium on the Gaines 070 Policy.

561.     On **March 18, 2015**, LaGambina caused Mesa to wire $213,000 to the bank account for the Gaines ILIT.  Exh. 42 (FCITB00000019).

562.     On **March 19, 2015**, Settling Trustee 6 wired $209,350 to FGLIC for payment of the Gaines 070 Policy premium.  *Id.*

563.     Settling Trustee 6 wired additional funds (approximately $3500) to himself, as payment for his role as "trustee" in service to the conspiracy.

564.     In reliance on the fraudulent misrepresentations perpetrated by the co-conspirators, FGLIC issued the second Gaines policy and paid Jason Mandel, Tower Group, and Network Partners commissions and bonuses totaling $417,571.50 for the fraudulent sale of the Gaines 070 Policy.

565.     Network Partners, Jason Mandel, and Tower Group paid Settling Party 2 approximately 95% of the commissions and bonuses they received from FGLIC for the fraudulent sale of the Gaines 070 Policy, thereby (i) unlawfully splitting commissions with an unlicensed person, *see* Conn. Gen. Stat. § 38a-702*l*(a); and (ii) unlawfully rebating premium payments, *see* Conn. Gen. Stat. § 38a-465i.

566.     On **March 31, 2015**, Tower Group wired $208,826 to Settling Party 2 for a matter "Regarding Roberta Gaines," thereby rebating the premium payment from the Gaines 070 Policy back to Settling Party 2.  Exh. 43 (FP_009116).

567.     The second-year premium on the Gaines 658 Policy was not paid.

568.     Accordingly, the Gaines 658 Policy lapsed worthless on **February 1, 2016**.  Exh. 44 (FGLIC_RL00001181).

569.     The second year premium on the Gaines 070 Policy was not paid.

570.     Accordingly, the Gaines 070 Policy lapsed worthless on **September 6, 2016**.

## Predicate Act Two: The STANLEY BYCK Policy

571.     Jason Mandel solicited Stanley Byck to sell him a policy under the Settling Party 2/Mesa scheme because Jason Mandel had known both Stanley Byck and his son, David Byck, for many years. Exh. 5 (D. Byck. Exam. Tr. 19:4-9).

572.     Stanley Byck is an accountant, and Jason Mandel had hired him to provide some accounting services years ago. Exh. 45 (S. Byck Exam. Tr. 9:10-12; 19:21-25).[21]

573.     In **2014**, Jason Mandel introduced David Byck to Settling Party 1 by telephone, and Settling Party 1 spoke with David Byck regarding a life insurance policy for David Byck's father, Stanley Byck. Exh. 5 (D. Byck Exam. Tr. 18:21-19:3, 20:6-12).

574.     Settling Party 1 told David Byck that his father could obtain a life insurance policy and fund the premium with "a non-recourse loan," meaning Stanley Byck was not personally liable to repay the loan. *Id.* (D. Byck Exam. Tr. 21:9-25).

575.     Settling Party 2 and David Byck entered into a non-disclosure agreement on **May 19, 2014**.  Exh. 46 (BYCK00000023-28).

576.     Settling Party 1 sent David Byck the Edwards Wildman Opinion. Exh. 5 (D. Byck. Exam. Tr. 31:19-32:9).

577.     David Byck acknowledged that, although he read the Edwards Wildman Opinion, he did not understand it. *Id.* (D. Byck. Exam. Tr. 34:4-11; 36:20-37:6).

578.     Settling Party 1 then directed Sharma to sell a FGLIC policy to Stanley Byck to be issued in the State of Florida. Exh. 4 (Sharma Exam. Tr. 110:18-24).

---

[21] FGLIC took the Examination of insured Stanley Byck on November 20, 2018 (hereinafter "S. Byck Exam. Tr. ___").

579.     Sharma contacted Stanley Byck by phone in about **November 2014**, and told Stanley Byck that he could qualify for a life insurance "senior program." Exh. 45 (S. Byck Exam. Tr. 31:10-21).

580.     Sharma promised Byck he could obtain free life insurance for a year.

581.     This offer of "free insurance" violates state insurance laws, rules, and regulations. *See* Fla. Stat. Ann. § 626.9541.

582.     Stanley Byck completed by hand an application for a life insurance policy with FGLIC. Exh. 45 (S. Byck Exam. Tr. 22:11-19).

583.     Stanley Byck testified that, when he filled out the application by hand, he truthfully answered Question 2 regarding whether the policy was funded by a loan, and checked the box marked "yes" to report that the premium ***was*** financed through a loan. *Id.* (S. Byck Exam. Tr. 46:3-12).

584.     Stanley Byck then mailed the application to Sharma. *Id.* (S. Byck Exam. Tr. 50:1).

585.     Sharma inputted the information provided by Stanley Byck into the computer-generated application, and intentionally falsified material facts on the application.

586.     ***First***, Sharma changed Stanley Byck's answer to the question about borrowing money to finance the premium, from "yes" to "no." Exh. 47 (FGLIC_RL00006993-7019); *see also* Exh. 45 (S. Byck Exam. Tr. 46:8-16).

587.     Sharma knew this representation was false when made because he knew Stanley Byck was financing the premium with a loan from a co-conspirator. Ex. 4 (Sharma Exam. Tr. 367:7-19).

588.     ***Second***, Sharma represented falsely that he "witnessed the signatures on this application" for Stanley Byck.  Exh. 47 (FGLIC_RL00006993-7019).

589.     Sharma knew this representation was false when made because he did not witness Stanley Byck's signature on the application, and had never even met Stanley Byck at the time the application was submitted.

590.     Stanley Byck testified that Sharma did not witness his signature. Exh. 45 (S. Byck Exam. Tr. 48:9-12; 50:8-9).

591.     Sharma himself admitted that he did not witness Stanley Byck's signature, and that the certification he signed on the application representing that he witnessed the signature was false. Exh. 4 (Sharma Exam. Tr. 180:1-11).

592.     In fact, Stanley Byck denied that the signature on his application was his own. Exh. 45 (S. Byck Exam. Tr. 46:17-47:9, 48:13-49:10).

593.     ***Third***, Sharma falsely represented to FGLIC that he was familiar with Stanley Byck in the letter covering Stanley Byck's application, in which Sharma claimed he "had the pleasure of knowing Mr. Byck for several years" and that "my experience and personal history with Stanley have endowed me with the utmost respect and esteem for him as a person and as a professional." Exh. 47 (FGLIC_RL00006996).

594.     Sharma's representation in his letter to FGLIC was false because Sharma did not, in fact, know Byck personally.

595.     Stanley Byck explicitly testified that Sharma's representation to FGLIC in the cover letter was false. Exh. 45 (S. Byck Exam. Tr. 39:12-40:3).

596.     Stanley Byck testified that he did not know Sharma, had never met Sharma in person, and that the only contact Sharma had with Byck was sending him the life insurance policy to fill out. *Id.* (S. Byck Exam. Tr. 39:12-40:3).

597.    Sharma also admitted that his statements in the introductory letter regarding Stanley Byck were false. Exh. 4 (Sharma Exam. Tr. 173:19-23).

598.    **Fourth**, in the same introductory letter Sharma misrepresented Byck's assets, specifically his net worth, cash, and notes. Exh. 45 (S. Byck Exam. Tr. 55:14-24; 57:5-9).

599.    Sharma admitted that he certified misstatements of fact in the policy applications to be submitted to FGLIC with the misrepresentations contained therein. Exh. 4 (Sharma Exam. Tr. 367:7-368:8).

600.    Sharma intended for FGLIC to rely on these false statement in order to issue a policy to Stanley Byck.

601.    Sharma's false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Fla. Stat. Ann. § 817.234(3).

602.    On or about **January 14, 2015**, Sharma and his d/b/a RequiteLife sent Stanley Byck's application materials over the wire to Network Partners.

603.    Network Partners, in its role as General Agent, was responsible for validating Byck's application materials prior to submitting them to FGLIC.

604.    Network Partners knew that the statement about not borrowing funds to finance the premium was false, because Network Partners knew that Stanley Byck was financing the premium with a loan from a co-conspirator, and Network Partners intended for FGLIC to rely on that false statement.

605.    Network Partners did not correct the false representations in Byck's application.

606.    On **January 21, 2015**, Network Partners sent the application by facsimile transmission over the wire to FGLIC with the false representations.

607.    Network Partners' false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Fla. Stat. Ann. § 817.234(3).

608.    On **March 2, 2015**, David Byck caused the creation of the Stanley Byck ILIT, executed by Stanley Byck as settlor, David Byck as trustee, and Sharma as a witness.  Exh. 48 (REQ000016-34).

609.    Sharma never witnessed the signatures on the Stanley Byck ILIT.

610.    In his capacity as trustee, David Byck established a bank account for the Stanley Byck ILIT.

611.    Settling Party 1 and Sharma caused a second life insurance application to be prepared on Stanley Byck's behalf, naming the Byck ILIT as the "owner" of the policy.  Exh. 49 (FGLIC_RL00007091-110).

612.    None of the above-described false statements were corrected on the subsequent application.

613.    Sharma executed the application on **March 5, 2015**, and Sharma and RequiteLife sent Stanley Byck's second life insurance application materials to Network Partners.

614.    Network Partners, in its role as General Agent, was responsible for validating Stanley Byck's application materials prior to submitting them to FGLIC.

615.    Network Partners knew that the statement about not borrowing funds to finance the premium was false, because Network Partners knew that Stanley Byck was financing the premium with a loan from a co-conspirator, and Network Partners intended for FGLIC to rely on that false statement.

616.    Network Partners did not correct the false representations in Stanley Byck's second application.

617.     On **March 6, 2015**, Network Partners sent Stanley Byck's application by the mail and wire to FGLIC with the false representations included in the materials.

618.     In reliance on the co-conspirators' misrepresentations, FGLIC issued an insurance policy to Stanley Byck in the State of Florida valued at $500,000 (the "Byck Policy") on **March 18, 2015**. Exh. 50 (S. Byck Policy dated March 18, 2015).

619.     The annual premium payment for the Byck Policy was $36,100. *Id.*

620.     Using funds rebated from the Gaines policy and the Soundview Fund investments, Settling Party 2 paid the first-year premium on the Byck Policy by covertly channeling the funds through Mesa, David Byck, and the Stanley Byck ILIT pursuant to a pair of sham loan agreements.

621.     Next, in about **April 2015**, LaGambina caused Mesa to make a sham loan of $36,100 to David Byck pursuant to a Loan Agreement.  Exh. 51 (GS00017050-54).

622.     The Loan Agreement states, "This is a non-recourse loan," on the first and second pages of the four-page document. *Id.*

623.     The Loan Agreement identifies Mesa as the Lender, and David Byck as the Borrower. *Id.*

624.     An unexecuted version of the Loan Agreement sets forth signature lines for LaGambina, on behalf of Mesa, and David Byck. *Id.*

625.     Next, in about **April 2015**, David Byck made a sham loan of $36,100 to the Stanley Byck ILIT, pursuant to a second Loan Agreement.  Exh. 52 (GS00014150).

626.     The second Loan Agreement identifies the loan as a "non-recourse" loan on the first and second pages of the four-page document. *Id.*

627.     An unexecuted version of the second Loan Agreement sets forth two signature lines for David Byck, both in his individual capacity and as trustee of the Stanley Byck ILIT. *Id.*

628.     Upon information and belief, LaGambina caused these sham loan agreements to be prepared.

629.     Upon information and belief, Settling Party 1 sent these sham loan agreements to David Byck through the mail or wire.

630.     On **April 21, 2015**, Settling Party 1 wired $36,400 to Mesa.  Exh. 33 (FP_009097).

631.     The next day, on **April 22, 2015**, LaGambina on behalf of Mesa wired $36,300 to the bank account of the Byck ILIT.  Exh. 53 (BOA-SDT000018).

632.     The day after that, **April 23, 2015**, David Byck wired $36,100 from the ILIT to FGLIC. *Id.*

633.     In reliance on the fraudulent misrepresentations perpetrated by David Meyer, Network Partners, Sharma, Settling Party 1, LaGambina, Settling Party 2, Mesa, and David Byck, FGLIC paid Defendants Sharma, RequiteLife, and Network Partners commissions and bonuses totaling $55,164.60, which equates to 152.8 percent of the first-year premium of $36,100.

634.     Network Partners, Sharma, and RequiteLife paid Settling Party 2 approximately 95% of the commissions and bonuses they received from FGLIC for the fraudulent sale of the Byck Policy, thereby (i) unlawfully splitting commissions with an unlicensed person, *see* Fla. Stat. Ann. § 626.753; and (ii) unlawfully rebating premium payments, *see* Fla. Stat. Ann. § 626.572.

635.     On **April 27, 2015**, Settling Party 2 sent Sharma and RequiteLife an invoice in the amount of $19,200 for "services rendered" to "client" Stanley Byck.   Exh. 54 (SHARMA_BK011234).

636.     On **May 5, 2015**, David Byck sent Settling Party 1 a letter seeking "payment for all consulting services" in the amount of $1800.  Exh. 55 (BYCK00000126).

637.   David Byck testified that Settling Party 1 paid this invoice. Exh. 5 (D. Byck Exam. Tr. 47:20-21).

638.   On **May 8, 2015**, Sharma, on behalf of RequiteLife, wired $19,200 to Settling Party 2, thereby rebating the premium payment back to Settling Party 2.   Exh. 56 (SHARMA-BK011234).

639.   The second-year premium on the S. Byck Policy was not paid.

640.   Accordingly, the Byck Policy lapsed worthless on **April 18, 2016**.   Exh. 57 (FGLIC_RL00007352-57).

641.   Stanley Byck never paid back the $36,400 loan from Mesa. Exh. 5 (D. Byck Exam. Tr. 40:16-41:2).

642.   Neither Mesa nor any other individual or entity has requested that Stanley Byck, David Byck, or the Stanley Byck ILIT repay the $36,400 loan from Mesa. *Id.* (D. Byck Exam. Tr. 40:16-41:4).

### 8. IN 2015, THE CO-CONSPIRATORS ABANDONED THE SETTLING PARTY 2/MESA SCHEME AND BEGAN TO OPERATE UNDER A SCHEME INVOLVING SETTLING PARTY 2 AND A NEW BUSINESS, CROSSRIDGE.

643.   Co-conspirators Jason Mandel, Marvin Meyer, David Meyer, Settling Party 1, and LaGambina lost confidence in the Settling Party 2/Mesa scheme, because the Settling Party 2/Mesa scheme did not provide assurance to the co-conspirators that the insured would use the Mesa loan to purchase an insurance policy.   Exh. 3 (LaGambina Exam. Tr. 976:25-978:15).

644.   Accordingly, in **late 2014**, Jason Mandel, Settling Party 1, LaGambina, and their co-conspirators strategized a modification to the Settling Party 2/Mesa scheme.

645.   This "improved" scheme involved the creation of a new entity, Crossridge Partners, Inc., ("Crossridge").

646.     On **January 13, 2015**, Crossridge was organized at the direction of Jason Mandel, Settling Party 1, and LaGambina, and created under the laws of the State of Delaware, with a principal place of business in Connecticut.

647.     The co-conspirators utilized Crossridge instead of Mesa as a vehicle for covertly financing insurance premiums through ILITs.

648.     After Edwards Wildman merged to become Locke Lord Edwards ("Locke Lord"), Jason Mandel and Settling Party 1 sought advice regarding the new Settling Party 2/Crossridge finance program.

649.     Locke Lord issued an opinion letter to Settling Party 2 dated **February 12, 2015**. Exh. 58 (the "Locke Lord Opinion").

650.     The Locke Lord Opinion advised the co-conspirators on the proposed financing structure, setting forth a roadmap for obtaining policies and financing insurance premiums properly and in compliance with Connecticut law.[22]

651.     The Locke Lord Opinion anticipated that Crossridge would act as an "investor" and would provide loans to finance the insurance premiums. *Id.* at p. 1.

652.     First, the insured would form an ILIT, which would own the insurance policy. *Id.* at p. 2

653.     Next, the insured's ILIT and Crossridge would form an LLC together. *Id.*

654.     Then, Crossridge would loan funds to the LLC, the LLC would loan funds to the ILIT, and the ILIT would pay the premium. *Id.* at pp. 2-3

---

[22] The co-conspirators did not obtain a legal opinion on the implications of their scheme under any other state law.

655.    The insured's ILIT could assign the life insurance policy, provided that the assignment did not occur within two years of the policy's issuance. *Id.* at p. 4.

656.    The Locke Lord Opinion attached sample forms as exhibits, including a Loan Agreement, an Assignment of Life Insurance Policy, and a Limited Liability Company Agreement.

657.    The Locke Lord Opinion identified many other conditions on the lawful execution of the premium finance structure.

658.    Jason Mandel and Settling Party 1 circulated the Locke Lord Opinion widely, to certain Agent Defendants, Trustee Defendants, Funding Defendants, and prospective insureds.

659.    The co-conspirators failed to follow the Locke Lord Opinion in many material respects.

660.    As demonstrated above, the co-conspirators tried numerous approaches and schemes to finance insurance premiums as an investment vehicle—first, Mesa, then Access Consumer Finance, then the Put Option contract through Soundview Fund, then Mountainview. Exh. 3 (LaGambina Exam. Tr. 829:11-839:12; 850:3-851:10).

661.    When each of those efforts failed, they obtained opinion letters from prominent law firms that described how the financing mechanism might be used within the bounds of Connecticut law.

662.    Instead of following that advice, the co-conspirators intentionally disregarded the requirements set forth in the opinion letters, and knowingly and intentionally operated outside the bounds of the law.

663.    The co-conspirators were told how to do it right.

664.    They intentionally chose to do it wrong.

665.     The co-conspirators' repeated and intentional disregard of the legal advice in the Locke Lord Opinion is evidence of the fraudulent intent of the co-conspirators, who nevertheless tried to cover their illicit actions by touting the Opinion to insureds.

## 9.     THE CO-CONSPIRATORS IMPLEMENTED THE FRAUDULENT SCHEME FUNDED THROUGH SETTLING PARTY 2 AND CROSSRIDGE: PREDICATE ACTS THREE THROUGH EIGHTEEN.

666.     The co-conspirators began selling policies and funding premiums under the Settling Party 2/Crossridge scheme in **2015**.

667.     On **February 17, 2015**, Settling Party 1 wired $322,000 to Crossridge to facilitate the fraudulent scheme. Exh. 33 (FP_009097).

### Predicate Act Three: The ROBERT SWETNICK Policy

668.     Jason Mandel or Settling Party 1 contacted Robert Swetnick, a New York resident, about selling Swetnick a life insurance policy that, in Swetnick's words, "wasn't going to, basically, . . . cost anything" because Swetnick could take out a loan to cover the premium. Exh. 60 (Swetnick Exam. Tr. 17:22-18:21; 22:6-21).[23]

669.     In other words, Jason Mandel or Settling Party 1 offered Swetnick "free insurance."

670.     Swetnick admitted under oath that he obtained "free life insurance," as he did not pay any money for the insurance policy; rather, it was funded through a loan that he never had to repay. *Id.* (Swetnick Exam. Tr. 79:4-20).

671.     This offer of "free insurance" violates state insurance laws, rules, and regulations in Connecticut, the state in which the policy was issued. *See* Conn. Gen. Stat. § 38a-816(1).

---

[23] FGLIC took the Examination of Trustee Defendant Robert Swetnick on December 3, 2018 (hereinafter "Swetnick Exam. Tr. ___").

672.     On **January 20, 2015**, Sharma, Settling Party 1, and Settling Trustee 4 caused the creation of an ILIT in Swetnick's name (the "Swetnick ILIT"), pursuant to a trust agreement executed by Robert Swetnick as settlor, Settling Trustee 4 as trustee, Swetnick's administrative assistant as "Witness #1," and Sharma as "Witness #2." Exh. 61 (SHARMA-BK003209-32); *see also* Exh. 60 Swetnick Exam. Tr. 48:6-14.

673.     Upon information and belief, Jason Mandel solicited Settling Trustee 4, an attorney, to serve as a trustee under the Settling Party 2/Crossridge scheme.

674.     Upon information and belief, Settling Trustee 4 has performed legal work for Jason Mandel for many years.

675.     The co-conspirators—notably Jason Mandel and Settling Party 1—wanted to solicit professionals, such as accountants and attorneys, to serve as trustees to the ILITs formed under the Settling Party 2/Crossridge scheme. Exh. 3 (LaGambina Exam. Tr. 145:10-19).

676.     Jason Mandel and Settling Party 1 wanted to exhibit "professionalism" to the insurance agents and brokers to whom they marketed the scheme, by referring trustees who held professional or fiduciary roles. *Id.* (LaGambina Exam. Tr. 146:7-14).

677.     In his capacity as trustee, Settling Trustee 4 established a bank account for the Swetnick ILIT.

678.     In **early 2015**, Sharma sought to obtain a FGLIC life insurance policy in Swetnick's name, in the amount of $7 million.

679.     At Sharma's request, Settling Party 1 completed Swetnick's life insurance application utilizing information that Swetnick provided to Settling Party 1 in a questionnaire. Exh. 60 (Swetnick Exam. Tr. 19:11-14).

680.    Sharma admitted that Settling Party 1 "assisted [Sharma] with the application" for Swetnick. Exh. 4 (Sharma Exam. Tr. 248:23-24).

681.    Sharma knew Settling Party 1 had not been appointed to serve as an insurance producer for FGLIC.

682.    Sharma thereby acted as a "surrogate" to Settling Party 1, a non-appointed insurance producer, in violation of Sharma's contract with FGLIC prohibiting an appointed insurance producer from "act[ing] as a "surrogate" for a non-licensed or non-appointed Producer." *See* Exh. 31 (Market Conduct Guide Rev. 12-2014, at p. 24).

683.    The Swetnick application asks: "Will you borrow money to pay the premium for the life insurance being applied for or have someone else pay these premiums for you in return for you assigning part or all of the policy values to someone else?"  Exh. 62 (FGLIC_RL00007380-418).

684.    Settling Party 1 and Swetnick falsely answered "no" to this question in the Swetnick application. *Id.*

685.    Settling Party 1 and Swetnick knew this representation was false because they knew Swetnick was financing the premium with a loan from a co-conspirator.

686.    Settling Party 1's and Swetnick's false statements in connection with the application violated applicable state insurance laws, regulations, and rules.  *See* Conn. Gen. Stat. § 38a-816(8).

687.    Sharma executed Swetnick's application on **February 3, 2015**, certifying to numerous material representations in the application that Sharma knew at the time were false.  Exh. 62 (FGLIC_RL00007380-418).

688.     Sharma admitted that he certified misstatements of fact in the policy applications to be submitted to FGLIC. Exh. 4 (Sharma Exam. Tr. 367:7-368:8).

689.     Sharma's false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Conn. Gen. Stat. § 38a-816(8).

690.     *First*, Sharma certified that the insured was not borrowing funds to finance the premium, a representation that Sharma knew to be false because he knew Swetnick was financing the premium with a loan from Crossridge.

691.     Sharma concealed from FGLIC the fact that Swetnick was obtaining a loan from Crossridge to induce FGLIC to issue the policy to Swetnick.

692.     *Second*, Sharma represented that he had "witnessed the signatures on this application" for Swetnick.  Exh. 62 (FGLIC_RL00007380-418).

693.     Sharma knew this representation was false when made because he did not witness Swetnick's signature on the application.

694.     *Third*, Sharma falsely assured FGLIC that he was familiar with Swetnick, in a letter Sharma sent along with Swetnick's application in which Sharma claimed he "had the pleasure of knowing [Swetnick] as we were introduced through mutual business associates. In my time knowing Robert I have seen that he leads an active lifestyle with strong ties to the community." *Id.* (FGLIC_RL00007380-418).

695.     Sharma's representation in his letter to FGLIC was false because Sharma did not, in fact, know Swetnick personally.

696.     Swetnick testified that, when Sharma wrote that letter, Swetnick had met Sharma in person "at the most… two times" and spoke to him on the phone "[p]erhaps two other times." Exh. 60 (Swetnick Exam. Tr. 29:3-10).

697.    Sharma also admitted that Settling Party 1 "helped [Sharma] in writing" the letter to FGLIC about Swetnick. Exh. 4 (Sharma Exam. Tr. 251:21-252:13).

698.    Sharma intended for FGLIC to rely on the false representations he made in connection with Swetnick's application.

699.    The Locke Lord Opinion explicitly advised Sharma, Settling Party 1, Swetnick, and their co-conspirators to answer all questions and items on the application "truthfully and accurately," yet the co-conspirators disregarded this basic requirement and submitted applications containing false representations.  *See* Exh. 58, at p. 2.

700.    On or about **February 3, 2015**, Sharma and his d/b/a RequiteLife sent Swetnick's application materials by wire to Network Partners.

701.    Network Partners, in its role as General Agent, was responsible for validating Swetnick's application materials prior to submitting them to FGLIC.

702.    Network Partners knew that the statement about not borrowing funds to finance the premium was false, because Network Partners knew that Swetnick was financing the premium with a loan from a co-conspirator, and Network Partners intended for FGLIC to rely on that false statement.

703.    Network Partners did not correct the false representations in Swetnick's application.

704.    On **February 4, 2015**, Network Partners sent the application by facsimile transmission over the wire to FGLIC with the false representations included in the materials.

705.    Network Partners' false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Conn. Gen. Stat. § 38a-816(8).

706.     In reliance on the false representations by Sharma, Settling Party 1, Swetnick, and Network Partners, FGLIC issued a policy to Swetnick with a value of $7 million (the "Swetnick Policy") on **March 25, 2015**, in the State of Connecticut.  Exh. 63 (GS0008238-8291).

707.     The premium for the Swetnick Policy was $337,540. *Id.*

708.     Settling Party 1 caused Settling Party 2 to wire sufficient funds to Crossridge to fund the premium.

709.     On **April 8, 2015**, LaGambina caused Crossridge to wire $339,700 to the bank account of the Swetnick ILIT.  Exh. 64 (GS00013603-06).

710.     The Locke Lord Opinion specifically advised the co-conspirators that, in order to remain compliant with Connecticut law, Crossridge must make a "cash capital contribution to an LLC," then the LLC would fund a loan to the ILIT.  Exh. 58 at pp. 2-3.

711.     LaGambina, Crossridge, and Settling Trustee 4 deliberately violated this requirement by wiring money directly from Crossridge to Swetnick's ILIT.

712.     On **April 9, 2015**, Settling Trustee 4 wired $337,540 from the ILIT to FGLIC, as payment of the premium on the Swetnick Policy.  Exh. 65 (FGLIC_RL00007999).

713.     Settling Trustee 4 withdrew an additional amount (approximately $2000) for himself, as payment for his service as trustee.  Exh. 66.

714.     In reliance on the fraudulent misrepresentations perpetrated by David Meyer, Network Partners, Sharma, Settling Party 1, LaGambina, Settling Party 2, Crossridge, and Settling Trustee 4, FGLIC paid Defendants Sharma, RequiteLife, and Network Partners commissions and bonuses totaling $523,187 for the fraudulent sale of the Swetnick Policy.

715.     Network Partners, Sharma, and RequiteLife paid Settling Party 2 approximately 95% of the commissions and bonuses they received from FGLIC, thereby (i) unlawfully splitting

commissions with an unlicensed person, *see* Conn. Gen. Stat. § 38a-702*l*(a); and (ii) unlawfully rebating premium payments, *see* Conn. Gen. Stat. § 38a-465i.

716.     Specifically, on **April 15, 2015**, Sharma, on behalf of RequiteLife, wired over $182,000 to Settling Party 2 for services rendered on the Swetnick Policy and other policies, thereby rebating the premium payment back to Settling Party 2.  Exh. 67 (FP_000088-90).

717.     On **April 25, 2015**, LaGambina established a business entity called Swetnick Partners, LLC.  Exh. 68 (GS00008199-230).

718.     A Limited Liability Company Agreement for Swetnick Partners was executed by Settling Trustee 4, as trustee of the Swetnick ILIT, and LaGambina, as President of Crossridge. *Id.*

719.     The LLC Agreement named the Swetnick ILIT and Crossridge as the sole members of Swetnick Partners, with the Swetnick ILIT owning the majority of membership interests. *Id.*

720.     Also on **April 25, 2015**, LaGambina and Settling Trustee 4 caused Swetnick Partners and the Swetnick ILIT to enter into a sham Loan Agreement for the amount of $339,540. Exh. 69 (GS00008231-37).

721.     The Loan Agreement falsely identifies Swetnick Partners as the Lender, and the ILIT as the Borrower. *Id.*

722.     Settling Trustee 4 executed the Loan Agreement twice: first on behalf of the Lender, Swetnick Partners, in his capacity as trustee of the majority shareholder; and second, on behalf of the Borrower, in his capacity as trustee of the trust. *Id.*

723.    In fact, the so-called "loan" was a sham:

(i)    The LLC never had the funds; the funds were wired from Crossridge to the ILIT directly.

(ii)    Moreover, the ILIT had no assets to repay the "loan" once the insurance policy lapsed shortly after the first anniversary of the policy.

724.    The Defendants referenced in this Predicate Act knew the loan was a sham.

725.    On **April 25, 2015**, LaGambina and Settling Trustee 4 caused the Swetnick ILIT to assign the Swetnick Policy to Swetnick Partners, pursuant to an Assignment of Life Insurance Policy.  Exh. 70 (GS0008187-98).

726.    Settling Trustee 4 executed the Assignment twice: first, as trustee of the assignor, the Swetnick ILIT; and second, as trustee of the majority shareholder of the assignee, Swetnick Partners.

727.    Although the Assignment stated that the policy had been in effect for two years, this statement was false on its face.

728.    The Locke Lord Opinion advised the co-conspirators that, in order to remain compliant with Connecticut law, a life insurance policy shall not be assigned within two years of issuance. Exh. 58, at p. 4.

729.    In fact, the co-conspirators assigned the Swetnick Policy to Swetnick Partners exactly one month after FGLIC issued the Policy.

730.    By first obtaining the Locke Lord Opinion and then deliberately disregarding its contents with respect to the Swetnick Policy and other policies, the co-conspirators acted with a clear intent to defraud FGLIC.

731.     Sharma, RequiteLife, David Meyer, Network Partners, Settling Party 1, Settling Party 2, LaGambina, Crossridge, and Settling Trustee 4 caused the life insurance application and all of the fraudulent agreements to be sent or transmitted by the mail and/or by wire.

732.     On **May 13, 2015**, Sharma, on behalf of RequiteLife, wired $19,200 to Settling Party 2 for services rendered on the Swetnick Policy, once again rebating the premium payment back to Settling Party 2.  Exh. 71 (FP_000093-95).

733.     The second-year premium on the Swetnick Policy was not paid.

734.     Accordingly, the Swetnick Policy lapsed worthless on **March 25, 2016**.  Exh. 72 (FGLIC_RL00008043).

735.     Settling Trustee 4, together with his fellow co-conspirators, utilized the same pattern of fraudulent and unlawful activity described above for three other policies issued by FGLIC: Joel Plasco (policy ending in 298); Yoav Sisley (policy ending in 097), and Kyle Solomon (policy ending in 383).

736.     The events and facts associated with the issuance of the Plasco, Sisley, and Solomon policies are all Predicate Acts.

737.     Insured Yoav Sisley is a client of Swetnick, a practicing attorney. Exh. 60 (Swetnick Exam. Tr. 14:1-5; 23:7-22).

738.     Swetnick acknowledged that he obtained "free insurance" from FGLIC. *Id.* (Swetnick Exam. Tr. 79:16-20).

739.     Swetnick also acknowledged reading the Locke Lord Opinion, which he received from Jason Mandel or Settling Party 1.  *Id.* (Swetnick Exam. Tr. 19:3-7).

740.     Swetnick nevertheless took actions in violation and deliberate disregard of the legal advice set forth in the Locke Lord Opinion, as discussed above.

741.    Swetnick perpetuated the fraud of "free insurance" offered by the co-conspirators by referring one of his own clients to the conspiracy and also serving as trustee to the scheme. *Id.* (Swetnick Exam. Tr. 81:9-21).

742.    Swetnick's fellow co-conspirators sold Swetnick's client a $10 million life insurance policy through another insurer. *Id.* (Swetnick Exam. Tr. 82:8-83:24).

743.    The premium on the policy was financed using the same Settling Party 2/Crossridge scheme that was used in connection with Swetnick's FGLIC policy. *Id.* (Swetnick Exam. Tr. 97:15-98:15).

744.    Swetnick and his fellow co-conspirators caused the creation of an ILIT in his client's name, for which he served as the trustee.

745.    As trustee of his client's ILIT, Swetnick signed the life insurance policy application; signed sham agreements with Crossridge (including an LLC agreement, a loan agreement, and an assignment); and wired the premium from his client's ILIT to the insurer. *Id.* (Swetnick Exam. Tr. 89:17-95:19).

**Predicate Act Four: The ISRAEL WEINSTOCK Policy**

746.    The co-conspirators sold insured Israel Weinstock ("Weinstock") two life insurance policies, issued in the State of Connecticut, which policies were procured by fraud and breach of fiduciary duty.

747.    On **February 11, 2015**, Agent Defendant Gregg Kirschner, Settling Party 1, and Settling Trustee 10 caused the creation of an ILIT in Weinstock's name (the "Weinstock ILIT"), pursuant to a trust agreement executed by Weinstock as settlor and Settling Trustee 10 as trustee. Exh. 73 (FGLIC_RL00002483).

748.    In his capacity as trustee, Settling Trustee 10 established a bank account for the Weinstock ILIT.

749.    In **February 2014**, Kirschner sought to obtain a FGLIC life insurance policy in Weinstock's name, in the amount of $5 million.

750.    Kirschner relied on Settling Party 1 to complete Weinstock's life insurance application.

751.    The application lists the primary insured as Weinstock, and the owner of the policy as the Weinstock ILIT.  Exh. 74 (FGLIC_RL00002455).

752.    The application asks: "Will you borrow money to pay the premium for the life insurance being applied for or have someone else pay these premiums for you in return for you assigning part or all of the policy values to someone else?" *Id.*

753.    Settling Party 1 falsely answered this question, "no." *Id.*

754.    Settling Party 1 knew this representation was false because he knew Weinstock was financing the premium with a loan from Crossridge.

755.    Settling Party 1's false statements in connection with the application violated applicable state insurance laws, regulations, and rules.  *See* Conn. Gen. Stat. § 38a-816(8).

756.    Kirschner executed Weinstock's application on **February 24, 2015**, certifying falsely that Weinstock was not borrowing funds to finance the premium. *Id.*

757.    Kirschner knew this representation about borrowing funds was false because he knew Weinstock was financing the premium with a loan from a co-conspirator.

758.    Kirschner concealed from FGLIC the fact that Weinstock was obtaining a loan in order to induce FGLIC to issue the policy to Weinstock.

759.     Kirschner's false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Conn. Gen. Stat. § 38a-816(8).

760.     Kirschner also knew Settling Party 1 completed the life insurance application on Weinstock's behalf.

761.     Kirschner knew that Settling Party 1 had not been appointed to serve as an insurance producer for FGLIC.

762.     Kirschner knowingly acted as a "surrogate" to Settling Party 1, a non-appointed insurance producer, in violation of Kirschner's contract with FGLIC prohibiting an appointed insurance producer from "act[ing] as a 'surrogate' for a non-licensed or non-appointed Producer." *See* Exh. 31 (Market Conduct Guide Rev. 12-2014, at p. 24).

763.     On or about **February 24, 2015**, Kirschner and his d/b/a MRM Advisors sent Weinstock's application materials by wire to Network Partners.

764.     Network Partners, in its role as General Agent, was responsible for validating Weinstock's application materials prior to submitting them to FGLIC.

765.     Network Partners knew that the statement in Weinstock's application that the insured would not borrow funds to finance the premium was false, because Network Partners knew the premium was to be financed by a loan from a co-conspirator, and Network Partners intended for FGLIC to rely on that false statement.

766.     Network Partners did not correct the false representations in Weinstock's application.

767.     On or about **February 24, 2015**, Network Partners sent the application materials by facsimile transmission over the wire to FGLIC.

768.   Network Partners' false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Conn. Gen. Stat. § 38a-816(8).

769.   In reliance on Kirschner's and Network Partners' misrepresentations, FGLIC issued a life insurance policy to Weinstock in the State of Connecticut with a value of $5 million on **May 1, 2015**.  Exh. 75 (FGLIC_RL00002586).

770.   The annual premium payment on the Weinstock Policy was $420,000. *Id.*

771.   Settling Party 1 caused Settling Party 2 to wire sufficient funds to Crossridge to fund the premium.

772.   On **May 13, 2015**, LaGambina caused Crossridge to wire $424,000 to the bank account of the Weinstock ILIT.  Exh. 76 (JPMORGAN-SDT 000016).

773.   On **May 15, 2015**, Settling Trustee 10 wired $420,000 from the ILIT to FGLIC, as payment of the premium on the Weinstock Policy.  Exh. 77 (FGLIC_RL00002719).

774.   Settling Trustee 10 withdrew an additional amount (approximately $4,000) for himself, as payment for his role as "trustee" in service to the conspiracy.

775.   In reliance on the fraudulent misrepresentations perpetrated by David Meyer, Network Partners, Kirschner, Settling Party 1, LaGambina, Settling Party 2, Crossridge, and Settling Trustee 10, FGLIC paid Kirschner, MRM Advisors, and Network Partners commissions and bonuses totaling $562,800 for the fraudulent sale of the Weinstock Policy.

776.   Network Partners, Kirschner, and MRM Advisors paid Settling Party 2 approximately 95% of the commissions and bonuses they received from FGLIC, thereby (i) unlawfully splitting commissions with an unlicensed person, *see* Conn. Gen. Stat. § 38a-702*l*(a); and (ii) unlawfully rebating premium payments, *see* Conn. Gen. Stat. § 38a-465i.

777.    At Settling Party 1's direction, LaGambina obtained power of attorney over the bank account of MRM, Kirschner's d/b/a. Exh. 3 (LaGambina Exam. Tr. 39:1-20).

778.    Kirschner agreed to grant LaGambina this access to MRM. *Id.* (LaGambina Exam. Tr. 40:6-7).

779.    Settling Party 1 wanted LaGambina to have control over MRM's account as a form of security for the scheme, to ensure Kirschner and MRM would pay their commissions back to Settling Party 2. *Id.* (LaGambina Exam. Tr. 39:21-40:5).

780.    On **June 1, 2015**, LaGambina established a business entity called Weinstock Partners, LLC.  Exh. 78 (GS0008784).

781.    A Limited Liability Company Agreement for Weinstock Partners was executed by Settling Trustee 10, as trustee of the Weinstock ILIT, and LaGambina, as President of Crossridge.

782.    The LLC Agreement named the Weinstock ILIT and Crossridge as the sole members of Weinstock Partners, with the Weinstock ILIT owning the majority of membership interests.

783.    Also on **June 1, 2015**, LaGambina and Settling Trustee 10 caused Weinstock Partners and the Weinstock ILIT to enter into a sham Loan Agreement for the amount of $422,000. Exh. 79 (GS0008680).

784.    The Loan Agreement falsely identifies Weinstock Partners as the Lender, and the Weinstock ILIT as the Borrower.

785.    Settling Trustee 10 executed the Loan Agreement twice: first on behalf of the Lender, Weinstock Partners, in his capacity as trustee of the majority shareholder; and second, on behalf of the Borrower, in his capacity as trustee of the trust.

786.   In fact, the so-called "loan" was a sham:

(i)   The LLC never had the funds; the funds were wired from Crossridge to the ILIT directly.

(ii)   Moreover, the ILIT had no assets to repay the "loan" once the insurance policy lapsed shortly after the first anniversary of the policy.

787.   The Defendants referenced in this Predicate Act knew the loan was a sham.

788.   Finally on **June 1, 2015**, LaGambina and Settling Trustee 10 caused the Weinstock ILIT to assign the Weinstock Policy to Weinstock Partners, pursuant to an Assignment of Life Insurance Policy. Exh. 80 (GS0008772).

789.   Settling Trustee 10 executed the Assignment twice: first, as trustee of the assignor, the Weinstock ILIT; and second, as trustee of the majority shareholder of the assignee, Weinstock Partners.

790.   Although the Assignment stated that the policy had been in effect for two years, this statement was false on its face.

791.   The actions taken by the Defendants referenced in this Predicate Act are in violation and deliberate disregard of the legal advice set forth in the Locke Lord Opinion, which is evidence of these Defendants' fraudulent intent.

792.   Kirschner, MRM Advisors, David Meyer, Network Partners, Settling Party 1, Settling Party 2, LaGambina, Crossridge, and Settling Trustee 10 caused the life insurance application and all of the fraudulent agreements to be sent or transmitted by the mail and/or by wire.

793.   The second-year premium on the Weinstock Policy was not paid.

794.     Accordingly, the Weinstock Policy lapsed worthless on **May 1, 2016**.  Exh. 81 (FGLIC_RL00002762).

795.     Settling Trustee 10, together with his fellow co-conspirators, utilized the same pattern of fraudulent and unlawful activity described above for four other policies issued by FGLIC: Max Frankel (policy ending in 465), Benjamin Greenfeld (policy ending in 153), Phillip Martin (policy ending in 639), and Bernard Schnitzler (policy ending in 683).

796.     The events and facts associated with the issuance of the Frankel, Greenfeld, Martin, and Schnitzler Policies are all Predicate Acts.

### Predicate Act Five: The RICHARD PROPPER Policy

797.     The co-conspirators sold insured Richard Propper a life insurance policy, issued in the State of Connecticut and valued at $8 million, which was procured by fraud and breach of fiduciary duty.

798.     Richard Propper testified his son Kerry Propper introduced him to Jason Mandel, who in turn introduced Richard Propper to Settling Party 1. Exh. 82 (Propper Exam. Tr. 23:10-15; 24:12-25:3).[24]

799.     Jason Mandel proposed to Richard Propper that he purchase a life-insurance policy. Jason Mandel described the prospective policy, to use Propper's word, as a "windfall."  *Id.* (Propper Exam. Tr. 25:15-22).

800.     Propper elaborated that Jason Mandel told him, "Sign up for a policy. And then the following year you had a choice of even continuing the policy or not. But the payments, in effect, were set to begin the following year."  *Id.* (Propper Exam. Tr. 26:15-25).

---

[24] FGLIC took the Examination of insured Richard Propper on November 29, 2018 (hereinafter "Propper Exam. Tr. ___").

801.    In other words, Jason Mandel told Richard Propper that he would have free life insurance for a year.

802.    This offer of "free insurance" violates state insurance laws, rules, and regulations in the state in which the policy was issued. *See* Conn. Gen. Stat. § 38a-816(1).

803.    According to Richard Propper, Jason Mandel represented that the insurance product on offer "has been vetted by a law firm, and he [Mandel] mentioned Locke Lord." *Id.* (Propper Exam. Tr. 26:15-28).

804.    Propper received a copy of the Locke Lord opinion but did not read it. *Id.* (Propper Exam. Tr. 188:6-20).

805.    Richard Propper stated under oath in an affidavit that Settling Party 2 and Settling Party 1 told him the funding structure underlying Richard Propper's life insurance policy "was getting approved by the underwriters at Fidelity." Exh. 83 (Affidavit of Richard Propper dated October 1, 2018 ("Propper Aff.") at p. 1).

806.    The statement made by Settling Party 1 and Settling Party 2 was false and was made with *scienter*.

807.    Howard Jahre served as the trustee to Richard Propper's ILIT.

808.    Jahre testified that he had known Jason Mandel since 2006 or 2007 because both Jason Mandel and Jahre worked with hedge funds. Exh. 2 (Jahre Exam. Tr. 36:2-10).

809.    Jason Mandel introduced Jahre to Settling Party 1. *Id.* (Jahre Exam. Tr. 36:23-37:2).

810.    Settling Party 1 met with Jahre in late 2014 or early 2015 to request that Jahre work on life insurance premium finance matters. *Id.* (Jahre Exam. Tr. 38:15-22; 40:7-11).

811.    Settling Party 1 provided Jahre with the Locke Lord Opinion, just as Jason Mandel had done for Richard Propper. *Id.* (Jahre Exam. Tr. 48:6-9).

812.    Settling Party 1 told Jahre that FGLIC had approved the funding scheme: "All I know is that [Settling Party 1] assured me that Fidelity was okay with the structure." *Id.* (Jahre Exam. Tr. 46:25-47:20; 90:20-22).

813.    In his capacity as trustee, Jahre established a bank account for the Richard Propper ILIT.

814.    Richard Propper undertook to apply for a life insurance application with FGLIC.

815.    He filled out parts of the application by hand, then gave the application to Settling Party 1, Jason Mandel, or Sharma. Exh. 82 (Propper Exam. Tr. 48:2-49:3).

816.    Settling Party 1, who was not appointed to serve as a FGLIC insurance producer, proceeded to complete the life insurance application for Richard Propper.

817.    The application lists the primary insured as Richard Propper, and the owner of the policy as an ILIT in Richard Propper's name (hereinafter, the "Propper ILIT").   Exh. 84 (FGLIC_RL00008071-8084).

818.    The application asks: "Will you borrow money to pay the premium for the life insurance being applied for or have someone else pay these premiums for you in return for you assigning part or all of the policy values to someone else?" *Id.*

819.    Settling Party 1 falsely answered this question, "no." *Id.*

820.    Settling Party 1 knew this representation was false because he knew Richard Propper was financing the premium with a loan from Crossridge.

821.    Settling Party 1's false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Conn. Gen. Stat. § 38a-816(8).

822.     Richard Propper executed the application by way of an electronic signature on **March 3, 2015**. Exh. 82 (Propper Exam. Tr. 60:23-61:9);  Exh. 84 (FGLIC_RL00008071-8084).

823.     Also on **March 3, 2015**, Sharma, Settling Party 1, and Jahre caused the creation of the Propper ILIT, which Richard Propper executed as settlor, Howard Jahre executed as trustee, and Sharma executed as a witness.  Exh. 85 (GS00024756-24779).

824.     Sharma executed Richard Propper's life insurance application on **March 3, 2015**, certifying to numerous representations in the application that Sharma knew at the time were false.

825.     Sharma admitted that he certified misstatements of fact in the policy applications to be submitted to FGLIC. Exh. 4 (Sharma Exam. Tr. 367:7-368:8).

826.     Sharma's false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Conn. Gen. Stat. § 38a-816(8).

827.     *First*, Sharma certified falsely that Richard Propper was not borrowing funds to finance the premium.

828.     Sharma knew this representation about borrowing funds was false because he knew Richard Propper was financing the premium with a loan from a co-conspirator.

829.     Sharma concealed from FGLIC the fact that Richard Propper was obtaining a loan from Crossridge to induce FGLIC to issue the policy to Propper.

830.     *Second*, Sharma knew Settling Party 1 completed the life insurance application on Propper's behalf.

831.     Sharma knew that Settling Party 1 had not been appointed to serve as an insurance producer for FGLIC.

832.    Sharma knowingly acted as a "surrogate" to Settling Party 1, a non-appointed insurance producer, in violation of Sharma's contract with FGLIC. *See* Exh. 31 (Market Conduct Guide Rev. 12-2014, at p. 24).

833.    Sharma concealed from FGLIC that Settling Party 1 had completed Propper's life insurance application, in order to further the conspiracy between Sharma, Settling Party 1, and their fellow co-conspirators.

834.    ***Third***, Sharma certified falsely that he had witnessed the signatures of both Richard Propper and Jahre on the application materials.

835.    Richard Propper testified that Sharma did not witness his signature. Exh. 82 (Propper Exam. Tr. 75:4-6).

836.    Trustee Defendant Jahre testified that Sharma made a false statement by signing that Sharma witnessed the signatures on the applications. Exh. 2 (Jahre Exam. Tr. 130:21-131:11).

837.    In fact, Jahre testified that his own signature was forged. *Id.* (Jahre Exam. Tr. 137:1-10).

838.    Jahre became incensed during his Examination when confronted with documents purporting to contain his signature that he does not believe he signed:

Q:      Now take a look at your signature. Did you sign this document [life insurance illustration]?

A:      No. How do they do these things? I mean, these guys are crooks.

*Id.* (Jahre Exam. Tr. 141:22-25).

839.    Jahre wasted no words in describing what he believes happened with respect to the co-conspirators and Dr. Propper's life insurance policy:

A:      ***It looks like they intentionally did this to screw the insurance company***.

*Id.* (Jahre Exam. Tr. 150:2-4) (emphasis added).

840.   ***Fourth***, Sharma falsely represented to FGLIC that he was familiar with Richard Propper, in order to induce FGLIC to issue the policy.

841.   Sharma wired a letter dated **March 5, 2015**,[25] to Network Partners along with Richard Propper's application representing to FGLIC that he "had the pleasure of getting to know Richard through mutual friends and business associates." Exh. 86 (FGLIC_RL00008085).

842.   Sharma intended that Network Partners would send the letter to FGLIC, for the purpose of issuing Richard Propper an insurance policy—and thus paying a commission to Sharma to be shared with the co-conspirators.

843.   Richard Propper testified that this statement, about Sharma and Richard Propper knowing each other through mutual friends and business associates, was false. Propper Exam. Tr. 63:15–64:14.

844.   Sharma admitted that he intentionally made false statements in the introductory letters he sent along with an insured's application materials, because he knew FGLIC would rely on them to issue the policies. Exh. 4 (Sharma Exam. Tr. 174:8-16).

845.   On or about **March 5, 2015**, Sharma and his d/b/a RequiteLife sent Richard Propper's application materials by the mail or wire to Network Partners.

846.   Network Partners, in its role as General Agent, was responsible for validating Richard Propper's application materials prior to submitting them to FGLIC.

---

[25] The letter contains a typographical error, listing the year as 2014 instead of 2015. Corroborating evidence suggests Richard Propper's life insurance application was submitted, along with this letter from Sharma, in 2015.

847.     Network Partners knew that the statement in Richard Propper's application that the insured would not borrow funds to finance the premium was false, because Network Partners knew the premium was to be financed by a loan from a co-conspirator, and Network Partners intended for FGLIC to rely on that false statement.

848.     Network Partners did not correct the false representations in Richard Propper's application.

849.     On **March 6, 2015**, Network Partners sent Richard Propper's application materials by facsimile transmission over the wire to FGLIC with the false representations included in the materials.

850.     Network Partners' false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Conn. Gen. Stat. § 38a-816(8).

851.     On **March 6, 2015**, Settling Party 1 sent an email to Richard Propper reporting that his application had been submitted to FGLIC.

852.     Anticipating that FGLIC would conduct an interview with Richard Propper as part of evaluating Propper's application, Settling Party 1 attached to this email a summary sheet for Propper to use during his interview.  Exh. 82 (Propper Exam. Tr. 45:6-23).

853.     Co-conspirator Sharma testified that he and Settling Party 1 prepared a summary sheet for prospective insureds like Propper to use in responding to the interviewer's questions to enable the insured to pass FGLIC's verification process. Exh. 4 (Sharma Exam. Tr. 243:24-244:18).

854.     In reliance on the co-conspirators' misrepresentations in Propper's application materials, FGLIC issued a life insurance policy to Richard Propper with a value of $8 million on **May 6, 2015** (the "Propper Policy").  Exh. 87 (GS0006417-95).

855.     The annual premium payment on the Propper Policy was $553,600. *Id.*

856.     Settling Party 1 caused Settling Party 2 to wire sufficient funds to Crossridge to fund the premium.

857.     On **June 2, 2015**, LaGambina caused Crossridge to wire $556,000 to the bank account of the Propper ILIT.  Exh. 88 (GS00013595).

858.     On **June 7, 2015**, a business entity named Propper Ventures, LLC, was formed pursuant to a Limited Liability Company Agreement executed by Jahre, as trustee of the Propper ILIT, and LaGambina, President of Crossridge.  Exh. 89 (GS00006509-39).

859.     The LLC Agreement named the Propper ILIT and Crossridge as the sole members of Propper Ventures, with the Propper ILIT owning the majority of membership interests.

860.     Also on **June 7, 2015**, LaGambina and Jahre caused Propper Ventures and the Propper ILIT to enter into a sham Loan Agreement for the amount of $555,600.   Exh. 90 (GS00006540-46).

861.     The Loan Agreement falsely identifies Propper Ventures as the Lender, and the trust as the Borrower.

862.     Jahre executed the Loan Agreement on behalf of the Lender, Propper Ventures (in his capacity as trustee of the majority shareholder), and on behalf of the Borrower (also in his capacity as trustee).

863.     In fact, the so-called "loan" was a sham:

    (i)    The LLC never had the funds; the funds were wired from Crossridge to the ILIT directly.

    (ii)    Moreover, the ILIT had no assets to repay the "loan" once the insurance policy lapsed shortly after the first anniversary of the policy.

864.     The Defendants referenced in this Predicate Act knew the loan was a sham.

865.     On **June 7, 2015**, LaGambina and Jahre caused the Propper ILIT to assign the Propper Policy to Propper Ventures, pursuant to an Assignment of Life Insurance Policy executed twice by Jahre—first, as trustee of the assignor, the Propper ILIT, and second, as trustee of the majority shareholder of the assignee, Propper Ventures.  Exh. 91 (GS00006496-508).

866.     Although the Assignment stated that the policy had been in effect for two years, this statement was false on its face.

867.     The actions taken by the Defendants referenced in this Predicate Act are in violation and deliberate disregard of the legal advice set forth in the Locke Lord Opinion, which is evidence of these Defendants' fraudulent intent.

868.     Sharma, Settling Party 2, Settling Party 1, Crossridge, LaGambina, and Jahre caused the life insurance application and all of the fraudulent agreements to be sent or transmitted by the mail and/or by wire.

869.     On **June 8, 2015**, Jahre wired $553,600 from the ILIT to FGLIC, as payment of the premium on the Propper Policy.  Exh. 92 (FGLIC_RL00008466).

870.     Jahre withdrew an additional amount (approximately $3,000) for himself, as payment for his role as "trustee" in service to the conspiracy.

871.   In reliance on the fraudulent misrepresentations perpetrated by David Meyer, Network Partners, Sharma, Settling Party 1, LaGambina, Settling Party 2, Crossridge, and Jahre, FGLIC paid Sharma, RequiteLife, and Network Partners commissions and bonuses totaling $861,830 for the sale of the Propper Policy.

872.   Network Partners, Sharma, and RequiteLife paid Settling Party 2 approximately 95% of the commissions and bonuses they received from FGLIC, thereby (i) unlawfully splitting commissions with an unlicensed person, *see* Conn. Gen. Stat. § 38a-702*l*(a); and (ii) unlawfully rebating premium payments, *see* Conn. Gen. Stat. § 38a-465i.

873.   Specifically, on **June 17, 2015**, Sharma, on behalf of RequiteLife, wired $374,000 to Settling Party 2.  Exh. 93 (FP_000097-99).

874.   The second-year premium on the Richard Propper Policy was not paid.

875.   Accordingly, the Propper Policy lapsed worthless on **June 6, 2016**.  Exh. 94 (FGLIC_RL00008510).

### **Predicate Act Six: The ISRAELA HARKHAM Policies**

876.   The co-conspirators sold insured Israela Harkham two life insurance policies, issued in the State of California, which policies were procured by fraud and breach of fiduciary duty.

877.   On **December 10, 2014**, Jason Mandel, Settling Party 1, and Trustee Defendant David Harkham caused the creation of an ILIT in Israela Harkham's name (the "Harkham ILIT"), pursuant to a trust agreement executed by Israela Harkham as settlor and David Harkham as trustee.  Exh. 95 (FGLIC_RL00001233).

878.   In his capacity as trustee, David Harkham established a bank account for the Harkham ILIT.

879.    In **the spring of 2015**, Jason Mandel, in his capacity as an insurance agent, sought to obtain a FGLIC life insurance policy in Israela Harkham's name, in the amount of $9 million.

880.    Jason Mandel relied on Settling Party 1 to complete the life insurance application for Israela Harkham.

881.    The application lists the primary insured as Israela Harkham, and the owner of the policy as the Harkham ILIT.  Exh. 96 (FGLIC_RL00001201-22).

882.    The application asks: "Will you borrow money to pay the premium for the life insurance being applied for or have someone else pay these premiums for you in return for you assigning part or all of the policy values to someone else?" *Id.*

883.    Settling Party 1 falsely answered this question, "no." *Id.*

884.    Settling Party 1 knew this representation was false because he knew Israela Harkham was financing the premium with a loan from Crossridge.

885.    Settling Party 1's false statements in connection with the application violated applicable state insurance laws, regulations, and rules.  *See* Cal. Ins. Code § 1871.4(a)(1), (3).

886.    Jason Mandel executed Israela Harkham's application on **March 16, 2015**, certifying falsely that Israela Harkham was not borrowing funds to finance the premium.

887.    Jason Mandel knew this representation about borrowing funds was false because he knew Israela Harkham was financing the premium with a loan from Crossridge.

888.    Jason Mandel concealed from FGLIC the fact that Israela Harkham was obtaining a loan from Crossridge to induce FGLIC to issue the policy to Israela Harkham.

889.    Jason Mandel's false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Cal. Ins. Code § 1871.4(a)(1), (3).

890.    Jason Mandel also knew Settling Party 1 completed the life insurance application on Israela Harkham's behalf.

891.    Jason Mandel knew that Settling Party 1 had not been appointed to serve as an insurance producer for FGLIC.

892.    Jason Mandel knowingly acted as a "surrogate" to Settling Party 1, a non-appointed insurance producer, in violation of Jason Mandel's contract with FGLIC.  *See* Exh. 31 (Market Conduct Guide Rev. 12-2014, at p. 24).

893.    Jason Mandel concealed from FGLIC that Settling Party 1 had completed the Israela Harkham life insurance application, in order to further the conspiracy between Jason Mandel, Settling Party 1, and their fellow co-conspirators.

894.    On or about **March 16, 2015**, Jason Mandel and his d/b/a Tower Group sent Israela Harkham's application materials by the mail or wire to Network Partners.

895.    Network Partners, in its role as General Agent, was responsible for validating Israela Harkham's application materials prior to submitting them to FGLIC.

896.    Network Partners knew that the statement in Israela Harkham's application that the insured would not borrow funds to finance the premium was false, because Network Partners knew the premium was to be financed by a loan from a co-conspirator, and Network Partners intended for FGLIC to rely on that false statement.

897.    Network Partners did not correct the false representations in Israela Harkham's application.

898.    On **March 18, 2015**, Network Partners sent the application by facsimile transmission over the wire to FGLIC with the false representations included in the materials.

899.     Network Partners' false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Cal. Ins. Code § 1871.4(a)(1), (3).

900.     In reliance on the co-conspirators' misrepresentations, FGLIC issued a life insurance policy to Israela Harkham with a value of $9 million (policy number ending in 269) on **June 4, 2015** (the "Harkham 269 Policy").  Exh. 97 (GS0003195).

901.     The annual premium payment on the Harkham 269 Policy was $346,590.  *Id.*

902.     Settling Party 1 caused Settling Party 2 to wire sufficient funds to Crossridge to fund the premium.

903.     In **late June 2015** LaGambina caused Crossridge to wire $346,700 to the bank account of the Harkham ILIT.  Exh. 98 (GS0003188).

904.     On **June 29, 2015**, Trustee Defendant David Harkham wired $346,590 from the Harkham ILIT to FGLIC as payment of the premium on the Harkham 269 Policy.  Exh. 99 (GS00013593).

905.     David Harkham withdrew an additional amount for himself, as payment for his role as "trustee" in service to the conspiracy.

906.     On **July 4, 2015**, LaGambina established a business entity called Harkham Partners, LLC.  Exh. 100 (GS00003156-87).

907.     A Limited Liability Company Agreement for Harkham Partners was executed by David Harkham, as trustee of the Harkham ILIT, and LaGambina, as President of Crossridge.

908.     The LLC Agreement named the Harkham ILIT and Crossridge as the sole members of Harkham Partners, with the Harkham ILIT owning the majority of membership interests.

909.     Also on **July 4, 2015**, LaGambina and David Harkham caused Harkham Partners and the Harkham ILIT to enter into a sham Loan Agreement for the amount of $348,590.  Exh. 101 (GS0003188).

910.     The Loan Agreement identifies Harkham Partners as the Lender, and the trust as the Borrower.

911.     David Harkham executed the Loan Agreement twice: first on behalf of the Lender, Harkham Partners, in his capacity as trustee of the majority shareholder; and second, on behalf of the Borrower, in his capacity as trustee of the trust.

912.     In fact, the so-called "loan" was a sham:

(i)      The LLC never had the funds; the funds were wired from Crossridge to the ILIT directly.

(ii)     Moreover, the ILIT had no assets to repay the "loan" once the insurance policy lapsed shortly after the first anniversary of the policy.

913.     The Defendants referenced in this Predicate Act knew the loan was a sham.

914.     On **July 4, 2015**, LaGambina and David Harkham caused the Harkham ILIT to assign the Harkham 269 Policy to Harkham Partners, pursuant to an Assignment of Life Insurance Policy.  Exh. 102 (GS0003144).

915.     David Harkham executed the Assignment twice: first, as trustee of the assignor, the Harkham ILIT; and second, as trustee of the majority shareholder of the assignee, Harkham Partners.

916.     Although the Assignment stated that the policy had been in effect for two years, this statement was false on its face.

917.    The actions taken by the Defendants referenced in this Predicate Act are in violation and deliberate disregard of the legal advice set forth in the Locke Lord Opinion, which is evidence of these Defendants' fraudulent intent.

918.    In **July 2015**, Settling Party 1 completed a second life insurance application on Israela Harkham's behalf, this time seeking $5 million.

919.    Settling Party 1 once again made a false representation that Harkham was not borrowing funds to pay the premium on the applied-for policy. Exh. 103 (FGLIC_RL00004433).

920.    Settling Party 1 knew the representation was false because he knew Harkham was financing the premium with a loan from Crossridge.

921.    Jason Mandel executed the second Israela Harkham application on **July 13, 2015**, certifying falsely again that Israela Harkham was not borrowing funds to finance the premium.

922.    Jason Mandel knew this representation in the second Israela Harkham application about borrowing funds was false, because he knew Israela Harkham was financing the premium with a loan from a co-conspirator.

923.    On or about **July 13, 2015**, Jason Mandel and his d/b/a Tower Group sent Harkham's second application materials by the mail or wire to Network Partners.

924.    Network Partners, in its role as General Agent, was responsible for validating Harkham's second application materials prior to submitting them to FGLIC.

925.    Network Partners knew that the statement in the second Harkham application about not borrowing funds to finance the premium was false, because Network Partners knew that Harkham was financing the premium with a loan from a co-conspirator, and Network Partners intended for FGLIC to rely on that false statement.

926.    Network Partners did not correct the false representations in Harkham's second application.

927.    On **July 15, 2015**, Network Partners sent Israela Harkham's second application materials by facsimile transmission over the wire to FGLIC with the false representations included in the materials.

928.    In reliance on the co-conspirators' representations, FGLIC issued a life insurance policy to Israela Harkham with a value of $5 million (policy number ending in 145) on **October 1, 2015** (the "Harkham 145 Policy"). Exh. 104 (Harkham 145 policy).

929.    The annual premium payment on the Harkham 145 Policy was $192,550. *Id.*

930.    Settling Party 1 caused Settling Party 2 to wire sufficient funds to Crossridge to fund the premium.

931.    Upon information and belief, in **October 2015** LaGambina caused Crossridge to wire at least $192,550 to the bank account of the Harkham ILIT.

932.    On **October 15, 2015**, David Harkham wired $192,550 from the Harkham ILIT to FGLIC as payment of the premium on the Harkham 145 Policy.  Exh. 105 (FGLIC_RL00004723).

933.    Upon information and belief, David Harkham withdrew an additional amount (approximately $2000) for himself, as payment for his role as "trustee" in service to the conspiracy.

934.    Upon information and belief, in the **fall or winter of 2015**, LaGambina and David Harkham caused Harkham Partners and the Harkham ILIT to enter into a second sham Loan Agreement for at least $192,550.

935.     Upon information and belief, this second so-called "loan" was a sham:

    (i)    The LLC never had the funds; the funds were wired from Crossridge to the ILIT directly.

    (ii)    Moreover, the ILIT had no assets to repay the "loan" once the insurance policy lapsed shortly after the first anniversary of the policy.

936.     The Defendants referenced in this Predicate Act knew the loan was a sham.

937.     Upon information and belief, in the **fall or winter of 2015**, LaGambina and David Harkham caused the Harkham ILIT to assign the Harkham 145 Policy to Harkham Partners, pursuant to an Assignment of Life Insurance Policy.

938.     The actions taken by the Defendants referenced in this Predicate Act are in violation and deliberate disregard of the legal advice set forth in the Locke Lord Opinion, which is evidence of these Defendants' fraudulent intent.

939.     In reliance on the fraudulent misrepresentations perpetrated by David Meyer, Network Partners, Jason Mandel, Settling Party 1, LaGambina, Settling Party 2, Crossridge, and David Harkham, FGLIC paid Jason Mandel, Tower Group, and Network Partners commissions and bonuses totaling $537,214.50 for the fraudulent sale of the Harkham 269 Policy and $298,452.50 for the fraudulent sale of the Harkham 145 Policy.

940.     David Meyer, Network Partners, Jason Mandel, and Tower Group paid Settling Party 2 approximately 95% of the commissions and bonuses they received from FGLIC, thereby rebating the premium payments back to their co-conspirators for the continuation and furtherance of the conspiracy.

941.     The second-year premium on the Harkham 269 Policy was not paid.

942.     Accordingly, the Harkham 269 Policy lapsed worthless on **June 4, 2016**.  Exh. 106 (FGLIC_RL00001594).

943.     The second-year premium on the Harkham 145 Policy was not paid.

944.     Accordingly, the Harkham 145 Policy lapsed worthless on **October 1, 2016**.  Exh. 107 (FGLIC_RL00004923).

### Predicate Act Seven: The STEVEN ETKIND Policy

945.     The co-conspirators sold insured Steven Etkind a life insurance policy valued at $6 million issued in the State of Connecticut (the "Etkind Policy"), which was procured by fraud and breach of fiduciary duty.

946.     Etkind, an attorney,[26] was familiar with Settling Party 1 because Settling Party 1 is the cousin of one of Etkind's clients. Exh. 108 (Etkind Exam. Tr. 19:18-19, 33:20-25).[27]

947.     Settling Party 1 introduced Etkind to Jason Mandel in **late 2014 or early 2015**. *Id.* (Etkind Exam. Tr. 20:17-21:3; 47:7-17).

948.     Jason Mandel or Settling Party 1 represented to Etkind that he could obtain a life insurance policy with "minimal payment or no payment upfront."  *Id.* (Etkind Exam. Tr. 21:14-16, 53:15-22, 81:6-14).

949.     Etkind testified, "I don't recall paying a dime." *Id.* (Etkind Exam. Tr. 25:20).

---

[26] On September 6, 2018, Etkind pleaded guilty to defrauding two charitable trust foundations for which he served as a co-trustee, and has since been sentenced to 37 months' imprisonment.  ECF 42 (Judgment), *United States v. Etkind*, No. 17-CR-590 (JGK) (S.D.N.Y. Jan. 25, 2019).

[27] FGLIC took the Examination of insured Steven Etkind on October 3, 2018 (hereinafter "Etkind Exam. Tr. ___").

950.     On **March 6, 2015**, Jason Mandel, Settling Party 1, and Trustee Defendant David Vynerib caused the creation of an ILIT in Etkind's name (the "Etkind ILIT"), pursuant to a trust agreement executed by Etkind as settlor and Vynerib as trustee.  Exh. 109 (PUB00000045).

951.     In his capacity as trustee, David Vynerib established a bank account for the Etkind ILIT.

952.     In **March 2015** Jason Mandel, in his capacity as an insurance agent, sought to obtain a FGLIC life insurance policy in Etkind's name, in the amount of $6 million.

953.     Jason Mandel forwarded Etkind's information to Settling Party 1 and relied on Settling Party 1 to prepare Etkind's life insurance application.

954.     Etkind testified that he provided some of the information in his application to Jason Mandel, but he did not complete the application himself. Exh. 108 (Etkind Exam. Tr. 89:18-90:9; 92:3-10).

955.     The application lists the primary insured as Etkind, and the owner of the policy as the Etkind ILIT. Exh. 110 (FGLIC-BK000207-19).

956.     The application asks: "Will you borrow money to pay the premium for the life insurance being applied for or have someone else pay these premiums for you in return for you assigning part or all of the policy values to someone else?" *Id.*

957.     Settling Party 1 falsely answered this question, "no." *Id.*

958.     Settling Party 1 knew this representation was false because he knew Etkind was financing the premium with a loan from Crossridge.

959.     Settling Party 1's false statements in connection with the application violated applicable state insurance laws, regulations, and rules.  *See* Conn. Gen. Stat. § 38a-816(8).

960.     Jason Mandel executed Etkind's application on **March 23, 2015**, certifying falsely that Etkind was not borrowing funds to finance the premium.

961.     Jason Mandel knew this representation about borrowing funds was false because he knew Etkind was financing the premium with a loan from Crossridge.

962.     Jason Mandel concealed from FGLIC the fact that Etkind was obtaining a loan from Crossridge to induce FGLIC to issue the policy to Etkind.

963.     Jason Mandel's false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Conn. Gen. Stat. § 38a-816(8).

964.     Jason Mandel also knew Settling Party 1 completed the life insurance application on Etkind's behalf.

965.     Jason Mandel knew that Settling Party 1 had not been appointed to serve as an insurance producer for FGLIC.

966.     Jason Mandel knowingly acted as a "surrogate" to Settling Party 1, a non-appointed insurance producer, in violation of Jason Mandel's contract with FGLIC.  *See* Exh. 31 (Market Conduct Guide Rev. 12-2014, at p. 24).

967.     Jason Mandel concealed from FGLIC that Settling Party 1 had completed the Etkind life insurance application, in order to further the conspiracy between Jason Mandel, Settling Party 1, and their fellow co-conspirators.

968.     On or about **March 23, 2015**, Jason Mandel and his d/b/a Tower Group sent Etkind's application materials by the mail or wire to Network Partners.

969.     Network Partners, in its role as General Agent, was responsible for validating Etkind's application materials prior to submitting them to FGLIC.

970.     Network Partners knew that the statement in Etkind's application that the insured would not borrow funds to finance the premium was false, because Network Partners knew the premium was to be financed by a loan from a co-conspirator, and Network Partners intended for FGLIC to rely on that false statement.

971.     Network Partners did not correct the false representations in Etkind's application.

972.     On **March 24, 2015**, Network Partners sent Etkind's application materials by facsimile transmission over the wire to FGLIC with the false representations included in the materials.

973.     Network Partners' false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Conn. Gen. Stat. § 38a-816(8).

974.     In reliance on the co-conspirators' misrepresentations, FGLIC issued a life insurance policy to Etkind with a value of $6 million on **June 2, 2015** (the "Etkind Policy").  Exh. 111 (FGLIC-BK000409).

975.     The annual premium payment on the Etkind Policy was $103,620. *Id.*

976.     Settling Party 1 wired sufficient funds to Crossridge to fund the premium.

977.     On **June 24, 2015**, LaGambina caused Crossridge to wire $104,400 to the bank account of the Etkind ILIT.  Exh. 112 (PUB00000003); Exh. 113 (GS00013593).

978.     On **June 26, 2015**, Trustee Defendant Vynerib wired $103,620 from the Etkind ILIT to FGLIC as payment of the premium on the Etkind Policy.  Exh. 112 (PUB00000003).

979.     Upon information and belief, Vynerib withdrew an additional amount for himself, as payment for his role as "trustee" in service to the conspiracy.

980.     On **July 2, 2015**, LaGambina established a business entity called Etkind Partners, LLC.  Exh. 114 (GS0001115).

981.    A Limited Liability Company Agreement for Etkind Partners was executed by Vynerib, as trustee of the Etkind ILIT, and LaGambina, as President of Crossridge.

982.    The LLC Agreement named the Etkind ILIT and Crossridge as the sole members of Etkind Partners, with the Etkind ILIT owning the majority of membership interests.

983.    Also on **July 2, 2015**, LaGambina and Vynerib caused Etkind Partners and the Etkind ILIT to enter into a sham Loan Agreement for the amount of $105,620.  Exh. 115 (GS0001147).

984.    The Loan Agreement falsely identifies Etkind Partners as the Lender, and the trust as the Borrower.

985.    Vynerib executed the Loan Agreement twice: first on behalf of the Lender, Etkind Partners, in his capacity as trustee of the majority shareholder; and second, on behalf of the Borrower, in his capacity as trustee of the trust.

986.    In fact, the so-called "loan" was a sham:

(i)      The LLC never had the funds; the funds were wired from Crossridge to the ILIT directly.

(ii)     Moreover, the ILIT had no assets to repay the "loan" once the insurance policy lapsed shortly after the first anniversary of the policy.

987.    The Defendants referenced in this Predicate Act knew the loan was a sham.

988.    On **July 2, 2015**, LaGambina and Vynerib caused the Etkind ILIT to assign the Etkind Policy to Etkind Partners, pursuant to an Assignment of Life Insurance Policy.  Exh. 116 (GS0001103).

989.    Vynerib executed the Assignment twice: first, as trustee of the assignor, the Etkind ILIT; and second, as trustee of the majority shareholder of the assignee, Etkind Partners.

990.    Although the Assignment stated that the policy had been in effect for two years, this statement was false on its face.

991.    The actions taken by the Defendants referenced in this Predicate Act are in violation and deliberate disregard of the legal advice set forth in the Locke Lord Opinion, which is evidence of these Defendants' fraudulent intent.

992.    In reliance on the fraudulent misrepresentations perpetrated by David Meyer, Network Partners, Jason Mandel, Settling Party 1, LaGambina, Settling Party 2, Crossridge, and Vynerib, FGLIC paid Jason Mandel, Tower Group, and Network Partners commissions and bonuses totaling $160,611 for the fraudulent sale of the Etkind Policy.

993.    David Meyer, Network Partners, Jason Mandel, and Tower Group paid Settling Party 2 approximately 95% of the commissions and bonuses they received from FGLIC, thereby (i) unlawfully splitting commissions with an unlicensed person, *see* Conn. Gen. Stat. § 38a-702*l*(a); and (ii) unlawfully rebating premium payments, *see* Conn. Gen. Stat. § 38a-465i.

994.    The second-year premium on the Etkind Policy was not paid.

995.    Accordingly, the Etkind Policy lapsed worthless on **June 2, 2016**.   Exh. 117 (FGLIC-BK000587).

### **Predicate Act Eight: The AARON SOKOL Policy**

996.    The co-conspirators sold insured Aaron Sokol a life insurance policy issued in the State of California and valued at $10 million, which was procured by fraud and breach of fiduciary duty.

997.    On **October 19, 2015**, Jason Mandel, Settling Party 1, and Settling Trustee 8 caused the creation an ILIT in Sokol's name (the "Sokol ILIT"), pursuant to a trust agreement executed by Sokol as settlor and Settling Trustee 8 as trustee.  Exh. 118 (FGLIC_RL00003892).

998.   In his capacity as trustee, William Settling Trustee 8 established a bank account for the Sokol ILIT.

999.   In **June 2015**, Jason Mandel sought to obtain a FGLIC life insurance policy in Aaron Sokol's name, in the amount of $10 million.

1000.   Jason Mandel relied on Settling Party 1 to prepare Sokol's life insurance application.

1001.   The application lists the primary insured as Sokol, and the owner of the policy as the Sokol ILIT.  Exh. 119 (FGLIC_RL00004363).

1002.   The application asks: "Will you borrow money to pay the premium for the life insurance being applied for or have someone else pay these premiums for you in return for you assigning part or all of the policy values to someone else?"  *Id.*

1003.   Settling Party 1 falsely answered this question, "no."  *Id.*

1004.   Settling Party 1 knew this representation was false because he knew Sokol was financing the premium with a loan from Crossridge.

1005.   Settling Party 1's false statements in connection with the application violated applicable state insurance laws, regulations, and rules.  *See* Conn. Gen. Stat. § 38a-816(8).

1006.   Jason Mandel executed Sokol's application on **June 16, 2015**, certifying falsely that Sokol was not borrowing funds to finance the premium.

1007.   Jason Mandel knew this representation about borrowing funds was false because he knew Sokol was financing the premium with a loan from Crossridge.

1008.   Jason Mandel concealed from FGLIC the fact that Sokol was obtaining a loan from Crossridge to induce FGLIC to issue the policy to Sokol.

1009.   Jason Mandel's false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Conn. Gen. Stat. § 38a-816(8).

1010.   Jason Mandel also knew Settling Party 1 completed the life insurance application on Sokol's behalf.

1011.   Jason Mandel knew that Settling Party 1 had not been appointed to serve as an insurance producer for FGLIC.

1012.   Jason Mandel knowingly acted as a "surrogate" to Settling Party 1, a non-appointed insurance producer, in violation of Jason Mandel's contract with FGLIC.  *See* Exh. 31 (Market Conduct Guide Rev. 12-2014, at p. 24).

1013.   Jason Mandel concealed from FGLIC that Settling Party 1 had completed the Sokol life insurance application, in order to further the conspiracy between Jason Mandel, Settling Party 1, and their fellow co-conspirators.

1014.   On or about **June 16, 2015**, Jason Mandel and his d/b/a Tower Group sent Sokol's application materials by the mail or wire to Network Partners.

1015.   Network Partners, in its role as General Agent, was responsible for validating Sokol's application materials prior to submitting them to FGLIC.

1016.   Network Partners knew that the statement in Sokol's application that the insured would not borrow funds to finance the premium was false, because Network Partners knew the premium was to be financed by a loan from a co-conspirator, and Network Partners intended for FGLIC to rely on that false statement.

1017.   Network Partners did not correct the false representations in Sokol's application.

1018.   On or about **June 16, 2015**, Network Partners sent Sokol's application materials by facsimile transmission over the wire to FGLIC with the false representations included in the materials.

1019.   Network Partners' false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Conn. Gen. Stat. § 38a-816(8).

1020.   In reliance on the co-conspirators' misrepresentations, FGLIC issued a life insurance policy to Sokol with a value of $10 million on **November 2, 2015** (the "Sokol Policy"). Exh. 120 (FGLIC_RL00004229).

1021.   On **December 2, 2015**, LaGambina established a business entity called Sokol Partners, LLC.  Exh. 121 (GS0007988).

1022.   A Limited Liability Company Agreement for Sokol Partners was executed by Settling Trustee 8, as trustee of the Sokol ILIT, and LaGambina, as President of Crossridge.

1023.   The LLC Agreement named the Sokol ILIT and Crossridge as the sole members of Sokol Partners, with the Sokol ILIT owning the majority of membership interests.

1024.   Also on **December 2, 2015**, LaGambina and Settling Trustee 8 caused Sokol Partners and the Sokol ILIT to enter into a sham Loan Agreement for the amount of $232,400. Exh. 122 (GS0008020).

1025.   The Loan Agreement identifies Sokol Partners as the Lender, and the trust as the Borrower.

1026.   Settling Trustee 8 executed the Loan Agreement twice: first on behalf of the Lender, Sokol Partners, in his capacity as trustee of the majority shareholder; and second, on behalf of the Borrower, in his capacity as trustee of the trust.

1027.   In fact, the so-called "loan" was a sham:

> (i)     The LLC never had the funds; the funds were wired from Crossridge to the
> ILIT directly.
>
> (ii)    Moreover, the ILIT had no assets to repay the "loan" once the insurance
> policy lapsed shortly after the first anniversary of the policy.

1028.   The Defendants referenced in this Predicate Act knew the loan was a sham.

1029.   On **December 2, 2015**, LaGambina and Settling Trustee 8 caused the Sokol ILIT to assign the Sokol Policy to Sokol Partners, pursuant to an Assignment of Life Insurance Policy. Exh. 123 (GS0007892).

1030.   Settling Trustee 8 executed the Assignment twice: first, as trustee of the assignor, the Sokol ILIT; and second, as trustee of the majority shareholder of the assignee, Sokol Partners.

1031.   Although the Assignment stated that the policy had been in effect for two years, this statement was false on its face.

1032.   The actions taken by the Defendants referenced in this Predicate Act are in violation and deliberate disregard of the legal advice set forth in the Locke Lord Opinion, which is evidence of these Defendants' fraudulent intent.

1033.   The annual premium payment on the Sokol Policy was $230,400.

1034.   Settling Party 1 caused Settling Party 2 to wire sufficient funds to Crossridge to fund the premium.

1035.   On **December 9, 2015**, LaGambina caused Crossridge to wire $233,000 to the bank account of the Sokol ILIT.  Exh. 124 (GS00013567).

1036.   On **December 10, 2015**, Settling Trustee 8 wired $230,400 from the Sokol ILIT to FGLIC as payment of the premium on the Sokol Policy.  Exh. 125 (FGLIC_RL00004286).

1037.   Upon information and belief, Settling Trustee 8 withdrew an additional amount (approximately $2,600) for himself, as payment for his role as "trustee" in service to the conspiracy.

1038.   In reliance on the fraudulent misrepresentations perpetrated by David Meyer, Network Partners, Jason Mandel, Settling Party 1, LaGambina, Settling Party 2, Crossridge, and Settling Trustee 8, FGLIC paid Jason Mandel, Tower Group, and Network Partners commissions and bonuses totaling $518,400 for the fraudulent sale of the Sokol Policy.

1039.   David Meyer, Network Partners, Jason Mandel, and Tower Group paid Settling Party 2 approximately 95% of the commissions and bonuses they received from FGLIC, thereby (i) unlawfully splitting commissions with an unlicensed person, *see* Conn. Gen. Stat. § 38a-702*l*(a); and (ii) unlawfully rebating premium payments, *see* Conn. Gen. Stat. § 38a-465i.

1040.   The second-year premium on the Sokol Policy was not paid.

1041.   Accordingly, the Sokol Policy lapsed worthless on **July 2, 2017**.   Exh. 126 (FGLIC_RL00004355).

1042.   Settling Trustee 8, together with his fellow co-conspirators, utilized the same pattern of fraudulent and unlawful activity described above for one other policy issued by FGLIC, namely that of fellow co-conspirator James Kaplan (policy ending in 956).

1043.   The events and facts associated with the issuance of the Kaplan policy are all Predicate Acts.

## Predicate Act Nine: The DAVID NEIMAN Policy

1044.   The co-conspirators sold insured David Neiman a life insurance policy issued in the State of Connecticut and valued at $5.5 million, which was procured by fraud and breach of fiduciary duty.

1045.   David Neiman stated under oath in a Declaration that his son Ephraim Neiman introduced him to the idea of obtaining a life insurance policy offered by the co-conspirators. Exh. 127 (Declaration of David Neiman dated May 23, 2018 ("Neiman Decl.") at ¶ 2).

1046.   According to David Neiman, his son "said I could have a life insurance policy for free for a year or maybe two years, I do not remember. I thought maybe it was a promotion by the agent or the company." *Id.* (Neiman Decl. at ¶ 3).

1047.   This offer of "free insurance" violates state insurance laws, rules, and regulations. *See, e.g.*, Conn. Gen. Stat. § 38a-816(1).

1048.   In **the summer of 2015**, Sharma sought to obtain a FGLIC life insurance policy in David Neiman's name, in the amount of $5.5 million.

1049.   Sharma relied on Settling Party 1 to prepare David Neiman's life insurance application.

1050.   The application lists the primary insured as David Neiman, and the owner of the policy as an irrevocable life insurance trust in Neiman's name (the "Neiman ILIT"). Exh. 128 (FGLIC_RL00010788).

1051.   The application asks: "Will you borrow money to pay the premium for the life insurance being applied for or have someone else pay these premiums for you in return for you assigning part or all of the policy values to someone else?"

1052.   Upon information and belief, Settling Party 1 falsely answered this question, "no."

1053.   Settling Party 1 knew this representation was false because he knew Neiman was financing the premium with a loan from Crossridge.

1054.   Settling Party 1's false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Conn. Gen. Stat. § 38a-816(8).

1055.   The life insurance application purportedly contains Neiman's signature, executed in Greenwich, Connecticut on **July 1, 2015**.

1056.   Neiman stated under oath in his Declaration that he does not recall ever seeing the life insurance application. Exh. 127 (Neiman Decl. ¶ 5).

1057.   Neiman stated under oath in his Declaration that he believes the signature on the application is not his.

1058.   He noted, "the second 'd' in David is crossed in the signature, which I do not do. I know I did not sign it in Greenwich, Connecticut, as [the application] states." *Id.*

1059.   Sharma executed David Neiman's life insurance application on **July 1, 2015**, certifying to numerous representations in the application that Sharma knew at the time were false.

1060.   Sharma admitted that he certified misstatements of fact in the policy applications to be submitted to FGLIC. Exh. 4 (Sharma Exam. Tr. 367:7-368:8).

1061.   Sharma's false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Conn. Gen. Stat. § 38a-816(8).

1062.   ***First***, Sharma certified falsely that Neiman was not borrowing funds to finance the premium.

1063.   Sharma knew this representation about borrowing funds was false because he knew David Neiman was financing the premium with a loan from a co-conspirator.

1064.   Sharma concealed from FGLIC the fact that Neiman was obtaining a loan from Crossridge to induce FGLIC to issue the policy to Neiman.

1065.   ***Second***, Sharma knew Settling Party 1 completed the life insurance application on Neiman's behalf.

1066.   Sharma knew that Settling Party 1 had not been appointed to serve as an insurance producer for FGLIC.

1067.   Sharma knowingly acted as a "surrogate" to Settling Party 1, a non-appointed insurance producer, in violation of Sharma's contract with FGLIC.  *See* Exh. 31 (Market Conduct Guide Rev. 12-2014, at p. 24).

1068.   Sharma concealed from FGLIC that Settling Party 1 had completed Neiman's life insurance application, in order to further the conspiracy between Sharma, Settling Party 1, and their fellow co-conspirators.

1069.   ***Third***, Sharma certified falsely that he had witnessed Neiman's signature as well as that of Settling Trustee 1, the trustee for the Neiman ILIT.

1070.   Bret Bernstein testified Sharma was not present to witness either Neiman's or Settling Trustee 1's signatures. Exh. 129 (Bernstein Exam. Tr. 89:7-12).[28]

1071.   Accordingly, Sharma's written certification that he witnessed David Neiman's signature on the application was false.

1072.   ***Fourth***, Sharma falsely represented to FGLIC that he was familiar with David Neiman, in order to induce FGLIC to issue the policy.

1073.   Sharma sent a letter dated **July 1, 2015**, along with David Neiman's application representing to FGLIC that Neiman "recognizes the value of a well-balanced personal and professional life; thusly he tries to spend plenty of time with his family and friends."  Exh. 128 (FGLIC_RL00010788).

---

[28] FGLIC took the Examination of Bret Bernstein on November 19, 2018 (hereinafter "Bernstein Exam. Tr. ___").

1074.   In the letter, Sharma represented further, "We believe [\$5.5 million in life insurance] coverage will be sufficient to meet Mr. Neiman's needs and provide him with the peace of mind he strives for." *Id.*

1075.   Sharma knew these representations were false when made, because Sharma never met Neiman and is not familiar with his values or the manner in which he spends his time.

1076.   Neiman stated in his Declaration that he never met or spoke to Sharma. Neiman Decl. at ¶ 4.

1077.   Sharma has admitted that he intentionally made false statements in the introductory letters he sent along with an insured's application materials, because he knew FGLIC would rely on them to issue the policies. Exh. 4 (Sharma Exam. Tr. 174:8-14).

1078.   On or about **July 1, 2015**, Sharma and his d/b/a RequiteLife sent David Neiman's application materials by the mail or wire to Network Partners.

1079.   Network Partners, in its role as General Agent, was responsible for validating David Neiman's application materials prior to submitting them to FGLIC.

1080.   Network Partners knew that the statement in David Neiman's application that the insured would not borrow funds to finance the premium was false, because Network Partners knew the premium was to be financed by a loan from a co-conspirator, and Network Partners intended for FGLIC to rely on that false statement.

1081.   Network Partners did not correct the false representations in David Neiman's application.

1082.   On **July 7, 2015**, Network Partners sent David Neiman's application materials by facsimile transmission over the wire to FGLIC with the false representations included in the materials.

1083.   Network Partners' false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Conn. Gen. Stat. § 38a-816(8).

1084.   Upon information and belief, in **July 2015** FGLIC telephoned David Neiman, or a person claiming to be David Neiman, and conducted an interview in connection with FGLIC's evaluation of David Neiman's life insurance application.

1085.   Neiman has stated under oath in his Declaration, "I do not recall having any telephone interview with anyone regarding the policy in July of 2015 or at any other time."  Exh. 127 (Neiman Decl. at ¶ 12).

1086.   In reliance on the co-conspirators' misrepresentations, FGLIC issued a life insurance policy to David Neiman with a value of $5.5 million on **August 3, 2015** (the "Neiman Policy").  Exh. 130 (GS0005883-5958).

1087.   On **August 7, 2015**, Sharma, Settling Party 1, and Settling Trustee 1 caused the creation of an ILIT in Neiman's name (the "Neiman ILIT"), pursuant to a trust agreement purportedly executed by Neiman as settlor and Settling Trustee 1 as trustee.   Exh. 131 (FGLIC_RL0001109-29).

1088.   David Neiman stated under oath that he had "no knowledge" of the trust itself or the trust agreement, and that he had never met or spoken with the trustee Settling Trustee 1— indeed, David Neiman declared, "I do not recall ever hearing of [Settling Trustee 1]."  Neiman Decl. at ¶¶ 9-11.

1089.   Bret Bernstein testified that Settling Trustee 1 never met or communicated with David Neiman. Exh. 129 (Bernstein Exam. Tr. 122:11-14).

1090.   Bernstein also testified that Settling Trustee 1 was not present when Neiman executed the trust. *Id.* (Bernstein Exam. Tr. 76:7-15).

1091.   As trustee, Settling Trustee 1 established a bank account for the Neiman ILIT.

1092.   The annual premium payment on the Neiman Policy was $474,540.   Exh. 130 (GS0005883-5958).

1093.   Settling Party 1 wired sufficient funds to Crossridge to fund the premium.

1094.   On **September 2, 2015**, LaGambina caused Crossridge to wire $475,600 to the bank account of the Neiman ILIT.  Exh. 132 (GS00013583).

1095.   On **September 3, 2015**, Settling Trustee 1 wired $474,540 from the Neiman ILIT to FGLIC, as payment of the premium on the Neiman Policy.  Exh. 133 (FGLIC_RL00011194).

1096.   Settling Trustee 1 withdrew an additional amount (approximately $1,060) himself, as payment for his service as "trustee," in furtherance of the conspiracy.

1097.   Bernstein testified that Settling Trustee 1 did not investigate the source of the funds used to pay for the premium. Exh. 129 (Bernstein Exam. Tr. 37:21-24).

1098.   On **September 3, 2015**, a business entity named Neiman Partners, LLC, was formed pursuant to a Limited Liability Company Agreement executed by Settling Trustee 1, as trustee of the Neiman ILIT, and LaGambina, President of Crossridge.  Exh. 134 (GS0005844).

1099.   The LLC Agreement named the Neiman ILIT and Crossridge as the sole members of Neiman, with the Neiman ILIT owning the majority of membership interests.

1100.   Also on **September 3, 2015**, LaGambina and Settling Trustee 1 caused Neiman Partners and the Neiman ILIT to enter into a sham Loan Agreement for the amount of $477,040. Exh. 135 (GS0053073-79).

1101.   The Loan Agreement falsely identifies Neiman Partners as the Lender, and the trust as the Borrower.

1102.   Settling Trustee 1 executed the Loan Agreement on behalf of the Lender, Neiman Partners (in his capacity as trustee of the majority shareholder), and on behalf of the Borrower (also in his capacity as trustee).

1103.   In fact, the so-called "loan" was a sham:

      (i)      The LLC never had the funds; the funds were wired from Crossridge to the ILIT directly.

      (ii)     Moreover, the ILIT had no assets to repay the "loan" once the insurance policy lapsed shortly after the first anniversary of the policy.

1104.   The Defendants referenced in this Predicate Act knew the loan was a sham.

1105.   Also on **September 3, 2015**, LaGambina and Settling Trustee 1 caused the Neiman ILIT to assign the Neiman Policy to Neiman Partners, pursuant to an Assignment of Life Insurance Policy.  Exh. 136 (GS0005832-43).

1106.   Settling Trustee 1 executed the Assignment as trustee of the assignor, the Neiman ILIT; Settling Trustee 1 also accepted the Assignment as trustee of the majority shareholder of the assignee, Neiman Partners.

1107.   Although the Assignment stated that the policy had been in effect for two years, this statement was false on its face.

1108.   The actions taken by the Defendants referenced in this Predicate Act are in violation and deliberate disregard of the legal advice set forth in the Locke Lord Opinion, which is evidence of these Defendants' fraudulent intent.

1109.   Sharma, Settling Party 2, Settling Party 1, Crossridge, LaGambina, and Settling Trustee 1 caused the life insurance application and all of the fraudulent agreements to be sent or transmitted by the mail and/or by wire.

1110.   In reliance on the fraudulent misrepresentations perpetrated by David Meyer, Network Partners, Sharma, Settling Party 1, LaGambina, Settling Party 2, Crossridge, and Settling Trustee 1, FGLIC paid Sharma, RequiteLife, and Network Partners commissions and bonuses totaling $735,537 for the fraudulent sale of the Neiman Policy.

1111.   Network Partners, Sharma, and RequiteLife paid Settling Party 2 approximately 95% of the commissions and bonuses they received from FGLIC, thereby (i) unlawfully splitting commissions with an unlicensed person, *see* Conn. Gen. Stat. § 38a-702*l*(a); and (ii) unlawfully rebating premium payments, *see* Conn. Gen. Stat. § 38a-465i.

1112.   Specifically, on **September 14, 2015**, Settling Party 2 sent an invoice to RequiteLife seeking payment of $256,000 related to "services rendered" to "client" David Neiman. Exh. 137 (SHARMA-BK011241).

1113.   The following day, **September 15, 2015**, RequiteLife wired the same amount of $256,000 to Settling Party 2.  Exh. 138 (FP-000005).

1114.   The second-year premium on the David Neiman Policy was not paid.

1115.   Accordingly, the Neiman Policy lapsed worthless on **August 3, 2016**.  Exh. 139 (FGLIC_RL00011241).

1116.   Settling Trustee 1, together with his fellow co-conspirators, utilized the same pattern of fraudulent and unlawful activity described above for four other policies issued by FGLIC: Alan Goddard (policy ending in 914), Linda Gracco (policy ending in 777), Richard Metsch (policy ending in 499), and David Neiman's wife Frimit Neiman (policy ending in 419).

1117.   The events and facts associated with the issuance of the Goddard, Gracco, Metsch, and Frimit Neiman policies are all Predicate Acts.

**Predicate Act Ten: The JUDITH COLE Policy**

1118.   The co-conspirators sold insured Judith Cole a life insurance policy issued in the State of California and valued at $2 million, which was procured by fraud and breach of fiduciary duty.

1119.   On **May 26, 2015**, Sharma, Settling Party 1, and Settling Trustee 3 caused the creation of an ILIT in Cole's name (the "Cole ILIT"), pursuant to a trust agreement executed by Cole as settlor and Settling Trustee 3 as trustee.  Exh. 140 (GS00012495).

1120.   In his capacity as trustee, Settling Trustee 3 established a bank account for the Cole ILIT.

1121.   In **August 2015**, Sharma sought to obtain a FGLIC life insurance policy in Cole's name, in the amount of $2 million.

1122.   Sharma relied on Settling Party 1 to prepare Cole's life insurance application.

1123.   The application lists the primary insured as Cole, and the owner of the policy as the Cole ILIT.  Exh. 141 (FGLIC_RL00011255-89).

1124.   The application asks: "Will you borrow money to pay the premium for the life insurance being applied for or have someone else pay these premiums for you in return for you assigning part or all of the policy values to someone else?"  *Id.*

1125.   Settling Party 1 falsely answered this question, "no."  *Id.*

1126.   Settling Party 1 knew this representation was false because he knew Cole was financing the premium with a loan from Crossridge.

1127.   Settling Party 1's false statements in connection with the application violated applicable state insurance laws, regulations, and rules.  *See* Cal. Ins. Code § 1871.4(a)(1), (3).

1128.   Sharma executed Cole's application on **August 7, 2015**, making numerous representations that Sharma knew at the time were false.

1129.   Sharma admitted that he certified misstatements of fact in the policy applications to be submitted to FGLIC. Exh. 4 (Sharma Exam. Tr. 367:7-368:8).

1130.   Sharma's false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Cal. Ins. Code § 1871.4(a)(1), (3).

1131.   ***First***, Sharma certified falsely that Cole was not borrowing funds to finance the premium.

1132.   Sharma knew this representation about borrowing funds was false because he knew Cole was financing the premium with a loan from a co-conspirator.

1133.   Sharma concealed from FGLIC the fact that Cole was obtaining a loan from Crossridge to induce FGLIC to issue the policy to Cole.

1134.   ***Second***, Sharma knew Settling Party 1 completed the life insurance application on Cole's behalf.

1135.   Sharma knew that Settling Party 1 had not been appointed to serve as an insurance producer for FGLIC.

1136.   Sharma knowingly acted as a "surrogate" to Settling Party 1, a non-appointed insurance producer, in violation of Sharma's contract with FGLIC.  *See* Exh. 31 (Market Conduct Guide Rev. 12-2014, at p. 24).

1137.   Sharma concealed from FGLIC that Settling Party 1 had completed the Cole life insurance application, in order to further the conspiracy between Sharma, Settling Party 1, and their fellow co-conspirators.

1138.   ***Third***, Sharma falsely represented to FGLIC that he was familiar with Cole, in order to induce FGLIC to issue the policy.

1139.   Sharma sent a letter dated **August 7, 2015**, along with the life insurance application, in which Sharma stated that he "had the pleasure of getting to know Judith through mutual friends and business associates."

1140.   Upon information and belief, Sharma's representation of familiarity with Cole was false.

1141.   Sharma has admitted that he intentionally made false statements in the introductory letters he sent along with an insured's application materials, because he knew FGLIC would rely on them to issue the policies. Exh. 4 (Sharma Exam. Tr. 174:8-14).

1142.   On or about **August 7, 2015**, Sharma and his d/b/a RequiteLife sent Cole's application materials by the mail or wire to Network Partners.

1143.   Network Partners, in its role as General Agent, was responsible for validating Cole's application materials prior to submitting them to FGLIC.

1144.   Network Partners knew that the statement in Cole's application that the insured would not borrow funds to finance the premium was false, because Network Partners knew the premium was to be financed by a loan from a c co-conspirator, and Network Partners intended for FGLIC to rely on that false statement.

1145.   Network Partners did not correct the false representations in Cole's application.

1146.   On **August 7, 2015**, Network Partners sent Cole's application materials by facsimile transmission over the wire to FGLIC with the false representations included in the materials.

1147.   Network Partners' false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Cal. Ins. Code § 1871.4(a)(1), (3).

1148.   In reliance on the co-conspirators' misrepresentations, FGLIC issued a life insurance policy to Cole with a value of $2 million on **October 12, 2015** (the "Cole Policy").  Exh. 142 (FGLIC_RL00011653).

1149.   On **October 29, 2015**, LaGambina established a business entity called Cole Ventures, LLC.  Exh. 143 (GS000862-93).

1150.   An unexecuted version of the Limited Liability Company Agreement for Cole Ventures sets forth signature lines for Settling Trustee 3, as trustee of the Cole ILIT, and LaGambina, as President of Crossridge.

1151.   The LLC Agreement named the Cole ILIT and Crossridge as the sole members of Cole Ventures, with the Cole ILIT owning the majority of membership interests.

1152.   On **October 29, 2015**, LaGambina and Settling Trustee 3 caused Cole Ventures and the Cole ILIT to enter into a sham Loan Agreement for the amount of $89,480.  Exh. 144 (GS000894-90).

1153.   The Loan Agreement falsely identifies Cole Ventures as the Lender, and the trust as the Borrower.

1154.   An unexecuted copy of the Loan Agreement sets forth two signature lines for Settling Trustee 3: first on behalf of the Lender, Cole Ventures, in his capacity as trustee of the majority shareholder; and second, on behalf of the Borrower, in his capacity as trustee of the trust.

1155.   In fact, the so-called "loan" was a sham:

    (i)      The LLC never had the funds; the funds were wired from Crossridge to the ILIT directly.

    (ii)     Moreover, the ILIT had no assets to repay the "loan" once the insurance policy lapsed shortly after the first anniversary of the policy.

1156.   The Defendants referenced in this Predicate Act knew the loan was a sham.

1157.   On **October 29, 2015**, LaGambina and Settling Trustee 3caused the Cole ILIT to assign the Cole Policy to Cole Ventures, pursuant to an Assignment of Life Insurance Policy.  Exh. 145 (GS000770-81).

1158.   An unexecuted copy of the Assignment sets forth two signature lines for Settling Trustee 3: first, as trustee of the assignor, the Cole ILIT; and second, as trustee of the majority shareholder of the assignee, Cole Ventures.

1159.   Although the Assignment stated that the policy had been in effect for two years, this statement was false on its face.

1160.   The annual premium payment on the Cole Policy was $89,480.

1161.   Settling Party 1 caused Settling Party 2 to wire sufficient funds to Crossridge to fund the premium.

1162.   On **November 3, 2015**, LaGambina caused Crossridge to wire $91,200 to the bank account of the Cole ILIT.  Exh. 146 (GS00013574).

1163.   On **November 9, 2015**, Settling Trustee 3 wired $89,480 from the ILIT to FGLIC, as payment of the premium on the Cole Policy.  Exh. 147 (FGLIC_RL00011742).

1164.   Settling Trustee 3 withdrew an additional amount (approximately $1,720) for himself, as payment for his role as "trustee" in service to the conspiracy.

1165.   The actions taken by the Defendants referenced in this Predicate Act are in violation and deliberate disregard of the legal advice set forth in the Locke Lord Opinion, which is evidence of these Defendants' fraudulent intent.

1166.   In reliance on the fraudulent misrepresentations perpetrated by David Meyer, Network Partners, Sharma, Settling Party 1, LaGambina, Settling Party 2, Crossridge, and Settling Trustee 3, FGLIC paid Sharma, RequiteLife, and Network Partners commissions and bonuses totaling $138,694 for the fraudulent sale of the Cole Policy.

1167.   David Meyer, Network Partners, Sharma, and RequiteLife paid Settling Party 2 approximately 95% of the commissions and bonuses they received from FGLIC, thereby rebating the premium payments back to their co-conspirators for the continuation and furtherance of the conspiracy.

1168.   The second-year premium on the Cole Policy was not paid.

1169.   Accordingly, the Cole Policy lapsed worthless on **October 12, 2016**.  Exh. 148 (FGLIC_RL00011790).

## Predicate Act Eleven: The KAREN MANDEL Policy

1170.   The co-conspirators sold insured Karen Mandel a life insurance policy issued in the State of Connecticut and valued at $2 million, which was procured by fraud and breach of fiduciary duty.

1171.   On **June 1, 2015**, Joshua Mandel, Settling Party 1, and Trustee Defendant Dana Mandel caused the creation of an ILIT in Karen Mandel's name (the "Karen Mandel ILIT"), pursuant to a trust agreement executed by Karen Mandel as settlor and Dana Mandel as trustee. Exh. 149 (FP_002105-28).

1172.   As trustee, Dana Mandel established a bank account for the Karen Mandel ILIT.

1173.   In **June 2015**, Joshua Mandel sought to obtain a FGLIC life insurance policy in Karen Mandel's name, in the amount of $2 million.

1174.   Joshua Mandel relied on Settling Party 1 to prepare Karen Mandel's life insurance application.

1175.   The application lists the primary insured as Karen Mandel, and the owner of the policy as the Karen Mandel ILIT.  Exh. 150 (FGLIC_BIP00097520).

1176.   The application asks: "Will you borrow money to pay the premium for the life insurance being applied for or have someone else pay these premiums for you in return for you assigning part or all of the policy values to someone else?"  *Id.*

1177.   Settling Party 1 falsely answered this question, "no."  *Id.*

1178.   Settling Party 1 knew this representation was false because he knew Karen Mandel was financing the premium with a loan from Crossridge.

1179.   Settling Party 1's false statements in connection with the application violated applicable state insurance laws, regulations, and rules.  *See* Conn. Gen. Stat. § 38a-816(8).

1180.   Agent Defendant Joshua Mandel executed Karen Mandel's application on **June 9, 2015**, certifying falsely that Karen Mandel was not borrowing funds to finance the premium.

1181.   Joshua Mandel knew this representation about borrowing funds was false because he knew Karen Mandel was financing the premium with a loan from a co-conspirator.

1182.   Joshua Mandel concealed from FGLIC the fact that Karen Mandel was obtaining a loan from Crossridge to induce FGLIC to issue the policy to Karen Mandel.

1183.   Joshua Mandel's false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Conn. Gen. Stat. § 38a-816(8).

1184.   Joshua Mandel also knew Settling Party 1 completed the life insurance application on Karen Mandel's behalf.

1185.   Joshua Mandel knew that Settling Party 1 had not been appointed to serve as an insurance producer for FGLIC.

1186.   Joshua Mandel knowingly acted as a "surrogate" to Settling Party 1, a non-appointed insurance producer, in violation of Joshua Mandel's contract with FGLIC.  *See* Exh. 31 (Market Conduct Guide Rev. 12-2014, at p. 24).

1187.   Joshua Mandel concealed from FGLIC that Settling Party 1 had completed Karen Mandel's life insurance application, in order to further the conspiracy between Joshua Mandel, Settling Party 1, and their fellow co-conspirators.

1188.   On or about **June 15, 2015**, Joshua Mandel and his d/b/a Rubicon sent Karen Mandel's application materials by the mail or wire to Network Partners.

1189.   Network Partners, in its role as General Agent, was responsible for validating Karen Mandel's application materials prior to submitting them to FGLIC.

1190.   Network Partners knew that the statement in Karen Mandel's application that the insured would not borrow funds to finance the premium was false, because Network Partners knew the premium was to be financed by a loan from a co-conspirator, and Network Partners intended for FGLIC to rely on that false statement.

1191.   Network Partners did not correct the false representations in Karen Mandel's application.

1192.   On **June 9, 2015**, Network Partners sent Karen Mandel's application materials by facsimile transmission over the wire to FGLIC with the false representations.

1193.   Network Partners' false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Conn. Gen. Stat. § 38a-816(8).

1194.   In reliance on the co-conspirators' misrepresentations, FGLIC issued a life insurance policy to Karen Mandel with a value of $2 million on **September 24, 2015** (the "Karen Mandel Policy").  Exh. 151 (FP_002151-94).

1195.   The annual premium payment on the Karen Mandel Policy was $47,100. *Id.*

1196.   Settling Party 1 caused Settling Party 2 to wire sufficient funds to Crossridge to fund the premium.

1197.   On **October 15, 2015**, LaGambina caused Crossridge to wire $48,000 to the bank account of the Karen Mandel ILIT.  Exh. 152 (GS00013579).

1198.   Upon information and belief, on or about **October 15, 2015**, trustee Dana Mandel wired $47,100 from the ILIT to FGLIC, as payment of the premium on the Karen Mandel Policy.

1199.   Upon information and belief, Dana Mandel withdrew an additional amount for herself, as payment for her role as "trustee" in service to the conspiracy.

1200.   On **November 5, 2015**, LaGambina established a business entity called Mandel Enterprise, LLC.  Exh. 153 (GS0005075).

1201.   A Limited Liability Company Agreement for Mandel Enterprise was executed by Dana Mandel, as trustee of the Karen Mandel ILIT, and LaGambina, as President of Crossridge.

1202.   The LLC Agreement named the Karen Mandel ILIT and Crossridge as the sole members of Mandel Enterprise, with the Karen Mandel ILIT owning the majority of membership interests.

1203.   On **November 5, 2015**, LaGambina and Dana Mandel caused Mandel Enterprise and the Karen Mandel ILIT to enter into a sham Loan Agreement for the amount of $49,100.  Exh. 154 (GS0005107).

1204.   The Loan Agreement identifies Mandel Enterprise as the Lender, and the trust as the Borrower.

1205.   Dana Mandel executed the Loan Agreement twice: first on behalf of the Lender, Mandel Enterprise, in his capacity as trustee of the majority shareholder; and second, on behalf of the Borrower, in his capacity as trustee of the trust.

1206.   In fact, the so-called "loan" was a sham:

      (i)     The LLC never had the funds; the funds were wired from Crossridge to the ILIT directly.

      (ii)    Moreover, the ILIT had no assets to repay the "loan" once the insurance policy lapsed shortly after the first anniversary of the policy.

1207.   The Defendants referenced in this Predicate Act knew the loan was a sham.

1208.   On **November 5, 2015**, LaGambina and Dana Mandel caused the Karen Mandel ILIT to assign the Karen Mandel Policy to Mandel Enterprise, pursuant to an Assignment of Life Insurance Policy.  Exh. 155 (GS0005063).

1209.   Dana Mandel executed the Assignment twice: first, as trustee of the assignor, the Karen Mandel ILIT; and second, as trustee of the majority shareholder of the assignee, Mandel Enterprise.

1210.   Jason Mandel executed the Assignment as a witness.

1211.   Although the Assignment stated that the policy had been in effect for two years, this statement was false on its face.

1212.   The actions taken by the Defendants referenced in this Predicate Act are in violation and deliberate disregard of the legal advice set forth in the Locke Lord Opinion, which is evidence of these Defendants' fraudulent intent.

1213.   In reliance on the fraudulent misrepresentations perpetrated by David Meyer, Network Partners, Joshua Mandel, Settling Party 1, LaGambina, Settling Party 2, Crossridge, and Dana Mandel, FGLIC paid Joshua Mandel, Rubicon, and Network Partners commissions and bonuses totaling $73,005 for the fraudulent sale of the Karen Mandel Policy.

1214.   David Meyer, Network Partners, Joshua Mandel, and Rubicon paid Settling Party 2 approximately 95% of the commissions and bonuses they received from FGLIC, thereby (i) unlawfully splitting commissions with an unlicensed person, *see* Conn. Gen. Stat. § 38a-702*l*(a); and (ii) unlawfully rebating premium payments, *see* Conn. Gen. Stat. § 38a-465i.

1215.   The second-year premium on the Karen Mandel Policy was not paid.

1216.   Accordingly, the Karen Mandel Policy lapsed worthless on **November 25, 2016**.

1217.   Trustee Defendant Dana Mandel, together with her co-conspirators, utilized the same pattern of fraudulent and unlawful activity described above for one other policy issued by FGLIC, namely Jack Mandel (policy ending in 707).

1218.   The events and facts associated with the issuance of the Jack Mandel policy are all Predicate Acts.

### Predicate Act Twelve: The INDRA CHANDRA Policy

1219.   The co-conspirators sold insured Indra Chandra a life insurance policy issued in the State of Connecticut and valued at $10 million, which was procured by fraud and breach of fiduciary duty.

1220.   In **July 2015**, Agent Defendant Joshua Mandel sought to obtain a FGLIC life insurance policy in Chandra's name.

1221.   Joshua Mandel relied on Settling Party 1 to prepare Chandra's life insurance application.

1222.   The application lists the primary insured as Chandra, and the owner of the policy as the Chandra ILIT.  Exh. 156 (FP_005636).

1223.   The application asks: "Will you borrow money to pay the premium for the life insurance being applied for or have someone else pay these premiums for you in return for you assigning part or all of the policy values to someone else?"  *Id.*

1224.   Settling Party 1 falsely answered this question, "no." *Id.*

1225.   Settling Party 1 knew this representation was false because he knew Chandra was financing the premium with a loan from Crossridge.

1226.   Settling Party 1's false statements in connection with the application violated applicable state insurance laws, regulations, and rules.  *See* Conn. Gen. Stat. § 38a-816(8).

1227.   Agent Defendant Joshua Mandel executed Chandra's application on **July 20, 2015**, certifying falsely that Chandra was not borrowing funds to finance the premium.

1228.   Joshua Mandel knew this representation about borrowing funds was false because he knew Chandra was financing the premium with a loan from a co-conspirator.

1229.   Joshua Mandel concealed from FGLIC the fact that Chandra was obtaining a loan in order to induce FGLIC to issue the policy to Chandra.

1230.   Joshua Mandel's false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Conn. Gen. Stat. § 38a-816(8).

1231.   Joshua Mandel also knew Settling Party 1 completed the life insurance application on Chandra's behalf.

1232.   Joshua Mandel knew that Settling Party 1 had not been appointed to serve as an insurance producer for FGLIC.

1233.   Joshua Mandel knowingly acted as a "surrogate" to Settling Party 1, a non-appointed insurance producer, in violation of Joshua Mandel's contract with FGLIC.  *See* Exh. 31 (Market Conduct Guide Rev. 12-2014, at p. 24).

1234.   Joshua Mandel concealed from FGLIC that Settling Party 1 had completed Chandra's life insurance application, in order to further the conspiracy between Joshua Mandel, Settling Party 1, and their fellow co-conspirators.

1235.   On or about **July 20, 2015**, Joshua Mandel and his d/b/a Rubicon sent Chandra's application materials by the mail or wire to Network Partners.

1236.   Network Partners, in its role as General Agent, was responsible for validating Chandra's application materials prior to submitting them to FGLIC.

1237.   Network Partners knew that the statement in Chandra's application that the insured would not borrow funds to finance the premium was false, because Network Partners knew the premium was to be financed by a loan from a co-conspirator, and Network Partners intended for FGLIC to rely on that false statement.

1238.   Network Partners did not correct the false representations in Chandra's application.

1239.   On or about **July 20, 2015**, Network Partners sent Chandra's application materials by facsimile transmission over the wire to FGLIC with the false representations included in the materials.

1240.   Network Partners' false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Conn. Gen. Stat. § 38a-816(8).

1241.   On **September 21, 2015**, Joshua Mandel, Settling Party 1, and Peter Bilfield caused the creation of an ILIT in Chandra's name (the "Chandra ILIT"), pursuant to a trust agreement executed by Chandra as settlor and Bilfield as trustee.  Exh. 157 (FP_005768).

1242.   As trustee, Peter Bilfield established a bank account for the Chandra ILIT.

1243.   In reliance on the co-conspirators' misrepresentations, FGLIC issued a life insurance policy to Chandra with a value of $10 million on **November 13, 2015** (the "Chandra Policy").  Exh. 158 (FGLIC_BIP00098665).

1244.   The annual premium payment on the Chandra Policy was $69,000. *Id.*

1245.   Settling Party 1 caused Settling Party 2 to wire sufficient funds to Crossridge to fund the premium.

1246.   On **December 11, 2015**, LaGambina caused Crossridge to wire $77,000 to the bank account of the Chandra ILIT.

1247.   Upon information and belief, in **December 2015**, Bilfield wired $69,000 from the ILIT to FGLIC, as payment of the premium on the Chandra Policy.

1248.   Upon information and belief, Bilfield withdrew an additional amount for himself, as payment for his role as "trustee" in service to the conspiracy.

1249.   On **December 10, 2015**, LaGambina established a business entity called Chandra Partners, LLC.  Exh. 159 (GS000727).

1250.   An unexecuted version of the Limited Liability Company Agreement for Chandra Partners sets forth signature lines for Peter Bilfield, as trustee of the Chandra ILIT, and LaGambina, as President of Crossridge.

1251.   The LLC Agreement named the Chandra ILIT and Crossridge as the sole members of Chandra Partners, with the Chandra ILIT owning the majority of membership interests.

1252.   On **December 10, 2015**, LaGambina and Bilfield caused Chandra Partners and the Chandra ILIT to enter into a sham Loan Agreement for the amount of $79,000.  Exh. 160 (GS000759).

1253.   The Loan Agreement identifies Chandra Partners as the Lender, and the trust as the Borrower.

1254.   An unexecuted copy of the Loan Agreement sets forth two signature lines for Bilfield: first on behalf of the Lender, Chandra Partners, in his capacity as trustee of the majority shareholder; and second, on behalf of the Borrower, in his capacity as trustee of the trust.

1255.   In fact, the so-called "loan" was a sham:

> (i)      The LLC never had the funds; the funds were wired from Crossridge to the ILIT directly.

> (ii)      Moreover, the ILIT had no assets to repay the "loan" once the insurance policy lapsed shortly after the first anniversary of the policy.

1256.   The Defendants referenced in this Predicate Act knew the loan was a sham.

1257.   Finally, upon information and belief, on **December 10, 2015**, LaGambina and Bilfield caused the Chandra ILIT to assign the Chandra Policy to Chandra Partners, pursuant to an Assignment of Life Insurance Policy.

1258.   Upon information and belief, Bilfield executed the Assignment twice: first, as trustee of the assignor, the Chandra ILIT; and second, as trustee of the majority shareholder of the assignee, Chandra Partners.

1259.   Although the Assignment stated that the policy had been in effect for two years, this statement was false on its face.

1260.   The actions taken by the Defendants referenced in this Predicate Act are in violation and deliberate disregard of the legal advice set forth in the Locke Lord Opinion, which is evidence of these Defendants' fraudulent intent.

1261.   In reliance on the fraudulent misrepresentations perpetrated by David Meyer, Network Partners, Joshua Mandel, Settling Party 1, LaGambina, Settling Party 2, Crossridge, and Bilfield, FGLIC paid Joshua Mandel, Rubicon, and Network Partners commissions and bonuses totaling $108,680 for the fraudulent sale of the Chandra Policy.

1262.   David Meyer, Network Partners, Joshua Mandel, and Rubicon paid Settling Party 2 approximately 95% of the commissions and bonuses they received from FGLIC, thereby (i) unlawfully splitting commissions with an unlicensed person, *see* Conn. Gen. Stat. § 38a-702*l*(a); and (ii) unlawfully rebating premium payments, *see* Conn. Gen. Stat. § 38a-465i.

1263.   The second-year premium on the Chandra Policy was not paid.

1264.   Accordingly, the Chandra Policy lapsed worthless on **May 13, 2017**.  Exh. 161 (FGLIC_BIP00098896).

## **Predicate Act Thirteen: The GAIL SCHER Policy**

1265.   The co-conspirators sold insured Gail Scher a life insurance policy issued in the State of California and valued at $4 million, which was procured by fraud and breach of fiduciary duty.

1266.   On **October 20, 2015**, Jason Mandel, Settling Party 1, and Settling Trustee 9 caused the creation of an ILIT in Gail Scher's name (the "Scher ILIT"), pursuant to a trust agreement

executed by Gail Scher as settlor and Settling Trustee 9 as trustee. Exh. 162 (FGLIC_RL00005921).

1267.  As trustee, Settling Trustee 9 established a bank account for the Scher ILIT.

1268.  In **November 2015**, Jason Mandel sought to obtain a FGLIC life insurance policy in Gail Scher's name, in the amount of $4 million.

1269.  Jason Mandel relied on Settling Party 1 to prepare Sokol's life insurance application.

1270.  The application lists the primary insured as Gail Scher, and the owner of the policy as the Scher ILIT. Exh. 163 (FGLIC_RL00006779).

1271.  The application asks: "Will you borrow money to pay the premium for the life insurance being applied for or have someone else pay these premiums for you in return for you assigning part or all of the policy values to someone else?" *Id.*

1272.  Settling Party 1 falsely answered this question, "no." *Id.*

1273.  Settling Party 1 knew this representation was false because he knew Gail Scher was financing the premium with a loan from Crossridge.

1274.  Settling Party 1's false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Cal. Ins. Code § 1871.4(a)(1), (3).

1275.  Jason Mandel executed Gail Scher's application on **November 9, 2015**, certifying falsely that Gail Scher was not borrowing funds to finance the premium.

1276.  Jason Mandel knew this representation about borrowing funds was false because he knew Gail Scher was financing the premium with a loan from Crossridge.

1277.  Jason Mandel concealed from FGLIC the fact that Gail Scher was obtaining a loan from Crossridge to induce FGLIC to issue the policy to Gail Scher.

1278.   Jason Mandel's false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Cal. Ins. Code § 1871.4(a)(1), (3).

1279.   Jason Mandel also knew Settling Party 1 completed the life insurance application on Gail Scher's behalf.

1280.   Jason Mandel knew that Settling Party 1 had not been appointed to serve as an insurance producer for FGLIC.

1281.   Jason Mandel knowingly acted as a "surrogate" to Settling Party 1, a non-appointed insurance producer, in violation of Jason Mandel's contract with FGLIC.  *See* Exh. 31 (Market Conduct Guide Rev. 12-2014, at p. 24).

1282.   Jason Mandel concealed from FGLIC that Settling Party 1 had completed Gail Scher's life insurance application, in order to further the conspiracy between Jason Mandel, Settling Party 1, and their fellow co-conspirators.

1283.   On or about **November 9, 2015**, Jason Mandel and his d/b/a Tower Group sent Gail Scher's application materials by the mail or wire to Network Partners.

1284.   Network Partners, in its role as General Agent, was responsible for validating Gail Scher's application materials prior to submitting them to FGLIC.

1285.   Network Partners knew that the statement in Gail Scher's application that the insured would not borrow funds to finance the premium was false, because Network Partners knew that Gail Scher was financing the premium with a loan from a co-conspirator, and Network Partners intended for FGLIC to rely on that false statement.

1286.   Network Partners did not correct the false representations in Gail Scher's application.

1287.   On **November 16, 2015**, Network Partners sent Gail Scher's application materials by facsimile transmission over the wire to FGLIC with the false representations included in the materials.

1288.   Network Partners' false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Cal. Ins. Code § 1871.4(a)(1), (3).

1289.   In reliance on the co-conspirators' misrepresentations, FGLIC issued a life insurance policy to Gail Scher with a value of $4 million on **February 23, 2016** (the "Scher Policy").  Exh. 164 (FGLIC_RL00006562).

1290.   The annual premium payment on the Scher Policy was $227,040. *Id.*

1291.   Settling Party 1 caused Settling Party 2 to wire sufficient funds to Crossridge to fund the premium.

1292.   On **March 11, 2016**, LaGambina caused Crossridge to wire $229,300 to the bank account of the Scher ILIT.

1293.   Upon information and belief, in **March 2016**, Settling Trustee 9 wired $227,040 from the ILIT to FGLIC, as payment of the premium on the Scher Policy.

1294.   Upon information and belief, Settling Trustee 9 withdrew an additional amount for himself, as payment for his role as "trustee" in service to the conspiracy.

1295.   On **March 14, 2016**, LaGambina established a business entity called Scher Partners, LLC.  Exh. 165 (GS0007335).

1296.   An unexecuted version of the Limited Liability Company Agreement for Scher Partners sets forth signature lines for Settling Trustee 9, as trustee of the Scher ILIT, and LaGambina, as President of Crossridge.

1297.   The LLC Agreement named the Scher ILIT and Crossridge as the sole members of Scher Partners, with the Scher ILIT owning the majority of membership interests.

1298.   On **March 14, 2016**, LaGambina and Settling Trustee 9 caused Scher Partners and the Scher ILIT to enter into a sham Loan Agreement for the amount of $295,090 to the Scher ILIT pursuant to a Loan Agreement.  Exh. 166 (GS0007367).

1299.   The Loan Agreement identifies Scher Partners as the Lender, and the trust as the Borrower.

1300.   An unexecuted copy of the Loan Agreement sets forth two signature lines for Settling Trustee 9: first on behalf of the Lender, Scher Partners, in his capacity as trustee of the majority shareholder; and second, on behalf of the Borrower, in his capacity as trustee of the trust.

1301.   In fact, the so-called "loan" was a sham:

> (i)      The LLC never had the funds; the funds were wired from Crossridge to the ILIT directly.

> (ii)     Moreover, the ILIT had no assets to repay the "loan" once the insurance policy lapsed shortly after the first anniversary of the policy.

1302.   The Defendants referenced in this Predicate Act knew the loan was a sham.

1303.   On **March 14, 2016**, LaGambina and Settling Trustee 9 caused the Scher ILIT to assign the Scher Policy to Scher Partners, pursuant to an Assignment of Life Insurance Policy. Exh. 167 (GS0007239).

1304.   An unexecuted copy of the Assignment sets forth two signature lines for Settling Trustee 9: first, as trustee of the assignor, the Scher ILIT; and second, as trustee of the majority shareholder of the assignee, Scher Partners.

1305.   Although the Assignment stated that the policy had been in effect for two years, this statement was false on its face.

1306.   The actions taken by the Defendants referenced in this Predicate Act are in violation and deliberate disregard of the legal advice set forth in the Locke Lord Opinion, which is evidence of these Defendants' fraudulent intent.

1307.   In reliance on the fraudulent misrepresentations perpetrated by David Meyer, Network Partners, Jason Mandel, Settling Party 1, LaGambina, Settling Party 2, Crossridge, and Settling Trustee 9, FGLIC paid Jason Mandel, Tower Group, and Network Partners commissions and bonuses totaling $351,912 for the fraudulent sale of the Scher Policy.

1308.   David Meyer, Network Partners, Jason Mandel, and Tower Group paid Settling Party 2 approximately 95% of the commissions and bonuses they received from FGLIC, thereby rebating the premium payments back to their co-conspirators for the continuation and furtherance of the conspiracy.

1309.   The second-year premium on the Scher Policy was not paid.

1310.   Accordingly, the Scher Policy lapsed worthless on **June 23, 2017**. Exh. 168 (FGLIC_RL00006963).

### Predicate Act Fourteen: The MICHAEL LICHTENSTEIN Policy

1311.   The co-conspirators sold insured Michael Lichtenstein a life insurance policy issued in the State of Florida and valued at $10 million, which was procured by fraud and breach of fiduciary duty.

1312.   On **June 30, 2015**, Sharma, Settling Party 1, and Settling Trustee 5 caused the creation of an ILIT in Michael Lichtenstein's name (the "Lichtenstein ILIT"), pursuant to an trust

agreement executed by Michael Lichtenstein as settlor and Settling Trustee 5 as trustee.  Exh. 169 (FGLIC_RL13634-35).

1313.   As trustee, Settling Trustee 5 established a bank account for the Michael Lichtenstein ILIT.

1314.   In **November 2015**, Sharma sought to obtain a FGLIC life insurance policy in Michael Lichtenstein's name.

1315.   Sharma relied on Settling Party 1 to prepare Michael Lichtenstein's life insurance application.

1316.   The application lists the primary insured as Michael Lichtenstein, and the owner of the policy as the Michael Lichtenstein ILIT.  Exh. 170 (FGLIC_RL00013603).

1317.   The application asks: "Will you borrow money to pay the premium for the life insurance being applied for or have someone else pay these premiums for you in return for you assigning part or all of the policy values to someone else?"  *Id.*

1318.   Settling Party 1 falsely answered this question, "no." *Id.*

1319.   Settling Party 1 knew this representation was false because he knew Michael Lichtenstein was financing the premium with a loan from Crossridge.

1320.   Settling Party 1's false statements in connection with the application violated applicable state insurance laws, regulations, and rules.  *See* Fla. Stat. Ann. § 817.234(3).

1321.   Sharma executed Michael Lichtenstein's application on **December 3, 2015**, certifying to numerous representations that Sharma knew at the time were false.

1322.   Sharma admitted that he certified misstatements of fact in the policy applications to be submitted to FGLIC. Exh. 4 (Sharma Exam. Tr. 367:7-368:8).

1323.   Sharma's false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Fla. Stat. Ann. § 817.234(3).

1324.   *First*, Sharma certified falsely that Michael Lichtenstein was not borrowing funds to finance the premium.

1325.   Sharma knew this representation about borrowing funds was false because he knew Michael Lichtenstein was financing the premium with a loan from a co-conspirator.

1326.   Sharma concealed from FGLIC the fact that Michael Lichtenstein was obtaining a loan in order to induce FGLIC to issue the policy to Michael Lichtenstein.

1327.   *Second*, Sharma knew Settling Party 1 completed the life insurance application on Michael Lichtenstein's behalf.

1328.   Sharma knew that Settling Party 1 had not been appointed to serve as an insurance producer for FGLIC.

1329.   Sharma knowingly acted as a "surrogate" to Settling Party 1, a non-appointed insurance producer, in violation of Sharma's contract with FGLIC.  *See* Exh. 31 (Market Conduct Guide Rev. 12-2014, at p. 24).

1330.   Sharma concealed from FGLIC that Settling Party 1 had completed Michael Lichtenstein's life insurance application, in order to further the conspiracy between Sharma, Settling Party 1, and their fellow co-conspirators.

1331.   *Third*, Sharma falsely represented to FGLIC that he was familiar with Michael Lichtenstein, in order to induce FGLIC to issue the policy.

1332.   Sharma sent a letter dated **December 3, 2015**, along with Michael Lichtenstein's application representing to FGLIC that he has "known Michael and his wife Doreen for some

time," and "[e]ver since I have known Michael he has always been a very active person." Exh. 171 (FGLIC_RL00013606).

1333. Upon information and belief, Sharma knew these representations were false when made, because Sharma was not familiar with Lichtenstein to the extent reflected in the letter.

1334. Sharma has admitted that he intentionally made false statements in the introductory letters he sent along with an insured's application materials, because he knew FGLIC would rely on them to issue the policies. Exh. 4 (Sharma Exam. Tr. 174:8-14).

1335. On or about **December 3, 2015**, Sharma and his d/b/a RequiteLife sent Michael Lichtenstein's application materials by the mail or wire to Network Partners.

1336. Network Partners, in its role as General Agent, was responsible for validating Lichtenstein's application materials prior to submitting them to FGLIC.

1337. Network Partners knew that the statement in Michael Lichtenstein's application that the insured would not borrow funds to finance the premium was false, because Network Partners knew that Michael Lichtenstein was financing the premium with a loan from a co-conspirator, and Network Partners intended for FGLIC to rely on that false statement.

1338. Network Partners did not correct the false representations in Lichtenstein's application.

1339. On **December 9, 2015**, Network Partners sent Michael Lichtenstein's application materials by facsimile transmission over the wire to FGLIC.

1340. Network Partners' false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Fla. Stat. Ann. § 817.234(3).

1341.   In reliance on the co-conspirators' misrepresentations, FGLIC issued a life insurance policy to Michael Lichtenstein with a value of $10 million on **January 28, 2016** (the "Lichtenstein Policy").  Exh. 172 (FGLIC_RL00013795).

1342.   On **February 16, 2016**, LaGambina established a business entity called Lichtenstein Partners, LLC.  Exh. 173 (GS0004820-51).

1343.   An unexecuted copy of the Limited Liability Company Agreement for Lichtenstein Partners sets forth a signature line for Settling Trustee 5, as trustee of the Lichtenstein ILIT, and a signature line for LaGambina, as President of Crossridge.

1344.   The LLC Agreement named the Lichtenstein ILIT and Crossridge as the sole members of Lichtenstein Partners, with the Lichtenstein ILIT owning the majority of membership interests.

1345.   On **February 16, 2016**, LaGambina and Settling Trustee 5 caused Lichtenstein Partners and the Lichtenstein ILIT to enter into a sham Loan Agreement for the amount of $182,000.  Exh. 174 (GS0004852-58).

1346.   The Loan Agreement falsely identifies Lichtenstein Partners as the Lender, and the trust as the Borrower.

1347.   An unexecuted copy of the Loan Agreement sets forth two signatures lines for Settling Trustee 5: first, on behalf of the Lender, Lichtenstein Partners, in her capacity as trustee of the majority shareholder; and second, on behalf of the Borrower, in her capacity as trustee of the trust.

1348.   In fact, the so-called "loan" was a sham:

      (i)      The LLC never had the funds; the funds were wired from Crossridge to the ILIT directly.

      (ii)     Moreover, the ILIT had no assets to repay the "loan" once the insurance policy lapsed shortly after the first anniversary of the policy.

1349.   The Defendants referenced in this Predicate Act knew the loan was a sham.

1350.   Also on **February 16, 2016**, LaGambina and Settling Trustee 5 caused the Lichtenstein ILIT to assign the Lichtenstein Policy to Lichtenstein Partners, pursuant to an Assignment of Life Insurance Policy.  Exh. 175 (GS0004808-19).

1351.   An unexecuted copy of the Assignment sets forth two signatures lines for Settling Trustee 5: first, as trustee of the assignor, the Lichtenstein ILIT; and second, as trustee of the majority shareholder of the assignee, Lichtenstein Partners.

1352.   Although the Assignment stated that the policy had been in effect for two years, this statement was false on its face.

1353.   Sharma, Settling Party 2, Settling Party 1, Crossridge, LaGambina, and Settling Trustee 5 caused the life insurance application and all of the fraudulent agreements to be sent or transmitted by the mail and/or by wire.

1354.   The annual premium payment for the Lichtenstein Policy was $180,000.

1355.   Settling Party 1 caused Settling Party 2 to wire sufficient funds to Crossridge to fund the premium.

1356.   On **February 23, 2016**, LaGambina caused Crossridge to wire $182,200 to the bank account of the Lichtenstein ILIT.  Exh. 176 (GS00012736).

1357.   On **February 24, 2016**, Settling Trustee 5 wired $180,000 from the ILIT to FGLIC, as payment of the premium on the Lichtenstein Policy.  Exh. 177 (FGLIC_RL00013840).

1358.   Settling Trustee 5 withdrew an additional amount (approximately $2,200) for herself, as payment for her role as "trustee" in service to the conspiracy.

1359.   The actions taken by the Defendants referenced in this Predicate Act are in violation and deliberate disregard of the legal advice set forth in the Locke Lord Opinion, which is evidence of these Defendants' fraudulent intent.

1360.   In reliance on the fraudulent misrepresentations perpetrated by David Meyer, Network Partners, Sharma, Settling Party 1, LaGambina, Settling Party 2, Crossridge, and Settling Trustee 5, FGLIC paid Sharma, RequiteLife, and Network Partners commissions and bonuses totaling $279,000 for the fraudulent sale of the Lichtenstein Policy.

1361.   David Meyer, Network Partners, Sharma, and RequiteLife paid Settling Party 2 approximately 95% of the commissions and bonuses they received from FGLIC, thereby (i) unlawfully splitting commissions with an unlicensed person, *see* Fla. Stat. Ann. § 626.753; and (ii) unlawfully rebating premium payments, *see* Fla. Stat. Ann. § 626.572.

1362.   The second-year premium on the Michael Lichtenstein Policy was not paid.

1363.   Accordingly, upon information and belief, the Lichtenstein Policy lapsed worthless on **January 26, 2018**.

### **Predicate Act Fifteen: The ALAN FALLAS Policy**

1364.   The co-conspirators sold insured Alan Fallas a life insurance policy, issued in the State of Connecticut and valued at $4 million, which was procured by fraud and breach of fiduciary duty.

1365.   On **January 18, 2015**, Agent Defendant Rebecca Nadler, Settling Party 1, and Settling Trustee 1 caused the creation of an ILIT in Fallas' name (the "Fallas ILIT"), pursuant to an irrevocable trust agreement executed by Alan Fallas as settlor and Settling Trustee 1 as trustee. Exh. 178 (BERNSTEIN-BK 001019).

1366.   Upon information and belief, the Fallas ILIT changed trustees from Settling Trustee 1 to Settling Trustee 7.

1367.   Either Settling Trustee 7 or Settling Trustee 1 established a bank account for the Fallas ILIT.

1368.   In **January 2016**, David A. Cohen, an Agent Defendant in the Network Partners hierarchy, directed Nadler to obtain a FGLIC life insurance policy in Fallas' name, in the amount of $4 million.

1369.   Nadler relied on Settling Party 1 to prepare Fallas' life insurance application.

1370.   The application lists the primary insured as Alan Fallas, and the owner of the policy as the Fallas ILIT.  Exh. 179 (FGLIC_BIP00096545).

1371.   The application asks: "Will you borrow money to pay the premium for the life insurance being applied for or have someone else pay these premiums for you in return for you assigning part or all of the policy values to someone else?"  *Id.*

1372.   Settling Party 1 falsely answered this question, "no." *Id.*

1373.   Settling Party 1 knew this representation was false because he knew Alan Fallas was financing the premium with a loan from Crossridge.

1374.   Settling Party 1's false statements in connection with the application violated applicable state insurance laws, regulations, and rules.  *See* Conn. Gen. Stat. § 38a-816(8).

1375.   Nadler executed Alan Fallas' application on **January 25, 2016**, certifying falsely that Alan Fallas was not borrowing funds to finance the premium.

1376.   Nadler knew this representation about borrowing funds was false because she knew Alan Fallas was financing the premium with a loan from a co-conspirator.

1377.   Nadler concealed from FGLIC the fact that Alan Fallas was obtaining a loan in order to induce FGLIC to issue the policy to Alan Fallas.

1378.   Nadler's false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Conn. Gen. Stat. § 38a-816(8).

1379.   Nadler knew Settling Party 1 completed the life insurance application on Alan Fallas' behalf.

1380.   Nadler knew that Settling Party 1 had not been appointed to serve as an insurance producer for FGLIC.

1381.   Nadler knowingly acted as a "surrogate" to Settling Party 1, a non-appointed insurance provider, in violation of her contract with FGLIC.

1382.   Nadler concealed from FGLIC that Settling Party 1 had completed Alan Fallas' life insurance application, in order to further the conspiracy between Nadler, Settling Party 1, and their fellow co-conspirators.

1383.   On or about **January 25, 2016**, Nadler sent Alan Fallas' application materials by the mail or wire to David A. Cohen, who had directed her activities, and Network Partners.

1384.   Network Partners, in its role as General Agent, and David A. Cohen were responsible for validating Fallas' application materials prior to submitting them to FGLIC.

1385.   Network Partners and David A. Cohen knew that the statement in Alan Fallas' application that the insured would not borrow funds to finance the premium was false, because

Network Partners knew that Alan Fallas was financing the premium with a loan from a co-conspirator.

1386.   Neither Network Partners nor David A. Cohen corrected the false representations in Fallas' application.

1387.   In **late January 2016**, Network Partners and David A. Cohen sent Alan Fallas' application materials by facsimile transmission over the wire to FGLIC.

1388.   The false statements made by David A. Cohen and Network Partners in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Conn. Gen. Stat. § 38a-816(8).

1389.   In reliance on the co-conspirators' misrepresentations, FGLIC issued a life insurance policy to Alan Fallas with a value of $4 million on **February 9, 2016** (the "Fallas Policy").  Exh. 180 (FGLIC_BIP00096616).

1390.   The annual premium payment on the Fallas Policy was $300,000. *Id.*

1391.   Upon information and belief, in **early 2016**, LaGambina and Settling Trustee 7 established an LLC in Fallas' name, pursuant to a Limited Liability Company Agreement.

1392.   Upon information and belief, in **early 2016**, LaGambina and Settling Trustee 7 caused the LLC in Fallas' name and the Fallas ILIT to enter into a sham Loan Agreement for at least $300,000.

1393.   The so-called "loan" was a sham because, upon information and belief:

(1)     The LLC never had the funds; the funds were wired from Crossridge to the ILIT directly.

(2)     Moreover, the ILIT had no assets to repay the "loan" once the insurance policy lapsed shortly after the first anniversary of the policy.

1394.   The Defendants referenced in this Predicate Act knew the loan was a sham.

1395.   Upon information and belief, in **early 2016**, LaGambina and Settling Trustee 7 caused the Fallas ILIT to assign the Fallas Policy to the LLC in Fallas' name, pursuant to an Assignment of Life Insurance Policy executed by Settling Trustee 7.

1396.   Although the Assignment stated that the policy had been in effect for two years, this statement was false on its face.

1397.   The actions taken by the Defendants referenced in this Predicate Act are in violation and deliberate disregard of the legal advice set forth in the Locke Lord Opinion, which is evidence of these Defendants' fraudulent intent.

1398.   David Meyer, Network Partners, Nadler, Settling Party 2, Settling Party 1, Crossridge, LaGambina, and Settling Trustee 7 caused the life insurance application and all of the fraudulent agreements to be sent or transmitted by the mail and/or by wire.

1399.   Settling Party 1 caused Settling Party 2 to wire sufficient funds to Crossridge to fund the premium.

1400.   On **February 24, 2016**, LaGambina caused Crossridge to wire $303,200 to the bank account of the Fallas ILIT.

1401.   Upon information and belief, in **early 2016**, Settling Trustee 7 wired $300,000 from the Fallas ILIT to FGLIC, as payment of the premium on the Fallas Policy.

1402.   Settling Trustee 7 withdrew an additional amount for herself, as payment for her role as "trustee" in service to the conspiracy.

1403.   In reliance on the fraudulent misrepresentations perpetrated by David Meyer, David A. Cohen, Network Partners, Nadler, Settling Party 1, LaGambina, Settling Party 2, Crossridge,

and Settling Trustee 7, FGLIC paid Nadler and Network Partners commissions and bonuses totaling $465,000 for the fraudulent sale of the Fallas Policy.

1404.  David Meyer, David A. Cohen, Network Partners, and Nadler paid Settling Party 2 approximately 95% of the commissions and bonuses they received from FGLIC, thereby (i) unlawfully splitting commissions with an unlicensed person, *see* Conn. Gen. Stat. § 38a-702*l*(a); and (ii) unlawfully rebating premium payments, *see* Conn. Gen. Stat. § 38a-465i.

1405.  The second-year premium on the Alan Fallas Policy was not paid.

1406.  Accordingly, the Fallas Policy lapsed worthless on **February 9, 2017**.

1407.  Settling Trustee 7, together with her fellow co-conspirators, utilized the same pattern of fraudulent and unlawful activity described above for one other policy issued by FGLIC, namely that of Yaffa Sarn (policy ending in 704).

1408.  The events and facts associated with the issuance of the Sarn policy are all Predicate Acts.

## Predicate Act Sixteen: The BARBARA KLEIN Policy

1409.  The co-conspirators sold insured Barbara Klein a life insurance policy issued in the State of California and valued at $10 million, which was procured by fraud and breach of fiduciary duty.

1410.  On **March 23, 2016**, Sharma, Settling Party 1, and Trustee Defendant Aaron Aftergood caused the creation of an ILIT in Klein's name (the "Klein ILIT"), pursuant to a trust agreement executed by Klein as settlor and Aftergood as trustee.  Exh. 181 (GS00013974-91).

1411.   Settling Party 1 introduced Barbara Klein to Aaron Aftergood by email. Exh. 182 (Aftergood Exam. Tr. 17:12-16).[29]

1412.   Aftergood never met Klein in person, and he spoke to her on the phone only once or twice. *Id.* (Aftergood Exam. Tr. 17:19-24).

1413.   Aftergood was not present when Klein executed the trust agreement. *Id.* (Aftergood Exam. Tr. 47:17-23).

1414.   Aftergood established a bank account for the Klein ILIT.

1415.   In **March 2016**, Sharma sought to obtain a FGLIC life insurance policy in Klein's name, in the amount of $10 million.

1416.   Sharma relied on Settling Party 1 to prepare Klein's life insurance application.

1417.   The application lists the primary insured as Barbara Klein, and the owner of the policy as the Klein ILIT.  Exh. 183 (GS0013974-91).

1418.   The application asks: "Will you borrow money to pay the premium for the life insurance being applied for or have someone else pay these premiums for you in return for you assigning part or all of the policy values to someone else?"  *Id.*

1419.   Settling Party 1 falsely answered this question, "no." *Id.*

1420.   Settling Party 1 knew this representation was false because he knew Barbara Klein was financing the premium with a loan from Crossridge.

1421.   Settling Party 1's false statements in connection with the application violated applicable state insurance laws, regulations, and rules.  *See* Cal. Ins. Code § 1871.4(a)(1), (3).

---

[29] FGLIC took the Examination of Trustee Defendant Aaron Aftergood on October 26, 2018 (hereinafter "Aftergood Exam. Tr. ___").

1422.   Sharma executed Barbara Klein's application on **March 30, 2016**, making numerous representations that Sharma knew to be false.

1423.   Sharma admitted that he certified misstatements of fact in the policy applications to be submitted to FGLIC. Exh. 4 (Sharma Exam. Tr. 367:7-368:8).

1424.   Sharma's false statements in connection with the application violated applicable state insurance laws, regulations, and rules. Cal. Ins. Code § 1871.4(a)(1), (3).

1425.   *First*, Sharma certified falsely that Barbara Klein was not borrowing funds to finance the premium.

1426.   Sharma knew this representation about borrowing funds was false because he knew Barbara Klein was financing the premium with a loan from a co-conspirator.

1427.   Sharma concealed from FGLIC the fact that Barbara Klein was obtaining a loan in order to induce FGLIC to issue the policy to Barbara Klein.

1428.   *Second*, Sharma knew Settling Party 1 completed the life insurance application on Barbara Klein's behalf.

1429.   Sharma knew that Settling Party 1 had not been appointed to serve as an insurance producer for FGLIC.

1430.   Sharma knowingly acted as a "surrogate" to Settling Party 1, a non-appointed insurance producer, in violation of Sharma's contract with FGLIC. *See* Exh. 31 (Market Conduct Guide Rev. 12-2014, at p. 24).

1431.   Sharma concealed from FGLIC that Settling Party 1 had completed Barbara Klein's life insurance application, in order to further the conspiracy between Sharma, Settling Party 1, and their fellow co-conspirators.

1432.   *Third*, Sharma sent a letter dated **March 30, 2016**, along with Klein's life insurance application, in which Sharma stated that he was "pleased to introduce" Klein to FGLIC, and stated further that she "leads a serene lifestyle, spending quality time with her family, exercising regularly, and providing her time to social causes." Exh. 184 (FGLIC RL00013220).

1433.   Sharma's representation of familiarity with Klein was false.

1434.   Sharma has admitted that he intentionally made false statements in the introductory letters he sent along with an insured's application materials, because he knew FGLIC would rely on them to issue the policies. Exh. 4 (Sharma Exam. Tr. 174:8-14).

1435.   On or about **March 30, 2016**, Sharma sent Barbara Klein's application materials by the mail or wire to Network Partners.

1436.   Network Partners, in its role as General Agent, was responsible for validating Klein's application materials prior to submitting them to FGLIC.

1437.   Network Partners knew that the statement in Barbara Klein's application that the insured would not borrow funds to finance the premium was false, because Network Partners knew that Barbara Klein was financing the premium with a loan from a co-conspirator, and Network Partners intended for FGLIC to rely on that false statement.

1438.   Network Partners did not correct the false representations in Klein's application.

1439.   On **April 1, 2016**, Network Partners sent Barbara Klein's application materials by facsimile transmission over the wire to FGLIC.

1440.   Network Partners' false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Cal. Ins. Code § 1871.4(a)(1), (3).

1441.   In reliance on the co-conspirators' misrepresentations, FGLIC issued a life insurance policy to Barbara Klein with a value of $10 million on **April 25, 2016** (the "Klein Policy"). Exh. 185 (FGLIC_RL00013328).

1442.   The annual premium payment on the Klein Policy was $567,600. *Id.*

1443.   Settling Party 1 caused Settling Party 2 to wire sufficient funds to Crossridge to fund the premium.

1444.   On **May 20, 2016**, LaGambina caused Crossridge to wire $572,000 to the bank account of the Klein ILIT.  Exh. 186 (GS00012761).

1445.   On **May 23, 2016**, Aftergood wired $567,600 from the ILIT to FGLIC, as payment of the premium on the Klein Policy.  Exh. 187 (FGLIC_RL00013511).

1446.   Aftergood withdrew an additional amount (approximately $4,400) for himself, as payment for his role as "trustee" in service to the conspiracy.

1447.   Aftergood did not inquire into the source of the funds to pay the premium.

Q. Did Barbara Klein have the means to pay the premium herself?

A. I have no idea.

Exh. 182 (Aftergood Exam. Tr. 53:25-54:2).

1448.   Aftergood made no attempt to ensure that the policy would stay in force for the benefit of the Klein Trust:

Q. Was it explained whether the policy would continue in force?

A. No.

* * *

Q. Did you expect that you would continue to pay annual premiums on behalf of the trust?

A. I didn't have any expectation either way.

Exh. 182 (Aftergood Exam. Tr. 27:21-28:4).

1449.   On **May 25, 2016**, LaGambina established a business entity called Klein Endeavors, LLC.  Exh. 188 (GS0004108-39).

1450.   An unexecuted copy of the Limited Liability Company Agreement for Klein Endeavors set forth signature lines for Aftergood, as trustee of the Klein ILIT, and LaGambina, as President of Crossridge.

1451.   The LLC Agreement named the Klein ILIT and Crossridge as the sole members of Klein Endeavors, with the Klein ILIT owning the majority of membership interests.

1452.   On **May 25, 2016**, LaGambina and Aftergood caused Klein Endeavors and the Klein ILIT to enter into a sham Loan Agreement for the amount of $571,600.   Exh. 189 (GS0004143-49).

1453.   The Loan Agreement falsely identifies Klein Endeavors as the Lender, and the trust as the Borrower.

1454.   An unexecuted copy of the Loan Agreement sets forth two signatures lines for Aaron Aftergood: first, on behalf of the Lender, Klein Endeavors, in his capacity as trustee of the majority shareholder; and second, on behalf of the Borrower, in his capacity as trustee of the trust.

1455.   In fact, the so-called "loan" was a sham:

    (i)     The LLC never had the funds; the funds were wired from Crossridge to the ILIT directly.

    (ii)    Moreover, the ILIT had no assets to repay the "loan" once the insurance policy lapsed shortly after the first anniversary of the policy.

1456.   The Defendants referenced in this Predicate Act knew the loan was a sham.

1457.   Also on **May 25, 2016**, LaGambina and Aftergood caused the Klein ILIT to assign the Klein Policy to Klein Endeavors, pursuant to an Assignment of Life Insurance Policy.  Exh. 190 (GS0004012-23).

1458.   An unexecuted copy of the Assignment sets forth two signatures lines for Aaron Aftergood: first, as trustee of the assignor, the Klein ILIT; and second, as trustee of the majority shareholder of the assignee, Klein Endeavors.

1459.   In reliance on the fraudulent misrepresentations perpetrated by David Meyer, Network Partners, Sharma, Settling Party 1, LaGambina, Settling Party 2, Crossridge, and Aftergood, FGLIC paid Sharma, RequiteLife, and Network Partners commissions and bonuses totaling $879,780 for the fraudulent sale of the Klein Policy.

1460.   David Meyer, Network Partners, Sharma, and RequiteLife paid Settling Party 2 approximately 95% of the commissions and bonuses they received from FGLIC, thereby rebating the premium payments back to their co-conspirators for the continuation and furtherance of the conspiracy.

1461.   The second-year premium on the Klein Policy was not paid.

1462.   Accordingly, the Klein Policy lapsed worthless on **October 27, 2017**.  Exh. 191 (SHARMA-BK018175-76).

### Predicate Act Seventeen: The RAYMOND SANSEVERINO Policy

1463.   The co-conspirators sold insured Raymond Sanseverino a life insurance policy issued in the State of Connecticut and valued at $10 million, which was procured by fraud and breach of fiduciary duty.

1464.   On **December 9, 2015**, Agent Defendant David R. Cohen, Settling Party 1, and Settling Trustee 11 caused the creation of an ILIT in Sanseverino's name (the "Sanseverino ILIT"),

pursuant to a trust agreement executed by Sanseverino as settlor and Settling Trustee 11 as trustee. Exh. 192 (FP_003769).

1465.   Settling Trustee 11 established a bank account for the Sanseverino ILIT.

1466.   In **early 2016**, David R. Cohen, an Agent Defendant in the MSL Insurance Advisors hierarchy (not to be confused with David A. Cohen, an Agent Defendant in the Network Partners hierarchy), sought to obtain a FGLIC life insurance policy in Sanseverino's name, in the amount of $10 million.

1467.   David R. Cohen relied on Settling Party 1 to prepare Sanseverino's life insurance application.

1468.   The application lists the primary insured as Raymond Sanseverino, and the owner of the policy as the Sanseverino ILIT.  Exh. 193 (FP_004000).

1469.   The application asks: "Will you borrow money to pay the premium for the life insurance being applied for or have someone else pay these premiums for you in return for you assigning part or all of the policy values to someone else?"  *Id.*

1470.   Settling Party 1 falsely answered this question, "no." *Id.*

1471.   Settling Party 1 knew this representation was false because he knew Raymond Sanseverino was financing the premium with a loan from Crossridge.

1472.   Settling Party 1's false statements in connection with the application violated applicable state insurance laws, regulations, and rules.  *See* Conn. Gen. Stat. § 38a-816(8).

1473.   David R. Cohen executed Raymond Sanseverino's application on **February 8, 2016**, certifying falsely that Raymond Sanseverino was not borrowing funds to finance the premium.

1474.   David R. Cohen knew this representation about borrowing funds was false because he knew Raymond Sanseverino was financing the premium with a loan from a co-conspirator.

1475.   David R. Cohen concealed from FGLIC the fact that Raymond Sanseverino was obtaining a loan from Crossridge to induce FGLIC to issue the policy to Raymond Sanseverino.

1476.   David R. Cohen's false statements in connection with the application violated applicable state insurance laws, regulations, and rules.  *See* Conn. Gen. Stat. § 38a-816(8).

1477.   David R. Cohen knew Settling Party 1 completed the life insurance application on Raymond Sanseverino's behalf.

1478.   David R. Cohen knew that Settling Party 1 had not been appointed to serve as an insurance producer for FGLIC.

1479.   David R. Cohen knowingly acted as a "surrogate" to Settling Party 1, a non-appointed insurance producer, in violation of Sharma's contract with FGLIC. *See* Exh. 31 (Market Conduct Guide Rev. 12-2014, at p. 24).

1480.   David R. Cohen concealed from FGLIC that Settling Party 1 had completed Raymond Sanseverino's life insurance application, in order to further the conspiracy.

1481.   On or about **February 8, 2016**, David R. Cohen sent Raymond Sanseverino's application materials by the mail or wire to MSL Insurance Advisors, LaGambina's alter ego, for validation and for submission to FGLIC.

1482.   MSL Insurance Advisors, in its role as General Agent, was responsible for validating Sanseverino's application materials prior to submitting them to FGLIC.

1483.   MSL Insurance Advisors knew that the statement in Sanseverino's application that the insured would not borrow funds to finance the premium was false, because MSL Insurance

Advisors and LaGambina knew that Sanseverino was financing the premium with a loan from Crossridge, LaGambina's own company.

1484.  MSL Insurance Advisors intended for FGLIC to rely on the false statement in Sanseverino's application.

1485.  MSL Insurance Advisors did not correct the false representations in Sanseverino's application.

1486.  On or about **February 8, 2016**, MSL Insurance Advisors sent Raymond Sanseverino's by facsimile transmission over the wire to FGLIC with the false representations included in the materials.

1487.  MSL Insurance Advisors' false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Conn. Gen. Stat. § 38a-816(8).

1488.  In reliance on the co-conspirators' misrepresentations, FGLIC issued a life insurance policy to Raymond Sanseverino with a value of $10 million on **March 28, 2016** (the "Sanseverino Policy").  Exh. 194 (FP_004147-92).

1489.  On **April 19, 2016**, LaGambina established a business entity called Sanseverino Enterprises, LLC.  Exh. 195 (GS0006954).

1490.  A Limited Liability Company Agreement for Sanseverino Enterprises was executed by Settling Trustee 11, as trustee of the Sanseverino ILIT, and LaGambina, as President of Crossridge.

1491.  The LLC Agreement named the Sanseverino ILIT and Crossridge as the sole members of Sanseverino Enterprises, with the Sanseverino ILIT owning the majority of membership interests.

172

1492.   On **April 19, 2016**, LaGambina and Settling Trustee 11 caused Sanseverino Enterprises and the Sanseverino ILIT to enter into a sham Loan Agreement for the amount of $713,600.  Exh. 196 (GS0006986).

1493.   The Loan Agreement identifies Sanseverino Enterprises as the Lender, and the trust as the Borrower.

1494.   Settling Trustee 11 executed the Loan Agreement twice: first, on behalf of the Lender, Sanseverino Enterprises, in his capacity as trustee of the majority shareholder; and second, on behalf of the Borrower, in his capacity as trustee of the trust.

1495.   In fact, the so-called "loan" was a sham:

 (i) The LLC never had the funds; the funds were wired from Crossridge to the ILIT directly.

 (ii) Moreover, the ILIT had no assets to repay the "loan" once the insurance policy lapsed shortly after the first anniversary of the policy.

1496.   The Defendants referenced in this Predicate Act knew the loan was a sham.

1497.   Also on **April 19, 2016**, LaGambina and Settling Trustee 11 caused the Sanseverino ILIT to assign the Sanseverino Policy to Sanseverino Enterprises, pursuant to an Assignment of Life Insurance Policy.  Exh. 197 (GS0006864).

1498.   Settling Trustee 11 executed the Assignment as trustee of the assignor, the Sanseverino ILIT, and as trustee of the majority shareholder of the assignee, Sanseverino Enterprises.

1499.   Although the Assignment stated that the policy had been in effect for two years, this statement was false on its face.

1500.   The annual premium payment on the Sanseverino Policy was $711,600.  Exh. 194 (FP_004128).

1501.   Settling Party 1 caused Settling Party 2 to wire sufficient funds to Crossridge to fund the premium.

1502.   On **May 20, 2016**, LaGambina caused Crossridge to wire $714,000 to the bank account of the Sanseverino ILIT.

1503.   Upon information and belief, in **May 2016** Settling Trustee 11 wired $711,600 from the ILIT to FGLIC, as payment of the premium on the Sanseverino Policy.

1504.   Settling Trustee 11 withdrew an additional amount for himself, as payment for his role as "trustee" in service to the conspiracy.

1505.   The actions taken by the Defendants referenced in this Predicate Act are in violation and deliberate disregard of the legal advice set forth in the Locke Lord Opinion, which is evidence of these Defendants' fraudulent intent.

1506.   In reliance on the fraudulent misrepresentations perpetrated by LaGambina, MSL Insurance Advisors, David R. Cohen, Settling Party 1, LaGambina, Settling Party 2, Crossridge, and Settling Trustee 11, FGLIC paid David R. Cohen, Daroco, and MSL Insurance Advisors commissions and bonuses totaling $1,102,980 for the fraudulent sale of the Sanseverino Policy.

1507.   Mark LaGambina, MSL Insurance Advisors, David R. Cohen, and Daroco paid Settling Party 2 approximately 95% of the commissions and bonuses they received from FGLIC, thereby (i) unlawfully splitting commissions with an unlicensed person, *see* Conn. Gen. Stat. § 38a-702*l*(a); and (ii) unlawfully rebating premium payments, *see* Conn. Gen. Stat. § 38a-465i.

1508.   The second-year premium on the Sanseverino Policy was not paid.

1509.   Accordingly, the Sanseverino Policy lapsed worthless on **April 28, 2017**.

## **Predicate Act Eighteen: The MAURICE LAUFER Policy**

1510.  The co-conspirators sold insured Maurice Laufer a fraudulent life insurance policy issued in the State of Connecticut and valued at $10 million, which was procured by fraud and breach of fiduciary duty.

1511.  On **January 20, 2016**, LaGambina, in his capacity as insurance agent, together with Settling Party 1 and Trustee Defendant Cesar Perez, caused the creation of an ILIT in Laufer's name (the "Laufer ILIT"), pursuant to a trust agreement executed by Laufer as settlor and Perez as trustee.  Exh. 198 (GS00016449).

1512.  In his capacity as trustee, Perez established a bank account for the Laufer ILIT.

1513.  In **May or June 2016**, LaGambina sought to obtain a FGLIC life insurance policy in Laufer's name, in the amount of $10 million.

1514.  LaGambina admitted under oath that he used the same Locke Lord structure while acting as an agent under MSL Insurance Advisors and wired portions of his commissions back to Settling Party 2.  Exh. 3 (LaGambina Exam. Tr. 107:7-16; 126:6-11).

1515.  LaGambina relied on Settling Party 1 to prepare Laufer's life insurance application.

1516.  The application lists the primary insured as Laufer, and the owner of the policy as the Laufer ILIT. Exh. 199 (Laufer application).

1517.  The application asks: "Will you borrow money to pay the premium for the life insurance being applied for or have someone else pay these premiums for you in return for you assigning part or all of the policy values to someone else?" *Id.*

1518.  Settling Party 1 falsely answered this question, "no." *Id.*

1519.  Settling Party 1 knew this representation was false because he knew Laufer was financing the premium with a loan from Crossridge.

1520.  Settling Party 1's false statements in connection with the application violated applicable state insurance laws, regulations, and rules.  *See* Conn. Gen. Stat. § 38a-816(8).

1521.  LaGambina executed Laufer's application on **June 16, 2016**, certifying falsely that Laufer was not borrowing funds to finance the premium.

1522.  LaGambina knew this representation about borrowing funds was false because he knew Laufer was financing the premium with a loan from Crossridge, LaGambina's own company.

1523.  LaGambina concealed from FGLIC the fact that Laufer was obtaining a loan from Crossridge to induce FGLIC to issue the policy to Laufer.

1524.  LaGambina's false statements in connection with the application violated applicable state insurance laws, regulations, and rules.  *See* Conn. Gen. Stat. § 38a-816(8).

1525.  LaGambina knew Settling Party 1 completed the life insurance application on Laufer's behalf.

1526.  LaGambina knew that Settling Party 1 had not been appointed to serve as an insurance producer for FGLIC.

1527.  LaGambina knowingly acted as a "surrogate" to Settling Party 1, a non-appointed insurance producer, in violation of Sharma's contract with FGLIC. *See* Exh. 31 (Market Conduct Guide Rev. 12-2014, at p. 24).

1528.  LaGambina concealed from FGLIC that Settling Party 1 had completed Laufer's life insurance application, in order to further the conspiracy.

1529.  LaGambina's alter ego MSL Insurance Advisors, in its role as General Agent, was responsible for validating Laufer's application materials prior to submitting them to FGLIC.

1530.  MSL Insurance Advisors knew that the statement in Laufer's application that the insured would not borrow funds to finance the premium was false, because MSL Insurance

Advisors and Mark LaGambina knew that Laufer was financing the premium with a loan from a Crossridge.

1531.   MSL Insurance Advisors intended for FGLIC to rely on the false statement in Laufer's application.

1532.   MSL Insurance Advisors did not correct the false representations in Laufer's application.

1533.   On or about **June 16, 2016**, MSL Insurance Advisors sent Laufer's application materials by facsimile transmission over the wire to FGLIC with the false representations included in the materials.

1534.   MSL Insurance Advisors' false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Conn. Gen. Stat. § 38a-816(8).

1535.   In reliance on the co-conspirators' misrepresentations, FGLIC issued a life insurance policy to Laufer with a value of $10 million on **July 13, 2016** (the "Laufer Policy"). Exh. 200 (FP_004128).

1536.   The annual premium payment on the Laufer Policy was $597,600. *Id.*

1537.   Settling Party 1 caused Settling Party 2 to wire sufficient funds to Crossridge to fund the premium.

1538.   On **July 22, 2016**, LaGambina caused Crossridge to wire $600,600 to the bank account of the Laufer ILIT.

1539.   On **July 25, 2016**, Perez wired $597,600 from the ILIT to FGLIC, as payment of the premium on the Laufer Policy.

1540.   Perez withdrew an additional amount for himself, as payment for his role as "trustee" in service to the conspiracy.

1541.   On **August 15, 2016**, LaGambina established a business entity called Laufer Enterprises, LLC.  Exh. 201 (GS0004361).

1542.   A Limited Liability Company Agreement for Laufer Enterprises was executed by Perez, as trustee of the Laufer ILIT, and LaGambina, as President of Crossridge.

1543.   The LLC Agreement named the Laufer ILIT and Crossridge as the sole members of Laufer Enterprises, with the Laufer ILIT owning the majority of membership interests.

1544.   On **August 15, 2016**, LaGambina and Perez caused Laufer Enterprises and the Laufer ILIT to enter into a sham Loan Agreement for the amount of $599,600.  Exh. 202 (GS0004393-99).

1545.   The Loan Agreement identifies Laufer Enterprises as the Lender, and the trust as the Borrower.

1546.   Perez executed the Loan Agreement twice: first, on behalf of the Lender, Laufer Enterprises, in his capacity as trustee of the majority shareholder; and second, on behalf of the Borrower, in his capacity as trustee of the trust.

1547.   In fact, the so-called "loan" was a sham:

  (i)     The LLC never had the funds; the funds were wired from Crossridge to the ILIT directly.

  (ii)    Moreover, the ILIT had no assets to repay the "loan" once the insurance policy lapsed shortly after the first anniversary of the policy.

1548.   The Defendants referenced in this Predicate Act knew the loan was a sham.

1549.   Also on **August 15, 2016**, LaGambina and Perez caused the Laufer ILIT to assign the Laufer Policy to Laufer Enterprises, pursuant to an Assignment of Life Insurance Policy.  *Id.* (GS0004349-60).

1550.   Perez executed the Assignment twice: first, as trustee of the assignor, the Laufer ILIT; and second, as trustee of the majority shareholder of the assignee, Laufer Enterprises.

1551.   Although the Assignment stated that the policy had been in effect for two years, this statement was false on its face.

1552.   The actions taken by the Defendants referenced in this Predicate Act are in violation and deliberate disregard of the legal advice set forth in the Locke Lord Opinion, which is evidence of these Defendants' fraudulent intent.

1553.   In reliance on the fraudulent misrepresentations perpetrated by LaGambina, MSL Insurance Advisors, Settling Party 1, Settling Party 2, Crossridge, and Perez, FGLIC paid LaGambina and MSL Insurance Advisors commissions and bonuses totaling $926,280 for the fraudulent sale of the Laufer Policy.

1554.   LaGambina and MSL Insurance Advisors paid Settling Party 2 approximately 95% of the commissions and bonuses they received from FGLIC, thereby (i) unlawfully splitting commissions with an unlicensed person, *see* Conn. Gen. Stat. § 38a-702*l*(a); and (ii) unlawfully rebating premium payments, *see* Conn. Gen. Stat. § 38a-465i.

1555.   The second-year premium on the Laufer Policy was not paid.

1556.   Accordingly, the Laufer Policy lapsed worthless on **August 13, 2017**.

1557.   Each of the Agent Defendants listed above—Sharma and his d/b/a RequiteLife, Jason Mandel and his d/b/a Tower Group, Joshua Mandel and his d/b/a Rubicon, Kirschner and his d/b/a MRM, Nadler, David R. Cohen and his d/b/a Daroco, and LaGambina and his d/b/a MSL Insurance Advisors—sold numerous policies in addition to those described in the foregoing Predicate Acts.

1558.   These Agent Defendants obtained these policies unlawfully and by fraud and false pretenses.

1559.   These policies were funded by the Network Partners Funding Defendants named in the foregoing Predicate Acts, pursuant to the Settling Party 2/Mesa scheme and/or Settling Party 2/Crossridge scheme.

1560.   The Trustee Defendants named in the foregoing Predicate Acts, as well as Trustee Doe Defendants, facilitated the unlawful and fraudulent funding of these policies by executing sham agreements and wiring premiums to FGLIC in a manner that concealed the true source of the funds.

1561.   The events and facts associated with the issuance of each and every policy sold by the Agent Defendants, funded by the Network Partners Funding Defendants, and/or facilitated by the Trustee Defendants including the Trustee Doe Defendants, pursuant to the Settling Party 2/Mesa and/or Settling Party 2/Crossridge scheme are all Predicate Acts.

**B.**   **DEFENDANTS' CONSPIRACY EXPANDS TO BIP: PREDICATE ACTS NINETEEN THROUGH THIRTY-SEVEN**

1562.   Once the fraudulent scheme had been operating successfully at Network Partners for some time, Defendants looked to expand the scheme to another General Agent.

1563.   Funding Defendant Michael Goldman was a consultant to Settling Party 2.

1564.   Funding Defendant Michael Goldman also consulted with BIP.

1565.   In **January 2015**, BIP solicited FGLIC to be appointed as a General Agent to FGLIC.

1566.   On or about **January 23, 2015**, BIP entered into an Agency Agreement with FGLIC, whereby BIP was appointed as, and agreed to act as, a producer and agent for FGLIC for

the purpose of selling insurance policies issued by FGLIC, in accordance with the terms of the Agency Agreement. *See* Exh. 11 (BIP Agency Agreement).

1567.   FGLIC also entered into an Insurance Producer Agreement with each of the Agent Defendants in the BIP hierarchy, *see* Exh. 1, whereby each Agent Defendant was appointed as, and agreed to act as, agents for FGLIC for the purpose of selling insurance policies issued by FGLIC, in accordance with the terms of the Insurance Producer Agreements.

1568.   As with Network Partners and the Agent Defendants in the Network Partners hierarchy, in signing the Agency Agreement and the Insurance Producer Agreement, BIP and all Agent Defendants in the BIP hierarchy agreed to be bound by and comply with: (i) all applicable insurance laws, rules and regulations; (ii) FGLIC's Market Conduct Guide; and (iii) FGLIC's Code of Ethical Procedure.

1569.   On **March 25, 2015**, BIP Agent David Crispel submitted a fraudulent application for a FGLIC life insurance policy on behalf of insured Nagib Kattan.

1570.   Beginning in **May of 2015** and continuing for another 14 months, Settling Party 2 began to funnel money to companies controlled by Michael Goldman, a BIP Funding Defendant.

1571.   Michael Goldman controlled and continues to control BIP Funding Defendants Harei At Inc. and Insured On Time Services, Inc., both New York corporations with principal places of business in the State of New York.

1572.   Michael Goldman also controlled and continues to control BIP Funding Defendants 107 Old Nyack LLC and CNM Services LLC, both New York limited liability companies with principal places of business in the State of New York.

1573.   Upon information and belief, the monies wired by Settling Party 2 to these businesses were used to fund the first fraudulent policies under the BIP hierarchy.

1574.   On **May 28, 2015**, Settling Party 2 wired $114,000 to Harei At Inc.   Exh. 203 (FP_000007, FP_000013, FP_000025, FP_000032, FP_000044, FP_000094, FP_000103, FP_000108, FP_000114).

1575.   On **July 8, 2015**, Settling Party 2 wired $81,872 to Harei At Inc.  *Id.*

1576.   On **August 7, 2015**, Settling Party 2 wired $50,000 to Harei At Inc., and on **August 10, 2015**, Settling Party 2 wired another $49,222 to Harei At Inc. *Id.*

1577.   On **September 18, 2015**, Settling Party 2 wired $48,000 to Harei At Inc. *Id.*

1578.   On **September 21, 2015**, Settling Party 2 wired $38,000 and $36,000 to Defendant Harei At Inc., in two separate wire transactions. *Id.*

1579.   From **October 2015** through **March 2016**, Settling Party 2 wired a total of $466,735 to Harei At Inc., in five separate wire transactions. *Id.*

1580.   In **2016**, Settling Party 2 and MSL Insurance Advisors continued to funnel money to Goldman-controlled companies in order to fund policies sold by the BIP hierarchy.

1581.   On **February 18, 2016**, Settling Party 2 wired $93,681 to Insured On Time Services, Inc. *Id.* (FP_000039).

1582.   On **March 4, 2016**, Settling Party 2 wired $58,570 to 107 Old Nyack LLC. *Id.* (FP_000044).

1583.   Between **June 1, 2016**, and **June 10, 2016**, Settling Party 2 wired a total of $134,740 to CNM Services LLC, in three separate wire transactions. *Id.* (FP_000481-83).

1584.   On **June 20, 2016**, MSL Insurance Advisors wired $250,000 to CNM Services LLC. *Id.* (GS00013425).

1585.   In **July 2016** and **August 2016**, Settling Party 2 wired a total of $241,550 to CNM Services LLC, in six separate wire transactions. *Id.* (FP_009401, FP_009406).

1586.   In sum, Settling Party 2 and MSL Insurance Advisors wired a total of *$1,662,370* to BIP Funding Defendants Harei At Inc., Insured On Time, 107 Old Nyack LLC, and CNM Services LLC.

1587.   Upon information and belief, in **December 2016** Settling Party 2 propped up another BIP Funding Defendant, Ronin Collins ("Collins") and his d/b/a Ocelot Advisory Partners ("Ocelot").

1588.   By December 2016, Settling Party 2 had accumulated numerous notes from Crossridge, evidencing loans Settling Party 2 made to Crossridge to fund the scheme.

1589.   On **December 1, 2016**, Settling Party 2 and Ocelot entered into an agreement whereby Settling Party 2 transferred its ownership interest in the Crossridge notes—in the total amount of *$14,659,050*—to Ocelot.   Exh. 3 (LaGambina Exam. Tr. 379:7-24); Exh. 204 (agreement).

1590.   Upon information and belief, Collins and Ocelot served as an additional source of funding when the conspiracy shifted from Network Partners to BIP.

1591.   Funding Does, presently unknown to FGLIC, participated in the conspiracy and funded premiums for policies sold within the BIP hierarchy.[30]

1592.   As Network Partners wound down, the sales of FGLIC policies through BIP ramped up significantly.

1593.   The chart below shows the pattern.

---

[30] The facts relating to policies sold by Agent Defendants in the BIP hierarchy, and funded by BIP Funding Defendants, are not as well developed as the facts involved in the Network Partners hierarchy because discovery in the *BIP* Litigation is presently stayed, and as Maryland courts recognize, in cases of fraud, the facts are often exclusively in the possession of the fraudsters.



1594.   It is clear from the chart that the same pool of monies was used to fund both groups of policies—when the monies began to be used for the benefit of BIP, the funds are no longer there for policies to be sold through Network Partners.

1595.   Therefore, in the chart, when the line showing the number of Network Partners policies issued goes down, the line showing the number of BIP policies issued goes up.

### Predicate Act Nineteen: The ROBERT BROEGE Policy

1596.   Agent Defendant Evan Pescatore sold insured Robert Broege (a New Jersey resident) a life insurance policy valued at $3 million, which was procured by fraud and breach of fiduciary duty.

1597.   In **July 2015**, Pescatore sought to obtain a FGLIC life insurance policy in Broege's name.

1598.   Pescatore caused Broege to complete a FGLIC life insurance application.

1599.   The application asks: "Will you borrow money to pay the premium for the life insurance being applied for or have someone else pay these premiums for you in return for you assigning part or all of the policy values to someone else?" Exh. 205 (FGLIC_BIP000047906).

1600.   Pescatore falsely answered this question "no" in Broege's application. *Id.*

1601.   On or about **July 22 2015**, Pescatore executed Broege's application, certifying falsely that Broege was not using funds from a third party in order to pay the insurance premium.

1602.   Upon information and belief, Pescatore knew this representation was false when made because he knew Broege was paying the premium with funds from a co-conspirator.

1603.   Upon information and belief, Pescatore concealed from FGLIC the fact that Broege was paying the premiums with funds from a co-conspirator induce FGLIC to issue the policy to Broege.

1604.   Upon information and belief, Pescatore also fraudulently concealed from FGLIC the fact that the application was not submitted for purposes of obtaining life insurance, but rather for the purpose of obtaining commissions and bonuses in excess of the policy's first-year premium.

1605.   Pescatore's false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* N.J. Stat. Ann. § 2C:21-4.6(a).

1606.   Using the mail and wire, Agent Defendant Pescatore delivered the fraudulent application to BIP on or about **July 22, 2015**.

1607.   BIP, in its role as General Agent, was responsible for validating Broege's application materials prior to submitting them to FGLIC.

1608.   BIP knew that the statement in Broege's application that the insured would not use funds from a third party to pay the premium was false, because BIP knew the premium was to be paid by funds from a co-conspirator, and BIP intended for FGLIC to rely on that false statement.

1609.   BIP did not correct the false representations in Broege's application.

1610.   On or about **July 22, 2015**, BIP sent Broege's application materials by the mail or wire to FGLIC with the false representations included in the materials.

1611.   BIP also fraudulently concealed from FGLIC the fact that the application was not submitted for purposes of obtaining life insurance, but rather for the purpose of obtaining commissions and bonuses in excess of the policy's first-year premium.

1612.   BIP's false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* N.J. Stat. Ann. § 2C:21-4.6(a).

1613.   In reliance on Pescatore's and BIP's misrepresentations, FGLIC issued a life insurance policy to Broege with a value of $3 million and an effective date of **October 16, 2015**. Exh. 206 (FGLIC_BIP00048211, FGLIC_BIP00048059-104).

1614.   The first year's premium for Broege's policy was $238,680. *Id.*

1615.   FGLIC received payment of the first-year premium for Broege's policy on **November 3, 2015**. *Id.*

1616.   Upon information and belief, the BIP Funding Defendants funneled money over the wire, in the form of a sham transaction, to Broege or his company in order to fund the premium.

1617.   Broege resides in New Jersey, but the premium payment came from an out-of-state bank, which constitutes evidence of the fraudulent scheme.

1618.   In reliance on Defendants' fraud, FGLIC paid Pescatore (through the company through which Pescatore did business) and BIP commissions totaling $358,020.00 for the fraudulent sale of Broege's policy.

1619.   Upon information and belief, BIP and Pescatore paid most of the commission and bonus payments back to the BIP Funding Defendants, thereby (i) unlawfully splitting commissions

with an unlicensed person, *see* N.J. Stat. Ann. § 17:22A-41d; and (ii) unlawfully rebating premium payments, *see* N.J. Stat. Ann. §§ 17:29A-15, 17:29-AA-14; 17B:30-13.

1620.   Broege failed to make the second year's scheduled premium payment.

1621.   Accordingly, Broege's policy lapsed worthless on **November 16, 2016**.  Exh. 207 (FGLIC_BIP00048258).

1622.   The profit of the conspiracy was $119,340.00 (the difference between the commission and the first year's premium).

### Predicate Act Twenty: The HENRY HON Policy

1623.   Agent Defendant Philip Hon sold insured Henry Hon a life insurance policy issued in the State of California and valued at $3 million, which was procured by fraud and breach of fiduciary duty.

1624.   In **January 2016**, Philip Hon sought to obtain a FGLIC life insurance policy in Henry Hon's name.

1625.   Philip Hon completed a FGLIC life insurance application for Henry Hon.

1626.   The application asks: "Will you borrow money to pay the premium for the life insurance being applied for or have someone else pay these premiums for you in return for you assigning part or all of the policy values to someone else?"  Exh. 208 (FGLIC_BIP00002793).

1627.   Philip Hon falsely answered this question "no" in Henry Hon's application. *Id.*

1628.   On or about **January 17, 2016**, Philip Hon executed Henry Hon's application, certifying falsely that Henry Hon was not using funds from a third party in order to pay the insurance premium.

1629.   Upon information and belief, Philip Hon knew this representation was false when made because he knew Henry Hon was paying the premium with funds from a co-conspirator, and Philip Hon intended for FGLIC to rely on that false statement.

1630.   Upon information and belief, Philip Hon concealed from FGLIC the fact that Henry Hon was paying the premiums with funds from a co-conspirator in order to induce FGLIC to issue the policy to Henry Hon.

1631.   Upon information and belief, Philip Hon also fraudulently concealed from FGLIC the fact that the application was not submitted for purposes of obtaining life insurance, but rather for the purpose of obtaining commissions and bonuses in excess of the policy's first-year premium.

1632.   Philip Hon's false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Cal. Ins. Code § 1871.4(a)(1), (3).

1633.   Using the mail and wire, Philip Hon delivered the fraudulent application to BIP on or about **January 17, 2016**.

1634.   BIP, in its role as General Agent, was responsible for validating Henry Hon's application materials prior to submitting them to FGLIC.

1635.   BIP knew that the statement in Henry Hon's application that the insured would not use funds from a third party to pay the premium was false, because BIP knew the premium was to be paid by funds from a co-conspirator, and BIP intended for FGLIC to rely on that false statement.

1636.   BIP did not correct the false representations in Henry Hon's application.

1637.   On or about **January 17, 2016**, BIP sent Henry Hon's application materials by the mail or wire to FGLIC with the false representations included in the materials.

1638.   BIP also fraudulently concealed from FGLIC the fact that the application was not submitted for purposes of obtaining life insurance, but rather for the purpose of obtaining commissions and bonuses in excess of the policy's first-year premium.

1639.   BIP's false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Cal. Ins. Code § 1871.4(a)(1), (3).

1640.   In reliance on Philip Hon's and BIP's misrepresentations, FGLIC issued a life insurance policy to Henry Hon with a value of $3 million and an effective date of **March 9, 2016**. Exh. 209 (FGLIC_BIP00002853).

1641.   The first year's premium for Henry Hon's policy was $109,000.00. *Id.*

1642.   FGLIC received payment of the first-year premium for Henry Hon's policy.

1643.   Upon information and belief, the BIP Funding Defendants funneled money over the wire, in the form of a sham transaction, to Henry Hon or his company in order to fund the premium.

1644.   In reliance on Defendants' fraud, FGLIC paid Philip Hon (through the company through which Philip Hon did business) and BIP commissions totaling $176,426.40 for the fraudulent sale of Henry Hon's policy.

1645.   Upon information and belief, BIP and Philip Hon paid most of the commission and bonus payments back to the BIP Funding Defendants, thereby rebating the premium payments back to their co-conspirators for the continuation and furtherance of the conspiracy.

1646.   Henry Hon failed to make the second year's scheduled premium payment.

1647.   A representative of FGLIC attempted to contact Henry Hon to inquire as to the reasons that Insured Henry Hon allowed the policy to lapse with no value after paying nearly $110,000 in premiums during the first year.

1648.   The listed telephone number for Henry Hon was out of service.

1649.   FGLIC sent a letter rescinding the policy on **August 3, 2017**, and Henry Hon's policy lapsed worthless on **August 9, 2017**.  Exh. 210 (FGLIC_BIP3096).

1650.   The profit of the conspiracy was $67,426.40 (the difference between the commission and the first year's premium).

1651.   Agent Defendant Philip Hon has sold at least two other policies through BIP that have lapsed.

1652.   These policies include those for insureds Veronica Jacobson (policy number ending in 384) and Volker Hunther (policy number ending in 388).

1653.   Upon information and belief, these two policies were also part of the same conspiracy to defraud FGLIC, and the events and facts associated with the issuance of these policies are also Predicate Acts.

### Predicate Act Twenty-One: The GEORGE DEUTSCH Policy

1654.   Agent Defendant Tzvie Leifer sold insured George Deutsch a life insurance policy issued in the State of Florida and valued at $8 million, which was procured by fraud and breach of fiduciary duty.

1655.   In **January 2016**, Leifer sought to obtain a FGLIC life insurance policy in Deutsch's name.

1656.   Leifer completed a FGLIC life insurance application for Deutsch.

1657.   The application asks: "Will you borrow money to pay the premium for the life insurance being applied for or have someone else pay these premiums for you in return for you assigning part or all of the policy values to someone else?"  Exh. 211 (FGLIC_BIP00000862).

1658.   Leifer falsely answered this question "no" in Deutsch's application. *Id.*

1659.   On or about **January 29, 2016**, Leifer executed Deutsch's application, certifying falsely that Deutsch was not using funds from a third party in order to pay the insurance premium. *Id.*

1660.   Upon information and belief, Leifer knew this representation was false when made because he knew Deutsch was paying the premium with funds from a co-conspirator.

1661.   Upon information and belief, Leifer concealed from FGLIC the fact that Deutsch was paying the premiums with funds from a co-conspirator in order to induce FGLIC to issue the policy to Deutsch.

1662.   Upon information and belief, Leifer also fraudulently concealed from FGLIC the fact that the application was not submitted for purposes of obtaining life insurance, but rather for the purpose of obtaining commissions and bonuses in excess of the policy's first-year premium.

1663.   Leifer's false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Fla. Stat. Ann. § 817.234(3).

1664.   Using the mail and wire, Leifer delivered the fraudulent application to BIP on **January 29, 2016**.

1665.   BIP, in its role as General Agent, was responsible for validating Deutsch's application materials prior to submitting them to FGLIC.

1666.   BIP knew that the statement in Deutsch's application that the insured would not use funds from a third party to pay the premium was false, because BIP knew the premium was to be paid by funds from a co-conspirator, and BIP intended for FGLIC to rely on that false statement.

1667.   BIP did not correct the false representations in Deutsch's application.

1668.   On or about **January 29, 2016**, BIP sent Deutsch's application materials by the mail or wire to FGLIC with the false representations included in the materials.

1669.   BIP also fraudulently concealed from FGLIC the fact that the application was not submitted for purposes of obtaining life insurance, but rather for the purpose of obtaining commissions and bonuses in excess of the policy's first-year premium.

1670.   BIP's false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Fla. Stat. Ann. § 817.234(3).

1671.   In reliance on Leifer's and BIP's misrepresentations, FGLIC issued a life insurance policy to Deutsch with a value of $8 million and an effective date of **April 5, 2016**.   Exh. 212 (FGLIC_BIP00000974).

1672.   The first year's premium for Deutsch's policy was $445,840.00. *Id.*

1673.   FGLIC received payment of the first-year premium for Deutsch's policy on **April 15, 2016**.   Exh. 213 (FGLIC_BIP00001143).

1674.   Upon information and belief, the BIP Funding Defendants funneled money over the wire, in the form of a sham transaction, to Deutsch or his company in order to fund the premium.

1675.   In reliance on Defendants' fraud, FGLIC paid Leifer (through the company through which Leifer did business) and BIP commissions totaling $636,013 for the fraudulent sale of Deutsch's policy.

1676.   Upon information and belief, BIP and Leifer paid most of the commission and bonus payments back to the BIP Funding Defendants, thereby (i) unlawfully splitting commissions with an unlicensed person, *see* Fla. Stat. Ann. § 626.753; and (ii) unlawfully rebating premium payments, *see* Fla. Stat. Ann. § 626.572.

1677.   Deutsch failed to make the second year's scheduled premium payment.

1678.   Accordingly, Deutsch's policy lapsed worthless on **May 5, 2017**.   Exh. 214 (FGLIC_BIP00001230).

1679.   A representative of FGLIC contacted Deutsch on **July 24, 2017**, to inquire as to the reasons that Deutsch allowed the policy to lapse with no value after paying nearly $450,000 in premiums during the first year.

1680.   Deutsch claimed to know very little about the transaction; denied knowing Leifer; claimed that Deutsch's son set up the policy for him; and said to the FGLIC representative: "I never wanted to be an accomplice or have anything to do with something illegal."

1681.   The profit of the conspiracy was $190,173 (the difference between the commission and the first year's premium).

1682.   Agent Defendant Tzvie Leifer sold at least four other policies through BIP that have lapsed.

1683.   These policies include those for insureds Jacob Movtady (policy number ending in 905), Miklos Gestetner (policy number ending in 613), Menachem Gross (policy number ending in 629), and Mazal Werczberger (policy number ending in 071).

1684.   Upon information and belief, these four policies were also part of the same conspiracy to defraud FGLIC, and the events and facts associated with the issuance of these policies are also Predicate Acts.

### Predicate Act Twenty-Two; The ELIEZER LAINE Policy

1685.   Agent Defendant Demetrios Velissarios sold insured Eliezer Laine (a New Jersey resident) a life insurance policy valued at $4.75 million, which was procured by fraud and breach of fiduciary duty.

1686.   In **March 2016**, Velissarios sought to obtain a FGLIC life insurance policy in Laine's name.

1687.   Velissarios completed a FGLIC life insurance application for Laine.

1688.   The application asks: "Will you borrow money to pay the premium for the life insurance being applied for or have someone else pay these premiums for you in return for you assigning part or all of the policy values to someone else?"  Exh. 215 (FGLIC_BIP00003114).

1689.   Velissarios falsely answered this question "no" in Laine's application. *Id.*

1690.   On or about **March 24, 2016**, Velissarios executed Laine's application, certifying falsely that Laine was not using funds from a third party in order to pay the insurance premium. *Id.*

1691.   Upon information and belief, Velissarios knew this representation was false when made because he knew Laine was paying the premium with funds from a co-conspirator.

1692.   Upon information and belief, Velissarios concealed from FGLIC the fact that Laine was paying the premiums with funds from a co-conspirator in order to induce FGLIC to issue the policy to Laine.

1693.   Upon information and belief, Velissarios also fraudulently concealed from FGLIC the fact that the application was not submitted for purposes of obtaining life insurance, but rather for the purpose of obtaining commissions and bonuses in excess of the policy's first-year premium.

1694.   Velissarios' false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* N.J. Stat. Ann. § 2C:21-4.6(a).

1695.   Using the mail and wire, Velissarios delivered the fraudulent application to BIP on or about **March 24, 2016**.

1696.   BIP (which Velissarios controlled) was responsible as the General Agent for validating Laine's application materials prior to submitting them to FGLIC.

1697.   BIP knew that the statement in Laine's application that the insured would not use funds from a third party to pay the premium was false, because BIP knew the premium was to be paid by funds from a co-conspirator, and BIP intended for FGLIC to rely on that false statement.

1698.   BIP did not correct the false representations in Laine's application.

1699.   On or about **March 24, 2016**, BIP sent Laine's application materials by the mail or wire to FGLIC with the false representations included in the materials.

1700.   BIP also fraudulently concealed from FGLIC the fact that the application was not submitted for purposes of obtaining life insurance, but rather for the purpose of obtaining commissions and bonuses in excess of the policy's first-year premium.

1701.   BIP's false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* N.J. Stat. Ann. § 2C:21-4.6(a).

1702.   In reliance on Velissarios' and BIP's misrepresentations, FGLIC issued a life insurance policy to Laine with a value of $4.75 million and an effective date of **May 27, 2016**. Exh. 216 (FGLIC_BIP00003170).

1703.   The first year's premium for Laine's policy was $264,717.50. *Id.*

1704.   FGLIC received payment of the first-year premium for Laine's policy on **June 10, 2016**. Exh. 217 (FGLIC_BIP00003344).

1705.   Upon information and belief, the BIP Funding Defendants funneled money over the wire, in the form of a sham transaction, to Laine or his company in order to fund the premium.

1706.   In reliance on Defendants' fraud, FGLIC paid Velissarios (through the company through which Velissarios did business) and BIP commissions totaling  $377,624.38 for the fraudulent sale of Laine's policy.

1707.   Upon information and belief, BIP and Velissarios paid most of the commission and bonus payments back to the BIP Funding Defendants, thereby (i) unlawfully splitting commissions with an unlicensed person, *see* N.J. Stat. Ann. § 17:22A-41d; and (ii) unlawfully rebating premium payments, *see* N.J. Stat. Ann. §§ 17:29A-15, 17:29-AA-14; 17B:30-13.

1708.   Laine failed to make the second year's scheduled premium payment.

1709.   On or about **August 3, 2017**, when Laine's policy was scheduled to lapse, FGLIC sent a "Lapse Letter" to Laine, asking whether Laine intended to allow the policy to lapse, and if so, inquiring as to the reasons for this decision.  Exh. 218 (FGLIC_BIP00003405).

1710.   In the Lapse Letter, FGLIC asked Laine to contact a FGLIC representative to discuss the policy. *Id.*

1711.   Laine did not respond.

1712.   A FGLIC representative attempted to contact Laine, but received no answer.  Exh. 219 (FGLIC_BIP00003406).

1713.   Laine sent no further premium payment.

1714.   FGLIC began sending letters to insureds who failed to respond to a Lapse Letter (or whose response to a Lapse Letter constituted further evidence of the conspiracy) notifying the insured that their policy was being rescinded effective immediately ("Rescission Letters").

1715.   FGLIC sent a Rescission Letter to Laine, rescinding the policy on or about **August 23, 2017**. *Id.*

1716.   The profit of the conspiracy was <u>$112,906.88</u> (the difference between the commission and the first year's premium).

1717.   Agent Defendant Velissarios has sold at least six other policies through BIP that have lapsed.

1718.   These policies include those for insureds Leah Schlesinger (policy number ending in 958), Marvin Berger (policy number ending in 141), Alexander Berger (policy number ending in 135), Abraham Jeremias (policy number ending in 539), Sam Guttman (policy number ending in 143), and Vera Guttman (policy number ending in 142).

1719.   Upon information and belief, these six policies were also part of the same conspiracy to defraud FGLIC, and the events and facts associated with the issuance of these policies are also Predicate Acts.

### <u>Predicate Act Twenty-Three: The VINH NGUYEN Policy</u>

1720.   Agent Defendant David Crispel sold insured Vinh Nguyen (a California resident) a life insurance policy valued at $5 million, which was procured by fraud and breach of fiduciary duty.

1721.   In **<u>April 2016</u>**, Crispel sought to obtain a FGLIC life insurance policy in Nguyen's name.

1722.   Crispel completed a FGLIC life insurance application for Nguyen.

1723.   The application asks: "Will you borrow money to pay the premium for the life insurance being applied for or have someone else pay these premiums for you in return for you assigning part or all of the policy values to someone else?"  Exh. 220 (FGLIC_BIP00029600).

1724.   Crispel falsely answered this question "no" in Nguyen's application. *Id.*

1725.   On or about **April 11, 2016**, Crispel executed Nguyen's application, certifying falsely that Nguyen was not using funds from a third party in order to pay the insurance premium.

1726.   Upon information and belief, Crispel knew this representation was false when made because he knew Nguyen was paying the premium with funds from a co-conspirator.

1727.   Upon information and belief, Crispel concealed from FGLIC the fact that Nguyen was paying the premiums with funds from a co-conspirator in order to induce FGLIC to issue the policy to Nguyen.

1728.   Upon information and belief, Crispel also fraudulently concealed from FGLIC the fact that the application was not submitted for purposes of obtaining life insurance, but rather for the purpose of obtaining commissions and bonuses in excess of the policy's first-year premium.

1729.   Crispel's false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Cal. Ins. Code § 1871.4(a)(1), (3).

1730.   Using the mail and wire, Crispel delivered the fraudulent application to BIP on or about **April 11, 2016**.

1731.   BIP, in its role as General Agent, was responsible for validating Nguyen's application materials prior to submitting them to FGLIC.

1732.   BIP knew that the statement in Nguyen's application that the insured would not use funds from a third party to pay the premium was false, because BIP knew the premium was to be paid by funds from a co-conspirator, and BIP intended for FGLIC to rely on that false statement.

1733.   BIP did not correct the false representations in Nguyen's application.

1734.   On or about **April 11, 2016**, BIP sent Nguyen's application materials by the mail or wire to FGLIC with the false representations included in the materials.

1735.   BIP also fraudulently concealed from FGLIC the fact that the application was not submitted for purposes of obtaining life insurance, but rather for the purpose of obtaining commissions and bonuses in excess of the policy's first-year premium.

1736.   BIP's false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Cal. Ins. Code § 1871.4(a)(1), (3).

1737.   In reliance on Crispel's and BIP's misrepresentations, FGLIC issued a life insurance policy to Nguyen with a value of $5 million and an effective date of **July 20, 2016**.  Exh. 221 (FGLIC_BIP00029537).

1738.   The first year's premium for Nguyen's policy was $459,600.00. *Id.*

1739.   FGLIC received payment of the first-year premium for Nguyen's policy.

1740.   Upon information and belief, the BIP Funding Defendants funneled money over the wire, in the form of a sham transaction, to Nguyen or her company in order to fund the premium.

1741.   In reliance on Defendants' fraud, FGLIC paid Crispel (through the company through which Crispel did business) and BIP commissions totaling  $574,500.00 for the fraudulent sale of Nguyen's policy.

1742.   Upon information and belief, BIP and Crispel paid most of the commission and bonus payments back to the BIP Funding Defendants, thereby rebating the premium payments back to their co-conspirators for the continuation and furtherance of the conspiracy.

1743.   Nguyen failed to make the second year's scheduled premium payment.

1744.   FGLIC sent a Lapse Letter on or about **December 29, 2017**, advising Nguyen of the policy's impending lapse.

1745.   In the Lapse Letter, FGLIC asked Insured Nguyen to contact a FGLIC representative to discuss the policy.

1746.   A representative of FGLIC contacted Insured Nguyen on **January 12, 2018**, to inquire as to the reasons that Insured Nguyen allowed the policy to lapse with no value after paying nearly $460,000 in premiums during the first year.

1747.   Insured Nguyen said that she did not want the policy anymore and knew it was going to lapse. When the representative asked why, Nguyen said "I don't want it" and hung up the phone.

1748.   FGLIC sent a Rescission Letter on or about **February 5, 2018**.

1749.   The profit of the conspiracy was $114,900.00 (the difference between the commission and the first year's premium).

1750.   Agent Defendant Crispel has sold at least six other policies through BIP that have lapsed.

1751.   These policies include those for insureds Alexander Bercovitz (policy number ending in 917), Gary Mangano (policy number ending in 916), Kazem Khavandegaran (policy number ending in 541), Uri Moyal (policy number ending in 268), Daniel Moyal (policy number ending in 574), and Mehrdad Sakaki.

1752.   Upon information and belief, these six policies were also part of the same conspiracy to defraud FGLIC, and the events and facts associated with the issuance of these policies are also Predicate Acts.

### Predicate Act Twenty-Four: The GEORGE OLSON Policy

1753.   Agent Defendant Trent James sold insured George Olson (a Utah resident) a life insurance policy valued at $1,999,999, which was procured by fraud and breach of fiduciary duty.

1754.   In **April 2016**, James sought to obtain a FGLIC life insurance policy in Olson's name.

1755.   James completed a FGLIC life insurance application for Olson.

1756.   The application asks: "Will you borrow money to pay the premium for the life insurance being applied for or have someone else pay these premiums for you in return for you assigning part or all of the policy values to someone else?"  Exh. 222 (FGLIC_BIP00006179).

1757.   James falsely answered this question "no" in Olson's application. *Id.*

1758.   On or about **April 27, 2016**, James executed Olson's application, certifying falsely that Olson was not using funds from a third party in order to pay the insurance premium.

1759.   Upon information and belief, James knew this representation was false when made because he knew Olson was paying the premium with funds from a co-conspirator.

1760.   Upon information and belief, James concealed from FGLIC the fact that Olson was paying the premiums with funds from a co-conspirator in order to induce FGLIC to issue the policy to Olson.

1761.   Upon information and belief, James also fraudulently concealed from FGLIC the fact that the application was not submitted for purposes of obtaining life insurance, but rather for the purpose of obtaining commissions and bonuses in excess of the policy's first-year premium.

1762.   James' false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Utah Code Ann. § 31A-31-103, 31A-23a-402(1).

1763.   Using the mail and wire, James delivered the fraudulent application to BIP on or about **April 27, 2016**.

1764.   BIP, in its role as General Agent, was responsible for validating Olson's application materials prior to submitting them to FGLIC.

1765.   BIP knew that the statement in Olson's application that the insured would not use funds from a third party to pay the premium was false, because BIP knew the premium was to be paid by funds from a co-conspirator, and BIP intended for FGLIC to rely on that false statement.

1766.   BIP did not correct the false representations in Olson's application.

1767.   On or about **April 27, 2016**, BIP sent Olson's application materials by the mail or wire to FGLIC with the false representations included in the materials.

1768.   BIP also fraudulently concealed from FGLIC the fact that the application was not submitted for purposes of obtaining life insurance, but rather for the purpose of obtaining commissions and bonuses in excess of the policy's first-year premium.

1769.   BIP's false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Utah Code Ann. § 31A-31-103, 31A-23a-402(1).

1770.   In reliance on James' and BIP's misrepresentations, FGLIC issued a life insurance policy to Olson with a value of $1,999,999, and an effective date of **July 22, 2016**.  Exh. 223 (FGLIC_BIP00006425-70).

1771.   The first year's premium for Olson's policy was $72,889.97. *Id.*

1772.   FGLIC received payment of the first-year premium for Olson's policy on or about **August 8, 2016**. *Id.* (FGLIC_BIP00006579).

1773.   Upon information and belief, the BIP Funding Defendants funneled money over the wire, in the form of a sham transaction, to Olson or his company in order to fund the premium.

1774.   In reliance on Defendants' fraud, FGLIC paid James (through the company through which James did business) and BIP commissions totaling $197,362.46 for the fraudulent sale of Olson's policy.

1775.   Upon information and belief, BIP and James paid most of the commission and bonus payments back to the BIP Funding Defendants, thereby (i) unlawfully splitting commissions with an unlicensed person, *see* Utah Code Ann. § 31A-23a-504; and (ii) unlawfully rebating premium payments, *see* Utah Code Ann. § 31A-23a-402.5(5)(a)(i).

1776.   Olson failed to make the second year's scheduled premium payment.

1777.   On or about **August 16, 2017**, when Olson's policy was about to lapse, FGLIC sent a Lapse Letter to Olson, asking whether Olson intended to allow the policy to lapse, and if so, inquiring as to the reasons for this decision.  Exh. 224 (FGLIC_BIP00006636).

1778.   A FGLIC representative contacted Olson on **August 29, 2017**.

1779.   Olson told the FGLIC representative that he decided not to pay any more premiums. Exh. 225 (FGLIC_BIP00006637).

1780.   The representative asked what FGLIC could do to help Olson retain the policy.

1781.   Olson replied, "Nothing."

1782.   The FGLIC representative asked Olson how he came to know Agent Defendant Trent James.

1783.   Olson refused to answer and hung up.

1784.   Olson sent no further premium payment.

1785.   FGLIC sent a Rescission Letter to Olson, rescinding the policy on or about **September 7, 2017**. *Id.*

1786.   The profit of the conspiracy was $124,472.49 (the difference between the commission and the first year premium).

1787.   Agent Defendant James also sold at least one other policy that has since lapsed.

1788.   This other policy is for Gerry Nix (policy number ending in 889).

1789.   Upon information and belief, this policy was also part of the same conspiracy to defraud FGLIC, and the events and facts associated with the issuance of this policy are also Predicate Acts.

### Predicate Act Twenty-Five: The MICHELLE CAMPOS Policy

1790.   Agent Defendant Dana Ballesto sold insured Michelle Campos a life insurance policy issued in the State of California and valued at $5 million, which was procured by fraud and breach of fiduciary duty.

1791.   In **June 2016**, Ballesto sought to obtain a FGLIC life insurance policy in Campos' name, in the amount of $5 million.

1792.   Ballesto completed a FGLIC life insurance application for Campos.

1793.   The application asks: "Will you borrow money to pay the premium for the life insurance being applied for or have someone else pay these premiums for you in return for you assigning part or all of the policy values to someone else?"  Exh. 226 (FGLIC_BIP00111119).

1794.   Ballesto falsely answered this question "no" in Campos' application. *Id.*

1795.   On or about **June 18, 2016**, Ballesto executed Campos' application, certifying falsely that Campos was not using funds from a third party in order to pay the insurance premium.

1796.   Upon information and belief, Ballesto knew this representation was false when made because she knew Campos was paying the premium with funds from a co-conspirator.

1797.   Upon information and belief, Ballesto concealed from FGLIC the fact that Campos was paying the premiums with funds from a co-conspirator in order to induce FGLIC to issue the policy to Campos.

1798.   Upon information and belief, Ballesto also fraudulently concealed from FGLIC the fact that the application was not submitted for purposes of obtaining life insurance, but rather for the purpose of obtaining commissions and bonuses in excess of the policy's first-year premium.

1799.   Ballesto's false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Cal. Ins. Code § 1871.4(a)(1), (3).

1800.   Using the mail and wire, Ballesto delivered the fraudulent application to BIP on or about **June 18, 2016**.

1801.   BIP, in its role as General Agent, was responsible for validating Campos' application materials prior to submitting them to FGLIC.

1802.   BIP knew that the statement in Campos' application that the insured would not use funds from a third party to pay the premium was false, because BIP knew the premium was to be paid by funds from a co-conspirator, and BIP intended for FGLIC to rely on that false statement.

1803.   BIP did not correct the false representations in Campos' application.

1804.   On or about **June 18, 2016**, BIP sent Campos' application materials by the mail or wire to FGLIC with the false representations included in the materials.

1805.   BIP also fraudulently concealed from FGLIC the fact that the application was not submitted for purposes of obtaining life insurance, but rather for the purpose of obtaining commissions and bonuses in excess of the policy's first-year premium.

1806.   BIP's false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Cal. Ins. Code § 1871.4(a)(1), (3).

1807.   In reliance on Ballesto's and BIP's misrepresentations, FGLIC issued a life insurance policy to Campos with a value of $5 million, and an effective date of **September 9, 2016**. Exh. 227 (FGLIC_BIP00111458).

1808.   The first year's premium for Campos' policy was $89,250.00. *Id.*

1809.   FGLIC received payment of the first-year premium for Campos' policy.

1810.   Upon information and belief, the BIP Funding Defendants funneled money over the wire, in the form of a sham transaction, to Campos or his company in order to fund the premium.

1811.   In reliance on Defendants' fraud, FGLIC paid Ballesto (through the company through which Ballesto did business) and BIP commissions totaling  $187,812.00 for the fraudulent sale of Campos' policy.

1812.   Upon information and belief, BIP and Ballesto paid most of the commission and bonus payments back to the BIP Funding Defendants, thereby rebating the premium payments back to their co-conspirators for the continuation and furtherance of the conspiracy.

1813.   Campos failed to make the second year's scheduled premium payment.

1814.   FGLIC sent a Lapse Letter on or about **June 25, 2018**, advising Campos of the policy's impending lapse.

1815.   In the Lapse Letter, FGLIC asked Campos to contact a FGLIC representative to discuss the policy.

1816.   A representative of FGLIC contacted Campos on **July 6, 2018**, to inquire as to the reasons that Campos allowed the policy to lapse with no value after paying nearly $90,000 in premiums during the first year.

1817.   Campos and her spouse stated that a different insurance agent, Stephan Leer, told them ***that they did not have to pay for the first year of the life insurance policy***.

1818.   Campos and her spouse stated that they were not in a position to pay the second year's premium.

1819.   Campos and her spouse knew Ballesto as Stephan Leer's administrative assistant.

1820.   Campos thereby confirmed that she was offered free insurance, in violation of applicable state insurance laws, rules and regulations.

1821.   FGLIC sent a Rescission Letter on or about **July 10, 2018**.

1822.   The profit of the conspiracy was $98,562.00 (the difference between the commission and the first year premium).

1823.   Agent Defendant Ballesto has sold at least two other policies through BIP that has lapsed.

1824.   This other policies are for insured Gurpreet Dhatt (policy numbers ending in 228, 471).

1825.   Upon information and belief, this policy was also part of the same conspiracy to defraud FGLIC, and the events and facts associated with the issuance of this policy are also Predicate Acts.

## Predicate Act Twenty-Six: The KENNETH WEBER Policy

1826.   Agent Defendant Chesky Weber sold insured Kenneth Weber a life insurance policy issued in the State of New Jersey and valued at $4.7 million, which was procured by fraud and breach of fiduciary duty.

1827.   In **July 2016**, Chesky Weber sought to obtain a FGLIC life insurance policy in Kenneth Weber's name.

1828.   Chesky Weber completed a FGLIC life insurance application for Kenneth Weber.

1829.   The application asks: "Will you borrow money to pay the premium for the life insurance being applied for or have someone else pay these premiums for you in return for you assigning part or all of the policy values to someone else?"  Exh. 228 (FGLIC_BIP00031367).

1830.   Chesky Weber falsely answered this question "no." *Id.*

1831.   On or about **July 14, 2016**, Chesky Weber executed Kenneth Weber's application, certifying falsely that Kenneth Weber was not using funds from a third party in order to pay the insurance premium.

1832.   Upon information and belief, Chesky Weber knew this representation was false when made because he knew Kenneth Weber was paying the premium with funds from a co-conspirator.

1833.   Upon information and belief, Chesky Weber concealed from FGLIC the fact that Kenneth Weber was paying the premiums with funds from a co-conspirator in order to induce FGLIC to issue the policy to Kenneth Weber.

1834.   Upon information and belief, Chesky Weber also fraudulently concealed from FGLIC the fact that the application was not submitted for purposes of obtaining life insurance, but rather for the purpose of obtaining commissions and bonuses in excess of the policy's first-year premium.

1835.   Chesky Weber's false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* N.J. Stat. Ann. § 2C:21-4.6(a).

1836.   Using the mail and wire, Chesky Weber delivered the fraudulent application to BIP on or about **July 14, 2016**.

1837.   BIP, in its role as General Agent, was responsible for validating Kenneth Weber's application materials prior to submitting them to FGLIC.

1838.   BIP knew that the statement in Kenneth Weber's application that the insured would not use funds from a third party to pay the premium was false, because BIP knew the premium

was to be paid by funds from a co-conspirator, and BIP intended for FGLIC to rely on that false statement.

1839.   BIP did not correct the false representations in Kenneth Weber's application.

1840.   On or about **July 14, 2016**, BIP sent Kenneth Weber's application materials by the mail or wire to FGLIC with the false representations included in the materials.

1841.   BIP also fraudulently concealed from FGLIC the fact that the application was not submitted for purposes of obtaining life insurance, but rather for the purpose of obtaining commissions and bonuses in excess of the policy's first-year premium.

1842.   BIP's false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* N.J. Stat. Ann. § 2C:21-4.6(a).

1843.   In reliance on Chesky Weber's and BIP's misrepresentations, FGLIC issued a life insurance policy to Kenneth Weber with a value of $4.7 million, and an effective date of **November 7, 2016**. Exh. 229 (FGLIC_BIP00031933).

1844.   The first year's premium for Kenneth Weber's policy was $1,121,796. *Id.*

1845.   FGLIC received payment of the first-year premium for Kenneth Weber's policy.

1846.   Upon information and belief, the BIP Funding Defendants funneled money over the wire, in the form of a sham transaction, to Kenneth Weber or his company in order to fund the premium.

1847.   In reliance on Defendants' fraud, FGLIC paid Chesky Weber (through the company through which Chesky Weber did business) and BIP commissions totaling $1,402,245.00 for the fraudulent sale of Kenneth Weber's policy.

1848.   Upon information and belief, BIP and Chesky Weber paid most of the commission and bonus payments back to the BIP Funding Defendants, thereby (i) unlawfully splitting

commissions with an unlicensed person, *see* N.J. Stat. Ann. § 17:22A-41d; and (ii) unlawfully rebating premium payments, *see* N.J. Stat. Ann. §§ 17:29A-15, 17:29-AA-14; 17B:30-13.

1849.   Kenneth Weber failed to make the second year's scheduled premium payment.

1850.   FGLIC sent a Lapse Letter on or about **December 29, 2017**, advising Kenneth Weber of the policy's impending lapse.

1851.   In the Lapse Letter, FGLIC asked Kenneth Weber to contact a FGLIC representative to discuss the policy.

1852.   A representative of FGLIC attempted to contact Kenneth Weber on **January 12, 2018**, to inquire as to the reasons that Kenneth Weber allowed the policy to lapse with no value after paying over $1.1 million in premiums during the first year.

1853.   The listed phone number for Kenneth Weber had been disconnected.

1854.   FGLIC sent a Rescission Letter on or about **February 5, 2018**.

1855.   The profit of the conspiracy was $280,449.00 (the difference between the commission and the first year premium).

1856.   Agent Defendant Chesky Weber has sold at least four other policies through BIP that have lapsed.

1857.   These policies include those for insureds Avraham Twersky (policy number ending in 898), Henry Weiss (policy number ending in 163), Bracha Deen (policy number ending in 621), and Gitle Weiss (policy number ending in 831).

1858.   Upon information and belief, these four policies were also part of the same conspiracy to defraud FGLIC, and the events and facts associated with the issuance of these policies are also Predicate Acts.

**Predicate Act Twenty-Seven: The RENATA GUTTERMAN Policy**

1859.   Agent Defendant Leon Lowenthal sold insured Renata Gutterman (a New Jersey resident) a life insurance policy valued at $4.75 million, which was procured by fraud and breach of fiduciary duty.

1860.   In **July 2016**, Lowenthal sought to obtain a FGLIC life insurance policy in Gutterman's name.

1861.   Lowenthal completed a FGLIC life insurance application for Gutterman.

1862.   The application asks: "Will you borrow money to pay the premium for the life insurance being applied for or have someone else pay these premiums for you in return for you assigning part or all of the policy values to someone else?"  Exh. 230 (FGLIC_BIP00011902).

1863.   Lowenthal falsely answered this question "no" in Gutterman's application. *Id.*

1864.   On or about **July 28, 2016**, Lowenthal executed Gutterman's application, certifying falsely that Gutterman was not using funds from a third party in order to pay the insurance premium.

1865.   Upon information and belief, Lowenthal knew this representation was false when made because he knew Gutterman was paying the premium with funds from a co-conspirator.

1866.   Upon information and belief, Lowenthal concealed from FGLIC the fact that Gutterman was paying the premiums with funds from a co-conspirator in order to induce FGLIC to issue the policy to Gutterman.

1867.   Upon information and belief, Lowenthal also fraudulently concealed from FGLIC the fact that the application was not submitted for purposes of obtaining life insurance, but rather for the purpose of obtaining commissions and bonuses in excess of the policy's first-year premium.

1868.   Lowenthal's false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* N.J. Stat. Ann. § 2C:21-4.6(a).

1869.   Using the mail and wire, Lowenthal delivered the fraudulent application to BIP on or about **July 28, 2016**.

1870.   BIP, in its role as General Agent, was responsible for validating Gutterman's application materials prior to submitting them to FGLIC.

1871.   BIP knew that the statement in Gutterman's application that the insured would not use funds from a third party to pay the premium was false, because BIP knew the premium was to be paid by funds from a co-conspirator, and BIP intended for FGLIC to rely on that false statement.

1872.   BIP did not correct the false representations in Gutterman's application.

1873.   On or about **July 28, 2016**, BIP sent Gutterman's application materials by the mail or wire to FGLIC with the false representations included in the materials.

1874.   BIP also fraudulently concealed from FGLIC the fact that the application was not submitted for purposes of obtaining life insurance, but rather for the purpose of obtaining commissions and bonuses in excess of the policy's first-year premium.

1875.   BIP's false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* N.J. Stat. Ann. § 2C:21-4.6(a).

1876.   In reliance on Lowenthal's and BIP's misrepresentations, FGLIC issued a life insurance policy to Gutterman with a value of $4.75 million, and an effective date of **September 1, 2016**. Exh. 231 (FGLIC_BIP00012243).

1877.   The first year's premium for Gutterman's policy was $795,031.25. *Id.*

1878.   FGLIC received payment of the first-year premium for Gutterman's policy on **September 29, 2016**. Exh. 232 (FGLIC_BIP00012332).

1879.   Upon information and belief, the BIP Funding Defendants funneled money over the wire, in the form of a sham transaction, to Gutterman or her company in order to fund the premium.

1880.   In reliance on Defendants' fraud, FGLIC paid Lowenthal (through the company through which Lowenthal did business) and BIP commissions totaling  $1,147,125.00 for the fraudulent sale of Gutterman's policy.

1881.   Upon information and belief, BIP and Lowenthal paid most of the commission and bonus payments back to the BIP Funding Defendants, thereby (i) unlawfully splitting commissions with an unlicensed person, *see* N.J. Stat. Ann. § 17:22A-41d; and (ii) unlawfully rebating premium payments, *see* N.J. Stat. Ann. §§ 17:29A-15, 17:29-AA-14; 17B:30-13.

1882.   Gutterman failed to make the second year's scheduled premium payment.

1883.   FGLIC sent a Lapse Letter on or about **October 19, 2017**, advising Gutterman of the policy's impending lapse.

1884.   In the Lapse Letter, FGLIC asked Gutterman to contact a FGLIC representative to discuss the policy.

1885.   A representative of FGLIC contacted Gutterman on **November 1, 2017**, to inquire as to the reasons that Gutterman allowed the policy to lapse with no value after paying nearly $800,000 in premiums during the first year.

1886.   Gutterman said that she did not want the policy to lapse, and she advised that she would contact Lowenthal.

1887.   Lowenthal called FGLIC's representative on **November 9, 2017**, and claimed that he would call again on **November 27, 2017**, to renew the policy.

1888.   Gutterman's policy was not renewed, nor did FGLIC receive further payment on the policy.

1889.   FGLIC sent a Rescission Letter on or about **November 29, 2017**.

1890.   The profit of the conspiracy was $352,093.75 (the difference between the commission and the first year premium).

1891.   Agent Defendant Lowenthal has sold at least four other policies through BIP that have lapsed.

1892.   These policies include those for Pinchas Unger (policy number ending in 820), Abraham Birnhack (policy number ending in 186), Cirla Birnhack (policy number ending in 908), and Ernest Fischer (policy number ending in 506).

1893.   Upon information and belief, these four policies were also part of the same conspiracy to defraud FGLIC, and the events and facts associated with the issuance of these policies are also Predicate Acts.

### Predicate Act Twenty-Eight: The JONATHAN BREIN Policy

1894.   Agent Defendant David Brein sold insured Jonathan Brein (a Virginia resident) a life insurance policy valued at $4.5 million, which was procured by fraud and breach of fiduciary duty.

1895.   In the **summer of 2016**, David Brein sought to obtain a FGLIC life insurance policy in Jonathan Brein's name.

1896.   David Brein completed a FGLIC life insurance application for Jonathan Brein.

1897.   The application asks: "Will you borrow money to pay the premium for the life insurance being applied for or have someone else pay these premiums for you in return for you assigning part or all of the policy values to someone else?"  Exh. 233 (FGLIC_BIP00095366).

1898.   David Brein falsely answered this question "no" in Jonathan Brein's application. *Id.*

1899.   On or about **August 1, 2016**, David Brein executed Jonathan Brein's application, certifying falsely that Jonathan Brein was not using funds from a third party in order to pay the insurance premium. *Id.*

1900.   Upon information and belief, David Brein knew this representation was false when made because he knew Jonathan Brein was paying the premium with funds from a co-conspirator.

1901.   Upon information and belief, David Brein concealed from FGLIC the fact that Jonathan Brein was paying the premiums with funds from a co-conspirator in order to induce FGLIC to issue the policy to Jonathan Brein.

1902.   Upon information and belief, David Brein also fraudulently concealed from FGLIC the fact that the application was not submitted for purposes of obtaining life insurance, but rather for the purpose of obtaining commissions and bonuses in excess of the policy's first-year premium.

1903.   David Brein's false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Va. Code. Ann. § 38.2-512.

1904.   Using the mail and wire, David Brein delivered the fraudulent application to BIP on **August 1, 2016**.

1905.   BIP, in its role as General Agent, was responsible for validating Jonathan Brein's application materials prior to submitting them to FGLIC.

1906.   BIP knew that the statement in Jonathan Brein's application that the insured would not use funds from a third party to pay the premium was false, because BIP knew the premium was to be paid by funds from a co-conspirator, and BIP intended for FGLIC to rely on that false statement.

1907.   BIP did not correct the false representations in Brein's application.

1908.   On or about **August 1, 2016**, BIP sent Jonathan Brein's application materials by the mail or wire to FGLIC with the false representations included in the materials.

1909.   BIP also fraudulently concealed from FGLIC the fact that the application was not submitted for purposes of obtaining life insurance, but rather for the purpose of obtaining commissions and bonuses in excess of the policy's first-year premium.

1910.   BIP's false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Va. Code. Ann. § 38.2-512.

1911.   In reliance on David Brein's and BIP's misrepresentations, FGLIC issued a life insurance policy to Jonathan Brein with a value of $4.5 million, and an effective date of **December 13, 2016**.   Exh. 234 (FGLIC_BIP00095838).

1912.   The first year's premium for Jonathan Brein's policy was $162,765.00.  *Id.*

1913.   FGLIC received payment of the first-year premium for Jonathan Brein's policy.

1914.   Upon information and belief, the BIP Funding Defendants funneled money over the wire, in the form of a sham transaction, to Jonathan Brein or his company in order to fund the premium.

1915.   In reliance on Defendants' fraud, FGLIC paid David Brein (through the company through which David Brein did business) and BIP commissions totaling  $264,600.00 for the fraudulent sale of Jonathan Brein's policy.

1916.   Upon information and belief, BIP and David Brein paid most of the commission and bonus payments back to the BIP Funding Defendants, thereby (i) unlawfully splitting commissions with an unlicensed person, *see* Va. Code Ann. § 38.2-1812; and (ii) unlawfully rebating premium payments, *see* Va. Code Ann. § 38.2-509.

1917.   Jonathan Brein failed to make the second year's scheduled premium payment.

1918.   FGLIC sent a Lapse Letter on or about **April 2, 2018**, advising Jonathan Brein of the policy's impending lapse.

1919.   In the Lapse Letter, FGLIC asked Jonathan Brein to contact a FGLIC representative to discuss the policy.

1920.   A representative of FGLIC contacted Jonathan Brein on **April 16, 2018**, to inquire as to the reasons that Jonathan Brein allowed the policy to lapse with no value after paying nearly $163,000 in premiums during the first year.

1921.   Jonathan Brein claimed that he was aware that the policy would lapse and that he did not have the money to pay the premium.

1922.   FGLIC sent a Rescission Letter on or about **May 10, 2018**.

1923.   The profit of the conspiracy was $101,835.00 (the difference between the commission and the first year premium).

1924.   Agent Defendant Brein has sold at least seven other policies through BIP that have lapsed.

1925.   These policies include those for David Brein (policy number ending in 926), Debra Brein (policy number ending in 106), Stephen DiMarco (policy number ending in 062), Jaime DiMarco (policy number ending in 061), Gary Weiss (policy number ending in 352), Melanie Weiss (policy number ending in 213), and Mark Rich (policy number ending in 049).

1926.   Upon information and belief, these seven policies were also part of the same conspiracy to defraud FGLIC, and the events and facts associated with the issuance of these policies are also Predicate Acts.

### Predicate Act Twenty-Nine: The DEIRDRE CASSIDY Policy

1927.   Agent Defendant Tatanisha Leer sold insured Deirdre Cassidy a life insurance policy issued in the State of California and valued at $2.9 million, which was procured by fraud and breach of fiduciary duty.

1928.   In **August 2016**, Leer sought to obtain a FGLIC life insurance policy in Deirdre Cassidy's name.

1929.   Leer completed a FGLIC life insurance application for Cassidy.

1930.   The application asks: "Will you borrow money to pay the premium for the life insurance being applied for or have someone else pay these premiums for you in return for you assigning part or all of the policy values to someone else?"  Exh. 235 (FGLIC_BIP00119957).

1931.   Leer falsely answered this question "no" in Cassidy's application. *Id.*

1932.   On or about **August 26, 2016**, Leer executed Cassidy's application, certifying falsely that Cassidy was not using funds from a third party in order to pay the insurance premium. *Id.*

1933.   Upon information and belief, Leer knew this representation was false when made because he knew Cassidy was paying the premium with funds from a co-conspirator.

1934.   Upon information and belief, Leer concealed from FGLIC the fact that Cassidy was paying the premiums with funds from a co-conspirator in order to induce FGLIC to issue the policy to Cassidy.

1935.   Upon information and belief, Leer also fraudulently concealed from FGLIC the fact that the application was not submitted for purposes of obtaining life insurance, but rather for the purpose of obtaining commissions and bonuses in excess of the policy's first-year premium.

1936.   Leer's false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Cal. Ins. Code § 1871.4(a)(1), (3).

1937.   Using the mail and wire, Leer delivered the fraudulent application to BIP on **August 26, 2016**.

1938.   BIP, in its role as General Agent, was responsible for validating Cassidy's application materials prior to submitting them to FGLIC.

1939.   BIP knew that the statement in Cassidy's application that the insured would not use funds from a third party to pay the premium was false, because BIP knew the premium was to be paid by funds from a co-conspirator, and BIP intended for FGLIC to rely on that false statement.

1940.   BIP did not correct the false representations in Cassidy's application.

1941.   On or about **August 26, 2016**, BIP sent Cassidy's application materials by the mail or wire to FGLIC with the false representations included in the materials.

1942.   BIP also fraudulently concealed from FGLIC the fact that the application was not submitted for purposes of obtaining life insurance, but rather for the purpose of obtaining commissions and bonuses in excess of the policy's first-year premium.

1943.   BIP's false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Cal. Ins. Code § 1871.4(a)(1), (3).

1944.   In reliance on Leer's and BIP's misrepresentations, FGLIC issued a life insurance policy to Cassidy with a value of $2.9 million, and an effective date of **November 7, 2016**.  Exh. 236 (FGLIC_BIP00120222).

1945.   The first year's premium for Cassidy's policy was $50,000.00. *Id.*

1946.   FGLIC received payment of the first-year premium for Cassidy's policy.

1947.   Upon information and belief, the BIP Funding Defendants funneled money over the wire, in the form of a sham transaction, to Cassidy or her company in order to fund the premium.

1948.   In reliance on Defendants' fraud, FGLIC paid Leer (through the company through which Leer did business) and BIP commissions totaling $55,150 for the fraudulent sale of Cassidy's policy.

1949.   Upon information and belief, BIP and Leer paid most of the commission and bonus payments back to the BIP Funding Defendants, thereby rebating the premium payments back to their co-conspirators for the continuation and furtherance of the conspiracy.

1950.   Cassidy failed to make the second year's scheduled premium payment.

1951.   FGLIC sent a Lapse Letter on or about **July 27, 2018**, advising Cassidy of the policy's impending lapse.

1952.   In the Lapse Letter, FGLIC asked Cassidy to contact a FGLIC representative to discuss the policy.

1953.   A representative of FGLIC contacted Cassidy on **August 3, 2018**, to inquire as to the reasons that Cassidy allowed the policy to lapse with no value after paying $50,000 in premiums during the first year.

1954.   Cassidy replied that she had seen the **July 27, 2018**, letter and she was aware that the policy would lapse.

1955.   When asked if there was a particular reason she did not renew, Cassidy said there was no particular reason and hung up on the representative.

1956.   FGLIC sent a Rescission Letter on or about **August 7, 2018**.

1957.   The profit of the conspiracy was $5150 (the difference between the commission and the first year premium).

1958.   Agent Defendant Leer has sold at least three other policies through BIP that have lapsed.

1959.   These policies include those for insureds Leo Cassidy (policy number ending in 674), Derek Perez (policy number ending in 672), and herself (Leer) (policy number ending in 260).

1960.   Upon information and belief, these three policies were also part of the same conspiracy to defraud FGLIC, and the events and facts associated with the issuance of these policies are also Predicate Acts.

## Predicate Act Thirty: The AVRAHAM KRAUSZ Policy

1961.   Agent Defendant Jacob Eisenberg sold insured Avraham Krausz (a New Jersey resident) a life insurance policy valued at $4.75 million, which was procured by fraud and breach of fiduciary duty.

1962.   In **August 2016**, Eisenberg sought to obtain a FGLIC life insurance policy in Avraham Krausz's name.

1963.   Eisenberg completed a FGLIC life insurance application for Krausz.

1964.   The application asks: "Will you borrow money to pay the premium for the life insurance being applied for or have someone else pay these premiums for you in return for you assigning part or all of the policy values to someone else?"  Exh. 237 (FGLIC_BIP00032506).

1965.   Eisenberg falsely answered this question "no" in Krausz's application.  *Id.*

1966.   On or about **August 30, 2016**, Eisenberg executed Krausz's application, certifying falsely that Krausz was not using funds from a third party in order to pay the insurance premium. *Id.*

1967.   Upon information and belief, Eisenberg knew this representation was false when made because he knew Krausz was paying the premium with funds from a co-conspirator.

1968.   Upon information and belief, Eisenberg concealed from FGLIC the fact that Krausz was paying the premiums with funds from a co-conspirator in order to induce FGLIC to issue the policy to Krausz.

1969.   Upon information and belief, Eisenberg also fraudulently concealed from FGLIC the fact that the application was not submitted for purposes of obtaining life insurance, but rather for the purpose of obtaining commissions and bonuses in excess of the policy's first-year premium.

1970.   Eisenberg's false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* N.J. Stat. Ann. § 2C:21-4.6(a).

1971.   Using the mail and wire, Eisenberg delivered the fraudulent application to BIP on **August 30, 2016**.

1972.   BIP, in its role as General Agent, was responsible for validating Krausz's application materials prior to submitting them to FGLIC.

1973.   BIP knew that the statement in Krausz's application that the insured would not use funds from a third party to pay the premium was false, because BIP knew the premium was to be paid by funds from a co-conspirator, and BIP intended for FGLIC to rely on that false statement.

1974.   BIP did not correct the false representations in Krausz's application.

1975.   On or about **August 30, 2016**, BIP sent Krausz's application materials by the mail or wire to FGLIC with the false representations included in the materials.

1976.   BIP also fraudulently concealed from FGLIC the fact that the application was not submitted for purposes of obtaining life insurance, but rather for the purpose of obtaining commissions and bonuses in excess of the policy's first-year premium.

1977.   BIP's false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* N.J. Stat. Ann. § 2C:21-4.6(a).

1978.   In reliance on Eisenberg's and BIP's misrepresentations, FGLIC issued a life insurance policy to Krausz with a value of $4.75 million, and an effective date of **October 19, 2016**. Exh. 238 (FGLIC_BIP00033094).

1979.   The first year's premium for Krausz's policy was $794,152.50. *Id.*

1980.   FGLIC received payment of the first-year premium for Krausz's policy on **November 2, 2016**, and **November 23, 2016**.

1981.   Upon information and belief, the BIP Funding Defendants funneled money over the wire, in the form of a sham transaction, to Krausz or his company in order to fund the premium.

1982.   In reliance on Defendants' fraud, FGLIC paid Eisenberg (through the company through which Eisenberg did business) and BIP commissions totaling $1,132,875.00 for the fraudulent sale of Krausz's policy.

1983.   Upon information and belief, BIP and Eisenberg paid most of the commission and bonus payments back to the BIP Funding Defendants, thereby (i) unlawfully splitting commissions with an unlicensed person, *see* N.J. Stat. Ann. § 17:22A-41d; and (ii) unlawfully rebating premium payments, *see* N.J. Stat. Ann. §§ 17:29A-15, 17:29-AA-14; 17B:30-13.

1984.   Krausz failed to make the second year's scheduled premium payment.

1985.   FGLIC sent a Lapse Letter on or about **December 5, 2017**, advising Krausz of the policy's impending lapse.

1986.   In the Lapse Letter, FGLIC asked Krausz to contact a FGLIC representative to discuss the policy.

1987.   A representative of FGLIC contacted Krausz on **December 18, 2017**, to inquire as to the reasons that Krausz allowed the policy to lapse with no value after paying nearly $795,000 in premiums during the first year.

1988.   Krausz stated that he was going to let the policy lapse for non-payment.

1989.   When FGLIC's representative asked why he wanted to end the policy, Krausz replied that the decision was made by others, along with himself.

1990.   When FGLIC's representative asked what Krausz meant by other people made the decision, Krausz refused to answer.

1991.   FGLIC sent a Rescission Letter on or about **January 15, 2018**.

1992.   The profit of the conspiracy was $338,722.50 (the difference between the commission and the first year premium).

1993.   Agent Defendant Eisenberg has sold at least three other policies through BIP that have lapsed.

1994.   These policies include those for insureds Ruth Itzkowitz (policy number ending in 603), Erica Gestetner (policy number ending in 771), and Roohangiz Natanzi Ram (policy number ending in 135).

1995.   Upon information and belief, these three policies were also part of the same conspiracy to defraud FGLIC, and the events and facts associated with the issuance of these policies are also Predicate Acts.

## Predicate Act Thirty-One: The ROBERT COHN Policy

1996.   Agent Defendant John Bivona sold insured Robert Cohn (a New Jersey resident) a life insurance policy which was procured by fraud and breach of fiduciary duty.

1997.   In **September 2016**, Bivona sought to obtain a FGLIC life insurance policy in Robert Cohn's name, in the amount of $2,399,999.00.

1998.   Bivona completed a FGLIC life insurance application for Cohn.

1999.   The application asks: "Will you borrow money to pay the premium for the life insurance being applied for or have someone else pay these premiums for you in return for you assigning part or all of the policy values to someone else?" Exh. 239 (FGLIC_BIP00071821).

2000.   Bivona falsely answered this question "no" in Cohn's application. *Id.*

2001.   On or about **September 6, 2016**, Bivona executed Cohn's application, certifying falsely that Cohn was not using funds from a third party in order to pay the insurance premium. *Id.*

2002.   Upon information and belief, Bivona knew this representation was false when made because he knew Cohn was paying the premium with funds from a co-conspirator.

2003.   Upon information and belief, Bivona concealed from FGLIC the fact that Cohn was paying the premiums with funds from a co-conspirator in order to induce FGLIC to issue the policy to Cohn.

2004.   Upon information and belief, Bivona also fraudulently concealed from FGLIC the fact that the application was not submitted for purposes of obtaining life insurance, but rather for the purpose of obtaining commissions and bonuses in excess of the policy's first-year premium.

2005.   Bivona's false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* N.J. Stat. Ann. § 2C:21-4.6(a).

2006.   Using the mail and wire, Bivona delivered the fraudulent application to BIP on **September 6, 2016**.

2007.   BIP, in its role as General Agent, was responsible for validating Cohn's application materials prior to submitting them to FGLIC.

2008.   BIP knew that the statement in Cohn's application that the insured would not use funds from a third party to pay the premium was false, because BIP knew the premium was to be paid by funds from a co-conspirator, and BIP intended for FGLIC to rely on that false statement.

2009.   BIP did not correct the false representations in Cohn's application.

2010.   On or about **September 6, 2016**, BIP sent Cohn's application materials by the mail or wire to FGLIC with the false representations included in the materials.

2011.   BIP also fraudulently concealed from FGLIC the fact that the application was not submitted for purposes of obtaining life insurance, but rather for the purpose of obtaining commissions and bonuses in excess of the policy's first-year premium.

2012.   BIP's false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* N.J. Stat. Ann. § 2C:21-4.6(a).

2013.   In reliance on Bivona's and BIP's misrepresentations, FGLIC issued a life insurance policy to Cohn with a value of $2,399,999.00, and an effective date of **December 16, 2016**. Exh. 240 (FGLIC_BIP00071496).

2014.   The first year's premium for Cohn's policy was $124,344.00. *Id.*

2015.   FGLIC received payment of the first-year premium for Cohn's policy.

2016.   Upon information and belief, the BIP Funding Defendants funneled money over the wire, in the form of a sham transaction, to Cohn or his company in order to fund the premium.

2017.   In reliance on Defendants' fraud, FGLIC paid Bivona (through the company through which Bivona did business) and BIP commissions totaling $254,867.50 for the fraudulent sale of Cohn's policy.

2018.   Upon information and belief, BIP and Bivona paid most of the commission and bonus payments back to the BIP Funding Defendants, thereby (i) unlawfully splitting commissions with an unlicensed person, *see* N.J. Stat. Ann. § 17:22A-41d; and (ii) unlawfully rebating premium payments, *see* N.J. Stat. Ann. §§ 17:29A-15, 17:29-AA-14; 17B:30-13.

2019.   Cohn failed to make the second year's scheduled premium payment.

2020.   FGLIC sent a Lapse Letter on or about **September 4, 2018**, advising Cohn of the policy's impending lapse.

2021.   In the Lapse Letter, FGLIC asked Cohn to contact a FGLIC representative to discuss the policy.

2022.   A representative of FGLIC contacted Cohn on **September 12, 2018**, to inquire as to the reasons that Cohn allowed the policy to lapse with no value after paying nearly $125,000.00 in premiums during the first year.

2023.   Cohn said he would have to contact Agent Defendant Bivona to make the decision of whether to renew the policy.

2024.   Cohn understood that the policy would expire worthless if the premium was not paid.

2025.   Cohn did not contact FGLIC's representative to provide further information, despite a request to do so.

2026.   FGLIC sent a Rescission Letter on or about **September 13, 2018**.

2027.   The profit of the conspiracy was $130,523.50 (the difference between the commission and the first year premium).

2028.   Agent Defendant Bivona has sold at least five other policies through BIP that have lapsed.

2029.   These policies include those for insureds Lloyd Bartner (policy number ending in 768), Steven Sugar (policy number ending in 049), Marc Sugar (policy number ending in 202), Lauralee Eisenlau (policy number ending in 774), and himself (Bivona) (policy number ending in 587).

2030.   Upon information and belief, these five policies were also part of the same conspiracy to defraud FGLIC, and the events and facts associated with the issuance of these policies are also Predicate Acts.

### Predicate Act Thirty-Two: The ROSALIA BECK Policy

2031.   Agent Defendant Shloime Wosner sold insured Rosalia Beck (a New Jersey resident) a life insurance policy which was procured by fraud and breach of fiduciary duty.

2032.   In **September 2016**, Wosner sought to obtain a FGLIC life insurance policy in Rosalia Beck's name, in the amount of $7.5 million.

2033.   Wosner completed a FGLIC life insurance application for Beck.

2034.   The application asks: "Will you borrow money to pay the premium for the life insurance being applied for or have someone else pay these premiums for you in return for you assigning part or all of the policy values to someone else?"  Exh. 241 (FGLIC_BIP00073951).

2035.   Wosner falsely answered this question "no" in Beck's application. *Id.*

2036.   On or about **September 26, 2016**, Wosner executed Beck's application, certifying falsely that Beck was not using funds from a third party in order to pay the insurance premium. *Id.*

2037.   Upon information and belief, Wosner knew this representation was false when made because he knew Beck was paying the premium with funds from a co-conspirator.

2038.   Upon information and belief, Wosner concealed from FGLIC the fact that Beck was paying the premiums with funds from a co-conspirator in order to induce FGLIC to issue the policy to Beck.

2039.   Upon information and belief, Wosner also fraudulently concealed from FGLIC the fact that the application was not submitted for purposes of obtaining life insurance, but rather for the purpose of obtaining commissions and bonuses in excess of the policy's first-year premium.

2040.   Wosner's false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* N.J. Stat. Ann. § 2C:21-4.6(a).

2041.   Using the mail and wire, Wosner delivered the fraudulent application to BIP on **September 26, 2016**.

2042.   BIP, in its role as General Agent, was responsible for validating Beck's application materials prior to submitting them to FGLIC.

2043.   BIP knew that the statement in Beck's application that the insured would not use funds from a third party to pay the premium was false, because BIP knew the premium was to be paid by funds from a co-conspirator, and BIP intended for FGLIC to rely on that false statement.

2044.   BIP did not correct the false representations in Beck's application.

2045.   On or about **September 26, 2016**, BIP sent Beck's application materials by the mail or wire to FGLIC with the false representations included in the materials.

2046.   BIP also fraudulently concealed from FGLIC the fact that the application was not submitted for purposes of obtaining life insurance, but rather for the purpose of obtaining commissions and bonuses in excess of the policy's first-year premium.

2047.   BIP's false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* N.J. Stat. Ann. § 2C:21-4.6(a).

2048.   In reliance on Wosner's and BIP's misrepresentations, FGLIC issued a life insurance policy to Beck with a value of $7.5 million, and an effective date of **December 5, 2016**. Exh. 242 (FGLIC_BIP00073373).

2049.   The first year's premium for Beck's policy was $425,000.00. *Id.*

2050.   FGLIC received payment of the first-year premium for Beck's policy.

2051.   Upon information and belief, the BIP Funding Defendants funneled money over the wire, in the form of a sham transaction, to Beck or his company in order to fund the premium.

2052.   In reliance on Defendants' fraud, FGLIC paid Wosner (through the company through which Wosner did business) and BIP commissions totaling $531,250 for the fraudulent sale of Beck's policy.

2053.   Upon information and belief, BIP and Wosner paid most of the commission and bonus payments back to the BIP Funding Defendants, thereby (i) unlawfully splitting commissions with an unlicensed person, *see* N.J. Stat. Ann. § 17:22A-41d; and (ii) unlawfully rebating premium payments, *see* N.J. Stat. Ann. §§ 17:29A-15, 17:29-AA-14; 17B:30-13.

2054.   Beck failed to make the second year's scheduled premium payment.

2055.   FGLIC sent a Lapse Letter on or about **May 21, 2018**, advising Beck of the policy's impending lapse.

2056.   In the Lapse Letter, FGLIC asked Beck to contact a FGLIC representative to discuss the policy.

2057.   A representative of FGLIC contacted Beck on **June 1, 2018**, to inquire as to the reasons that Beck allowed the policy to lapse with no value after paying $425,000 in premiums during the first year.

2058.   Beck told the representative that she remembered very little about the policy.

2059.   After the representative questioned her, Beck said she remembered completing the application and the medical tests but did not remember the name of the agent.

2060.   She said that she would not answer any more questions and that FGLIC's representative should contact Agent Defendant Wosner for any further information.

2061.   FGLIC sent a Rescission Letter on or about **June 6, 2018**.

2062.   The profit of the conspiracy was $106,250.00 (the difference between the commission and the first year premium).

2063.   Agent Defendant Wosner has sold at least one other policy through BIP that has lapsed.

2064.   This other policy is for Chaim Berkowitz (policy number ending in 410).

2065.   Upon information and belief, this policy was also part of the same conspiracy to defraud FGLIC, and the events and facts associated with the issuance of this policy are also Predicate Acts.

### Predicate Act Thirty-Three: The JOHN RUNYAN Policy

2066.   Agent Defendant Gerald Hughes sold insured John Runyan a life insurance policy issued in the State of California and valued at $2.9 million, which was procured by fraud and breach of fiduciary duty.

2067.   In **October 2016**, Hughes sought to obtain a FGLIC life insurance policy in John Runyan's name.

2068.   Hughes completed a FGLIC life insurance application for Runyan.

2069.   The application asks: "Will you borrow money to pay the premium for the life insurance being applied for or have someone else pay these premiums for you in return for you assigning part or all of the policy values to someone else?"  Exh. 243 (FGLIC_BIP00025775).

2070.   Hughes falsely answered this question "no" in Runyan's application.  *Id.*

2071.   On or about **October 11, 2016**, Hughes executed Runyan's application, certifying falsely that Runyan was not using funds from a third party in order to pay the insurance premium. *Id.*

2072.   Upon information and belief, Hughes knew this representation was false when made because he knew Runyan was paying the premium with funds from a co-conspirator.

2073.   Upon information and belief, Hughes concealed from FGLIC the fact that Runyan was paying the premiums with funds from a co-conspirator in order to induce FGLIC to issue the policy to Runyan.

2074.   Upon information and belief, Hughes also fraudulently concealed from FGLIC the fact that the application was not submitted for purposes of obtaining life insurance, but rather for the purpose of obtaining commissions and bonuses in excess of the policy's first-year premium.

2075.   Hughes' false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Cal. Ins. Code § 1871.4(a)(1), (3).

2076.   Using the mail and wire, Hughes delivered the fraudulent application to BIP on **October 11, 2016**.

2077.   BIP, in its role as General Agent, was responsible for validating Runyan's application materials prior to submitting them to FGLIC.

2078.   BIP knew that the statement in Runyan's application that the insured would not use funds from a third party to pay the premium was false, because BIP knew the premium was to be paid by funds from a co-conspirator, and BIP intended for FGLIC to rely on that false statement.

2079.   BIP did not correct the false representations in Runyan's application.

2080.   On or about **October 11, 2016**, BIP sent Runyan's application materials by the mail or wire to FGLIC with the false representations included in the materials.

2081.   BIP also fraudulently concealed from FGLIC the fact that the application was not submitted for purposes of obtaining life insurance, but rather for the purpose of obtaining commissions and bonuses in excess of the policy's first-year premium.

2082.   BIP's false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Cal. Ins. Code § 1871.4(a)(1), (3).

2083.   In reliance on Hughes' and BIP's misrepresentations, FGLIC issued a life insurance policy to Runyan with a value of $2.9 million, and an effective date of **December 22, 2016**.  Exh. 244 (FGLIC_BIP00025713).

2084.   The first year's premium for Runyan's policy was $30,788.70. *Id.*

2085.   FGLIC received payment of the first-year premium for Runyan's policy.

2086.   Upon information and belief, the BIP Funding Defendants funneled money over the wire, in the form of a sham transaction, to Runyan or his company in order to fund the premium.

2087.   In reliance on Defendants' fraud, FGLIC paid Hughes (through the company through which Hughes did business) and BIP commissions totaling $38,485.87 for the fraudulent sale of Runyan's policy.

2088.   Upon information and belief, BIP and Hughes paid most of the commission and bonus payments back to the BIP Funding Defendants, thereby rebating the premium payments back to their co-conspirators for the continuation and furtherance of the conspiracy.

2089.   Runyan failed to make the second year's scheduled premium payment.

2090.   FGLIC sent a Lapse Letter on or about **January 4, 2018**, advising Runyan of the policy's impending lapse.

2091.   In the Lapse Letter, FGLIC asked Runyan to contact a FGLIC representative to discuss the policy.

2092.   A representative of FGLIC contacted Runyan on **January 18, 2018**, to inquire as to the reasons that Runyan allowed the policy to lapse with no value after paying nearly $31,000 in premiums during the first year.

2093.   Runyan refused to talk and hung up the phone.

2094.   FGLIC sent a Rescission Letter on or about **February 22, 2018**.

2095.   The profit of the conspiracy was $7,697.17 (the difference between the commission and the first year premium).

2096.   Agent Defendant Hughes has sold at least three other policies through BIP that have lapsed.

2097.   These policies include those for insureds Erik Quisling (policy number ending in 621), Dino Warda (policy number ending in 693), and James Cunningham (policy number ending in 576).

2098.   Upon information and belief, these three policies were also part of the same conspiracy to defraud FGLIC, and the events and facts associated with the issuance of these policies are also Predicate Acts.

## Predicate Act Thirty-Four: The LAURENCE SCHREIBER Policy

2099.   Agent Defendant Stanley Chesed sold insured Laurence Schreiber (a California resident) a life insurance policy which was procured by fraud and breach of fiduciary duty.

2100.   In **October 2016**, Chesed sought to obtain a FGLIC life insurance policy in Laurence Schreiber's name, in the amount of $1.75 million.

2101.   Chesed completed a FGLIC life insurance application for Schreiber.

2102.   The application asks: "Will you borrow money to pay the premium for the life insurance being applied for or have someone else pay these premiums for you in return for you assigning part or all of the policy values to someone else?"  Exh. 245 (FGLIC_BIP00008883).

2103.   Chesed falsely answered this question "no" in Schreiber's application. *Id.*

2104.   On or about **October 26, 2016**, Chesed executed Schreiber's application, certifying falsely that Schreiber was not using funds from a third party in order to pay the insurance premium. *Id.*

2105.   Upon information and belief, Chesed knew this representation was false when made because he knew Schreiber was paying the premium with funds from a co-conspirator.

2106.   Upon information and belief, Chesed concealed from FGLIC the fact that Schreiber was paying the premiums with funds from a co-conspirator in order to induce FGLIC to issue the policy to Schreiber.

2107.   Upon information and belief, Chesed also fraudulently concealed from FGLIC the fact that the application was not submitted for purposes of obtaining life insurance, but rather for the purpose of obtaining commissions and bonuses in excess of the policy's first-year premium.

2108.   Chesed's false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Cal. Ins. Code § 1871.4(a)(1), (3).

2109.  Using the mail and wire, Chesed delivered the fraudulent application to BIP on **October 26, 2016**.

2110.  BIP, in its role as General Agent, was responsible for validating Schreiber's application materials prior to submitting them to FGLIC.

2111.  BIP knew that the statement in Schreiber's application that the insured would not use funds from a third party to pay the premium was false, because BIP knew the premium was to be paid by funds from a co-conspirator, and BIP intended for FGLIC to rely on that false statement.

2112.  BIP did not correct the false representations in Schreiber's application.

2113.  On or about **October 26, 2016**, BIP sent Schreiber's application materials by the mail or wire to FGLIC with the false representations included in the materials.

2114.  BIP also fraudulently concealed from FGLIC the fact that the application was not submitted for purposes of obtaining life insurance, but rather for the purpose of obtaining commissions and bonuses in excess of the policy's first-year premium.

2115.  BIP's false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Cal. Ins. Code § 1871.4(a)(1), (3).

2116.  In reliance on Chesed's and BIP's misrepresentations, FGLIC issued a life insurance policy to Schreiber with a value of $1.75 million, and an effective date of **December 13, 2016**. Exh. 246 (FGLIC_BIP00008966).

2117.  The first year's premium for Schreiber's policy was $78,085.00. *Id.*

2118.  FGLIC received payment of the first-year premium for Schreiber's policy on **December 20, 2016**.

2119.   Upon information and belief, the BIP Funding Defendants funneled money over the wire, in the form of a sham transaction, to Schreiber or his company in order to fund the premium.

2120.   In reliance on Defendants' fraud, FGLIC paid Chesed (through the company through which Chesed did business) and BIP commissions totaling $97,606.25 for the fraudulent sale of Schreiber's policy.

2121.   Upon information and belief, BIP and Chesed paid most of the commission and bonus payments back to the BIP Funding Defendants, thereby rebating the premium payments back to their co-conspirators for the continuation and furtherance of the conspiracy.

2122.   Schreiber failed to make the second year's scheduled premium payment.

2123.   FGLIC sent a Lapse Letter on or about **August 3, 2017**, advising Schreiber of the policy's impending lapse.

2124.   In the Lapse Letter, FGLIC asked Schreiber to contact a FGLIC representative to discuss the policy.

2125.   Schreiber did not contact FGLIC as the letter requested.

2126.   FGLIC sent a Rescission Letter on or about **August 11, 2017**.

2127.   The profit of the conspiracy was $19,521.25 (the difference between the commission and the first year premium).

### Predicate Act Thirty-Five: The STEVEN YOUNG Policy

2128.   Agent Defendant Coffey Anderson sold insured Steven Young a life insurance policy issued in the State of California and valued at $5 million, which was procured by fraud and breach of fiduciary duty.

2129.   In **November 2016**, Anderson sought to obtain a FGLIC life insurance policy in Steven Young's name.

2130.   Anderson completed a FGLIC life insurance application for Young.

2131.   The application asks: "Will you borrow money to pay the premium for the life insurance being applied for or have someone else pay these premiums for you in return for you assigning part or all of the policy values to someone else?"  Exh. 247 (FGLIC_BIP00027099).

2132.   Anderson falsely answered this question "no" in Young's application. *Id.*

2133.   On or about **November 10, 2016**, Anderson executed Young's application, certifying falsely that Young was not using funds from a third party in order to pay the insurance premium. *Id.*

2134.   Upon information and belief, Anderson knew this representation was false when made because he knew Young was paying the premium with funds from a co-conspirator.

2135.   Upon information and belief, Anderson concealed from FGLIC the fact that Young was paying the premiums with funds from a co-conspirator in order to induce FGLIC to issue the policy to Young.

2136.   Upon information and belief, Anderson also fraudulently concealed from FGLIC the fact that the application was not submitted for purposes of obtaining life insurance, but rather for the purpose of obtaining commissions and bonuses in excess of the policy's first-year premium.

2137.   Anderson's false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Cal. Ins. Code § 1871.4(a)(1), (3).

2138.   Using the mail and wire, Anderson delivered the fraudulent application to BIP on **November 10, 2016**.

2139.   BIP, in its role as General Agent, was responsible for validating Young's application materials prior to submitting them to FGLIC.

2140.   BIP knew that the statement in Young's application that the insured would not use funds from a third party to pay the premium was false, because BIP knew the premium was to be paid by funds from a co-conspirator, and BIP intended for FGLIC to rely on that false statement.

2141.   BIP did not correct the false representations in Young's application.

2142.   On or about **November 10, 2016**, BIP sent Young's application materials by the mail or wire to FGLIC with the false representations included in the materials.

2143.   BIP also fraudulently concealed from FGLIC the fact that the application was not submitted for purposes of obtaining life insurance, but rather for the purpose of obtaining commissions and bonuses in excess of the policy's first-year premium.

2144.   BIP's false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Cal. Ins. Code § 1871.4(a)(1), (3).

2145.   In reliance on Anderson's and BIP's misrepresentations, FGLIC issued a life insurance policy to Young with a value of $5 million, and an effective date of **December 23, 2016**. Exh. 248 (FGLIC_BIP00026920).

2146.   The first year's premium for Young's policy was $138,000.00. *Id.*

2147.   FGLIC received payment of the first-year premium for Young's policy on **February 6, 2017**.

2148.   Upon information and belief, the BIP Funding Defendants funneled money over the wire, in the form of a sham transaction, to Young or his company in order to fund the premium.

2149.   In reliance on Defendants' fraud, FGLIC paid Anderson (through the company through which Anderson did business) and BIP commissions totaling $172,500 for the fraudulent sale of Young's policy.

2150.   Upon information and belief, BIP and Anderson paid most of the commission and bonus payments back to the BIP Funding Defendants, thereby rebating the premium payments back to their co-conspirators for the continuation and furtherance of the conspiracy.

2151.   Young failed to make the second year's scheduled premium payment.

2152.   FGLIC sent a letter on or about **December 5, 2017**, advising Young of the policy's impending lapse.

2153.   In the Lapse Letter, FGLIC asked Young to contact a FGLIC representative to discuss the policy.

2154.   A representative of FGLIC contacted Young on **December 18, 2017**, to inquire as to the reasons that Young allowed the policy to lapse with no value after paying $138,000 in premiums during the first year.

2155.   Young claimed that he knew the policy would lapse and decided to get a policy from someone else, but that he had to end the call to attend a meeting.

2156.   The FGLIC representative asked if there was a convenient time to resume the conversation and Young replied, "you can try, we'll see" and hung up the phone.

2157.   FGLIC sent a Rescission Letter on or about **January 22, 2018**.

2158.   The profit of the conspiracy was $34,500.00 (the difference between the commission and the first year premium).

2159.   Agent Defendant Anderson has sold at least three other policies through BIP that have lapsed.

2160.   These policies include those for insureds Kevin Hogan (policy number ending in 090), Amritpal Tiwana (policy number ending in 308), and Philip Waterford (policy number ending in 788).

2161.   Upon information and belief, these three policies were also part of the same conspiracy to defraud FGLIC, and the events and facts associated with the issuance of these policies are also Predicate Acts.

### Predicate Act Thirty-Six: The TERESA MACCARONE Policy

2162.   Agent Defendant Chris Hall sold insured Teresa Maccarone a life insurance policy issued in the State of California and valued at $3 million, which was procured by fraud and breach of fiduciary duty.

2163.   In **November 2016**, Hall sought to obtain a FGLIC life insurance policy in Maccarone's name, in the amount of $3 million.

2164.   Hall caused completed a FGLIC life insurance application for Maccarone.

2165.   The application asks: "Will you borrow money to pay the premium for the life insurance being applied for or have someone else pay these premiums for you in return for you assigning part or all of the policy values to someone else?"  Exh. 249 (FGLIC_BIP00052554).

2166.   Hall falsely answered this question "no" in Maccarone's application. *Id.*

2167.   On or about **November 19, 2016**, Hall executed Maccarone's application, certifying falsely that Maccarone was not using funds from a third party in order to pay the insurance premium. *Id.*

2168.   Upon information and belief, Hall knew this representation was false when made because he knew Maccarone was paying the premium with funds from a co-conspirator.

2169.   Upon information and belief, Hall concealed from FGLIC the fact that Maccarone was paying the premiums with funds from a co-conspirator in order to induce FGLIC to issue the policy to Maccarone.

2170.   Upon information and belief, Hall also fraudulently concealed from FGLIC the fact that the application was not submitted for purposes of obtaining life insurance, but rather for the purpose of obtaining commissions and bonuses in excess of the policy's first-year premium.

2171.   Hall's false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Cal. Ins. Code § 1871.4(a)(1), (3).

2172.   Using the mail and wire, Hall delivered the fraudulent application to BIP on **November 19, 2016**.

2173.   BIP, in its role as General Agent, was responsible for validating Maccarone's application materials prior to submitting them to FGLIC.

2174.   BIP knew that the statement in Maccarone's application that the insured would not use funds from a third party to pay the premium was false, because BIP knew the premium was to be paid by funds from a co-conspirator, and BIP intended for FGLIC to rely on that false statement.

2175.   BIP did not correct the false representations in Maccarone's application.

2176.   On or about **November 19, 2016**, BIP sent Maccarone's application materials by the mail or wire to FGLIC with the false representations included in the materials.

2177.   BIP also fraudulently concealed from FGLIC the fact that the application was not submitted for purposes of obtaining life insurance, but rather for the purpose of obtaining commissions and bonuses in excess of the policy's first-year premium.

2178.   BIP's false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Cal. Ins. Code § 1871.4(a)(1), (3).

2179.   In reliance on Hall's and BIP's misrepresentations, FGLIC issued a life insurance policy to Maccarone with a value of $3 million, and an effective date of **December 21, 2016**.  Exh. 250 (FGLIC_BIP00052491).

2180.   The first year's premium for Maccarone's policy was $90,720.00. *Id.*

2181.   FGLIC received payments of the first-year premium for Maccarone's policy on **January 17, 2017**, and **February 11, 2017**.

2182.   Upon information and belief, the BIP Funding Defendants funneled money over the wire, in the form of a sham transaction, to Maccarone or his company in order to fund the premium.

2183.   In reliance on Defendants' fraud, FGLIC paid Hall (through the company through which Hall did business) and BIP commissions totaling at least $19,800 for the fraudulent sale of Maccarone's policy.

2184.   Upon information and belief, BIP and Hall paid most of the commission and bonus payments back to the BIP Funding Defendants, thereby rebating the premium payments back to their co-conspirators for the continuation and furtherance of the conspiracy.

2185.   Maccarone failed to make the second year's scheduled premium payment.

2186.   FGLIC sent a Lapse Letter on or about **October 4, 2018** advising Maccarone of the policy's impending lapse.

2187.   In the Lapse Letter, FGLIC asked Maccarone to contact a FGLIC representative to discuss the policy.

2188.   A representative of FGLIC attempted to contact Maccarone on **October 16, 2018** to inquire as to the reasons that Maccarone allowed the policy to lapse with no value after paying nearly $91,000 in premiums during the first year.

2189.   The representative spoke with a female who would not identify herself but said she would take a message for Maccarone, but Maccarone did not return the call.

2190.   FGLIC sent a Rescission Letter on or about **October 19, 2018**.

2191.   Agent Defendant Hall has sold at least one other policy through BIP that lapsed, specifically that of Vardan Stambulyan (policy number ending in 394).

2192.   The events and facts associated with the issuance of this policy are also Predicate Acts.

### Predicate Act Thirty-Seven: The PABLO DAROUX Policy

2193.   Agent Defendant Bruce Dilworth sold insured Pablo Daroux a life insurance policy issued in the State of California and valued at $2 million, which was procured by fraud and breach of fiduciary duty.

2194.   In **December 2016**, Dilworth sought to obtain a FGLIC life insurance policy in Daroux's name.

2195.   Dilworth completed a FGLIC life insurance application for Daroux.

2196.   The application asks: "Will you borrow money to pay the premium for the life insurance being applied for or have someone else pay these premiums for you in return for you assigning part or all of the policy values to someone else?"  Exh. 251 (FGLIC_BIP00044778).

2197.   Dilworth falsely answered this question "no" in Daroux's application. *Id.*

2198.   On or about **December 10, 2016**, Dilworth executed Daroux's application, certifying falsely that Daroux was not using funds from a third party in order to pay the insurance premium. *Id.*

2199.   Upon information and belief, Dilworth knew this representation was false when made because he knew Daroux was paying the premium with funds from a co-conspirator.

2200.   Upon information and belief, Dilworth concealed from FGLIC the fact that Daroux was paying the premiums with funds from a co-conspirator in order to induce FGLIC to issue the policy to Daroux.

2201.   Upon information and belief, Dilworth also fraudulently concealed from FGLIC the fact that the application was not submitted for purposes of obtaining life insurance, but rather for the purpose of obtaining commissions and bonuses in excess of the policy's first-year premium.

2202.   Dilworth's false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Cal. Ins. Code § 1871.4(a)(1), (3).

2203.   Using the mail and wire, Dilworth delivered the fraudulent application to BIP on **December 10, 2016**.

2204.   BIP, in its role as General Agent, was responsible for validating Daroux's application materials prior to submitting them to FGLIC.

2205.   BIP knew that the statement in Daroux's application that the insured would not use funds from a third party to pay the premium was false, because BIP knew the premium was to be paid by funds from a co-conspirator, and BIP intended for FGLIC to rely on that false statement.

2206.   BIP did not correct the false representations in Daroux's application.

2207.   On or about **December 10, 2016**, BIP sent Daroux's application materials by the mail or wire to FGLIC with the false representations included in the materials.

2208.   BIP also fraudulently concealed from FGLIC the fact that the application was not submitted for purposes of obtaining life insurance, but rather for the purpose of obtaining commissions and bonuses in excess of the policy's first-year premium.

2209.   BIP's false statements in connection with the application violated applicable state insurance laws, regulations, and rules. *See* Cal. Ins. Code § 1871.4(a)(1), (3).

2210.   In reliance on Dilworth's and BIP's misrepresentations, FGLIC issued a life insurance policy to Daroux with a value of $2 million, and an effective date of **January 23, 2017**. Exh. 252 (FGLIC_BIP00044635).

2211.   The first year's premium for Daroux's policy was $47,960.00. *Id.*

2212.   FGLIC received payment of the first-year premium for Daroux's policy on **February 2, 2017**.

2213.   Upon information and belief, the BIP Funding Defendants funneled money over the wire, in the form of a sham transaction, to Daroux or his company in order to fund the premium.

2214.   In reliance on Defendants' fraud, FGLIC paid Dilworth (through the company through which Dilworth did business) and BIP commissions totaling $13,992 for the fraudulent sale of Daroux's policy.

2215.   Upon information and belief, BIP and Dilworth paid most of the commission and bonus payments back to the BIP Funding Defendants, thereby rebating the premium payments back to their co-conspirators for the continuation and furtherance of the conspiracy.

2216.   Daroux failed to make the second year's scheduled premium payment.

2217.   FGLIC sent a Lapse Letter on or about **August 3, 2018** advising Daroux of the impending lapse.

2218.   In the Lapse Letter, FGLIC asked Daroux to contact a FGLIC representative to discuss the policy.

2219.   A representative of FGLIC attempted to contact Daroux on **August 17, 2018** to inquire as to the reasons that Daroux allowed the policy to lapse with no value after paying nearly $48,000 in premiums during the first year.

2220.   Daroux never answered nor called back in response to FGLIC's voicemail.

2221.  FGLIC sent a Rescission Letter on or about **August 23, 2018**.

2222.  The profit of the conspiracy was $\underline{\$39,490}$ (the difference between the commission plus bonus and the first year premium).

2223.  Agent Defendant Dilworth has sold at least one other policy through BIP that lapsed, specifically that of Doug Powell (policy number ending in 878).

2224.  The events and facts associated with the issuance of this policy are also Predicate Acts.

C.  **FGLIC DISCOVERED THE FRAUDULENT REBATING SCHEME.**

    1.  **HIGH LAPSE RATES ON LARGE POLICIES, WITH NO COMPLAINTS FROM INSUREDS, LED FGLIC TO INVESTIGATE FOR FRAUD.**

2225.  In about **April 2016**, FGLIC noticed that the Lapse Rate of FGLIC policies sold by the Agent Defendants during the second year after issuance varied dramatically and materially from FGLIC's usual and ordinary business and its product Lapse Rates.

2226.  In the insurance industry, the "Lapse Rate" is the percentage of policies that lapse in a given policy year.

2227.  FGLIC's Large Policies (*i.e.*, policies for which the insured paid $25,000 or more in annual premiums), issued from 2011 through August 1, 2016, had a Lapse Rate of 0.1% during the first policy year.

2228.  FGLIC's Large Policies issued from 2011 through August 1, 2016, had a Lapse Rate of 9.9% during the second policy year.

2229.  From the date Network Partners became an agent of FGLIC in October 2014, the Lapse Rate for FGLIC Large Policies sold by the Agent Defendants in the Network Partners hierarchy is 0% during the first policy year.

2230.   The Lapse Rate for Large Policies sold by Agent Defendants in the Network Partners hierarchy during the second policy year is *83.9% - more than eight times higher than the Lapse Rate for FGLIC's policies sold by other agents*.

2231.   Since BIP became an agent of FGLIC in January 2015, the Lapse Rate for FGLIC Large Policies sold by Agent Defendants in the BIP hierarchy is 0.0% during the first policy year.

2232.   The Lapse Rate for Large Policies sold by Agent Defendants in the BIP hierarchy during the second policy year is *85.2% – more than eight times higher than the Lapse Rate for FGLIC's policies sold by other agents*.

2233.   Since MSL Insurance Advisors became an agent of FGLIC in September 2015, the Lapse Rate for FGLIC Large Policies sold by Agent Defendants in the MSL Insurance Advisors hierarchy is 0.0% during the first policy year.

2234.   The Lapse Rate for Large Policies sold by Agent Defendants in the MSL Insurance Advisors hierarchy during the second policy year is *100%.*

2235.   Not a single Large Policy sold by the Agent Defendants in the MSL Insurance Advisors hierarchy remained in force after the first year.

2236.   The difference in the Agent Defendants' Lapse Rate was a strong early indicator of fraudulent conduct.

2237.   Until FGLIC had a sufficient number and percentage of lapsed policies, it had no reason to suspect it was being defrauded.

2238.   FGLIC also noticed that the pattern of behavior exhibited by the insureds and the holders of the Agent Defendant-generated policies that lapsed after the first year did not make economic sense.

2239.   In the ordinary course of FGLIC's business, FGLIC would expect an insured whose policy is about to lapse in the second year, after payment of a significant premium during the first year, to complain to FGLIC about the lapse.

2240.   Here, none of the insureds who were introduced to FGLIC by the Agent Defendants and who purchased Large Policies issued by FGLIC complained to FGLIC about the pending lapse of their Large Policies.

2241.   By way of example, it makes absolutely no financial sense for an insured to (i) make a $400,000 to $500,000 premium payment during the first policy year; (ii) make no payments after the first year; (iii) allow the policy to lapse worthless during the second year; and (iv) _**not**_ contact FGLIC to complain.

2242.   Reasonable and honest people just do not spend $400,000 to $500,000 for a single year of life insurance without taking some sort of action to prevent a lapse—unless they never made the premium payment in the first place, or expected their agent to do so, either of which involves fraudulent rebating.

2243.   After FGLIC noticed the unusually high Lapse Rate among Large Policies sold by the Agent Defendants, FGLIC diligently undertook an investigation, which included reaching out to insureds whose policies had lapsed.

2244.   FGLIC discovered the fraud that is the subject of this lawsuit when it learned from these insureds, beginning in the summer of 2016, that the Agent Defendants had offered the insureds "free insurance" for a year.

2245.   The discovery taken in the *Sharma/RequiteLife* Bankruptcies has since confirmed and conclusively proven that the Defendants in the Network Partners and MSL Insurance Advisors hierarchies conspired to offer insureds "free life insurance";  made false representations on life

insurance applications and supporting materials to induce FGLIC to issue a policy; paid the premiums through a web of co-conspirator investors; and then rebated the commissions and bonuses back to the funding sources.

2246.   Jason Mandel expressed concern that the conspiracy would be revealed by FGLIC's investigation and discovery efforts in the *Sharma/RequiteLife* Bankruptcies.

2247.   Jason Mandel called Settling Party 1 on March 3, 2018, and alerted Settling Party 1 that FGLIC sent a subpoena to Settling Trustee 10.

2248.   On his call with Settling Party 1, Jason Mandel stated, "Now . . . with the Trustee, do you think regarding the policy he's gonna feel obligated to provide information that he may have signed with Crossridge.  That's mostly likely gonna be his stance, right?"

2249.   In other words, Jason Mandel noted that the subpoena might produce the sham loan agreements and assignments executed between Mark LaGambina, on behalf of Crossridge, and Settling Trustee 10, as trustee of one or more ILITs.

2250.   Jason Mandel foresaw that the production of these sham agreements would lead FGLIC to connect the fraudulent life insurance applications with the Funding Defendants' payment of insureds' premiums.

2251.   On the March 3, 2018, call, Jason Mandel stated, "Cause I just you know, my concern's obviously Mark [LaGambina].  They have a knowledge of who Mark is from his other career path, as a broker [of MSL Insurance Advisors].  So, um, okay, I guess, I guess **this is the beginning of uh, of some issues**, I guess is my take on it . . .  **This is, this is pretty bad, I guess right?**"

### 2. **SOME DEFENDANTS ATTEMPTED TO INFLUENCE WITNESSES TO CHANGE THEIR TESTIMONY ABOUT THE "FREE INSURANCE."**

2252. Once the scheme started to unravel, and FGLIC began questioning insureds and others, some of the Defendants reached out to witnesses to influence their testimony.

2253. For example, Bret Bernstein testified that Settling Trustee 1 never even met Sharma until the **summer of 2017**—well after the policies had been placed and had lapsed, and the fraud had been exposed—when Sharma and co-conspirator Jason Mandel traveled to Florida to meet with Settling Trustee 1 to discuss what he should say in regards to the litigation. Exh. 129 (Bernstein Exam. Tr. 34:21-35:8).

2254. Insured Stanley Byck signed an Affidavit in **April 2017** that exposed Sharma as having offered him free insurance, after which Sharma contacted Stanley Byck and David Byck in an attempt to get Stanley Byck to change his testimony. Exh. 4 (Sharma Exam. Tr. 193:3-24).

2255. Sharma also arranged for his lawyer to contact David Byck and Stanley Byck to compel Stanley Byck to change his testimony. *Id.* (Sharma Exam. Tr. 192:16-196:3).

2256. Co-conspirator Jason Mandel also called David Byck "a couple of times" and told David to "make sure" his father Stanley Byck told FGLIC's investigator that Stanley Byck's policy was not "free insurance." Exh. 5 (D. Byck Exam. Tr. 99:18-21).

2257. According to David Byck, Jason Mandel threatened that, if David Byck did not tell the investigator what Jason Mandel wanted him to say, Jason Mandel would "call" the premium loan. *Id.* (D. Byck Exam. Tr. 105:20-106:2; 109:16-21).

2258. The fact that Jason Mandel threatened to call the loan, which on its face is a "non-recourse loan" for which repayment is not required, *see* Exh. 51 (GS00017050-54), proves that Jason Mandel controls much of this conspiracy.

### 3.  DAMAGES TO FGLIC.

2259.  The conspiracy is continuing and continues to harm FGLIC.

2260.  FGLIC did not receive premiums from virtually all of the Large Policies sold by the Agent Defendants after the first year, and consequently each of the subject policies either lapsed, was rescinded prior to lapse, or is pending lapse.

2261.  FGLIC incurred damages consisting of a portion of the lost premiums on the insureds' Large Policies, the exact amount of which damages will be proven at trial.

2262.  FGLIC also incurred damages consisting of the commissions and bonuses paid to the Agent Defendants in connection with the insureds' Large Policies, which commissions and bonuses would not have been paid but for the unlawful and fraudulent misconduct of the Defendants, the exact amount of which damages exceeds $75,000.

### COUNT 1 – CIVIL CONSPIRACY TO DEFRAUD FGLIC
### (AGAINST ALL DEFENDANTS)

2263.  FGLIC repeats and re-alleges the allegations set forth in Paragraphs 1 through 2261 of the Second Amended Complaint as if fully set forth herein.

2264.  The Defendants, each aiding and abetting one another, and being aided and abetted by one another, knowingly devised and participated in a scheme and artifice to defraud FGLIC and obtain and retain money from FGLIC in the form of commissions and bonuses in excess of the first-year premium of insurance policies, by means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts, as further described below.

2265.  The Defendants knowingly and willfully conspired and agreed with each other, to defraud FGLIC and other life insurers of commissions and bonus payments through the unlawful rebating of insurance premiums.

## Object of the Conspiracy

2266.   The object of Defendants' conspiracy was to induce FGLIC to issue life insurance policies that would stay in force for a year (or in limited instances, two years), in order for Defendants to fraudulently obtain commissions and bonus payments from FGLIC that exceeded the first year's premium.

## Means and Manner of the Conspiracy

2267.   The co-conspirators used the following means and manner, among others, to accomplish the objects and purpose of the conspiracy.

2268.   The Defendants established a "cover" or artifice to conceal the fraudulent transfer of funds from the Funding Defendants to FGLIC.

2269.   The Agent Defendants obtained appointments to serve as life insurance agents for FGLIC.

2270.   The Agent Defendants and their co-conspirators, including Settling Party 1, solicited prospective insureds and induced them to obtain life insurance.

2271.   Unlicensed persons such as Settling Party 1 completed life insurance applications with and on behalf of insureds, intentionally and materially misrepresenting to FGLIC on the application that the insured was not borrowing funds in order to pay the premium on the policy.

2272.   The Agent Defendants certified and approved of the life insurance applications knowing the representation about borrowing funds was false, in order to induce FGLIC to issue the policy.

2273.   Once the policy was issued, the Funding Defendants and Trustee Defendants fraudulently channeled money from the Funding Defendants to FGLIC through the "cover" or artifice, in order to pay the first-year premium.

2274.   The Agent Defendants received commissions and bonuses from FGLIC in amounts up to 155% of the first-year premium, and transferred the bulk of their commission and bonus payments back to the Funding Defendants, to finance additional premiums and perpetuate the conspiracy.

2275.   Each of the Defendants was paid out of the commissions and bonuses that the Defendants obtained fraudulently from FGLIC in furtherance of the conspiracy.

2276.   The Defendants, having devised and intending to devise the scheme and artifice described above, caused to be sent, delivered, and moved by the United States Postal Service and by private and commercial interstate carriers' various mailings, items, and things for the purpose of executing and attempting to execute such scheme or artifice.

2277.   The Defendants also caused to be transmitted by means of wire communication in interstate commerce various writings, signs, signals, pictures, and sounds for the purpose of executing and attempting to execute such scheme or artifice.

## Overt Acts

2278.   In furtherance of the conspiracy and to effect its unlawful objectives, the Defendants committed and caused to be committed thousands of overt acts, as set forth in this Second Amended Complaint and described in detail with respect to the Predicate Acts listed above.

2279.   The Defendants established a pattern of misconduct by repeatedly executing the steps of their fraudulent and unlawful rebating scheme for each insured on whose behalf they fraudulently obtained a life insurance policy.

2280.   The following conduct and overt acts committed by each of the Defendants, aiding and abetting each other and being aided and abetted by each other, demonstrate the ongoing conspiracy between and among the Defendants:

(1)     Agent Defendants Network Partners, M&M, MSL Insurance Advisors, and BIP entered into Agency Agreements with FGLIC, in order to sell fraudulent life insurance policies in breach of the fiduciary duties they owed to FGLIC.

(2)     All of the individual Agent Defendants and their d/b/a companies in the Network Partners, MSL Insurance Advisors, and BIP "hierarchies" entered into Insurance Producer Agreements with FGLIC, in order to sell fraudulent life insurance policies in breach of the fiduciary duties they owed to FGLIC.

(3)     The Funding Defendants capitalized the conspiracy, specifically with a loan to Settling Party 2 in the amount of $1.25 million, to be repaid at an interest rate of 24% per annum.

(4)     Settling Party 2 wired funds to Funding Defendants Mesa and Crossridge, to finance the premiums for policies sold by Agent Defendants in the Network Partners and MSL Insurance Advisors hierarchies.

(5)     Settling Party 2 and MSL Insurance Advisors later wired substantial funds—over $1.6 million—to additional Funding Defendants controlled by Funding Defendant Michael Goldman, to fund policies sold by Agent Defendants in the BIP hierarchy.

(6)     Settling Party 2 also transferred its ownership interest in notes (evidencing loans owed by Crossridge, in the total amount of $14.6 million) to Funding Defendants Ronin Collins and Ocelot, which served as an additional source of funding for policies in the BIP hierarchy.

(7)     The Agent Defendants and their co-conspirators, including Settling Party 1, solicited and enticed insureds with the offer of "free life insurance" for a year.

(8)     The Agent Defendants certified life insurance applications which they knew contained false representations, in breach of their fiduciary duties owed to FGLIC, and sent the applications to Agent Defendants Network Partners, MSL Insurance Advisors, or BIP to validate and submit to FGLIC.

(9)     Agent Defendants Network Partners, MSL Insurance Advisors, and BIP violated their duties to validate the applications, and instead submitted the applications to FGLIC through the mail and wire with the false representations included in the application materials.

(10)    With respect to policies placed by Network Partners and MSL Insurance Advisors, the Funding Defendants, including but not limited to Jason Mandel, Settling Party 1, Settling Party 2, LaGambina, Mesa, and Crossridge, worked in concert with the Trustee Defendants to establish shell ILITs and LLCs on behalf of the insured, in order to conceal the transfer of funds from the Funding Defendants to FGLIC.

(11)    LaGambina, Crossridge, and the Trustee Defendant established an LLC in the insured's name, in which the ILIT and Crossridge were the sole members of the LLC, with the ILIT owning the majority of membership interest.

(12)    The Trustee Defendant executed a sham loan agreement to transfer cash from Crossridge to the LLC to the ILIT. In fact, the LLC never had any funds; it was used as a shell, in deliberate disregard of the legal advice set forth in the Locke Lord Opinion.

(13)    The Trustee Defendant executed an assignment in which the policy was assigned by the ILIT to the LLC.

(14)    All of the above agreements usually were executed within weeks or months of FGLIC's issuance of the life insurance policy—sometimes before the policy was issued, sometimes afterward. These actions disregarded the legal advice set forth in the Locke Lord Opinion, which expressly stated that the assignment was not to be completed within two years of the policy's issuance.

(15)    Crossridge wired a sum in excess of the first-year premium to the bank account of the ILIT.

(16)    The Trustee Defendant wired the first-year premium from the ILIT's bank account to FGLIC.

(17)    The Trustee Defendant withdrew an additional amount (between a few hundred dollars and a few thousand dollars) and wired that sum to him- or herself as payment for contributing to the conspiracy.

(18)    With respect to policies placed by BIP, the Defendants largely jettisoned the ILIT and LLC structure, and instead the Funding Defendants primarily wired the money for the premiums directly to the insureds or their companies, for payment to FGLIC.

(19)    After FGLIC received the first-year premium for the policy, Agent Defendants Network Partners, MSL Insurance Advisors, and BIP, as well as the individual agents who submitted life insurance applications to them, then received commissions and bonuses from FGLIC of up to 155% of the first-year premium.

(20)    All the Agent Defendants wired the bulk of their commission and bonus payments back to the Funding Defendants, thereby rebating premium payments in violation of applicable state laws, rules, and regulations.

(21)     Much of the money the Funding Defendants received from Agent Defendants in the form of fraudulently obtained commissions and bonuses was reinvested back into the program, to illegally finance new insurance policies.

2281.   In conducting the above-described overt acts, Defendants violated state insurance laws by rebating insurance premiums through the mail and wire; making material false representations on life insurance application and sending those applications through the mail and wire; and splitting commissions and bonuses from FGLIC with the unlicensed persons.

2282.   Each of the actions taken by the Agent Defendants, Funding Defendants, and Trustee Defendants was necessary to execute and perpetrate this fraudulent scheme.

2283.   All Defendants were complicit in the actions of the others in furtherance of the conspiracy.

2284.   The Examinations taken in the *Sharma/RequiteLife* Bankruptcies, together with the documents produced by subpoena in the bankruptcy actions, confirm the existence and extent of this conspiracy, and each Defendant's knowledge of and/or complicity in the actions and role of their fellow co-conspirators.

2285.   Defendants intended to defraud FGLIC, as evidenced by the following facts:

(1)     The Funding Defendants and the Agent Defendants intentionally misrepresented the source of funding for the premiums on the life insurance application.

(2)     The Agent Defendants falsely certified that they witnessed signatures on documents submitted to FGLIC that they did not, in fact, witness, and indeed some of the signatures submitted to FGLIC were forged.

(3)     The Agent Defendants falsely represented that they knew the insureds when they did not, and falsely represented the insureds' financial condition.

(4)    The chief architects of the scheme—Jason Mandel, Settling Party 1, and Marvin Meyer—learned as early as April 2014, when the Connecticut Insurance Department rejected Mountainview Finance's request for a premium-finance license, that Connecticut state law prohibits financing premiums directly to insureds, yet these co-conspirators proceeded to develop premium finance schemes that would violate Connecticut law.

(5)    The Defendants obtained and distributed amongst their co-conspirators a legal opinion from the Locke Lord law firm that set forth, in detail, the manner in which to operate their scheme in compliance with Connecticut state law, yet the co-conspirators repeatedly, systematically, knowingly, and intentionally disregarded the legal advice set forth in their lawyers' opinions.

(6)    The Defendants conspired to represent to insureds and other third parties that their scheme was lawful, had been approved by FGLIC, and indeed had been "blessed" by a legal opinion—none of which was true.

2286.  FGLIC did not receive premiums for the insureds' policies after the first year (or, in a few instances, the second year), and consequently each of the subject policies either lapsed, was rescinded prior to lapse, or are pending lapse.

2287.  FGLIC incurred damages consisting of the commissions paid to the Agent Defendants in connection with the insureds' policies, which commissions would not have been paid but for the Defendants' conspiracy.

2288.  FGLIC also incurred damages consisting of the lost premiums on the insureds' policies.

2289.   These damages were proximately caused by the Defendants' actions, aiding and abetting one another and being aided and abetted by one another, all in furtherance of the fraudulent and unlawful rebating conspiracy perpetrated by each of the Defendants and all of them.

## COUNT 2 – VIOLATION OF RACKETEER INFLUENCED & CORRUPT ORGANIZATIONS ACT (AGAINST ALL DEFENDANTS)

2290.   FGLIC repeats and re-alleges the allegations set forth in Paragraphs 1 through 2289 of the Second Amended Complaint as if fully set forth herein.

2291.   FGLIC is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

2292.   Each of the Defendants is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

### Defendants' RICO Enterprise

2293.   The Defendants have engaged and are presently engaged in an ongoing "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), which enterprise was engaged in, and the activities of which affected, interstate commerce.

2294.   Each of the Defendants is and has been associated with the enterprise and participated in its management and operation by directing its affairs and by conducting business with each other.

2295.   The Defendants' enterprise has an ongoing organization and an ascertainable structure, and their enterprise functions as a continuing unit with separate roles and responsibilities all contributing to their unlawful and fraudulent rebating scheme.

2296.   Each Defendant's participation in the unlawful and fraudulent rebating scheme and actions taken in furtherance of the same scheme was necessary for the successful operation of the scheme.

## Defendants' Pattern of Racketeering Activity

2297.   The Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity for the unlawful purpose of defrauding FGLIC, which began or around in 2015 and continues to this day, and which consists of numerous and repeated violations of the federal mail and wire fraud statutes, *see, e.g.*, 18 U.S.C. §§ 1341 and 1343, which prohibit the use of any interstate or foreign mail or wire facility for the purpose of executing a scheme to defraud.

2298.   The purpose of the scheme to defraud was to induce the sale of sham life insurance policies and fund the first-year premiums, in order to fraudulently obtain commissions and bonuses from FGLIC and other insurance companies in excess of the first-year premiums.

2299.   To further the scheme to defraud, the Defendants solicited prospective insureds by unlawfully offering "free life insurance" for a year, then submitted fraudulent applications for insurance policies as "surrogates" for non-appointed producers.

2300.   These applications were not submitted for the purpose of obtaining life insurance for the insureds, but for the fraudulent purpose of obtaining commissions and bonuses from FGLIC in excess of the premiums paid, with no expectation that the policies would be funded longer than a year.

2301.   To further the scheme to defraud, the Defendants established shell LLCs and ILITs and/or completed sham transactions in order to funnel money surreptitiously from the Funding Defendants to FGLIC in the form of premiums.

2302.   The Defendants used the mail and wire to conduct this fraudulent and unlawful scheme by sending fraudulent insurance applications through the mail and wire; sending contracts for shell LLC and ILITs through the mail and wire; sending premium payments from the Funding

Defendants over the wire; and rebating the premium payments back to the funding sources over the wire.

2303.   In addition, the Defendants each participated, directly and indirectly, in the conduct of the enterprise's affairs through a pattern of unlawful activity under 18 U.S.C. § 1961(i)(b), 1961(5) and 1962(c), including but not limited to:

(1)     Deceiving FGLIC by submitting applications containing false and fraudulent statements to FGLIC for the express purpose of receiving commissions in excess of the first-year premiums, rather than for the purpose of obtaining life insurance for the insureds;

(2)     Deceiving FGLIC regarding the sources and/or the purposes of the premium payments received; and

(3)     Sharing the ill-gotten gains of the conspiracy (i.e., the difference between the first year commission payments and the first year premiums) among the Defendants.

2304.   Defendants used the same unlawful and fraudulent scheme and artifice to fraudulently obtain and unlawfully fund insurance policies, and upon information and belief, the Defendants utilized this same scheme and artifice with regard to each of the hundreds of insurance policies they sold for FGLIC during the relevant time period.

2305.   As further evidence of the fraudulent scheme and conspiracy, certain Agent Defendants began calling FGLIC after the announcement of the change to the chargeback provision, requesting a calculation of the minimum payment required to take certain insurance policies over the second policy year threshold.

2306.   In other words, the Agent Defendants were trying to ascertain how much more the co-conspirators needed to pay in order to avoid the two-year chargeback provision.

2307.   As described throughout the Complaint, the Defendants engaged in a pattern of related and continuous predicate acts since around the beginning of 2015.

2308.   The predicate acts had the same or similar results, participants, victims, and methods of commission.

2309.   The predicate acts were related and not isolated events.

2310.   The enterprise set forth above constitutes both an open-ended and closed-ended pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

2311.   The Defendants' enterprise constitutes an open-ended pattern of racketeering activity because the Agent Defendants continue to hold themselves out as FGLIC's agents and because many of the fraudulent insurance policies are still pending lapse.

2312.   The enterprise poses a threat of continuing criminal conduct beyond the period during which the predicate acts were performed.

2313.   The Defendants' enterprise also constitutes a closed-ended pattern of racketeering activity because the predicate acts extend over a substantial period of time and include various fraudulent acts and injuries to FGLIC, other insurers, and the public.

2314.   As a direct and proximate result of the racketeering activities of the Defendants and their violations of 18 U.S.C. § 1962(c), FGLIC has been injured in its business and property, within the meaning of 18 U.S.C. § 1964(c), in an amount to be proven at trial, but which exceeds $75,000.

2315.   Specifically, FGLIC has been damaged by the loss of premiums from the insureds and the commissions and bonuses paid to the Agent Defendants as a result of the unlawful and fraudulent rebating conspiracy.

2316.   FGLIC is not the only insurance carrier that was victimized by this scheme.

2317.   For example, Agent Defendant Sharma submitted a false application through M&M to procure an insurance policy for insured Marsha Hickson, written by Prudential.

2318.   Ms. Hickson died, and Prudential paid $10 million to her beneficiaries on the sham policy issued on the basis of a fraudulent application.

2319.   The Defendants' racketeering activities also victimized and harmed the public by inflating premiums for life insurance.

2320.   By committing the insurance fraud described herein, and by violating the insurance laws regarding, for example, the payment of rebates and inducements to the insureds, the Defendants also violated the public's interest in not being deceived with respect to the sale of insurance products.

## COUNT 3 – FRAUD
## (AGAINST AGENT DEFENDANTS, AGENT DOES, AND OTHER PERSON DOES)

2321.   FGLIC repeats and re-alleges the allegations set forth in Paragraphs 1 through 2320 of the Second Amended Complaint as if fully set forth herein.

2322.   The Agent Defendants, each aiding and abetting one another, and being aided and abetted by one another, knowingly devised and participated in a scheme and artifice to defraud and obtain and retain money by means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts, as further described below.

2323.   The Agent Defendants, as FGLIC's agents, each owed FGLIC a fiduciary duty.

2324.   FGLIC, as principal, had reason to put its trust in the Agent Defendants, and had reason to rely on, and put its confidence and faith in, the Agent Defendants, who each had the duty to act in FGLIC's best interest.

2325.   The Agent Defendants knowingly made false representations of material facts to FGLIC and omitted and concealed material facts with the intent to induce FGLIC to pay commissions to the Agent Defendants.

2326.   Specifically, the Agent Defendants made the following false representations of fact:

(1)     Falsely represented that the insureds did not use outside funding for the premiums, when in fact they did;

(2)     Falsely represented insureds' financial condition;

(3)     Falsely represented that they knew the policyholders in the introductory letters, when they did not;

(4)     Falsely represented that they performed the work on the FGLIC policy applications, when in fact they acted as a surrogate for Settling Party 1, a non-appointed insurance producer;

(5)     Falsely represented that they witnessed the signatures on the FGLIC policy applications, when they did not; and

(6)     Falsely represented that the insureds' and trustees' signatures were truthful, when many policy applications contained forged signatures.

2327.   In addition, the Agent Defendants concealed important and material facts, including that the policy applicant was receiving money for the premium from other sources, and that co-conspirator Settling Party 1 was the primary, if not sole, contact for the insureds.

2328.   The Agent Defendants made these false representations and material omissions knowing that each was false, and intending that FGLIC would rely on the false representations and material omissions and agree to pay the Agent Defendants the commissions for fraudulent policies.

2329.   The Agent Defendants knew that if they disclosed the true nature of these policy applications, FGLIC would not have approved them.

2330.   FGLIC's reliance upon the fraudulent misrepresentations and material omissions was expected and foreseeable by Agent Defendants.

2331.   In taking these actions, the Agent Defendants perpetrated their part in a conspiracy to obtain life insurance policies and commissions from FGLIC under false pretenses.

2332.   The Agent Defendants made the material false statements and omissions described in this Complaint in furtherance of the conspiracy to defraud FGLIC.

2333.   FGLIC has suffered damages in that it issued policies to insureds based upon its trust and confidence, and its reliance on the Agent Defendants, who owed FGLIC fiduciary duties.

2334.   FGLIC did not receive any premiums for the insureds' policies after the first year, and consequently these policies either lapsed, were rescinded prior to lapse, or are pending lapse.

2335.   FGLIC incurred damages consisting of the commissions paid to the Agent Defendants in connection with the insureds' policies, which commissions would not have been paid but for the fraud and deceitful acts committed by the Agent Defendants upon which FGLIC relied to its detriment.

2336.   FGLIC incurred further damages consisting of the lost premiums on the insureds' policies, which may exceed $20,000,000.

### COUNT 4 – TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS
### (AGAINST ALL DEFENDANTS)

2337.   FGLIC repeats and re-alleges the allegations set forth in Paragraphs 1 through 2336 of the Second Amended Complaint as if fully set forth herein.

2338.   FGLIC has and had prospective business relationships with prospective insureds which pose the probability of future economic benefits for FGLIC.

2339.   FGLIC issues a life insurance policy with the reasonable expectation that the insured will pay a premium every year, which eventually will accumulate and inure to the benefit of the policy's beneficiaries.

2340.   It does not make economic sense for an insured to pay a large premium and then allow the policy to lapse worthless after the first year, thereby losing the premium.

2341.   Defendants were and are aware of FGLIC's prospective business relationships with prospective insureds, as well as the above-described principle that a life insurance policy is intended to remain, and commonly does remain, in force for many years.

2342.   Defendants intentionally, tortiously, and maliciously interfered with FGLIC's relationship with the insureds to whom the Defendants conspired to sell FGLIC insurance policies.

2343.   To effect Defendants' fraudulent and unlawful scheme of systematically inducing insureds to obtain life insurance, Defendants represented to the prospective insureds that the FGLIC policy amounted to "free life insurance" for a year.

2344.   Specifically, the Agent Defendants and their co-conspirators, including Settling Party 1, in furtherance of Defendants' fraudulent scheme, intentionally misrepresented to the prospective insureds that they could obtain a life insurance policy without paying any premiums in the first year.

2345.   Defendants' actions and representations toward the insureds directly and proximately caused injury to FGLIC.

2346.   Had the Defendants not misrepresented to the prospective insureds that they could obtain a life insurance policy without paying the first-year premium, the prospective insured would

have either (i) purchased the policy and paid the premium on an annual basis for many years into the future, or (ii) declined to purchase the policy, in which case FGLIC would not have paid commissions and bonuses to the Agent Defendants that they did not honestly earn.

2347.   FGLIC suffered actual damages in the form of lost premiums for future years on the policy as well as lost commissions and bonuses that FGLIC paid to the Agent Defendants as a result of Defendants' fraudulent and unlawful rebating scheme.

## COUNT 5 – BREACH OF CONTRACT
## (AGAINST NETWORK PARTNERS, M&M, MSL INSURANCE ADVISORS, BIP, AGENT DOES, AND OTHER PERSON DOES.)

2348.   FGLIC repeats and re-alleges the allegations set forth in Paragraphs 1 through 2347 of the Second Amended Complaint as if fully set forth herein.

2349.   FGLIC entered into the Agency Agreement with Network Partners in October 2014, with M&M, with BIP in January 2015, and with MSL Insurance Advisors in September 2014; the contracts constituted a valid contract when each of the parties entered into it.

2350.   FGLIC has fully performed all of its obligations under the Agency Agreements with Network Partners, M&M, MSL Insurance Advisors, and BIP.

2351.   Network Partners, M&M, MSL Insurance Advisors, and BIP breached the Agency Agreement by failing to abide by its terms because they conspired to submit fraudulent applications and allowed their co-conspirators to finance the first-year premiums on the insureds' behalf, in violation of the Agency Agreement, as part of a fraudulent rebating scheme. *See, e.g.*, Exh. 9 (Network Partners Agency Agreement).

2352.   Network Partners, M&M, MSL Insurance Advisors, and BIP also breached Section 13(vi) of the Agency Agreement by extending credit in the form of arranging for premium payments by the Funding Defendants for the purpose of purchasing insurance. *See id.*

2353.   Pursuant to Section 8 of the Agency Agreement, Network Partners, M&M, MSL Insurance Advisors, and BIP agreed "to comply with the policies, procedures and other terms set forth in the Company's Market Conduct Guide (the 'Guide') and the Company's Code of Ethical Conduct for Producers and Employees (the 'Code') as either or both may be amended from time to time." *See id.*

2354.   The Market Conduct Guide listed fraudulent insurance acts in Section XI, which include "[k]nowingly or willfully make any false or fraudulent statement in or with reference to any application for insurance." *See id.*

2355.   Network Partners, M&M, MSL Insurance Advisors, and BIP breached the Market Conduct Guide and committed a fraudulent insurance act as defined therein by falsely representing to the insureds, either directly or through the their co-conspirators at their direction, that the insureds would not need to pay the full annual premiums with respect to their applications for insurance.

2356.   The Market Conduct Guide contains restrictions on marketing and specifically forbids producers from:

> Make[in] any statement (i.e., such as the policy will be "self-supporting") or represent in any way that premium payments will not be required unless such representation is accompanied by an adequate explanation as to what benefits would be provided or discontinued at the time when payments will no longer be required, and the conditions under which this would occur.

*See* Exh. 31 (Market Conduct Guide).

2357.   Network Partners, M&M, MSL Insurance Advisors, and BIP breached the Market Conduct Guide by falsely representing to the insureds, either directly or through their co-conspirators at their direction, that the insureds could maintain insurance policies from FGLIC

without paying the full annual premiums, despite knowing that such policies would require annual premium payments in full.

2358.   FGLIC has been damaged by these breaches of the Agency Agreement and Market Conduct Guide in that FGLIC issued policies to the insureds based upon the submission by Network Partners, M&M, MSL Insurance Advisors, and BIP of applications for these policies, which policies subsequently lapsed when additional premiums due were not paid.

2359.   But for the acts and omissions of Network Partners, M&M, MSL Insurance Advisors, and BIP, and their submission of these policy applications in breach of the Agency Agreement and Market Conduct Guide, FGLIC would not have issued these policies.

2360.   FGLIC did not receive any premiums for the insureds' policies after the first year, and consequently each of these policies has either lapsed or is pending lapse.

2361.   FGLIC incurred damages consisting of a portion of the lost premiums on the insureds' policies, the exact amount of which damages will be proven at trial.

2362.   FGLIC also incurred damages consisting of the commissions paid to Network Partners, M&M, MSL Insurance Advisors, and BIP, and their individual agents in connection with the insureds' policies, which commissions would not have been paid but for the breach of contract by Network Partners, M&M, MSL Insurance Advisors, and BIP, the exact amount of which damages will be proven at trial.

2363.   These damages were proximately caused by Network Partners, M&M, MSL Insurance Advisors, and BIP, which were in breach of the Agency Agreement and Market Conduct Guide.

<u>**COUNT 6 – BREACH OF CONTRACT**</u>
<u>**(AGAINST JASON MANDEL, TOWER GROUP, TOWER PARTNERS, LAGAMBINA,**</u>
<u>**MSL INSURANCE ADVISORS, SHARMA, REQUITELIFE, KIRSCHNER, MRM,**</u>
<u>**JOSHUA MANDEL, RUBICON, DAVID A. COHEN, NADLER, DAVID R. COHEN,**</u>
<u>**DAROCO, VELISSARIOS, VELCO, ANDERSON, BIVONA, BALLESTO, BREIN,**</u>
<u>**CHESED, CRISPEL, DILWORTH, EISENBERG, PHILIP HON, HUGHES, JAMES,**</u>
<u>**ROCK ISLAND, LEER, LEIFER, HBM LIFE, LOWENTHAL, PESCATORE, WEBER,**</u>
<u>**WOSNER, AGENT DOES, AND OTHER PERSON DOES)**</u>

2364.   FGLIC repeats and re-alleges the allegations set forth in Paragraphs 1 through 2363 of the Second Amended Complaint as if fully set forth herein.

2365.   Jason Mandel, Tower Group, Tower Partners, LaGambina, MSL Insurance Advisors Sharma, RequiteLife, Kirschner, MRM, Joshua Mandel, Rubicon, David A. Cohen, Nadler, David R. Cohen, Daroco, Velissarios, Velco, Anderson, Bivona, Ballesto, Brein, Chesed, Crispel, Dilworth, Eisenberg, Philip Hon, Hughes, James, Rock Island, Leer, Leifer, HBM Life, Lowenthal, Pescatore, Weber, Wosner, Agent Does, and Other Person Does shall be collectively referenced in this Count and in Count 8 as the "Individual Agent Defendants."

2366.   Each of the Individual Agent Defendants entered into an Insurance Producer Agreement with FGLIC, which constituted a valid contract between FGLIC and each of the Individual Agent Defendants.  *See, e.g.*, Exh. 12 (Sharma Insurance Producer Agreement).

2367.   FGLIC has fully performed all of its obligations under the Insurance Producer Agreement.

2368.   The Individual Agent Defendants breached the Insurance Producer Agreement by failing to abide by its terms as they offered insurance without payment of the full annual premium, in violation of the Insurance Producer Agreement, as part of a fraudulent rebating scheme.  *See id.*

2369.   FGLIC has been damaged by the Individual Agent Defendants' breaches of the Insurance Producer Agreement and Market Conduct Guide in that it issued policies to the insureds

based upon the Individual Agent Defendants' submission of false applications for these policies, which policies subsequently lapsed when additional premiums due were not paid.

2370.   But for the Individual Agent Defendants' acts and omissions and its submission of these false policy applications in breach of the Insurance Producer Agreement and Market Conduct Guide, FGLIC would not have issued these policies.

2371.   FGLIC did not receive any premiums for the insured's policies after the first year and consequently each of these policies has either lapsed or is pending lapse.

2372.   FGLIC incurred damages consisting of a portion of the lost premiums on the insureds' policies, the exact amount of which damages will be proven at trial.

2373.   FGLIC also incurred damages consisting of the commissions paid to the Individual Agent Defendants in connection with the insureds' policies, which commissions would not have been paid but for the breach of contract by the Individual Agent Defendants, the exact amount of damages will be proven at trial.

2374.   These damages were proximately caused by the actions of the Individual Agent Defendants, which were in breach of the Insurance Producer Agreement and Market Conduct Guide when, upon information and belief, the Individual Agent Defendants, either directly or through its co-conspirators, falsely represented to the insureds that they could maintain insurance policies from FGLIC without paying the full annual premiums, despite knowing that such policies would require annual premium payments in full.

## COUNT 7 – RESCISSION, RESTITUTION, AND CONSTRUCTIVE TRUST (AGAINST NETWORK PARTNERS, M&M, MSL INSURANCE ADVISORS, AND BIP, IN THE ALTERNATIVE)

2375.   FGLIC repeats and re-alleges the allegations set forth in Paragraphs 1 through 2374 of the Second Amended Complaint as if fully set forth herein.

2376.   FGLIC entered into the Agency Agreement with Network Partners, M&M, MSL Insurance Advisors, and BIP in good faith.

2377.   This claim and the remedy sought sounds in equity.

2378.   FGLIC respectfully requests that the jury render an advisory opinion as to the facts for the benefit of the Court, which shall decide the cause of action and remedy.

2379.   Upon information and belief, Network Partners, M&M, MSL Insurance Advisors, and BIP entered into the Agency Agreement with FGLIC for the fraudulent purpose of obtaining commission payments from FGLIC under the false premise that Network Partners, M&M, MSL Insurance Advisors, and BIP were legitimately selling insurance products for the benefit of the insureds.

2380.   FGLIC has fully performed all of its obligations under the Agency Agreement.

2381.   Network Partners, M&M, MSL Insurance Advisors, and BIP breached the Agency Agreement by failing to abide by its terms as, upon information and belief, they either offered insurance without payment of the full annual premium, or conspired with the insureds to pay some or all of the first year premiums on the insureds' behalf, in violation of the Agency Agreement. *See, e.g.*, Exh. 9 (Network Partners Agency Agreement).

2382.   Network Partners, M&M, MSL Insurance Advisors, and BIP also breached Section 15(vi) of the Agency Agreement by, upon information and belief, extending credit in the form of arranging for premium payments for the purpose of purchasing insurance.  *See id.*

2383.   Pursuant to Section 8 of the Agency Agreement, Network Partners, M&M, MSL Insurance Advisors, and BIP agreed "to comply with the policies, procedures and other terms set forth in the Company's Market Conduct Guide (the 'Guide') and the Company's Code of Ethical

Conduct for Producers and Employees (the 'Code') as either or both may be amended from time to time." *See id.*

2384.   Upon information and belief, Network Partners, M&M, MSL Insurance Advisors, and BIP breached the Market Conduct Guide and committed a fraudulent insurance act as defined therein by either falsely representing to the insureds, either directly or through their co-conspirators at their direction, that the insureds would not need to pay the full annual premiums with respect to their applications for insurance, or conspiring with insureds to pay some or all of the first year premiums on the insureds' behalf, as part of a fraudulent rebating scheme. *See id.*

2385.   Upon information and belief, Network Partners, M&M, MSL Insurance Advisors, and BIP breached the Market Conduct Guide by falsely representing to the insureds, either directly or through their co-conspirators at their direction, that the insureds could maintain insurance policies from FGLIC without paying the full annual premiums, despite knowing that such policies would require annual premium payments in full. *See id.*

2386.   The actions by Network Partners, M&M, MSL Insurance Advisors, and BIP constitute material breaches of the Agency Agreement such that they go to the root of, and defeat the object of, the agreement (i.e., the sale of legitimate insurance policies).

2387.   FGLIC, upon learning of the fraudulent scheme, promptly exercised its right to rescind the Agency Agreement and gave notice of its intent to rescind, through its initial Complaint.

2388.   However, Network Partners, M&M, MSL Insurance Advisors, and BIP are clearly unwilling to return to FGLIC the consideration and benefits received under the Agency Agreement.

2389.   Based on the fraudulent intent of Network Partners, M&M, MSL Insurance Advisors, and BIP in entering into the Agency Agreement, and their material breaches of that agreement, the Agency Agreement should be rescinded, and the parties restored to their pre-contractual positions.

2390.   Network Partners, M&M, MSL Insurance Advisors, and BIP acquired their commission payments from FGLIC under fraudulent and unlawful circumstances; as such, it would be inequitable for Network Partners, M&M, MSL Insurance Advisors, and BIP to retain such payments.

2391.   Specifically, such commission payments were acquired based on a fraudulent intent and in material breach of the Agency Agreement.

2392.   Network Partners, M&M, MSL Insurance Advisors, and BIP have been unlawfully and unjustly enriched through receipt of such commission payments under these circumstances.

2393.   The commissions received by Network Partners, M&M, MSL Insurance Advisors, and BIP, and the Individual Agent Defendants in their respective hierarchies, should be placed in a constructive trust for the benefit of FGLIC and anyone else harmed by this scheme.

**COUNT 8 – RESCISSION, RESTITUTION, AND CONSTRUCTIVE TRUST (AGAINST JASON MANDEL, TOWER GROUP, TOWER PARTNERS, LAGAMBINA, MSL INSURANCE ADVISORS, SHARMA, REQUITELIFE, KIRSCHNER, MRM, JOSHUA MANDEL, RUBICON, DAVID A. COHEN, NADLER, DAVID R. COHEN, DAROCO, VELISSARIOS, VELCO, ANDERSON, BIVONA, BALLESTO, BREIN, CHESED, CRISPEL, DILWORTH, EISENBERG, PHILIP HON, HUGHES, JAMES, ROCK ISLAND, LEER, LEIFER, HBM LIFE, LOWENTHAL, PESCATORE, WEBER, WOSNER, AGENT DOES, AND OTHER PERSON DOES IN THE ALTERNATIVE)**

2394.   FGLIC repeats and re-alleges the allegations set forth in Paragraphs 1 through 2393 of the Second Amended Complaint as if fully set forth herein.

2395.   FGLIC entered in good faith into the Insurance Producer Agreements with the Individual Agent Defendants Jason Mandel, Tower Group, Tower Partners, LaGambina, MSL

Insurance Advisors, Sharma, RequiteLife, Kirschner, MRM, Joshua Mandel, Rubicon, David A. Cohen, Nadler, David R. Cohen, Daroco, Velissarios, Velco, Anderson, Bivona, Ballesto, Brein, Chesed, Crispel, Dilworth, Eisenberg, Philip Hon, Hughes, James, Rock Island, Leer, Leifer, HBM Life, Lowenthal, Pescatore, Weber, and Wosner.

2396.   This claim and the remedy sought sounds in equity.

2397.   FGLIC respectfully requests that the jury render an advisory opinion as to the facts for the benefit of the Court, which shall decide the cause of action and remedy.

2398.   Upon information and belief, the Individual Agent Defendants entered into the Insurance Producer Agreements, with FGLIC for the fraudulent purpose of obtaining commission payments from FGLIC under the false premise that the Individual Agent Defendants were legitimately selling insurance products for the benefit of the insureds.

2399.   FGLIC has fully performed all of its obligations under the Insurance Producer Agreements.

2400.   The Individual Agent Defendants breached the Insurance Producer Agreements by failing to abide by their terms as, upon information and belief, the Individual Agent Defendants either offered insurance without payment of the full annual premium, or conspired with the insureds to pay some or all of the first year premiums on the insureds' behalf, in violation of the Insurance Producer Agreements, as part of a fraudulent rebating scheme.

2401.   The Individual Agent Defendants also breached Section 13(vi) of the Insurance Producer Agreements by, upon information and belief, extending credit in the form of arranging for premium payments by the Individual Agent Defendants or by a third party for the purpose of purchasing insurance.

2402.   Pursuant to Section 5 of the Insurance Producer Agreement, the Individual Agent Defendants agreed "to comply with the policies, procedures and other terms set forth in the Company's Market Conduct Guide (the 'Guide') and the Company's Code of Ethical Conduct for Producers and Employees (the 'Code') as either or both may be amended from time to time."

2403.   Upon information and belief, the Individual Agent Defendants breached the Market Conduct Guide and committed a fraudulent insurance act as defined therein by either falsely representing to the insureds, either directly or through the Individual Agent Defendants' co-conspirators at the Individual Agent Defendants' direction, that the insureds would not need to pay the full annual premiums with respect to their applications for insurance, or conspiring with insureds to pay some or all of the first year premiums on the insureds' behalf.

2404.   Upon information and belief, the Individual Agent Defendants breached the Market Conduct Guide by falsely representing to the insureds, either directly or through the Individual Agent Defendants' co-conspirators at the Individual Agent Defendants' direction, that the insureds could maintain insurance policies from FGLIC without paying the full annual premiums, despite knowing that such policies would require annual premium payments in full.

2405.   The Individual Agent Defendants' actions constitute material breaches of the Insurance Producer Agreements such that they go to the root of, and defeat the object of, the agreement (i.e., the sale of legitimate insurance policies).

2406.   FGLIC, upon learning of the fraudulent scheme, promptly exercised its right to rescind the Insurance Producer Agreements and gave notice of its intent to rescind, through its initial Complaint.

2407.   However, the Individual Agent Defendants are clearly unwilling to return to FGLIC the consideration and benefits received under the Insurance Producer Agreements.

2408.   Based on the Individual Agent Defendants' fraudulent intent in entering into the Insurance Producer Agreements, and their material breaches of those agreements, the Insurance Producer Agreements should be rescinded, and the parties restored to their pre-contractual positions.

2409.   The Individual Agent Defendants acquired their commission payments from FGLIC under circumstances rendering it inequitable for the Individual Agent Defendants to retain such payments.

2410.   Specifically, such commission payments were acquired based on a fraudulent intent and in material breach of the Insurance Producer Agreements.

2411.   The Individual Agent Defendants have been unlawfully and unjustly enriched through receipt of such commission payments under these circumstances.

2412.   The commissions received by the Individual Agent Defendants should be placed in a constructive trust for the benefit of FGLIC and anyone else harmed by this scheme.

## COUNT 9 – NEGLIGENCE BY FAILING TO ACT WITH THE  FIDUCIARY DUTY REQUIRED FROM AGENT TO PRINCIPAL (AGAINST NETWORK PARTNERS, M&M, MSL INSURANCE ADVISORS, AND BIP)

2413.   FGLIC repeats and re-alleges the allegations set forth in Paragraphs 1 through 2412 of the Second Amended Complaint as if fully set forth herein.

2414.   As agents, Network Partners, M&M, MSL Insurance Advisors, and BIP owed their principal FGLIC a fiduciary duty, including but not limited to a duty to act solely for FGLIC's benefit in all matters connected to their agencies.

2415.   As agents, Network Partners, M&M, MSL Insurance Advisors, and BIP also owed their principal FGLIC a duty to avoid any conflict between their own self-interest and the interests of FGLIC.

2416.   As agents, Network Partners, M&M, MSL Insurance Advisors, and BIP owed their principal FGLIC a duty to disclose any information FGLIC might reasonably want to know about the transactions and relationship between them.

2417.   Network Partners, M&M, MSL Insurance Advisors, and BIP breached the duties they owed as agents to their principal FGLIC by, upon information and belief, offering "free life insurance" to the insureds, which scheme was solely in their own best interest (and the best interest of their co-conspirators) and was not in the best interests of FGLIC, as the scheme resulted in FGLIC's payment to Network Partners, M&M, MSL Insurance Advisors, and BIP of commissions for the sale of insurance policies that did not generate the anticipated continuing premium income for FGLIC, as the policies lapsed after the first year and no additional premiums were paid.

2418.   Network Partners, M&M, MSL Insurance Advisors, and BIP breached the duties they owed as agents to their principal FGLIC by, upon information and belief, acting in conflict with FGLIC's best interests.

2419.   Network Partners, M&M, MSL Insurance Advisors, and BIP, either directly or through their co-conspirators at their direction, made promises of reduced cost insurance that conflicted with the interests of FGLIC in keeping these policies in force, and in obtaining further and future premiums on the policies sold by Network Partners, M&M, MSL Insurance Advisors, and BIP.

2420.   Network Partners, M&M, MSL Insurance Advisors, and BIP breached the duties they owed as agents to their principal FGLIC, upon information and belief, when they concealed from FGLIC the fact that Network Partners, M&M, MSL Insurance Advisors, and BIP, either directly or through their co-conspirators at their direction, were offering reduced cost insurance, and concealed that the insureds were not paying the entire first year premiums.

2421.   Network Partners', M&M's, MSL Insurance Advisors', and BIP's breach of their duties as agents to their principal FGLIC constituted negligence because Network Partners, M&M, MSL Insurance Advisors, and BIP failed to abide by the duties of care they owed to FGLIC.

2422.   FGLIC has suffered damages in that it issued policies to the insureds based upon the acts and omissions of Network Partners, M&M, MSL Insurance Advisors, and BIP, and their submission of applications for these policies in violation of their duties as agents, which policies subsequently lapsed when additional premiums which were due were not paid.

2423.   But for their submission of these policy applications in breach of their duties as agents, and more particularly in breach of their fiduciary duty as agents, FGLIC would not have issued these policies.

2424.   FGLIC did not receive any premiums for the insureds' policies after the first year, and consequently these policies have either lapsed or are pending lapse.

2425.   FGLIC incurred damages consisting of a portion of the lost premiums on the insureds' policies, the exact amount of which damages will be proven at trial.

2426.   FGLIC also incurred damages consisting of the commission and bonus payments to Network Partners, M&M, MSL Insurance Advisors, and BIP in connection with the insureds' policies, which commissions and bonuses would not have been paid but for the breach of contract by Network Partners, M&M, MSL Insurance Advisors, and BIP, the exact amount of which damages will be proven at trial.

2427.   These damages were proximately caused by the actions of Network Partners, M&M, MSL Insurance Advisors, and BIP which constituted negligence and a breach of the fiduciary duty they owed to FGLIC as agents.

## COUNT 10 – INDEMNIFICATION AND ATTORNEYS' FEES
## (AGAINST NETWORK PARTNERS, M&M, MSL INSURANCE ADVISORS, AND BIP)

2428.   FGLIC repeats and re-alleges the allegations set forth in Paragraphs 1 through 2426 of the Second Amended Complaint as if fully set forth herein.

2429.   Pursuant to the Agency Agreement, Network Partners, M&M, MSL Insurance Advisors, and BIP agreed to indemnify and hold FGLIC harmless as follows:

**Indemnification of Company**: You agree to indemnify, hold harmless and defend (with commercially reasonable counsel of the Company's choice subject to your agreement not to be unreasonably withheld) the Company against any claim, judgment, loss, settlement, cost, damage or other expense (including but not limited to attorney's fees but excluding any such items assessed by a regulatory agency) the Company may suffer or incur, as the result of any error or omission; fraudulent, negligent, or unauthorized act; or breach of this Agreement by you, Producers appointed by you, your officers, your employees, any persons whose activities result in the Agency receiving from the Company any compensation or other remuneration subject to the following exceptions:

1.      Settlements or judgments representing life insurance policy limits paid in contestable claims; and

2.      Class Actions under either Federal or State law unless (1) there is an adjudication by a court of competent jurisdiction that you knowingly permitted Producers to engage in acts or omissions found by said court to be the basis for liability or (2) the Class Action alleges actions relative to a course of business engaged in by you and alleges only vicarious liability as to the Company.

The Company shall have exclusive authority to direct the defense and effect any settlement in any action for which the foregoing indemnity may apply. You also agree to reimburse the Company for any judgment, loss, settlement, cost, damage or other expense (including but not limited to reasonable attorney's fees but excluding any such items assessed by a regulatory agency) incurred by the Company in answering, defending or otherwise addressing any: arbitration claim; attachment; complaint; court proceeding; dispute; garnishment; regulatory or other inquiry or investigation; or other proceeding involving you. Producers appointed to you, your officers, your employees, all persons who act on your behalf or at your direction, and all persons whose activities result in the Agency receiving from the Company any compensation or other remuneration. You shall, upon demand, pay the Company as a debt due hereunder any sums due to it in accordance with this section.

2430.   As set forth above, Network Partners, M&M, MSL Insurance Advisors, and BIP breached the Agency Agreement and the Market Conduct Guide, and engaged in conduct constituting fraud, conspiracy, tortious interference, negligence, and unauthorized acts.

2431.   Accordingly, FGLIC is entitled to indemnification under Section 21 of the Agency Agreement for damages including, but not limited to, the costs, expenses, attorneys' fees incurred by FGLIC in connection with this action, and also in connection with any other future action or proceeding involving the conduct of Network Partners, M&M, MSL Insurance Advisors, and BIP as alleged herein.

2432.   FGLIC is entitled to damages pursuant to the indemnification provision in an amount to be proven at trial.

## DEMAND JURY TRIAL

2433.   Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, FGLIC demands a trial by jury on any issues triable of right by a jury.

2434.   FGLIC requests that the Court impanel an advisory jury for any issues not triable of right by a jury.

## PRAYER FOR RELIEF

**WHEREFORE**, FGLIC requests that this Court issue a Judgment and Order as follows:

A.   Awarding to FGLIC against the Defendants as follows:

  i.   Damages consisting of all or a portion of the lost premiums on the insureds' policies, the exact amount of which damages will be proven at trial;

  ii.   Damages consisting of the commissions and bonuses paid to the Agent Defendants and the Agent Does in connection with the insureds' policies, the exact amount of which damages will be proven at trial;

iii.    Damages consisting of the costs, expenses, and attorneys' fees incurred by FGLIC in connection with this action, and also in connection with any other future action or proceeding involving the Defendants' conduct as alleged herein; and

iv.    Granting FGLIC such other and further relief as the Court may deem just and proper.

B.    In the alternative, FGLIC seeks relief that:

i.    FGLIC is entitled to rescind the Agency Agreements and the Insurance Producer Agreements, based on the Agent Defendants' material breach of said agreements, and restore the parties to their precontractual positions;

ii.    A constructive trust be charged upon the commission and bonus payments made to the Agent Defendants for the benefit of FGLIC; and

iii.    The Court grant such other and further relief as the Court may deem just, proper, and equitable under the circumstances, including an award of attorney fees and costs to FGLIC.

Dated:  March _____, 2019                Respectfully submitted,

                                           **NORTON ROSE FULBRIGHT US LLP**
                                           By: _____
                                           Frank A. Taylor
                                           Julie H. Firestone
                                           *Admitted Pro Hac Vice*
                                           60 South Sixth Street, Suite 3100
                                           Minneapolis, Minnesota 55402-2157
                                           Telephone: 612-321-2800
                                           Fax: 612-321-2299
                                           Email: julie.firestone@nortonrosefulbright.com
                                           Email: frank.taylor@nortonrosefulbright.com

                                           Priscilla A. Donovan (Bar No. 27031)
                                           Daniel J. Donovan (Bar No. 22661)
                                           Donovan & Rainie, LLC
                                           One South Street, Suite 1120
                                           Baltimore, Maryland 21202
                                           Telephone: 410-685-8800
                                           Fax: 410-685-8885
                                           Email: pard@donovanrainie.com
                                           Email: djd@donovanrainie.com

                                           **ATTORNEYS FOR PLAINTIFF FIDELITY
                                           & GUARANTY LIFE INSURANCE
                                           COMPANY**