IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

FILED ___ ___ LOGGED ___ ENTERED ___ RECEIVED

MAR 2 9 2019

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY ___ DEPUTY

FIDELITY & GUARANTY
LIFE INSURANCE CO.,                    *

    Plaintiff,                    *           Civil Action No. RDB-17-1508

    v.                            *

ABHINAV SHARMA, *et al.*,               *

    Defendant.                    *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

This case arises from an alleged insurance rebating scheme. The Amended Complaint alleges that Defendant Network Partners International, LLC ("Network Partners") coordinated with Defendants Abhinav Sharma ("Sharma"), RequiteLife, Inc. ("RequiteLife"), Jason Mandel, Tower Strategic Group, LLC ("Tower Strategic"), Gregg Kirschner ("Kirschner"), MRM Advisors, LLC ("MRM"), Joshua Mandel, Rubicon Advisory Partners, Inc. ("Rubicon Advisory"), Rebecca Nadler ("Nadler"), Evan Pescatore ("Pescatore"), Agent Does 1-10, and Other Person Does 1-10 (collectively, the "Agent Defendants"),[1] to perpetuate a fraudulent rebating conspiracy, collecting large commissions and bonuses from Fidelity & Guaranty Life Insurance Company ("Fidelity") by financing the expensive first-year premiums for life insurance policies and allowing them to lapse after just one year. In furtherance of the scheme, Defendants are alleged to have made fraudulent misrepresentations to insurance

---

[1] Defendants Joshua Mandel, Rubicon Advisory Partners, Inc., Jason Mandel, Tower Strategic Group, LLC, Gregg Kirschner, and MRM Advisors, LLC refer to themselves as the "Broker Defendants." This Court occasionally uses this descriptor to reference this sub-set of the Defendants.

customers and Fidelity. Because Fidelity paid commissions representing 155% of the policy's first year premium payment, this scheme cost Fidelity millions of dollars.

Now pending before this Court are the following motions: (1) the Broker Defendants' 12(b)(6) and 9(b) Motion to Dismiss the Amended Complaint (ECF No. 88); (2) Plaintiff's Motion for Relief in Scheduling Rule 26(f) Conference (ECF No. 91); (3) Defendant Rebecca Nadler's Motion to Dismiss (ECF No. 96); (4) Defendant Network Partners International, LLC's Motion to Dismiss the Amended Complaint (ECF No. 121); (5) Defendant Evan Pescatore's Motion to Dismiss and, Alternatively, Motion to Strike Plaintiff's Jury Demand and Certain Allegations in the Amended Complaint (ECF No. 129); and (6) Plaintiff's Motion for Leave to File a Second Amended Complaint (ECF No. 159).[2] The parties' submissions have been reviewed and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2018). For the reasons stated herein, Plaintiff's Motion for Leave to File a Second Amended Complaint (ECF No. 159) is DENIED WITHOUT PREJUDICE to refile a more succinct pleading. The motions to dismiss (ECF Nos. 88, 96, 121, 129) are DENIED IN PART AND GRANTED IN PART. Specifically, Count 2 of the Amended Complaint is DISMISSED; Count 6 is DISMISSED; and 7 is DISMISSED as to all Defendants except Sharma and RequiteLife, Inc.[3] Plaintiff's Motion for Relief in Scheduling Rule 26(f) Conference (ECF No. 91) is DENIED

---

[2] The Motion for Preliminary Injunction filed by Defendants RequiteLife, Inc. and Abhinav Sharma (ECF No. 26), the Motion to Stay Pending Resolution of Motion to Consolidate filed by Defendants RequiteLife, Inc. and Abhinav Sharma (ECF No. 29), and Fidelity's Motion to Bar Defendants from Introducing Evidence in their Reply Memorandum in Support of Preliminary Injunction (ECF No. 31) remain stayed by this Court's April 26, 2018 Order (ECF No. 64). Fidelity has notified this Court that it has reached a settlement agreement with Defendants RequiteLife, Inc. and Abhinav Sharma. (ECF No. 159-1, at 1 n.1.)

[3] As explained *infra*, the defects associated with these Counts would not have been remedied by the Plaintiff's proposed Second Amended Complaint.

AS MOOT.[4] The Notice of Supplemental Authority (ECF No. 146) is HEREBY

STRICKEN. The following claims remain:

| Count | Claim | Defendant |
|---|---|---|
| 1 | Fraud | Network Partners, Agent Defendants, and Other Person Does |
| 3 | Violation of Racketeer Influenced & Corrupt Organizations Act | Network Partners, the Agent Defendants, and Other Person Does |
| 4 | Breach of Contract | Network Partners |
| 5 | Breach of Contract | Agent Defendants |
| 7 | Rescission, Restitution, and Constructive Trust (in the Alternative) | Sharma and RequiteLife |
| 8 | Negligence by Failing to Act with the Fiduciary Duty Required from Agent to Principal | Network Partners |
| 9 | Indemnification and Attorneys' Fees | Network Partners |

## BACKGROUND

### I.  Factual Background

In a ruling on a motion to dismiss, this Court must accept the factual allegations in the

plaintiff's complaint as true and construe those facts in the light most favorable to the plaintiff.

*See, e.g., Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999). Plaintiff alleges that

Network Partners and the Agent Defendants perpetuated an affinity marketing conspiracy

involving members of the Hasidic and Orthodox Jewish communities. (ECF No. 57, at ¶¶ 1,

2.) The object of this alleged conspiracy was to conduct an insurance rebating scheme

targeting these groups. (*Id.* at ¶ 1.)

The alleged illegal activity began in October 2014, when Network Partners applied to

become Fidelity's General Agent. (*Id.* at ¶ 30.) Fidelity alleges that Network Partners made

---

[4] This Court will issue a modified Scheduling Order in due course providing for a Rule 26(f) conference.

false representations in order to obtain this position. (*Id.* at ¶ 31.) On October 16, 2014, Network Partners entered into an "Agency Agreement" with Fidelity, which appointed it to act as a producer and agent for Fidelity for the purpose of selling insurance policies. (*Id.* at ¶ 32, Ex. D.) Section 15 of this Agreement states as follows:

> **Section 15. Limitations of Authority**: You are not authorized to: (i) incur on behalf of the Company any expense, indebtedness or liability; (ii) make, alter or discharge contracts; (iii) waive forfeitures; (iv) quote rates except as published by the Company; (v) extend the time of payment of any premium; (vi) extend credit for the purpose of purchasing or keeping any insurance product in force; (vii) approve any application for insurance; (viii) represent to any person(s) that any insurance is in effect before the Company so acknowledges; (ix) acknowledge or represent the existence of any insurance with the Company; (x) make any representation or state any opinion regarding the validity or payment of any claim; or (xi) engage in any act on behalf of the Company that is not specifically authorized by this Agreement.

(*Id.* at ¶ 195.)

Fidelity also entered into an "Insurance Producer Agreement" with Sharma, RequiteLife, Jason Mandel, Tower Strategic, Joshua Mandel, Rubicon Advisory, Nadler, Pescatore, and each of the Agent Does (collectively, the "Agent Defendants"), which appointed these persons and entities to act as the agents for Fidelity for the purpose of selling insurance policies. (*Id.* at ¶ 34.) Section 13 of the Insurance Producer Agreement included the same provision as quoted above, including the prohibition on extending credit for the purpose of purchasing or keeping any insurance product in force. (*Id.* at ¶ 197.)

Like other insurance companies, Fidelity pays its agents a hefty commission for selling life insurance policies. (*Id.* at ¶¶ 16-17.) In this case, Fidelity paid its agents up to 155% of a policy's first year premium in commission and bonus payments. (*Id.* at ¶ 16.) Fidelity claims that this figure is not terribly surprising, as other insurance companies also pay commissions

and bonuses in excess of each insured's first year premium. (*Id.* at ¶ 17-18.) Driving these large commissions was Fidelity's expectation that the life insurance policies would remain in effect for years and that Fidelity would turn a profit on its policies. (*Id.* at ¶ 19.) It was therefore essential that Fidelity's customers enter into their life insurance contracts with the intent to renew them for a period of time and not to allow them to lapse after just one year.

Fidelity alleges that Network Partners, the Agent Defendants, and Other Person Does breached their contracts and their fiduciary duties as insurance agents by conspiring and scheming to sell insurance policies issued by Fidelity for the sole purpose of obtaining commission payments which exceeded the first year's premiums, then allowing the policies to lapse after one year. (*Id.* at ¶ 38.) It is alleged that Network Partners and the Agent Defendants lied to Fidelity by claiming that they were "properly selling" the policies. (*Id.*) Network Partners allegedly directed the activities of the other Defendants, including their sale and financing of life insurance products. (*Id.*)

To achieve their illicit objectives, Defendants allegedly falsely represented to the Insureds that they could maintain their policies without paying the full annual premiums, and that the agents would arrange for their payment instead (*Id.* at ¶ 45.) Network Partners and the Agent Defendants then conspired with Other Person Does to pay some or all of the first-year premiums. (*Id.*) Next, the Defendants submitted fraudulent applications for life insurance to Fidelity (*Id.*) After Fidelity paid the Defendants commissions and bonuses, the Defendants would use these funds to pay the Insured's premiums. (*Id.*) These policies were not intended to be renewed after one year, and the Defendants either allowed or encouraged the Insured to let their policies lapse. (*Id.*) The Defendants allegedly predicted the difference between the

5

commissions (plus bonuses) they received and the first year's premium, thereby obtaining a profit. (*Id.*)

Fidelity bolsters these claims by referencing the unusually high lapse rates associated with the insurance policies sold by the Defendants. (*Id.* at ¶ 39.) An insurance policy may "lapse" by the insured's failure to pay the annual premium. The "Lapse Rate" describes the percentage of policies that lapse in a given policy year. (*Id.* at ¶ 40.) Fidelity's Large Policies (*i.e.*, policies for which the insured paid $25,000 or more in annual premiums) issued from 2011 through August 1, 2016 allegedly had a Lapse Rate of 9.9% during the second policy year. (*Id.* at ¶ 41.) The Lapse Rate for Large Policies sold by Network Partners and the Agent Defendants during the second policy year was **84.4%**—a figure eight times higher than the Lapse Rate for Fidelity's policies sold by other agents. (*Id.* at ¶ 44.) Fidelity argues that these lapse rates "make[] absolutely no financial sense" in the absence of fraud. (*Id.* at ¶ 49.) As Fidelity notes, it would not be sensible for an Insured to make a large premium payment (Fidelity supplies the hypothetical figure of $400,000) only to make no payments after the first year. (*Id.* at ¶ 49.)

Fidelity does not merely describe the broader contours of the conspiracy or appeal to logic; it alleges several specific instances of allegedly fraudulent insurance sales. Fidelity provides a chart cataloging "ill-gotten commissions and bonuses paid over some fifteen months." This chart includes the truncated policy number, its effective date, the name of the selling agent, the upline agency associated with the sale, and the commission and bonuses received associated with each alleged act of misconduct. (*Id.* at ¶ 13.) All Defendants, save for Joshua Mandel, are implicated in these transactions (*Id.*) Furthermore, Fidelity lists eight

"predicate acts" forming the basis for its claims. (*Id.* at ¶¶ 101, 111, 121, 136, 146, 156, 167, 177.) By way of example, Defendant Kirschner is alleged to have sold a life insurance policy with a face amount of $7,500,000 and an effective date of October 24, 2015. (*Id.* at ¶ 167.) The first-year premium for the policy was $416,400.00. (*Id.* at ¶ 168.) The Insured, referred to as "BS" did not make the second year's scheduled premium payment; in other words, he paid $416,400.00 for one year of life insurance coverage. (*Id.* at ¶¶ 169, 172.) Network Partners and Kirschner, meanwhile, earned $822,420.00 in commission and bonus payments from Fidelity. (*Id.* at ¶ 173.) Suspiciously, although BS resides in Brooklyn, New York, he used an out-of-state bank account to fund the first-year premium and an out-of-state trustee to establish the beneficiary trust, which was formed in Connecticut. (*Id.* at ¶ 175.)

## II.    Procedural Background

On June 2, 2017 Fidelity commenced this lawsuit, naming only Abhinav Sharma, RequiteLife, Inc., and John Doe as Defendants. (ECF No. 1.) On June 30, 2017 Brokerage Insurance Partners, Inc. ("BIP") filed a lawsuit against Fidelity, currently pending before the Honorable George L. Russell, III of this Court. *See Brokerage Insurance Partners, Inc. v. Fidelity & Guranty Life Insurance Co., et al.* (GLR-17-1815) (the "BIP" litigation). On April 4, 2018 Fidelity filed an Amended Complaint, joining the remaining defendants. (ECF No. 57.) In the Amended Complaint, Fidelity asserts nine Counts:

| Count | Claim | Defendant |
|---|---|---|
| 1 | Fraud | Network Partners, Agent Defendants, and Other Person Does |
| 2 | Civil Conspiracy to Breach Duty of Agent to Principal and Aiding and Abetting that Breach | Network Partners and Agent Defendants |

| 3 | Violation of Racketeer Influenced & Corrupt Organizations Act | Network Partners, the Agent Defendants, and Other Person Does |
|---|---|---|
| 4 | Breach of Contract | Network Partners |
| 5 | Breach of Contract | Agent Defendants |
| 6 | Rescission, Restitution, and Constructive Trust (in the Alternative) | Network Partners |
| 7 | Rescission, Restitution, and Constructive Trust (in the Alternative) | Agent Defendants |
| 8 | Negligence by Failing to Act with the Fiduciary Duty Required from Agent to Principal | Network Partners |
| 9 | Indemnification and Attorneys' Fees | Network Partners |

On September 4, 2018, Fidelity answered the Complaint in the BIP litigation, asserting counterclaims against BIP closely resembling those in the Amended Complaint.

## STANDARDS OF REVIEW

### I. Motion for Leave to File an Amended Complaint.

Under Rule 15(a) of the Federal Rules of Civil Procedure, leave to file an amended complaint "shall be freely given when justice so requires." This "liberal rule" reinforces the "federal policy in favor of resolving cases on their merits instead of disposing them on technicalities." *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006). As noted by the United States Court of Appeals for the Fourth Circuit, Rule 15(a) ensures that the "plaintiff [is] given every opportunity to cure a formal defect in his pleading." *Ostrzenski v. Seigel*, 177 F.3d 245, 252–53 (4th Cir.1999) (quoting 5A Charles Allen Wright & Arthur R. Miller, Federal Practice & Procedure § 1357 (2d ed.1990)).

The "liberal rule" of Rule 15(a), however, is not absolute. A court may deny leave to file an amended complaint when the amendment "would be prejudicial to the opposing party,

there has been bad faith on the part of the moving party, or the amendment would be futile." *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir.1986) (citing *Forman v. Davis*, 371 U.S. 178, 182 (1962)). Delay alone may not serve as the basis for denying a plaintiff's motion. *Oroweat Foods Co.*, 785 F.2d at 509. Rather, any claimed delay "must be accompanied by prejudice, bad faith, or futility." *Id.* at 510 (citing *Davis v. Piper Aircraft Co.*, 615 F.2d 606, 613 (4th Cir.1980)). A court must consider the "nature of the amendment and the timing," as the "further the case progresse[s] before judgment [is] entered, the more likely it is that the amendment will prejudice the defendant or that a court will find bad faith on the plaintiff's part." *Laber*, 438 F.3d at 427.

## II.    Motion to Dismiss for Failure to State a Claim.

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 12(b)(6) procedure authorizes the dismissal of a complaint if it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). The purpose of Rule 12(b)(6) is "to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). To satisfy Rule 8(a)(2), a complaint need not include "detailed factual allegations." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,

9

637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *Hall v. DirectTV, LLC*, 846 F.3d 757, 765 (4th Cir. 2017).

Rule 9(b) of the Federal Rules of Civil Procedure requires that "the circumstances constituting fraud be stated with particularity." Fed. R. Civ. P. 9(b). The rule "does not require the elucidation of every detail of the alleged fraud, but does require more than a bare assertion that such a cause of action exists." *Mylan Labs., Inc. v. Akzo, N.V.,* 770 F. Supp. 1053, 1074 (D. Md. 1991). To satisfy the rule, a plaintiff must "identify with some precision the date, place and time of active misrepresentations or the circumstances of active concealments." *Johnson v. Wheeler,* 492 F. Supp. 2d 492, 509 (D. Md. 2007). As the United States Court of Appeals for the Fourth Circuit stated in *United States ex rel. Nathan v. Takeda Pharms. North America, Inc.,* 707 F.3d 451 (4th Cir. 2013), the aims of Rule 9(b) are to provide notice to defendants of their alleged misconduct, prevent frivolous suits, eliminate fraud actions where all the facts are learned after discovery, and protect defendants from harm to their goodwill and reputation. 707 F.3d at 456 (citation omitted).

## ANALYSIS

### I. Leave to Amend.

Nearly two years after it filed the present lawsuit, Fidelity seeks leave to file a Second Amended Complaint which is 284 pages long, contains 2,424 paragraphs, adds over sixty defendants (some of whom are anonymous), and attaches over a thousand pages of exhibits. It justifies these changes by referencing extensive discovery which has taken place in related bankruptcy proceedings before the United States Bankruptcy Court for the Northern District of Illinois. Three sets of Defendants oppose Fidelity's Motion and have filed three Responses

in Opposition. (ECF Nos. 163, 164, and 165.) These Defendants maintain that the Second Amended Complaint is neither a "short and plain statement of the claim" as required by Rule 8(a) and that the extravagant amendments Fidelity proposes would prejudice them. (ECF No. 163, at 2-3; ECF No. 164, at 15-19; ECF No. 165, at 3-4.)

As this Court has previously cautioned, leave to file an amended complaint is "not guaranteed." *See Lacy v. Nat'l R.R. Passenger Corp.*, RDB-14-0179, 2014 WL 6967957, at \*7 (D. Md. Dec. 8, 2014). The "proper length and level of clarity for a pleading cannot be defined with any great precision and is largely a matter that is left for the discretion of the trial court." *Stone v. Warfield*, 184 F.R.D. 553, 554 (D. Md. Feb. 22, 1999) (quoting Charles A. Wright and Arthur R. Miller, 5 Federal Practice & Procedure § 1217 (2d Ed. 1990)). In exercising this discretion, this Court must balance its policy of granting leave to amend against its obligation to "manage [its] docket[] and courtroom[] with a view toward the efficient and expedient resolution of cases." *Abdul-Mumit*, 896 F.3d at 292 (quoting *Dietz v. Bouldin*, --- U.S. ---, 136 S. Ct. 1885, 1892 (2016).

In some situations, the "nature of the amendment and its timing" may warrant the conclusion that it is prejudicial to defendants. *Adbul-Mumit v. Alexandria Hyundai, LLC*, 896 F.3d 278, 293 (4th Cir. 2018) (quoting *Laber*, 438 F.3d at 427). Accordingly, while plaintiffs are afforded "every opportunity to cure a formal defect," see *Ostrzenski*, 177 F.3d at 252-53, they may not use amendments to "radically alter" the course of litigation long after it has commenced. *See Macsherry v. Sparrows Point, LLC*, ELH-15-0022, 2016 WL 8669914, at \*9 (D. Md. Oct. 28, 2016) (quoting *Cottman Transmission Sys. LLC v. Kershner*, 429 F. Supp. 2d 461, 473 (E.D. Pa. 2007).

The shear length of the Second Amended Complaint contravenes the spirit of the Federal Rules, which contemplates a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Although Fidelity must meet a heightened pleading standard to adequately plead its fraud claims, it may do so in a Complaint which is significantly more concise. As discussed below, the operative Amended Complaint (itself 58 pages long) adequately satisfied this pleading standard. Most problematically, the Second Amended Complaint would join over sixty new Defendants—some of whom are anonymous, and others who have been added only for the purposes of settlement. A pleading amendment is not the proper means of effectuating all of these goals at once, thereby radically altering the course of the litigation in one move nearly two years after it has commenced. At a future date, this Court is willing to entertain full briefing on Motions to Join and Motions to Consolidate. Fidelity may even seek leave to amend its Complaint once more, this time taking heed of this Court's guidelines.[5] Accordingly, the Motion for Leave to File a Second Amended Complaint (ECF No. 159) is DENIED WITHOUT PREJUDICE.

## II. Motions to Dismiss the Amended Complaint.

The Broker Defendants, Network Partners, Rebecca Nadler, and Evan Pescatore have filed four separate Motions to Dismiss (ECF Nos. 88, 96, 121, and 129), all of which have been ripe for some time. Because the issues presented in these motions overlap considerably, and the motion of Rebecca Nadler adopts the arguments presented in the Broker Defendant's Motion to Dismiss, this Memorandum Order will address them together. Collectively, the

---

[5] In a telephone conference with the parties in this action, this Court cautioned Fidelity that it expected that its Second Amended Complaint would be concise to promote effective case management.

Defendants have called for the dismissal of each of the nine counts in the Amended Complaint. For the reasons stated herein, the motions are DENIED.

## A. Count 1—Fraud

In Count I of the Amended Complaint, Fidelity asserts a claim of fraud against Network Partners, the Broker Defendants, Evan Pescatore, and unidentified "other person Does." Each responding Defendant asserts that Fidelity has failed to meet the heightened pleading standards of Rule 9(b) of the Federal Rules of Civil Procedure with respect to its fraud claims. To recover for a claim of fraud or intentional misrepresentation under Maryland law, a plaintiff must show: "(1) that the defendant made a false representation to the plaintiff, (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation." *Nails v. S & R, Inc.,* 334 Md. 398, 639 A.2d 660, 668 (Md. 1994). With respect to the knowledge or scienter elements of the cause of action, the United States Court of Appeals for the Fourth Circuit has noted that "Rule 9(b) allows conclusory allegations of defendant's knowledge as to the true facts and of the defendant's intent to deceive." *Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 784 (4th Cir. 1999) (citing 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1297 (2d ed. 1990)). The Complaint must, however, "identify with some precision the date, place and time of active misrepresentations or the circumstances of active concealments." *Johnson v. Wheeler,* 492 F. Supp. 2d 492, 509 (D. Md. 2007).

13

The existing Amended Complaint easily satisfies Rule 9(b)'s pleading requirements. It alleges that in 2014 Network Partners and other Defendants, including the Broker Defendants and Nadler, contacted prospective customers about purchasing insurance from Fidelity for the sole purpose of obtaining commission and bonus payments through an illegal rebating scheme. (Am. Compl. at ¶ 94, ECF No. 57.) The scheme was perpetuated in early 2015 through 2016. (*Id.* at ¶ 27.) The Amended Complaint references specific misrepresentations made by the Defendants to the insured parties and to Fidelity, including that the life insurance policy applications were legitimate applications for life insurance. (*Id.* at ¶¶ 27, 218.) Moreover, the Amended Complaint thoroughly describes the methods by which the Defendants perpetuated a fraudulent scheme. (*Id.* at ¶¶ 27, 29-32, 34, 36, 38, 39-45, 48, 84-98.) Finally, the Amended Complaint describes several instances of alleged sham life insurance sales, specifying the date of each transaction. (*Id.* at ¶¶ 136, 146, 156, 167, 177.) The Amended Complaint specifically identifies Defendants Abhinav Sharma, Jason Mandel, Gregg Kirschner, and Rebecca Nadler (all allegedly working in consort with Network Partners) and Pescatore (working under Brokerage Insurance Partners) as the agents orchestrating sham sales. The Amended Complaint even contains a chart summarizing their sales, including the date they took place, the upline agency with which they conduct business, and the commissions they earned. (*Id.* at ¶ 13.) These allegations are sufficient.

## B. Count 2—Civil Conspiracy to Breach Duty of Agent to Principal.

In Count 2, Fidelity alleges that the Defendants engaged in a civil conspiracy to breach their fiduciary duties and to aid and abet that breach.[6] (Am. Compl. ¶¶ 223-249.) At this stage,

---

[6] The proposed Second Amended Complaint does not contain a civil conspiracy claim based on the breach of

14

Fidelity must allege a *prima facie* claim of civil conspiracy, *i.e.*, "a combination of two or more persons by an agreement or understanding to accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal, with the further requirement that the act or means employed must result in damages to the plaintiff." *Hill v. Brush Engineered Materials, Inc.*, 383 F. Supp. 2d 814, 821 (D. Md. 2005) (quoting *BEP, Inc. v. Atkinson*, 174 F. Supp. 2d 400, 408 (D. Md. 2001)). Conspiracy is not a tort on its own but is dependent on some underlying tort that caused injury to the plaintiff. *Id.* (citations omitted).

Defendants argue that Fidelity's conspiracy claim must be dismissed because Maryland[7] does not permit plaintiffs to advance a breach of fiduciary duty as a stand-alone cause of action. In *Kann v. Kann*, 344 Md. 689, 690 A.2d 509 (1997), the Maryland Court of Appeals held that "there is no omnibus tort for the breach of fiduciary duty by any and all fiduciaries." 344 Md. 689, 690 A.2d 509, 520-21 (1997). The Court clarified that its holding did not foreclose any action based on the breach of a fiduciary duty. *Id.* at 521. Under *Kann*, a plaintiff may not pursue a stand-alone claim for breach of fiduciary duty; rather, the breach must constitute an element of another cause of action. *See Day v. United Bank*, PX-16-0975, 2018 WL 3707833, at *11 n.6 (D. Md. Aug. 3, 2018) (citing *Boiardi v. Freestate*, ELH-11-1676, 2013 WL 5410131, at *6-7 (D. Md. Sept. 25, 2013). Stated another way, a breach of fiduciary duty may be "relevant to other causes of action," but it cannot "constitute a stand alone

fiduciary duty.

[7] Pursuant to the Governing Law Provision in the Insurance Producer Agreement and the Agency Agreement, Maryland law applies. (Am. Compl. Ex. E, at § 29, ECF No. 57-5; Am. Compl. Ex. E, at § 27, ECF No. 57-6.)

nonduplicative cause of action." *Boiardi*, 2013 WL 5410131, at *7 (quoting *Waserman Goldstein Family LLC v. Kay*, 197 Md. App. 586, 631-32, 14 A.2d 1193, 1219 (2011).

A breach of fiduciary duty may not serve as the tort underling Fidelity's civil conspiracy claim. In this case, Fidelity's conspiracy claim is premised on a breach of fiduciary duty arising from the Defendants agreement to abide by the terms of an Insurance Producer Agreement and an Agency Agreement. (ECF No. 57, at ¶¶ 235-236.) Fidelity also pursues breach of contract claims against these Defendants arising from this very same conduct. (*Id.* at ¶¶ 278-303.) While the alleged breaches of fiduciary duty may be relevant to Fidelity's breach of contract claims, they do not give rise to an independent cause of action. To the extent that Fidelity seeks to bring a cause of action based on a breach of contract, Maryland law does not recognize such a claim. *Hale Trucks of Maryland, LLC v. Volvo Trucks North America, Inc.*, 224 F. Supp. 2d 1010, 1021 (D. Md. Sept. 11, 2002). Moreover, Fidelity may not pursue a conspiracy claim based on its claim of negligent breach of fiduciary duty articulated in Count 8. *Baublitz v. Peninsula Regional Medical Center*, WMN-10-0819, 2010 WL 3199343, at *6 (D. Md. Aug. 12, 2010) ("One cannot agree or conspire to be negligent."). Accordingly, the Motion to Dismiss is GRANTED as to Count 2.

### C. Count 3—Violation of Racketeer Influenced & Corrupt Organizations Act.

In Count 3 of the Amended Complaint, Fidelity advances a Racketeer Influenced and Corrupt Organizations Act ("RICO") claim pursuant to 18 U.S.C. § 1962(c), which prohibits "any person employed by or associated with any enterprise" to conduct "such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). To make out a prima facie RICO case under this provision, the plaintiff must show

16

the existence of the following elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity and (5) a resulting injury in his business or property (6) by reason of the RICO violation." *Kun Lee v. PMG 1001, LLC*, RDB-09-1514, 2010 WL 148323, at *3 (D. Md. Jan. 11, 2010) (quoting *D'Addario v. Geller*, 264 F. Supp. 2d 367, 396 (E.D. Va. 2003)). Fidelity has sufficiently alleged these elements.

### 1. Conduct

Network Partners argues that Fidelity has failed to allege that it engaged in "conduct" because the Amended Complaint does not sufficiently describe its role in the alleged criminal enterprise. In *Reves v. Ernst & Young*, 507 U.S. 170, 113 S. Ct. 1163 (1993), the Supreme Court held that "RICO liability is not limited to those with a formal position in the enterprise, but *some* part in directing the enterprise's affairs is required." 507 U.S 170, 113 S. Ct. at 1170. This requirement is designed to prevent RICO claims from reaching "outsiders" who have merely conducted their *"own* affairs." *United States v. Grubb*, 11 F.3d 426, 439 n.24 (4th Cir. 1993) (quoting *Reves*, 507 U.S. at 185, 113 S. Ct. at 1173). To support its argument, Network Partners relies on persuasive authority which holds that that the plaintiff must give some suggestion of "which Defendants directed the activities of the alleged scheme." *Davis v. Hudgins*, 896 F. Supp. 561, 567 (E.D. Va. Aug. 2, 1995); *see also In re Insurance Brokerage Antitrust Litigation*, 618 F.3d 300, 370-73 (3d Cir. 2010) ("Simply pleading that a defendant 'participated in the operation or management' of an enterprise, however, is not enough to make out a violation of § 1962(c).").

Fidelity has satisfied this requirement by alleging that Network Partners "acted as the hub" of the alleged conspiracy and "directed" the Agent Defendants to solicit the sham sales of life insurance. (ECF No. 57, at ¶ 29.) These allegations are elaborated upon at various

17

points throughout the Complaint: the scheme started when Network Partners became Fidelity's General Agent in 2014; continued as it acted as the "upline agency" for various co-defendants, overseeing numerous fraudulent life insurance sales which are described in detail, and specifically supervised the activities of Defendant Rebecca Nadler, who "reported directly to Network Partners." (*Id.* at ¶¶ 13, 29, 29, n.3, 30.) In sum, the Amended Complaint gives adequate assurance that Network Partners and its co-defendants were not merely "outsiders" tending to their own affairs who have been inadvertently swept into a RICO lawsuit. Each Defendant is alleged to have played a role in a wide-spread insurance rebating scheme and Network Partners in particular is alleged to have managed these affairs.

### 2. Enterprise

An enterprise is "an ongoing organization, formal or informal, in which the various associates function as a continuing unit." *Palmetto State Medical Center, Inc. v. Operation Lifeline*, 117 F.3d 142, 148 (4th Cir. 1997) (citing *United States v. Turkette*, 452 U.S. 576, 583, 101 S. Ct. 2524, 2528 (1981)). As all Defendants[8] have noted, the plaintiff must provide some factual content regarding the relationships between or among them to satisfy this element. *See Grant v. Shapiro & Burson*, 871 F. Supp. 2d 462, 473 (D. Md. 2012) (holding that plaintiff failed to allege that defendants were engaged in an "enterprise" because the complaint alleged only that the "Defendants engaged in a mortgage lending enterprise.")

Fidelity has adequately pled the existence of an enterprise by describing, albeit in general terms, the hierarchy and structure of the insurance rebating scheme. Again, Network

---

[8] Network Partners, Evan Pescatore, and the "Broker Defendants" (whose arguments are adopted by Rebecca Nadler) rely on *Grant*.

Partners is alleged to sit at the nerve center of an insurance rebating scheme, directing the activities of various insurance agents and related entities. The relationships among these parties are not difficult to decipher, especially when drawing all reasonable factual inferences in favor of the Plaintiff and employing common sense, which this Court may not abandon. Network Partners was Fidelity's General Agent. As the "upline agency" for most of the remaining Defendants, it supervised and managed their activities. Although Evan Pescatore is alleged to have worked with a different upline agency (Brokers Insurance Partners), the Amended Complaint nevertheless alleges that Network Partners directed Pescatore's insurance sales. The methods employed to perpetuate the conspiracy are rehearsed at length. At this stage, these allegations are sufficient to survive a motion to dismiss.

### 3. Predicate Acts

Fidelity has predicated its claims of RICO violations on the Defendants' alleged commission of mail fraud and wire fraud.[9] (ECF No. 57, at ¶ 262.) Section 1961 of RICO defines "racketeering activity" to include a number of acts proscribed by the criminal code, including mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343. These crimes have similar core elements: "(1) defendant's knowing participation in a scheme to defraud; and (2) the mails or interstate wire facilities were used in furtherance of the scheme, but they need not be an essential element of the scheme." *Proctor v. Metropolitan Money Store Corp.*, 645 F. Supp. 2d 464, 473 (D. Md. 2009) (citation omitted). "It is well established that

---

[9] Although Fidelity contends that it bases its claims on "other unlawful activity," it does not elaborate on this point. (ECF No. 127, at 11.)

Rule 9(b) applies to RICO claims where the alleged predicate acts involved fraud." *Superior Bank, F.S.B. v. Tandem Nat. Mortgage, Inc.*, 197 F. Supp. 2d 298, 326 (D. Md. 2000).

Fidelity has satisfied this pleading standard. The Complaint alleges that each defendant participated in an elaborate scheme to commit mail and wire fraud by "sending fraudulent insurance applications through the mail and wire, sending premium payments from undisclosed funding sources through the wire, and rebating the premium payments back to the insureds and/or the funding sources through the wire." (ECF No. 57, at ¶ 262.) The Complaint specifies a specific time period during which allegedly fraudulent insurance applications were submitted and lists numerous examples of these unlawful acts. Moreover, as Judge Garbis of this Court once observed of a similar RICO claim, "it is virtually certain that the Defendants, if they did any of the allegedly fraudulent acts alleged . . . at all, would at some point have used the mails and wires themselves." *Superior Bank*, 197 F. Supp. 2d at 321.

### 4. Pattern of Racketeering Activity

All Defendants have argued that Plaintiff has not alleged a "pattern" of racketeering activity. RICO defines a "pattern of racketeering activity" as requiring at least two acts of racketeering activity within ten years of each other. 18 U.S.C. § 1961(5). Chief Judge James K. Bredar of this Court has thoughtfully discussed the meaning and purpose of the "pattern" element of a RICO claim as follows:

> To prove a pattern, a plaintiff is required to show that the predicate acts "are [1] related *and* [2] that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989). Acts are related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 240. "'Continuity' is both a closed– and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a

threat of repetition." *Id.* at 241; *accord Menasco, Inc. v. Wasserman*, 886 F.2d 681, 683–84 (4th Cir. 1989) ("[P]redicate acts must be part of a prolonged criminal endeavor.").

*Capital Lighting and Supply, LLC v. Wirtz*, JKB-17-3765, 2018 WL 3970469, at *5

(D. Md. Aug. 20, 2018).

As Judge Bredar explained, the Fourth Circuit has adopted a "flexible" approach to the pattern inquiry which "looks to the 'criminal dimension and degree' of the alleged misconduct." *Capital Lighting*, 2018 WL 3970469, at *6 (quoting *Brandenburg v. Seidel*, 859 F.2d 1179, 1185 (4th Cir. 1988); *HMK Corp. v. Walsey*, 828 F.2d 1071, 1073 (4th Cir. 1987). "The mere fact that the predicate acts were all in furtherance of a *single* scheme or directed at a *single* victim does not automatically foreclose RICO liability." *Capital Lighting*, 2018 WL 3970469, at *6 (citing *Al-Abood v. El-Shamari*, 217 F.3d 225, 238 (4th Cir. 2000); *Brandenburg*, 859 F.2d at 1185).

In light of the totality of the allegations, the Amended Complaint suffices to allege a pattern of racketeering activity. Fidelity alleges that the Defendants participated in an ongoing scheme revolving around Network Partners, which allegedly directed the activities of Sharma and RequiteLife, Jason Mandel, TSG, Kirschner and MRM, Joshua Mandel and RAP, Nadler, Pescatore, and other persons. (*Id.* at ¶ 29.) These parties "conspired together to sell life insurance for the fraudulent purpose of obtaining commissions that were in excess of the premiums paid." (*Id.* at ¶ 255.) Their life insurance rebating scheme was allegedly widespread and continuous; Fidelity has identified numerous instances of alleged fraud associated with the insurance rebating scheme from early 2015 and 2016. (*Id.* at ¶¶ 101-87.) Fidelity's contentions are supported by a detailed summary of numerous insurance sales, the corresponding date of

the transaction, and the commissions earned thereby. (*Id.* at ¶ 13.) These allegations depict "a continuous criminal endeavor" which RICO is intended to combat. *Zepkin*, 812 F.2d at 154. Although the Amended Complaint identifies only a single victim—Fidelity—the widespread nature of the alleged illegal activity places this case within the ambit of RICO.

Defendants Joshua Mandel, Rebecca Nadler, and Evan Pescatore have advanced some version of the argument that the Amended Complaint fails to allege that they engaged in a "pattern" of racketeering activity because they are not personally implicated in any acts of mail or wire fraud. As this Court has previously recognized, "it is indisputable that to maintain a section 1962(c) action, at least two predicate acts must be pleaded against each defendant." *Park v. Jack's Food Sys., Inc.*, 907 F. Supp. 914, 917 (D. Md. 1995). This requirement does not necessarily require the plaintiff to allege that "each Defendant committed separate specific acts of mail or wire fraud." *Superior Bank*, 197 F. Supp. 2d at 323 (dismissing as "completely without merit" the contention that plaintiff must allege that each Defendant engaged in specific acts of wire fraud).

Contrary to Defendants' contentions, the Amended Complaint sufficiently alleges that all Defendants engaged in a pattern of racketeering activity. All defendants are alleged to have committed multiple acts of mail and wire fraud by "sending fraudulent insurance applications through the mail and wire, sending premium payments from undisclosed funding sources through the wire, and rebating the premium payments back to the insureds and/or the funding sources through the wire." (ECF No. 57, at ¶ 262.) The Amended Complaint identifies a particular insurance sale transaction conducted by Nadler which allegedly implicates her in the broader pattern of the alleged racketeering activities and alleges that she "reported directly to

Network Partners." (ECF No. 57, at ¶ 29 n.3.)  Even employing Rule 9(b)'s heightened pleading requirements, these allegations are sufficient at this stage.  Accordingly, the Motion to Dismiss is DENIED as to Count 3.

### D. Counts 4 and 5—Breach of Contract

In Count 4 of the Amended Complaint, Fidelity argues that Network Partners breached the Agency Agreement by extending credit to potential insurance customers for the purpose of purchasing insurance and by falsely representing to the insureds that they would not need to pay the full annual premiums for Fidelity's life insurance products. (ECF No. 57, at ¶¶ 282, 285.)  In Count 5, Fidelity argues that each Agent Defendant breached an Insurance Product Agreement by engaging in similar conduct.  (*Id.* at ¶ 297.)  "In Maryland, a breach of contract claim is sufficiently pled when the pleader 'alleges the existence of a contractual obligation' and a 'material breach of that obligation' by the opposing party." *Yarn v. Hamburger Law Firm, LLC*, RDB-12-3096, 2014 WL 2964986, at *3 (D. Md. June 30, 2014) (quoting *RRC Ne., LLC v. BAA Md., Inc.*, 413 Md. 638, 994 A.2d 430, 442 (Md. 2010).

Fidelity has easily satisfied this requirement as to Network Partners.  Fidelity alleges that Network Partners entered into an Agency Agreement in which it agreed to act as Fidelity's producer and agent for the purpose of selling insurance policies.  (*Id.* at ¶ 32.)  Pursuant to Section 15(vi) of this agreement, Network Partners was prohibited from "extend[ing] credit for the purpose of purchasing or keeping any insurance product in force."  Network Partners also allegedly violated this provision by financing the sale of life insurance to obtain commissions.  (*Id.* at ¶ 199.) Pursuant to Section 8 of the Agency Agreement, Network Partners agreed "to comply with the policies, procedures and other terms set forth in the

23

Company's Market Conduct Guide (the 'Guide') and the Company's Code of Ethical Conduct for Producers and Employees (the 'Code') as either or both may be amended from time to time." (*Id.* at ¶ 283.) Section XI of the Guide listed fraudulent insurance acts, including to "knowingly or willfully make any false or fraudulent statement in or with reference to any application for insurance." (*Id.* at ¶ 284.) The Guide also prohibited producers from making "any statement (i.e., such as the policy will be 'self-supporting') or represent in any way that premium payments will not be required . . . ." (*Id.* at ¶ 286.) Fidelity alleges that Network Partners breached the provisions of the Guide by falsely representing, either directly or by directing the other Defendants to do so, that the Insured could maintain insurance policies from Fidelity without paying the full annual premiums. (*Id.* at ¶ 287.)

Fidelity has also stated a breach of contract claim with respect to the Agent Defendants, who entered into an Insurance Producer Agreement with Fidelity. Section 13(vi) of this agreement prohibited the agents from "extend[ing] credit for the purpose of purchasing or keeping any insurance product in force." By extending credit to the Insured, the Defendants allegedly breached this provision. (*Id.* at ¶¶ 199, 331.) In Section 5 of the Insurance Producer Agreement, the Agent Defendants agreed to comply with the Guide, which, as just discussed, prohibited the Defendants from making certain representations with respect to Fidelity's insurance products. Fidelity alleges the Agent Defendants breached its contract by falsely representing that the insureds would not need to pay the full annual premiums. (*Id.* at ¶ 204.) Accordingly, the Motion to Dismiss Counts 4 and 5 is DENIED.

### E. Counts 6 and 7—Rescission, Restitution, and Constructive Trust

As Judge Hollander of this Court has explained, Maryland law assigns the following elements to a claim of rescission:

> 1) That [the plaintiff] was induced into assenting to the contract as the result of fraud, negligent misrepresentation, undue influence or duress, or there was a material breach by the other party, or there was a mutual or unilateral mistake in contracting;
> 2) That he or she returned the consideration or was unconditionally willing to return to the other party both the consideration that was given and any benefits received under the contract;
> 3) That he or she exercised the right to rescind promptly and did not treat the contract as a continuing obligation; and
> 4) That he or she gave notice of the intention to rescind.

*Wiseman v. First Mariner Bank*, ELH-12-2423, 2013 WL 5375248, at *16 (D. Md. Sept. 23, 2013) (citing Paul Mark Sandler & James K. Archibald, Pleading Causes of Action in Maryland § 2.24, at 130 (5th Ed. 2013). In some contexts, the filing of a Complaint may provide sufficient notice of the plaintiff's intent to rescind. *Nkengfack v. Homecomings Financial, LLC*, RDB-08-2746, 2009 WL 1663533, at *4 (D. Md. June 15, 2009) (finding that plaintiff provided adequate notice of his intention to rescind under the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.*, by filing a complaint seeking rescission as a remedy).

In this case, Fidelity has not adequately pled a claim of rescission. Fidelity alleges that, upon learning of the fraudulent scheme perpetuated by the Defendants, Fidelity gave notice of its right to rescind the Agency Agreement "by filing its initial Complaint."[10] (*Id.* ¶ 316, 336.) Problematically, the initial Complaint was asserted only against Abhinav Sharma, RequiteLife, Inc., and "John Doe." (ECF No. 1.) This "notice" was ineffective as to any other Defendant, including those moving to dismiss Fidelity's rescission claim. Accordingly, the Motion to

---

[10] The proposed Second Amended Complaint relies on this same contention. (ECF No. 159-6, at ¶¶ 2406, 2387.)

Dismiss is GRANTED as to Count 6 and GRANTED as to Count 7 except as to Defendants Sharma and RequiteLife.

## F. Count 8—Negligence by Failing to Act with the Fiduciary Duty Required from Agent to Principal.

Defendant Network Partners argues that this claim must be dismissed because Fidelity has not alleged that Network Partners owed a duty to Fidelity independent of its contractual obligations. Maryland law permits plaintiffs to allege the breach of fiduciary duty as a component of a negligence claim. *MacDonald v. Patriot, LLC*, No. 450, Sept. Term, 2016, 2017 WL 1788115, at *10 (Md. Ct. Spec. App. May 5, 2017). To allege a breach of fiduciary duty, the plaintiff must demonstrate (1) the existence of a fiduciary relationship, (2) breach of the duty owed by the fiduciary to the beneficiary, and (3) harm to the beneficiary resulting from the breach." *Id.* (citing *Lyon v. Campbell*, 120 Md. App. 412, 439, *cert. denied*, 350 Md. 487 (1998)).

A negligence cause of action may not arise *solely* from a contractual relationship between two parties. *Lawyers Title Ins. Corp. v. Rex Title Corp.*, 282 F.3d 292, 293-94 (4th Cir. 2002). However, "when an independent duty accompanies a contractual obligation, the independent duty may give rise to a tort action." *Id.* at 294. Maryland courts have held that precisely this sort of actionable, independent duty arises from contracts between an insurance company and its agent. *Id.* (collecting Maryland case law). Accordingly, an insurance agent who temporarily retains insurance premiums, rather than immediately forwarding them to the insurance company, may be sued in negligence. *Insurance Co. of N.A. v. Miller*, 362 Md. 361, 765 A.2d 587 (2001).

In this case, Fidelity, an insurance company, has brought a negligence claim against its General Agent, Network Partners. Accordingly, Maryland law recognizes that Network Partners owes an independent duty of care to Fidelity. Fidelity has adequately alleged a breach of this duty of care by alleging that Fidelity "offered insurance to the Insured with a reduced annual premium, which scheme was solely in Network Partners' best interest and was not in the best interest of Fidelity" and "concealed that the Insured were not paying the entire first year premiums." *Id.* at ¶¶ 344-350. At this stage, these allegations are sufficient. Accordingly, the Motion to Dismiss is DENIED as to Count 8.

## G. Count 9—Indemnification and Attorney's Fees

Fidelity alleges that, pursuant to paragraph 21 of the Agency Agreement, Network Partners agreed to indemnify Fidelity and pay its attorney's fees resulting from "any error or omission; fraudulent, negligent, or unauthorized act; or breach of this Agreement by you." (ECF No. 57, at ¶ 359, Ex. D, at § 21.) Fidelity alleges that this provision has been triggered based on its allegations against Network Partners of "fraud, conspiracy, negligence, and other acts." (ECF No. 57, at ¶ 360.) This Court has found that Fidelity has adequately pled claims of fraud and negligence against Network Partners. Accordingly, the Motion to Dismiss Count 9 is DENIED.

## III.   Motions to Strike

This litigation has proved contentious. The parties have requested that this Court strike several items from the record and have even levied accusations of anti-Semitism. (*See, e.g.,* ECF No. 129-1, at 3.) Rule 12(f) of the Federal Rules of Civil Procedure governs motions to strike and only permits the striking from a pleading of "any redundant, immaterial,

impertinent, or scandalous matter." Motions to strike under Rule 12(f) are disfavored and "should be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties." *Schultz v. Braga*, 290 F. Supp. 2d 637, 654–55 (D. Md. 2003). Accordingly, "in reviewing motions to strike . . . federal courts have traditionally 'view[ed] the pleading under attack in a light most favorable to the pleader.'" *Palmer v. Oakland Farms, Inc.*, No. 5:10–cv00029, 2010 WL 2605179, at *2 (W.D. Va. June 24, 2010) (quoting Clark v. Milam, 152 F.R.D. 66, 71 (S.D. W. Va. 1993)).

### A. Motions to Strike References to Hasidic and Orthodox Jewish Communities.

Both Defendants Evan Pescatore and Rebecca Nadler have asked this Court to strike paragraphs 2 and 3 of the Amended Complaint. In paragraph 2, the Amended Complaint alleges that the rebating scheme at the heart of this case "involves various members of the Hasidic and Orthodox Jewish communities." (ECF No. 57, at ¶ 2.) Paragraph 3 alleges that "leaders and members of these Hasidic and Orthodox Jewish communities already have been the subject of federal investigations and criminal proceedings." (*Id.* at ¶ 3.) It then references two news articles concerning guilty pleas taken by a rabbi in Brooklyn, New York and a notary public in Lakewood, New Jersey.

Plaintiff contends that references to these communities are "relevant to show that the rebating fraud was deliberately designed to manipulate the trust inherent to groups that share the same social or religious bond." (ECF No. 137, at 22.) As paragraphs 2 and 3 only seek to elucidate the rebating scheme's connection to the Hasidic and Orthodox communities, is not so scandalous that it warrants elimination from this litigation. Accordingly, the Motion to Strike these allegations is DENIED.

### B. Motion to Strike reference to criminal proceedings against Evan Pescatore.

Evan Pescatore separately seeks to strike the Amended Complaint's reference to a criminal indictment against him in New Jersey and the related statements of a prosecutor. (*Id.* at ¶¶ 4-8.) In a Notice of Supplemental Authority (ECF No. 143), Pescatore informs the Court that the Superior Court of New Jersey has dismissed the indictments against him. (ECF No. 143.) While the relevance of these allegations is somewhat opaque, they at least relate to Pescatore's involvement in the insurance industry and suspicions of wrongdoing. Accordingly, this Court does not find that the allegations are so scandalous and impertinent that they warrant excision from the record. Accordingly, the Motion to Strike these Allegations is DENIED.

### C. Motion to Strike Jury Demand.

Additionally, Evan Pescatore seeks to strike Fidelity's jury demand, citing Section 29 of the Producer Agreement, titled "Dispute Resolution; Jurisdiction," attached as Exhibit E to the Amended Complaint. (ECF No. 129-1, at 21.) That Section states:

> The parties hereto mutually agree that all suits and special proceedings brought with respect to this Agreement . . . shall be brought only in the courts of the State of Maryland located in the City of Baltimore and of the United States District Court for the District of Maryland – Northern Division.
>
> . . .
>
> The parties mutually agree that that they . . . . waive a trial by jury of any controversy or issue arising under or with respect to [the Producer] Agreement, any other agreement or document received or delivered in connetion with [the Producer] Agreement or with respect to any aspect of [the Product and Fidelity's] relationship that shall now or hereafter exist."

Fidelity's only response to this argument is that it "has set forth an alternate claim for relief that the Insurance Producer Agreement is rescinded," thereby preserving its right to pursue a jury trial. (ECF No. 137, at 20 n.6.) As explained *supra*, Fidelity has failed to allege a claim of rescission. Accordingly, its sole argument on this issue is unavailing. Fidelity itself has alleged that it entered into this agreement and has sought to enforce its jurisdictional provisions, which requires the parties consent to suit in this Court. Accordingly, there appears to be no reason to permit Fidelity to pursue a jury trial against Mr. Pescatore, or any Defendant alleged to have entered into the Producer Agreement. Nevertheless, this Court will hold this matter in abeyance. The parties have not adequately briefed the issue, and it would be unfair to hold Fidelity to a footnote contained in its Response to an alternative argument in Pescatore's Motion to Dismiss. Accordingly, the Motion to Strike this Jury Demand is DENIED WITHOUT PREJUDICE.

### D. Motion to Strike Notice of Supplemental Authority.

In a subsequently filed Notice of Supplemental Authority (ECF No. 146), Network Partners has attempted to supplement its Motion to Dismiss (ECF No. 121) by attaching filings associated with the Sharma and RequiteLife bankruptcy proceedings. Fidelity has petitioned this Court to strike these materials. (ECF No. 147.) These so-called "supplemental authorities" are wholly irrelevant to the pending Motion to Dismiss.[11] Accordingly, Defendant's Notice of Supplemental Authorities (ECF No. 146) is HEREBY STRICKEN from the record.

---

[11] This Court takes no position on their relevance to other matters.

# CONCLUSION

For the reasons stated above, Plaintiff's Motion for Leave to File a Second Amended Complaint (ECF No. 159) is DENIED WITHOUT PREJUDICE to refile a more succinct pleading. The motions to dismiss (ECF Nos. 88, 96, 121, 129) are DENIED IN PART AND GRANTED IN PART. Specifically, Count 2 of the Amended Complaint is DISMISSED; Count 6 is DISMISSED; and 7 is DISMISSED as to all Defendants except Sharma and RequiteLife, Inc. Plaintiff's Motion for Relief in Scheduling Rule 26(f) Conference (ECF No. 91) is DENIED AS MOOT. The Notice of Supplemental Authority (ECF No. 146) is HEREBY STRICKEN.

The following claims remain:

| Count | Claim | Defendant |
|-------|-------|-----------|
| 1 | Fraud | Network Partners, Agent Defendants, and Other Person Does |
| 3 | Violation of Racketeer Influenced & Corrupt Organizations Act | Network Partners, the Agent Defendants, and Other Person Does |
| 4 | Breach of Contract | Network Partners |
| 5 | Breach of Contract | Agent Defendants |
| 7 | Rescission, Restitution, and Constructive Trust (in the Alternative) | Sharma and RequiteLife |
| 8 | Negligence by Failing to Act with the Fiduciary Duty Required from Agent to Principal | Network Partners |
| 9 | Indemnification and Attorneys' Fees | Network Partners |

A separate Order follows.

Dated: March 29, 2019

_____
Richard D. Bennett
United States District Judge